CA NO. 11-99003

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEZMOND C. MITCHELL,<br>Petitioner-Appellant,<br>v.<br>UNITED STATES OF AMERICA,<br>Respondent-Appellee. | **DEATH PENALTY CASE**<br>DC No. CV 09-8089-MHM |

# APPELLANT'S OPENING BRIEF

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

SEAN K. KENNEDY
Federal Public Defender
STATIA PEAKHEART
JONATHAN C. AMINOFF
GIA KIM
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-4408

Attorneys for Petitioner-Appellant
LEZMOND C. MITCHELL

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION. . . . 1

II. QUESTIONS PRESENTED. . . . 2

A. CERTIFIED ISSUES. . . . 2

B. PROCEDURAL ISSUES. . . . 2

C. UNCERTIFIED ISSUES. . . . 2

III. STATEMENT OF JURISDICTION. . . . 4

IV. STATEMENT OF ADDENDUM. . . . 4

V. STATEMENT OF THE CASE. . . . 4

A. BAIL/DETENTION STATUS. . . . 4

B. COURSE OF PROCEEDINGS. . . . 4

VI. STATEMENT OF FACTS. . . . 6

A. APPOINTMENT OF COUNSEL. . . . 6

B. EVIDENCE OF INTOXICATION IN DISCOVERY. . . . 7

C. SUBSTANCE ABUSE ISSUES IN JURY SELECTION . . . . 8

1. Juror Questionnaire. . . . 8

2. Voir Dire. . . . 9

D. PRETRIAL INDICATIONS OF DEFENSE STRATEGY. . . . 11

1. Jury Instructions. . . . 11

2. Witness Lists. . . . 11

3. Estimates of Length of Trial. . . . 12

E. THE GUILT PHASE. . . . 12

1. Opening Statements. . . . 12

2. The Government's Case. . . . 12

**TABLE OF CONTENTS (continued)**

**Page**


3. The Defense Case. . . . 16

4. Jury Instructions. . . . 16

5. Guilt-Phase Closing Arguments.. . . . 17

F. THE PENALTY PHASE.. . . . 17

1. Mitchell's Waiver of His Penalty-Phase Appearance. . . . 17

2. Gateway Intent and Aggravating and Mitigating Factors. . . . 18

3. Penalty Opening Statements.. . . . 19

4. Government Case: Aggravating Factors. . . . 19

5. Defense Case: Mitigating Factors. . . . 20

6. Impaired Capacity Instruction. . . . 23

7. Penalty Closing Arguments. . . . 24

8. Verdicts and Sentencing.. . . . 26

G. SECTION 2255 PROCEEDINGS. . . . 27

1. Investigation. . . . 27

a. Social History.. . . . 27

b. Intoxication. . . . 30

c. Mental Health.. . . . 31

2. Counsel's Description of Guilt-Phase Strategy. . . . 33

3. Counsel's Description of Penalty-Phase Strategy. . . . 34

a. Social History.. . . . 34

b. Intoxication. . . . 35

c. Mental Health.. . . . 35

d. Mitchell's Waiver of Penalty-Phase Appearance. . . . 36

4. Observers' View of Penalty-Phase Preparation. . . . 36

## TABLE OF CONTENTS (continued)

Page


a. Mitigation Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

b. Experienced Death-Penalty Attorneys.. . . . . . . . . . . . . . 37

5. New Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

a. Social History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

b. Intoxication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

c. Mental Health.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

VII. SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFIED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VIII. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Standard of Review for Certified Claims. . . . . . . . . . . . . . . . . . . . . . . . 47

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A. COUNSEL WAS INEFFECTIVE WITH RESPECT TO INVESTIGATING, PREPARING, AND PRESENTING AN INTOXICATION DEFENSE AT THE GUILT PHASE (CLAIM A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1. Counsel's Failure to Investigate Intoxication Constituted Deficient Performance, Not Strategic Judgment. . . . . . . . . . . 47

2. Counsel's Failure to Adequately Investigate and Present Evidence of Intoxication Prejudiced Mitchell's Guilt-Phase Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B. COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRESENT MITIGATING EVIDENCE OF SUBSTANCE ABUSE, SOCIAL HISTORY, MENTAL HEALTH ISSUES, AND EXECUTIVE FUNCTIONING DEFICITS RESULTED IN INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE (CLAIMS B AND D).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

1. Counsel's Deficient Investigation of Mitigation Evidence Precluded a Fully Informed Decision Regarding Sentencing Strategy and Culminated in a Deficient Penalty-Phase Presentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

a. Counsel's Failure to Investigate the Wide Range of Potentially Mitigating Evidence at the Penalty Phase Constituted Deficient Performance. . . . . . . . . . . . . . . . . 59

**TABLE OF CONTENTS (continued)**

**Page**


b. In Addition to Being Unreasonable Because It Was Based on Deficient Investigation, Counsel's Chosen Mitigation Strategy Was Unreasonable In Itself. . . . . . 67

c. To the Extent That Counsel Tried to Put Issues of Mitchell's Social History and Substance Abuse Before the Jury, They Did So Deficiently. . . . . . . . . . . . . . . . . 70

2. Mitchell Was Prejudiced by Counsel's Failure to Competently Investigate, Prepare, and Present Mitigating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

PROCEDURAL ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

C. THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING AN EVIDENTIARY HEARING ON THE CERTIFIED CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL IN THIS CAPITAL CASE.. . . . 85

D. THE DISTRICT COURT ERRED BY NOT PERMITTING MITCHELL'S SECTION 2255 COUNSEL TO INTERVIEW THE TRIAL JURORS IN HIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

1. Mitchell's Request for Leave to Interview the Trial Jurors.. . 90

2. Mitchell Has Shown Good Cause for Interviewing the Jurors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

3. Even if Mitchell Has Not Shown Good Cause, The District Court Erred by Rigidly Enforcing a Local Rule in Violation of the Rules Governing Section 2255 Cases, and the Fifth, Sixth, and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . 92

UNCERTIFIED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Standard for Certificate of Appealability. . . . . . . . . . . . . . . . . . . . . . . 96

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

E. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF FEDERAL-TRIBAL COLLUSION TO DEPRIVE HIM OF HIS FEDERAL PROCEDURAL RIGHTS TO PROMPT PRESENTMENT AND APPOINTED COUNSEL (CLAIM R). . . . . 97

## TABLE OF CONTENTS (continued)

Page

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

1. New Facts, Not Developed at Trial Due to Ineffective Assistance of Counsel, Merit Reconsideration of Mitchell's Collusion Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

2. This Court Should Grant an Evidentiary Hearing on Mitchell's Collusion Claim Because The Record Does Not Conclusively Show That There Was No Federal-Tribal Working Arrangement to Deprive Him of His Federal Procedural Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

F. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF INEFFECTIVE ASSISTANCE REGARDING HIS SUBSTANTIVE INCOMPETENCY AT THE TIME HE WAIVED HIS PENALTY-PHASE APPEARANCE (CLAIM S).. . . . . . . . . 105

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

1. Waiver of Penalty-Phase Appearance. . . . . . . . . . . . . 105

2. Substance Abuse and Mental Health Issues at the Time of Waiver of Penalty-Phase Appearance. . . . . . 107

3. Post-conviction Depositions of Trial Counsel.. . . . . . 108

4. This Court Should Order an Evidentiary Hearing on Mitchell's Claims of Substantive Incompetence and Related Ineffective Assistance of Counsel Claim. . . . 109

G. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CONFLICT-OF-INTEREST CLAIM (CLAIM C). . . . . . 112

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

1. The Arizona Federal Public Defender Office's Concurrent Representation of Mitchell and an Unnamed Client Involved in Mitchell's Case. . . . . . . 113

2. The Record Does Not Conclusively Show That Mitchell's Representation Was Unaffected by the Concurrent Representation.. . . . . . . . . . . . . . . . . . . . . 114

**TABLE OF CONTENTS (continued)**

**Page**


H. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM CONCERNING THE WEARING OF COMMEMORATIVE BUTTONS BY THE VICTIMS' FAMILIES AT TRIAL (CLAIM T). . . . . . . 116

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

1. Evidence Regarding the Buttons in the Trial Record. 116

2. This Court's Decision on Direct Appeal. . . . . . . . . . . 117

3. Section 2255 Proceedings. . . . . . . . . . . . . . . . . . . . . . 117

4. In Light of New Facts Indicating That the Buttons Could Have Been Seen by the Jury and Were Worn During a Key Portion of the Trial, This Court Should Reconsider Whether the Wearing of Such Buttons Deprived Mitchell of a Fair Trial. . . . . . . . . . . . . . . . . 118

5. Trial Counsel Performed Deficiently by Failing to Object to the Wearing of Buttons by the Victims' Families, and Mitchell Was Prejudiced as a Result . . . . . . . . . . . . . . 123

6. At a Minimum, Mitchell Is Entitled to an Evidentiary Hearing on the Buttons Issue. . . . . . . . . . . . . . . . . . . 124

I. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM THAT THE GOVERNMENT VIOLATED BRADY BY BELATEDLY DISCLOSING THE NAVAJO NATION'S REQUEST FOR LENIENCY IN MITCHELL'S CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

1. The Government's Last-Minute Disclosure of the Navajo Nation's Letter. . . . . . . . . . . . . . . . . . . . . . . . 125

2. This Court's Decision Regarding the Navajo Nation Letter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

3. New Facts Concerning the Brady *Claim*. . . . . . . . . . . 126

4. The District Court's Ruling on the Navajo Nation Letter Claim in the Section 2255 Motion. . . . . . . . . . 127

## TABLE OF CONTENTS (continued)

Page


5. New Facts Warrant Reconsideration of the Navajo Nation Letter *Brady* Claim.. . . . . . . . . . . . . . . . . . . . . 127

J. This Court Should Grant a COA and Relief on Cumulative Error at the Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

IX. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

CERTIFICATE OF RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Abdul-Kabir v. Quarterman*,
550 U.S. 233 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Ainsworth v. Woodford*,
268 F.3d 868 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

*Allen v. Woodford*,
395 F.3d 979 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

*Anderson v. United States*,
318 U.S. 350 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Argo v. United States*,
473 F.2d 1315 (9th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 118, 127

*Atkins v. Virginia*,
536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Barefoot v. Estelle*,
463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Barnett v. United States*,
384 F.2d 848 (5th Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Bean v. Calderon*,
163 F.3d 1073 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 75, 81

*Boyde v. Brown*,
404 F.3d 1159 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Brady v. Maryland*,
373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Carey v. Musladin*,
549 U.S. 70 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 121, 123

*Caro v. Woodford*,
280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Clark v. American Commerce Nat. Bank*,
974 F.2d 127 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Correll v. Ryan*,
539 F.3d 938 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## TABLE OF AUTHORITIES (continued)

**Page**

*Cuyler v. Sullivan*,
446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Detrich v. Ryan*,
__ F.3d __, 2012 WL 1526132 (9th Cir. May 2, 2012). . . . . . . . . . . . . 67, 77

*Douglas v. Woodford*,
316 F.3d 1079 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 68, 75, 78, 80

*Drope v. Missouri*,
420 U.S. 162 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Duncan v. Ornoski*,
528 F.3d 1222 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 83

*Dusky v. United States*,
362 U.S. 402 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Dziurgot v. Luther*,
897 F.2d 1222 (1st Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*Earp v. Ornoski*,
431 F.3d 1158 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 88

*Eddings v. Oklahoma*,
455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Frierson v. Woodford*,
463 F.3d 982 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 62, 63

*Gonzalez v. Arizona*,
__ F.3d __, 2012 WL 1293149 (9th Cir. Apr. 17, 2012) (en banc). 57, 62, 63

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 70, 73

*Hendricks v. Calderon*,
70 F.3d 1032 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 64, 72, 73, 123

*Holloway v. United States*,
526 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hovey v. Ayers*,
458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 80, 82

*Jack v. United States*
435 F.2d 317 (9th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

**TABLE OF AUTHORITIES (continued)**

**Page**

*James v. Ryan*,
__ F.3d __ 2012 WL 639292 (9th Cir. Feb. 29, 2012). . . . . . . . . . . . *passim*

*Jeffries v. Blodgett*,
5 F.3d 1180 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Jeffries v. Wood*,
114 F.3d 1484 (9th Cir. 1997) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Jennings v. Woodford*,
290 F.3d 1006 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Jermyn v. Horn*,
266 F.3d 257 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Johnson v. Baldwin*,
114 F.3d 835 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Johnson v. United States*,
2012 WL 992109 (N.D. Iowa Mar. 22, 2012). . . . . . . . . . . . . . . . . . . *passim*

*Kane v. United States*,
399 F.2d 730 (9th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Karis v. Calderon*,
283 F.3d 1117 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kaufman v. United States*,
394 U.S. 217 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Keeney v. Tamayo-Reyes*,
504 U.S. 1 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Lambright v. Schriro*,
490 F.3d 1103 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 81, 84

*Lambright v. Stewart*,
220 F.3d 1022 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 97

*Lopez v. United States*,
439 F.2d 997 (9th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Mak v. Blodgett*,
970 F.2d 614 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Martinez v. Ryan*,
132 S. Ct. 1309 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**TABLE OF AUTHORITIES (continued)**

**Page**

*Massaro v. United States*,
538 U.S. 500 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 93

*Mayes v. Gibson*,
210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Mayfield v. Woodford*,
270 F.3d 915 (9th Cir. 2001) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Miller-El v. Cockrell*,
537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Mills v. Maryland*,
486 U.S. 367 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Musladin v. Lamarque*,
427 F.3d 653 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 120

*Norris v. Risley*,
878 F.2d 1178 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Norris v. Risley*,
918 F.2d 828 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . 116, 119, 124, 129

*Padilla v. Kentucky*,
130 S. Ct. 1473 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Penry v. Lynaugh*,
492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Porter v. McCollum*,
130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Rompilla v. Beard*,
545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 65, 73

*Sanchez v. United States*,
50 F.3d 1448 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124, 129

*Sanders v. United States*,
373 U.S. 1 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 111

*Sasser v. United States*,
452 F.2d 1104 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Sears v. Upton*,
130 S. Ct. 3259 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 79, 83

**TABLE OF AUTHORITIES (continued)**

**Page**

*Seidel v. Merkle*,
146 F.3d 750 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Silva v. Woodford*,
279 F.3d 825 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sinisterra v. United States*,
600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 87

*Siripongs v. Calderon*,
35 F.3d 1308 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Slack v. McDaniel*,
529 U.S. 473 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Smith v. Stewart*,
140 F.3d 1263 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Smith v. Stewart*,
189 F.3d 1004 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Stankewitz v. Woodford*,
365 F.3d 706 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 70

*Stanley v. Schriro*,
598 F.3d 612 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 89

*Strickland v. Washington*,
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Summerlin v. Schriro*,
427 F.3d 623 (9th Cir. 2005) (en banc). . . . . . . . . . . . . . . . . . . . . . . . 61, 82

*Teti v. Bender*,
507 F.3d 50 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Townsend v. Sain*,
372 U.S. 293 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Alvarez-Sanchez*,
511 U.S. 350 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 101, 103

*United States v. Bagley*,
473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*United States v. Baumann*,
692 F.2d 565 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 86

**TABLE OF AUTHORITIES (continued)**

**Page**

*United States v. Black*,
482 F.3d 1035 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Burrows*,
872 F.2d 915 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 86

*United States v. Bynum*,
362 F.3d 574 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States v. Chacon-Palomares*,
208 F.3d 1157 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Christakis*,
238 F.3d 1164 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 47, 112, 116

*United States v. Coppola*,
281 F.2d 340 (2d Cir. 1960) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Echeverry*,
759 F.2d 1451 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 56

*United States v. Friedman*,
366 F.3d 975 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Heller*,
551 F.3d 1108 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Howard*,
381 F.3d 873 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 85, 109, 112

*United States v. Jackson*,
209 F.3d 1103 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 92

*United States v. Jackson*,
448 F.2d 539 (5th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Kenyon*,
481 F.3d 1054 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Kohl*,
972 F.2d 294 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Leonti*,
326 F.3d 1111 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 47, 85, 124

*United States v. Lilly*,
512 F.2d 1259 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**TABLE OF AUTHORITIES (continued)**

**Page**

*United States v. Manzo*,
675 F.3d 1204 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 127

*United States v. Michaud*,
268 F.3d 728 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 102, 104

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Nelson*,
297 Fed. Appx. 563 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*United States v. Pierce*,
561 F.2d 735 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Rahm*,
993 F.2d 1405 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Rodrigues*,
347 F.3d 818 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Sayetsitty*,
107 F.3d 1405 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Ward*,
989 F.2d 1015 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Valerio v. Crawford*,
306 F.3d 724 (9th Cir. 2002) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Wallace v. Stewart*,
184 F.3d 1112 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 64

*Wiggins v. Smith*,
539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor*,
529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 73, 80

*Wong v. Belmontes*,
130 S. Ct. 383 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Woods v. Dugger*,
923 F.2d 1454 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 122

*Woodson v. North Carolina*,
428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**TABLE OF AUTHORITIES (continued)**

**Page**

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 3005 . . . . . 6

18 U.S.C. § 3006A. . . . . 115

18 U.S.C. § 3591 . . . . . 18, 69

18 U.S.C. § 3592 . . . . . *passim*

18 U.S.C. § 3593 . . . . . 122

18 U.S.C. § 5033 . . . . . 98

28 U.S.C. § 1291 . . . . . 4

28 U.S.C. § 2107 . . . . . 4

28 U.S.C. § 2253 . . . . . 96

28 U.S.C. § 2255 . . . . . *passim*

Fed. R. App. P. 4 . . . . . 5

Fed. R. Crim. P. 33(b) (2002) . . . . . 90

Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 12 . . . . . 93, 94

**LOCAL RULES**

D. Alaska Loc. Civ. R. 83.1(h) . . . . . 95

D. Ariz. Loc. Civ. R. 39.2(b). . . . . . 91, 94, 95

D. Ariz. Loc. Crim. R. 24.2 . . . . . 91, 95

D. Mont. Loc. Civ. R. 48.1(b) . . . . . 95

D. Mont. Loc. Crim. R. 24.2(b) . . . . . 95

D. Nev. Loc. R. 48-1 . . . . . 95

D. Or. Loc. R. 48-2 . . . . . 95

## TABLE OF AUTHORITIES (continued)

**Page**

E.D. Wash. Loc. R. 47.1(d) . . . . . . . . . . 95

W.D. Wash. Loc. R. 47(d) . . . . . . . . . . 95

## MISCELLANEOUS

2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* 41.6d (5th ed. 2005) . . . . . . . . . . 89

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003) . . . . . . . . . . 50

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.15.1 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003) . . . . . . . . . . 95

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 11.4.1 (1989 ed.) . . . . . . . . . . 60

*ABA Standards for Criminal Justice: Prosecution and Defense Function* 4-4.1 (3d ed. 1993) . . . . . . . . . . 48

Navajo Nation Title 17-380.A.1 . . . . . . . . . . 100

CA NO. 11-99003

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEZMOND C. MITCHELL,<br><br>Petitioner-Appellant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent-Appellee. | DC# CV 09-8089-MHM |

# I.

# INTRODUCTION

Lezmond Mitchell, a member of the Navajo Nation, was convicted in federal district court of carjacking resulting in death and other offenses for crimes committed on the Navajo Reservation in Arizona. He was sentenced to death on the carjacking count. After a divided panel of this Court affirmed his convictions and sentence, Mitchell filed a motion to vacate his sentence under 28 U.S.C. § 2255. The district court denied the Section 2255 motion without holding an evidentiary hearing but certified three ineffective assistance of counsel claims for appeal. In addition to those ineffective-assistance claims, Mitchell raises two procedural claims concerning the denial of his requests for juror interviews and an evidentiary hearing, and six uncertified claims concerning federal-tribal collusion, Mitchell's competency to waive his appearance at the penalty phase, trial counsel's conflict of interest, prejudicial spectator conduct, the eleventh-hour disclosure of a letter in which the Navajo Nation asked the United States government not to seek the death penalty in Mitchell's case, and cumulative error.

# II.

# QUESTIONS PRESENTED

## A. CERTIFIED ISSUES

1. Did trial counsel's deficient investigation and presentation of an intoxication defense constitute ineffective assistance at the guilt phase?

2. Was trial counsel ineffective at the penalty phase for failing to competently investigate, prepare, and present mitigating evidence of Mitchell's substance abuse, social history, mental health issues, and executive functioning deficits?

## B. PROCEDURAL ISSUES

3. Did the district court abuse its discretion by not granting Mitchell, a death-sentenced federal prisoner, an evidentiary hearing on any of his ineffective-assistance claims, when the trial record contradicted counsel's claims of strategic judgment?

4. Did the district court erroneously apply a local rule requiring a showing of "good cause" to deny Mitchell's request for juror interviews, when (a) application of the rule is inconsistent and inequitable in the context of capital Section 2255 proceedings, and (b) Mitchell's assertions of extraneous information or outside influence satisfied the good cause standard in any event.

## C. UNCERTIFIED ISSUES

5. Did federal and tribal authorities enter into a working arrangement to arrest and imprison Mitchell on minor tribal charges in order to deprive Mitchell of his federal procedural rights to prompt presentment and appointed counsel?

6. Was Mitchell incompetent to waive his appearance at the penalty phase of his trial, due to a combination of major depression and heavy use of jail-brewed alcohol, heroin, and antipsychotic medications while in custody?

7. Did the Arizona Federal Public Defender Office's concurrent representation of a client connected to Mitchell's case constitute an actual conflict of interest, and is Mitchell entitled to discovery of the other client's name?

8. Did the wearing of large buttons bearing the victims' photographs by spectators threaten Mitchell's right to a fair trial, and was counsel ineffective for not moving for a mistrial or otherwise objecting to the buttons?

9. Is there a reasonable probability that the government's timely disclosure of a letter from the Navajo Nation Attorney General to the United States Attorney's Office, in which the Navajo Nation asked the federal government not to seek the death penalty against Mitchell, would have changed the outcome of Mitchell's penalty phase, by giving counsel the opportunity to investigate the Nation's position on the death penalty and call a representative of the Nation to testify at trial?

10. Does the cumulative impact of ineffective assistance at the penalty phase, prejudicial spectator conduct, and the *Brady* violation involving the Navajo Nation letter require relief with respect to Mitchell's sentence?

## III.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 2255. The district court issued an order denying relief on September 30, 2010, and issued a certificate of appealability on three claims. (ER 71-72.)[1] Mitchell's timely motion to alter or amend was denied on December 21, 2010. (ER 79.) Mitchell filed a notice of appeal on February 17, 2011, which was timely pursuant to 28 U.S.C. § 2107(b) and Federal Rule of Appellate Procedure 4(a)(1)(B) and 4(a)(4)(A)(iv). (ER 4199.)

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291, 2253(c)(1)(B), and 2255(d).

## IV.

## STATEMENT OF ADDENDUM

Pertinent statutes and rules are set forth in the separately bound addendum.

## V.

## STATEMENT OF THE CASE

### A. BAIL/DETENTION STATUS

Mitchell is on federal death row in Terre Haute, Indiana.

### B. COURSE OF PROCEEDINGS

On November 19, 2002, a second superseding indictment was filed in the District of Arizona charging Mitchell and Johnny Orsinger with carjacking

---

[1] "ER" refers to the Excerpts of Record, and "SER" refers to the Sealed Excerpts of Record. "CR" refers to the Clerk's Record and is followed by the applicable docket control number.

resulting in death, the first-degree murders of Alyce Slim and Jane Doe,[2] felony murder in the course of robbery and kidnapping, robbery, and kidnapping on or about October 28, 2001. (SER 1-3.) Mitchell was also charged with two counts of robbery and two firearms violations in connection with the robbery of a trading post on the Navajo Reservation on October 31, 2001. (SER 4-5.) Following a jury trial, Mitchell was convicted of all counts and sentenced to death on the carjacking count, and two consecutive life terms plus 384 months on the remaining counts. (ER 1099-1100.) Orsinger, whose juvenile status rendered him statutorily ineligible for the death penalty, pled guilty and was sentenced to two consecutive terms of life imprisonment. (CR 448.)

A divided panel of this Court affirmed Mitchell's conviction and sentence in a published opinion. *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007). The Supreme Court denied Mitchell's petition for certiorari on June 9, 2008. (ER 1105-1106.)

Prior to filing this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, Mitchell's post-conviction counsel sought leave to interview the trial jurors in his case. (CR 1.) On June 8, 2009, Mitchell filed his initial Section 2255 motion. (CR 9.) After the district court denied his request to interview the trial jurors, Mitchell filed an amended Section 2255 motion on October 14, 2009. (ER 1-10, 1107-1386.) On September 30, 2010, the district court denied the amended Section 2255 motion, without argument or an evidentiary hearing. (ER 71-73.) The district court denied Mitchell's motion to alter or amend the judgment on December 21, 2010. (ER 79.) This timely appeal followed. (ER 4199.)

---

[2] In compliance with the privacy protections of Federal Rule of Appellate Procedure 25(a)(5), the minor victim will be referred to as "Jane Doe."

# VI.

# STATEMENT OF FACTS[3]

## A. APPOINTMENT OF COUNSEL

Mitchell was represented by three attorneys: Jeffrey Williams and Gregory Bartolomei, both assistant federal public defenders, and John Sears, an attorney in private practice who served as learned counsel.[4] (ER 3916-3917.) Williams and Sears focused on the guilt phase, and Bartolomei focused on the penalty phase. (ER 3917, 4091, 4144.)

Williams was lead counsel. (ER 3996.) Mitchell was Williams's first federal capital client. (ER 3969.) Williams had represented three capital defendants in state court,[5] but he had never tried a penalty phase before a jury: one case was decapitalized, and the other two involved judge sentencing under Arizona law. (ER 3970-3973.) Williams cross-examined four of the prosecution's guilt-phase witnesses and conducted the direct examination of one witness at the penalty phase. (ER 678, 720, 835, 1008.)

Sears joined Mitchell's defense team several months after Williams and Bartolomei had been appointed. (ER 4181.) Sears had previously served as learned counsel in two or three federal capital cases, but Mitchell's was his first federal capital case to go to trial. (ER 4120-4121.) Sears had represented

---

[3] The facts set forth here relate only to the certified claims of ineffective assistance of counsel. Facts supporting the procedural and uncertified claims are set forth under those individual claims.

[4] A federal capital defendant is entitled to two attorneys, "of whom at least 1 shall be learned in the law applicable to capital cases[.]" 18 U.S.C. § 3005.

[5] Williams mentioned a fourth Arizona case that was either decapitalized or was not a capital case at all. (ER 3972.)

approximately six capital defendants in state court,[6] only one of which was ultimately tried as a capital case. (ER 4119, 4181-4182.) As the primary "courtroom presence" in Mitchell's case, Sears conducted the voir dire, delivered opening and closing statements for both the guilt and penalty phases, and cross-examined eleven prosecution witnesses. (ER 678, 720, 779, 835, 863, 931, 984, 1079, 4124.)

Bartolomei, who assumed primary responsibility for developing mitigation, had not tried a murder case and had no capital litigation experience. (ER 4029, 4088, 4091, 4112.) Bartolomei examined all but one of Mitchell's penalty-phase witnesses. (ER 966, 1008.)

Voir dire in Mitchell's trial began on April 1, 2003. (SER 358.) Jail records indicate that in the sixteen months before trial, Sears visited Mitchell for 28 minutes (in May 2002), Williams visited for 8 hours and 5 minutes (last visiting in October 2002), and Bartolomei visited for 39 hours and 40 minutes. (ER 3628-3648.)

### B. Evidence of Intoxication in Discovery

At the very first status hearing, after the government had summarized the allegations, the district court asked, "Now, was there evidence, I guess, I'm just curious, was there -- were defendants -- was there any purported drinking?" (ER 102.) The government acknowledged that at least some of the defendants' statements referred to drinking alcohol. (ER 102.)

In fact, before he made his initial appearance in federal court on November 29, 2001, Mitchell gave four statements to the FBI, all of which mentioned drinking on or about October 28, 2001, the alleged date of the murders:

---

[6] It is unclear how many of these state cases predated Mitchell's case. (ER 4119.)

- On the afternoon of November 4, Mitchell stated that he had purchased beer and passed out several times from drinking on October 27[7] and October 28. (ER 1897.)
- On the night of November 4, Mitchell stated that he and Orsinger were hitchhiking and "fucking partying out somewhere" when they were picked up by the victims. (ER 1882.) In this interview, Mitchell mentioned "drinking" twenty-two times and reported resulting blackouts and memory loss. (ER 1882-1896.)
- On November 5, Mitchell admitted helping Orsinger stab Slim but "said that he was so drunk (at the time of the murder) that he could not remember how many times" he stabbed her. (ER 1900.)
- On November 29, Mitchell stated that he and Orsinger drank beer before going to Gallup, New Mexico, where they purchased liquor. (ER 1902.) They carried the liquor in a bag as they hitchhiked back home. (ER 1903.)

Drugs and drug paraphernalia, along with Mitchell's belongings, were found in the room where Mitchell was found sleeping at the time of his arrest. (ER 329-330, 347-352.)

## C. SUBSTANCE ABUSE ISSUES IN JURY SELECTION

### 1. *Juror Questionnaire*

On January 24, 2003, Mitchell's defense counsel requested that the veniremembers answer six questions relating to substance abuse. (ER 110.) In a hearing regarding the proposed juror questionnaire, the government

[7] The FBI 302 form incorrectly records the date as *Sunday*, October 27. (ER 1897.) However, October 27, 2001, was a Saturday, and it is clear from context that the Mitchell was referring to Saturday, October 27.

acknowledged that the record included evidence of drinking and possible cocaine use and did not object to "advising the jury that the case may involve alcohol and/or drug use." (ER 513, 516.) Sears argued that ascertaining the veniremembers' attitudes on drugs and alcohol was necessary "because there will be, in our view, evidence of alcohol, substance abuse introduced in this trial through any number of possible witnesses." (ER 514.)

The final juror questionnaire asked whether prospective jurors were associated with an organization concerned with alcohol or drug abuse; whether they, a close friend, or family member had been affected by alcohol or drug abuse or an alcohol- or drug-related incident; and whether they, a close friend, or family member had been diagnosed or received treatment for alcoholism or drug abuse. (ER 3486.)

**2. *Voir Dire***

Sears asked follow-up questions of veniremembers who reported personal experience with substance abuse in their questionnaires.[8] Some of Sears's questions probed veniremembers' general ability to be fair or serve on a case involving evidence of drug or alcohol abuse. (SER 372, 377, 396, 421.) Other, more specific follow-up questions tested prospective jurors' openness to guilt-phase defenses and penalty-phase mitigation involving drug or alcohol abuse. For instance, Sears asked J.D.[9] whether her family's substance abuse problems would impact her ability to fairly evaluate "evidence about substance abuse in any context, either in connection with the case or somebody trying to explain their life

[8] The seated jurors and alternates' completed questionnaires can be found at SER 6-357.

[9] Because the voir dire proceedings are sealed, veniremembers will be referred to by initials.

and what happened in their life[.]" (SER 361.) Sears also asked a number of veniremembers whether their personal history would cause them to judge others "more harshly" if they heard evidence of substance abuse.[10] (SER 366, 390, 402, 411.)

None of the veniremembers indicated they could not be fair in the face of evidence of drug or alcohol abuse. To the contrary, several stated that their personal history made them particularly understanding of alcoholics or drug users. H.B., for example, stated that his relatives' drug problems would cause him to "have sympathy" for substance abusers. (SER 384-385.) R.A. said that, as a recovering alcoholic, he would not judge substance abusers more harshly because he "understand[s] alcoholics a little better than the average person does." (SER 380.) C.L. stated that she was "accepting of" her father's drinking problem. (SER 402.) And T.D. believed that his prior DUI arrest had "opened [his] eyes" and "saved [his] life." (SER 410-411.)

Likewise, several of the veniremembers selected as jurors or alternates[11] had positive experiences with recovery from substance abuse. When Sears asked seated juror K.B. if evidence of drug or alcohol abuse would shock or offend her, K.B. replied, "[A]ll the years of being around [substance abuse] in my opinion certainly has helped me understand it more. Years of therapy helped me -- help you understand those diseases better." (SER 414.) L.M., who ultimately was

---

[10] By the last day of voir dire, the government anticipated the defense questioning regarding alcohol and drug abuse by asking two veniremembers whether their personal experiences would affect their views of substance abuse evidence; both said it would not. (SER 418, 424.)

[11] Because the four alternates were not selected until immediately before deliberations began, the guilt phase was tried without the parties knowing which jurors would be seated. (ER 946.)

chosen as an alternate, said that his son's imprisonment for drug possession was "the best thing that ever happened to him." (SER 256, 389-390.) Similarly, alternate juror J.M. stated that his stepdaughter's arrest for drug possession would not lead him to judge someone "more harshly because they might have had a problem with alcohol or drugs." (SER 405-406.) J.M. indicated that his stepdaughter had "straightened out" and was "doing really good." (SER 406.)

## D. Pretrial Indications of Defense Strategy

### 1. *Jury Instructions*

Prior to trial, on March 6, 2003, the defense requested that the district court give Ninth Circuit Model Instruction 6.8,[12] which provided: "You may consider evidence of [intoxication] . . . in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the intent required to commit [crime charged]." (ER 527.) Yet the defense did not, at the same time, request an instruction on impaired capacity as a mitigating factor in the penalty phase. (ER 546, 567.)

### 2. *Witness Lists*

On March 11, 2003, several weeks before the trial began, the district court noted that Mitchell had not provided notice of a mental health expert, as required by Federal Rule of Criminal Procedure 12.2. Bartolomei stated that mental health evidence was "still being developed," and that counsel had no plans to introduce any expert evidence related to mental disease or defect in the guilt phase but might present some such evidence in the penalty phase. (ER 598.) Bartolomei further stated that the defense would "probably" present a witness "in terms of explaining background and matters along those lines, social history, there would be an expert

[12] The intoxication-diminished capacity instruction is now Ninth Circuit Model Jury Instruction 6.9.

for that." (ER 598.)

On March 28 and April 1, Mitchell submitted penalty-phase witness lists consisting solely of friends and family. (ER 651-653.) The defense did not call any experts at either phase of the trial.

#### 3. *Estimates of Length of Trial*

During voir dire, Sears estimated a week-long defense case in the guilt phase and three to four days of penalty-phase mitigation. (SER 374.) In fact, the defense did not present a case at the guilt phase, and by the end of the guilt phase, Sears had revised his mitigation estimate downward to half a day. (ER 951-952.)

### E. THE GUILT PHASE

#### 1. *Opening Statements*

The government's theory of the case was that Mitchell and Orsinger killed the victims to obtain a truck for use in the trading post robbery. (ER 685-687.) In the defense's five-minute opening statement, Sears conceded that the crimes were horrible, and that Mitchell was present when they occurred. (ER 680, 688.) However, Sears argued that the killings were the "wild, unpredictable, rageful act" of Orsinger alone. (ER 688.)

#### 2. *The Government's Case*

On Sunday, October 28, 2001, sixty-three-year-old Alyce Slim and her nine-year-old granddaughter, Jane Doe, set off from the house of Marlene Slim, Slim's daughter and Doe's mother. (ER 689-691, 693.) Slim planned to drive her pickup truck from Marlene's house in Fort Defiance, Arizona, on the Navajo Indian Reservation ("Reservation"), to visit Betty Denison, a medicine woman who lived on the Reservation in Tohatchi, New Mexico, about thirty to thirty-five minutes away. (ER 690-691, 694.)

Slim and Doe arrived at Denison's house at about 4:30 p.m. (ER 694.)

Although Denison was unable to treat Slim's ailments, she accompanied Slim and Doe to the house of another medicine woman, Marie Dale. (ER 694-695.) Slim set up an appointment with Dale for the following evening. (ER 695.) Slim and Doe dropped off Denison at about 5:00 p.m. and drove away. (ER 695.) Slim did not show up for work on Monday, and Doe did not show up for school. (ER 692.)

Raushandal Combs testified that on the night of Monday, October 29, he and Gregory Nakai gave Mitchell and Orsinger a ride to an area near Mitchell's grandfather's house. (ER 765-766, 768.) Orsinger was carrying a big bag. (ER 765.) Orsinger gave Combs directions to a location about twenty-five miles away, in Tsaile, near Orsinger's father's residence. (ER 767.) Combs and Nakai picked up Mitchell and Orsinger in Tsaile two hours later, at which point Orsinger no longer had the bag. (ER 766, 768.)

On October 31, 2001, three men wearing Halloween masks and purple gloves robbed the Red Rock Trading Post on the Reservation. (ER 697-698, 706.) At least two of the men had guns. (ER 699, 701.) The robbers took $5,542.32 from the safe and registers and the employees' purses before tying up the employees and leaving. (ER 702-704, 707, 842.) Witnesses saw one of the robbers pumping gas into a pickup truck matching the description of Slim's truck. (ER 707, 710.)

Cooperating witness Jason Kinlicheenie testified that he, Jakegory Nakai, and Mitchell robbed the trading post. (ER 745-746.) Kinlicheenie further testified that Jakegory Nakai came up with the plan to rob the trading post and discussed it with Gregory Nakai (Jakegory's brother) and Mitchell. (ER 743-744.) According to Kinlicheenie, Mitchell and Orsinger left on a Friday night for Gallup, New Mexico, to obtain a truck for use in the robbery. (ER 744, 753.) When they returned from Gallup, Mitchell told Kinlicheenie that he had stolen a truck and

parked it in the mountains. (ER 744.) Later, he told Kinlicheenie that he and Orsinger had killed two people, a "small" person and an "old lady." (ER 745.) Kinlicheenie saw Mitchell with a silver butterfly knife, which Mitchell said he got from the knife shop at the Gallup mall. (ER 754.)

Slim's abandoned truck was recovered on November 1, 2001, near Wheatfields, Arizona. (ER 714-715.) The truck contained bloodstains, and the interior had been burned. (ER 716, 782-786, 788.) The driver's seat was lacerated, and the truck contained burned cleaning materials, clothing, purple latex gloves, Halloween masks, purses, and a bloodstained blanket. (ER 773-776, 781.) Mitchell's fingerprint and palm print were found on the truck bed, and he could not be excluded as a DNA contributor to one of the masks. (ER 847-848, 855.)

Following a tip by Jimmy Nakai (Gregory and Jakegory's brother), Mitchell and several others were arrested at the Nakai house early on the morning of November 4, 2001. (ER 789.) During the arrests and ensuing search, a silver butterfly knife fell out of Mitchell's pants, and a black knife was found in the other bedroom. (ER 790, 792.) Slim's DNA matched blood found on the silver butterfly knife; Mitchell, Slim, and Jakegory Nakai could not be excluded as contributors to DNA found on the black knife. (ER 853-855.)

FBI Agent Raymond Duncan recounted Mitchell's initial, non-incriminating statement on the afternoon of November 4, 2001. (ER 825-826.) Agent Trace Kirk testified that later that day, Mitchell admitted to being present while Orsinger killed Slim and Doe and confessed to the trading post robbery. (ER 729-730, 837-838.) At the end of the interview, Mitchell agreed to assist law enforcement in finding the bodies. (ER 730.)

On the morning of November 5, Orsinger directed the FBI to the location of the bodies in Tsaile. (ER 730, 812.) The victims' bodies and two large rocks

containing Doe's blood were recovered from the scene. (ER 812, 815, 828, 856.) Mitchell arrived at the crime scene about an hour later and told the agents where the victims' heads and hands were buried. (ER 727-728, 730.) Two latex gloves were in the hole with the body parts. (ER 816-817.) Mitchell could not be excluded as a contributor of the DNA on one of the gloves. (ER 859.)

Slim's cause of death was stab wounds that punctured her left lung, heart, and aorta. (ER 882.) Slim's thirty-three wounds were consistent with the silver and black knives, and included defensive wounds. (ER 879, 881-882, 886.) Doe's cause of death was blunt force trauma injuries to the head, consistent with the two rocks found at the scene. (ER 889-890.) The pathologist also noted a very small incised wound on Doe's neck. (ER 886.) Slim's and Doe's heads and hands had been removed postmortem. (ER 880-881, 889.)

Agent Kirk testified regarding Mitchell's unrecorded November 5 interview at the crime scene. (ER 730-731.) According to Kirk, Mitchell stated that he had participated in stabbing Slim, that he had cut Doe's throat twice, that he told Doe to lay down on the ground and die, and that he and Orsinger took turns dropping rocks on Doe's head. (ER 730-731.) Kirk testified that Mitchell also stated that he dug a hole, that Orsinger used an axe to sever the victims' heads and hands, and that they put the heads and hands into the hole. (ER 731.)

Duncan testified that in the November 29 interview, Mitchell stated that he and Orsinger had hitchhiked from Round Rock to Gallup to buy liquor. (ER 829.) Duncan further testified that McKinley County, New Mexico, where Gallup is located, prohibits alcohol sales on Sundays. (ER 831.) When Sears attempted to question Duncan regarding Mitchell's reference to drinking on the day of the carjacking, the government's objection was sustained. (ER 839.)

Duncan and Agent Kent Hush testified that on November 29, Mitchell

admitted stabbing Slim four or five times and helping Orsinger throw rocks on Doe's head. (ER 797, 830.) According to Duncan, Mitchell also admitted digging a hole and helping Orsinger bury the victims' heads and hands in the hole. (ER 830.)

Defense counsel subpoenaed Orsinger as a trial witness. (ER 860.) Out of the presence of the jury, Orsinger stated that he would invoke his Fifth Amendment privilege against self-incrimination with respect to any questions involving the carjacking of Slim and Doe. (ER 885) The district court found that there was a basis for Orsinger's invocation, and that Orsinger need not invoke before the jury. (ER 886.)

**3. *The Defense Case***

The defense did not call any witnesses, and Mitchell did not testify. (ER 899.)

**4. *Jury Instructions***

On May 5, 2003, when the guilt phase was almost over and after all of the agents had testified, the defense reiterated their request for the model jury instruction on intoxication. (ER 675.) At the close of the evidence on May 6, the government argued that the defense was not entitled to the instruction because "there has been absolutely no evidence of intoxication in this case." (ER 903.) The government noted that while the defense asked Agent Duncan about intoxication, the government's objection had been sustained. (ER 903.) The district court stated that an intoxication instruction was included "because I knew that the defense would probably be able to point to something in the record that would support this somehow." (ER 903.) Sears admitted that the evidence "doesn't support you giving this instruction." (ER 903.) Therefore, the district court did not instruct the jury on intoxication at the guilt phase.

### 5. *Guilt-Phase Closing Arguments*

The government argued in closing that Mitchell and Orsinger killed the victims as part of a premeditated plan to obtain a truck to use in the trading post robbery. (ER 923-930.)

In closing, Sears urged the jury to question the accuracy of Mitchell's statements and argued that there was not proof beyond a reasonable doubt that Mitchell aided and abetted the killings of Slim and Doe, or that Slim's killing occurred in the District of Arizona. (ER 934-937.) Sears conceded that the evidence might support convictions for felony murder in the course of robbery and kidnapping. (ER 938-939.) But he argued that Mitchell's lack of premeditation precluded convictions for carjacking resulting in death and first-degree murder, even if the jury found that he had aided and abetted those crimes, because Orsinger simply "went off." (ER 938, 940.)

The jury returned guilty verdicts on all counts the next day. (ER 950.)

## F. The Penalty Phase

### 1. *Mitchell's Waiver of His Penalty-Phase Appearance*[13]

After the verdicts were read, Mitchell informed the district court that he did not want to appear at the penalty phase. (SER 427.) Defense counsel immediately moved to withdraw due to Mitchell's "active refus[al] to cooperate and assist us on his defense." (ER 952.) On the following day, May 9, counsel renewed their motion to withdraw, citing a breakdown in communication; the district court, finding that "any substitution of counsel would be detrimental to the defendant's interests," denied the motion. (SER 433-434.) On May 14, the district court accepted Mitchell's waiver of his appearance at the penalty phase. (SER 443.)

[13] Additional facts relating to an uncertified claim concerning Mitchell's competency to waive his penalty-phase appearance are set forth *infra* pp. 105-112.

Afterward, counsel again moved to withdraw because Mitchell declined to discuss his waiver of appearance with them, and the district court again denied their request. (SER 443-444.)

### 2. *Gateway Intent and Aggravating and Mitigating Factors*

The government alleged all four statutory "gateway intent factors" for each victim.[14] (ER 980, 1065-1066.) The government also alleged the following statutory aggravating factors under 18 U.S.C. § 3592(c): (1) that the defendant committed the killing for pecuniary gain; (2) that the defendant committed the killing in an especially heinous, cruel, or depraved manner; (3) that the defendant committed the killing after substantial planning and premeditation; (4) that the victims were particularly vulnerable due to old age, youth, or infirmity; (5) that the defendant intentionally killed or attempted to kill more than one person in a single criminal episode; and (6) that the death of [Jane Doe] occurred during the commission and attempted commission of the kidnapping of [Jane Doe]. (ER 981, 1066.) The government also alleged the nonstatutory aggravating factor of injury, harm, and loss to the victims' families. (ER 981, 1068.)

---

[14] These factors are

> that the defendant (A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2).

The defense initially alleged five mitigating factors, and the district court instructed the jury accordingly: (1) Mitchell's lack of a significant prior criminal record; (2) that another person equally culpable in the crime will not be punished by death; (3) that Mitchell would be sentenced to life imprisonment without parole if not executed; (4) that Mitchell had responded well to structured environments and would make an excellent adaptation to prison if sentenced to life without parole; and (5) that other factors in Mitchell's childhood, background, record, character, or any other circumstance mitigated against a death sentence. (ER 981-982.)

**3. *Penalty Opening Statements***

In their penalty opening, the government told the jury it was adopting the guilt-phase evidence to satisfy the gateway intent and statutory aggravating factors, and that the only new evidence was victim-impact testimony from the family. (ER 983-984.)

In the defense penalty opening, Sears told the jury that they would hear why Mitchell's was "a life worth saving," as well as evidence regarding Orsinger's culpability and criminal history, information on the Navajo Nation's anti-death-penalty position, and background on "Lezmond's life up to those fateful days in October of 2001." (ER 984.)

**4. *Government Case: Aggravating Factors***

The government's penalty-phase presentation consisted entirely of victim-impact evidence. Leo Slim testified that the loss of his wife Alyce had hurt him and their seven children. (ER 986.) Marlene Slim testified that she missed her mother and daughter greatly. (ER 992.) Slim's other daughters, Geraldine Slim and Kimberly Houston, discussed how they and their children had been negatively impacted by the deaths. (ER 987, 990.) All of Slim's daughters emphasized

Slim's crucial role in educating her grandchildren about Navajo culture. (ER 987-991.)

**5. *Defense Case: Mitigating Factors***

Bartolomei examined the friends, family, and former educators who testified as Mitchell's mitigation witnesses.

The defense's key witness was Robert Roessel, who knew Mitchell from his tenure as executive director at Rough Rock High School, a school on the Reservation that emphasized Navajo culture. (ER 994-995.) Roessel testified that Mitchell was an outstanding athlete and student. (ER 996.) Roessel thought that Mitchell, coming from a family of educators, had the potential to end up teaching others in prison, and that his life should be spared. (ER 999.) Roessel last saw Mitchell at his high school graduation in 2000 -- more than a year before the October 2001 crimes -- where Mitchell "made some very fine remarks" to the graduating class. (ER 999.)

Some of Roessel's testimony was unfavorable. In particular, Roessel recounted how, after graduation, Mitchell had disappointed him by burglarizing his office and stealing a computer and the shotgun used in the trading post robbery. (ER 997, 1001.) Roessel had to intervene so Mitchell could graduate after he allegedly possessed a marijuana joint at school. (ER 996.) Roessel also admitted that he had no idea what happened to Mitchell after graduation, and that Mitchell was a smart person who could think things through and be responsible for his actions. (ER 1000-1001.)

Roessel and his wife Ruth, a teacher, touched on Mitchell's troubled childhood. Roessel testified that Mitchell lacked pride and "didn't know who he was" because he grew up in a home with "no love." (ER 997, 999.) Mitchell never knew his father, and his one-quarter Navajo background was a "liability" on

the Reservation. (ER 998-999.) Mitchell's mother and maternal grandparents were educators by profession who took little interest in Mitchell's education or Navajo culture. (ER 997-998.) Ruth Roessel alluded to Mitchell's "cold home," marked by the absence of his mother and grandmother. (ER 1003.)

Other educators spoke to Mitchell's intelligence, leadership capabilities, and nonviolent nature. Marty Conrad, Mitchell's high school football coach, testified that Mitchell was a team leader and interacted well with his teammates. (ER 1018-1020.) John Fontes, the assistant principal at Mitchell's high school, testified that Mitchell became an excellent student. (ER 1021.) Sonja Halsey, Mitchell's former English teacher, testified that he was bright, eager to learn, and respectful. (ER 1028.) Both Fontes and Halsey testified that Mitchell tended to withdraw from violence and could teach others in a structured environment. (ER 1021, 1023, 1028, 1030.) Halsey mentioned that she had heard that alcohol was involved in Mitchell's crimes, which surprised her because she had not heard of Mitchell having an alcohol problem before that. (ER 1029.) Both Fontes and Halsey testified that Mitchell's mother, Sherry Mitchell, refused to accept Fontes's calls about Mitchell's marijuana possession incident and indicated she wanted nothing to do with her son. (ER 1022, 1028.)

Several of Mitchell's family and friends testified briefly. Auska Mitchell, Mitchell's uncle, stated that Mitchell was respectful and loving towards his family, aside from one incident in which Auska caught Mitchell with a marijuana pipe. (ER 1016.) Auska asked that Mitchell's life be spared because he "was a good kid until he met Johnny Orsinger." (ER 1017.) Lorenzo Reed and Tammy Sebahe, Mitchell's friends, described how Mitchell lived at their home during his senior year of high school; Mitchell did chores and was treated like a member of the family. (ER 1025-1026, 1031.) Sebahe had visited Mitchell in pretrial custody

and had not seen him create a disturbance. (ER 1032.)

On cross-examination of Mitchell's mitigation witnesses, the government elicited that Mitchell was smart and thoughtful, knew the difference between right and wrong, and wouldn't allow himself to get "dragged into" violent situations. (ER 1017, 1023, 1030.)

After the government had concluded its penalty-phase presentation and the defense had already examined two witnesses, Bartolomei informed the district court that the defense would present seven more mitigation witnesses plus a videotape of Mitchell's grandmother. (ER 1004.) Williams, who had not delivered the penalty opening or examined any penalty-phase witnesses, then spoke up to say that the defense would have eight witnesses because it intended to call Agent Duncan. (ER 1004-1005.) Williams proffered that Agent Duncan would be called to testify not only regarding Orsinger's other crimes and Mitchell's lack of criminal history, but also to the fact that Mitchell had indicated "that he consumed what appears to be an enormous amount of alcohol" on the day the murders. (ER 1005.) The district court ruled that Agent Duncan's testimony on these points would be admitted at the penalty phase. (ER 1013.)

Williams then called Agent Duncan, the case agent, as the last live witness. (ER 1032.) Duncan testified that Mitchell reported drinking so heavily on the day of the offenses that he passed out and could not remember details of the crimes, including where he and Orsinger were picked up by Slim. (ER 1032-1033.) However, on cross-examination by the government, Duncan testified that he didn't believe Mitchell's report of heavy drinking and blackouts was accurate because Mitchell was later able to take law enforcement to the site of the bodies. (ER 1037.) Duncan added that while Mitchell had mentioned buying liquor in Gallup on Sunday, October 28, Gallup is in a county that is dry on Sundays. (ER 1042.)

Agent Duncan also testified that Orsinger and Gregory Nakai were convicted of similar charges for the murders of Jasper Sam and David Begay in August 2001, but were not facing the death penalty for those convictions. (ER 1035.) Sam and Begay had been attacked and carjacked by Gregory Nakai, Orsinger, and others after Sam bought bootleg alcohol from the group. (ER 1035-1036.) Orsinger and Gregory Nakai then shot Begay and Sam, respectively. (ER 1036.) Mitchell had no prior felony convictions. (ER 1036.)

A videotaped deposition of Bobbi Mitchell, Mitchell's ailing grandmother, was then played for the jury. (ER 1043.) Bobbi Mitchell outlined her educational and career background, Mitchell's unsettled childhood, and his struggles to fit in as a "half-breed on the Reservation." (ER 1056.) She said she loved Mitchell very much and asked the jury to spare his life because "[h]e is so much a teacher and an educator" and had a "talent for music and for other people." (ER 1056.)

**6. *Impaired Capacity Instruction***

At the close of the penalty-phase evidence, Sears requested an instruction on the statutory mitigating factor of impaired capacity, based on Duncan's testimony regarding Mitchell's report of intoxication.[15] (ER 1050.) The government objected, noting that the intoxication issue "has obviously been known for a while. It's been in all of the reports about drinking." (ER 1050.) The district court found that there was sufficient evidence of alcohol consumption to warrant an impaired capacity instruction, and the jury was so instructed. (ER 1062, 1069.)

---

[15] The Federal Death Penalty Act ("FDPA") defines "impaired capacity" as "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1).

### 7. *Penalty Closing Arguments*

The government's closing argument focused on the brutality of, and alleged pecuniary motive for, the crimes. (ER 1072.) The government argued that the guilt-phase evidence satisfied the gateway intent factors and aggravating factors for both victims. (ER 1073-1077.) The government further argued that the victim-impact evidence established the nonstatutory aggravating factor of harm to the family. (ER 1077) The government urged the jury to impose a death sentence because "[s]ome crimes are so bad, so horrific, so inexplicable, so unnecessary, that we cannot explain them. We simply punish them." (ER 1078.)

In defense closing, Sears argued that the FDPA's gateway intent factors for death eligibility required the jury to find "to find unanimously beyond a reasonable doubt that Lezmond Mitchell was the actual killer of both of these people." (ER 1081-1082.) Noting the similarity of the Sam/Begay murders and the fact that Orsinger had already killed two people by the time he and Mitchell went to Gallup, Sears suggested that Orsinger was the actual killer of both victims. (ER 1080.) Sears also emphasized the lack of proportionality in Orsinger and Gregory Nakai's non-capital sentences. (ER 1082-1083.)

Sears mentioned that Mitchell was "drinking hard" at the time of the murders, but he did not connect this evidence to any mitigating factor. (ER 1080.)

In terms of mitigation, Sears pointed to Mitchell's lack of a criminal record and the positive qualities he exhibited before "[s]omething happened." (ER 1080.) Sears continued, "Let's talk for a minute about what happened. I can't tell you. I can't tell you because we are never going to know. None of us are ever going to know exactly what happened." (ER 1083-1084.) Sears noted Mitchell's lack of family support, epitomized by what he characterized as Bobbi Mitchell's self-centered statement at the penalty phase:

> She was my witness. But she spoke for 29 minutes without talking about Lezmond. She talked about herself. And at the end she talked about Lezmond. I know that undercuts the value of what she says, but for God's sake, that's powerful information about what happened to Lezmond. His grandmother who raised him is asked to give a statement to a jury that's concerning whether he should die and she wants to talk about her own resume.

(ER 1084.) Nevertheless, Sears ultimately downplayed Mitchell's social history, stating, "That's an awful way to send somebody out into the world. But people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

After dismissing the effect of Mitchell's background, Sears said, "So what happened? What happened? Lezmond didn't know who he was. He didn't know if he was Navajo. He didn't know if he was Anglo. . . . He was always an outsider. That's not an excuse for murder. Of course it's not. But it helps us understand that." (ER 1084.) Sears also highlighted Orsinger's bad influence on Mitchell and called Mitchell a "jackass" for being present during the murders. (ER 1084.) "Of course it's not fair for Lezmond to breathe the same air if he is the killer," Sears stated. (ER 1085.) But Sears urged the jury to consider that "maybe some year" Mitchell could "help one person" by serving as a "negative object lesson" to other inmates or by having a book written about him. (ER 1085.)

Sears also quoted from the Navajo Nation Attorney General's letter disclosed to the defense the day before the penalty phase began (ER 968-969), arguing that it was important that "the Navajo people, the nation with the most at

stake in this case," didn't want the death penalty in Mitchell's case. (ER 1086.) Sears concluded with a plea for mercy, as he asked the jury to embrace "the possibility that if Lezmond Mitchell lives on, he might help someone else[.] Maybe he won't. Maybe he will. But isn't it worth a chance?" (ER 1086-1087.)

In rebuttal, the government argued that Orsinger's juvenile status rendered the defense's proportionality argument irrelevant. (ER 1088.) The government also disputed the defense's argument that Mitchell had to be the actual killer to satisfy the gateway intent factors. (ER 1088-1089.) The government argued that Mitchell had enjoyed many advantages in life, yet chose to live and associate with killers. (ER 1089.) With respect to the mitigation evidence, the government commented, "[I]s that how you come to cause this kind of death, your mother's not in the picture?" (ER 1089.) Although the government acknowledged the Navajo Nation's position was not to be "taken lightly," it contended that Mitchell had "completely rejected" Navajo values through his actions. (ER 1090.) Portraying Mitchell as intelligent and remorseless, the government argued that the jury should show no mercy to Mitchell because he had shown no mercy to the victims. (ER 1090-1091.)

**8. *Verdicts and Sentencing***

On May 20, 2003, the jury recommended the death sentence. (ER 1096.) The jury found all gateway intent factors and statutory and nonstatutory aggravators true for both victims. (ER 1095-1097.) The jury also found the following mitigating factors: twelve jurors found that Mitchell did not have a significant prior record, that another person equally culpable will not be punished by death, and that Mitchell would be sentenced to life imprisonment without possibility of release if not sentenced to death. (ER 1096-1097.) Two jurors found that Mitchell had responded well to structured environments and would

adapt well to prison, one juror found impaired capacity, and six jurors found mitigating elements in Mitchell's childhood, background, record, character, or any other circumstance of the offense. (ER 1096-1097.) Seven jurors wrote in that they found the Navajo Nation letter mitigating. (SER 452, 460.) On September 15, 2003, the district court imposed the death sentence on the carjacking count, and two life sentences plus 384 months on the remaining counts. (ER 1100.)

## G. SECTION 2255 PROCEEDINGS

The parties presented additional information concerning defense counsel's investigation and preparation in declarations, exhibits, and depositions filed in the course of these Section 2255 proceedings.

### 1. *Investigation*

#### a. Social History

Mitchell's trial counsel hired a mitigation specialist, Vera Ockenfels. (ER 3305.) Ockenfels, an attorney with capital-defense experience, communicated primarily with Bartolomei and had little meaningful contact with Williams or Sears. (ER 3305.) The defense's fact investigator, Karl Brandenberger, drove Ockenfels to her appointments and "kept her safe on the reservation" but did not interview any mitigation witnesses. (ER 3270-3271.)

Ockenfels conducted a social history investigation, which entailed interviewing Mitchell's caretakers, extended family, teachers, and medical and psychological treatment providers and gathering supporting documentation. (ER 3306.) Although Ockenfels contacted most of Mitchell's friends, Bartolomei spoke to Mitchell, Mitchell's grandparents, Mitchell's uncle, and former educators. (ER 4038-4043.)

The defense failed to enlist Sherry Mitchell, Mitchell's mother, in their mitigation efforts. Ockenfels sought Sherry's insights into the Mitchell family's

history of mental illness but alienated her by passing on personal information to Mitchell that Sherry expressly instructed her not to reveal. (ER 3204-3205.) As a result, counsel did not obtain a social history from Mitchell's mother, and heard only Mitchell's grandmother's sanitized account of his upbringing. (ER 3205, 4039.)

In a draft social history report dated November 2, 2002, Ockenfels detailed Mitchell's family history, education, behavioral issues, mental health and medical history, cultural identity issues, substance abuse history, and prior criminal history. (ER 3089-3134.) Ockenfels characterized Mitchell's childhood as marked by abandonment, instability, isolation, and abuse. (ER 3099-3108.) Mitchell never knew his father, an exchange student from the Marshall Islands, and his mother often left him with his maternal grandparents while she pursued her career. (ER 3098-3108.) When Mitchell lived with Sherry, the result was interpersonal conflict, as well as physical and verbal abuse. (ER 3101-3103.) Mitchell's grandmother, likewise, was frequently absent due to employment off the Reservation and when present, she was physically and verbally abusive to Mitchell, as she had been to Sherry during her childhood. (ER 3097, 3101.) Mitchell's grandfather, George, was distant and uninterested. (ER 3102.) Mitchell's mother and grandparents had graduate degrees in education and worked as teachers and school administrators on and off the Reservation, but they showed a pronounced lack of interest in Mitchell's education and well-being. (ER 3096, 3098, 3104.)

Mitchell, who was one-quarter Navajo, lacked a strong tie to Navajo culture and couldn't speak the Navajo language. (ER 3093, 3120-3123.) Mitchell's mixed racial background, inability to speak Navajo, and the relative education of his family isolated him from his peers and extended family on the Navajo

Reservation. (ER 3094, 3103, 3113 n.37.)

Mitchell started displaying behavioral problems indicative of Attachment Disorder and Attention Deficit Disorder in kindergarten, and they persisted through his school years. (ER 3112-3115.) When he was seventeen, Mitchell underwent counseling with Dr. Edward Fields, who documented Mitchell's suicidal ideation and drug use and diagnosed him as a "very troubled young man" who needed "intensive psychotherapy" to avoid "anti-social behavior that could produce serious law encounters." (ER 3117-3118.) Mitchell never received the recommended treatment. (ER 3119.) Mitchell's law enforcement contacts included arrests (but no prior convictions) for graffiti, disorderly conduct, criminal damage to property, a reported theft from his grandmother, and the alleged burglary of Roessel's office. (ER 3134.)

Ockenfels catalogued Mitchell's long history of drug and alcohol abuse: an arrest for public intoxication a year before the crimes; regular use of alcohol, marijuana, cocaine, and crack; increasingly heavy use of crystal meth and alcohol in the period preceding the offenses; and a referral for alcohol treatment in jail shortly after his arrest. (ER 3124-3126.) The arrest for public intoxication stemmed from a rollover accident in which the driver was killed and Mitchell was the passenger. (ER 3124.)

Ockenfels described Mitchell's lack of direction after graduation, when, unemployed and without a stable place to live, he moved from city to city and job to job. (ER 3111.) Upon returning to the Reservation in August 2001, he started living at the Nakai house, drinking heavily, doing drugs, and staying up for days at time. (ER 3125, 3131.)

Ockenfels recommended that the trial team consult a mental health expert, such as a forensic psychologist, to present Mitchell's social history in a

compelling manner to the jury. (ER 3308.) Despite Bartolomei's pretrial representation to the court that the defense would "probably" present such an expert during the penalty phase (ER 598), no expert of any kind testified on Mitchell's behalf at trial.

**b. Intoxication**

All three defense counsel stated in depositions that Mitchell told them that he was not under the influence of drugs or alcohol at the time of the crimes. (ER 3942, 4031-4032, 4128.) Trial counsel did not see any evidence of drinking in the FBI's crime-scene photographs. (ER 3967.)

Bartolomei told Ockenfels that the defense would not pursue intoxication evidence because Mitchell had denied being drunk or high at the time of the killings. (ER 3307.) Based on her investigation of other capital cases, Ockenfels advised Bartolomei that it was not uncommon for a client to falsely deny alcohol and drug use, either in general or at the time of the offense. (ER 3307.) Further, drawing upon her experience as a criminal defense attorney in New Mexico, with significant experience with Native American clients, Ockenfels emphasized that it is not uncommon for young Native American clients to minimize or deny their addiction to alcohol and drugs to their attorneys. (ER 3307-3308.) Nevertheless, relying on Mitchell's alleged denials, trial counsel did not do any additional investigation of intoxication.

Ockenfels concluded that Mitchell was addicted to drugs and alcohol and that his substance abuse affected his mental state at the time of the killings. (ER 3306.) She therefore recommended that the trial team consult with a psychopharmacologist or other expert to determine whether Mitchell was "tweaking" from drug use and/or sleep deprivation and whether he was in a fugue state during the killings. (ER 3307.) Trial counsel did not pursue this line of

investigation.

Ockenfels also recommended that trial counsel interview Orsinger, Mitchell's co-defendant, about alcohol and drug use prior to the killings. (ER 3308.) It is disputed whether this interview occurred. Williams and Bartolomei recalled that the defense attempted to interview Orsinger, but Orsinger's attorney would not allow it. (ER 3929, 4097.) Defense investigator Brandenberger gave conflicting hearsay statements as to whether he interviewed Orsinger, but the file obtained by Section 2255 counsel contains no record of this interview, or any notes by Brandenberger whatsoever. (ER 3270-3271, 4112.) Orsinger could not remember whether he was interviewed by Brandenberger, but he stated in a post-conviction declaration that by the time he and Mitchell arrived in Gallup, they had been awake for several days drinking beer and using drugs, including marijuana laced with cocaine and methamphetamine. (ER 3218.)

Trial counsel did not recall seeking to interview co-defendant Gregory Nakai, the defendants in the Sam/Begay murder case, or any other residents of the Nakai house at the time of Mitchell's arrest. (ER 4001, 4045, 4127.)

Bartolomei knew that Mitchell was "partying a lot" but wasn't sure whether he had "a problem" with drugs and alcohol. (ER 4043.) Williams knew Mitchell smoked marijuana and drank alcohol but "never got the impression that he was addicted to . . . meth or cocaine." (ER 3932.) Sears knew generally that Mitchell had a history of substance abuse. (ER 4134.) Investigator Brandenberger had no knowledge of Mitchell using drugs before the offenses, in pretrial custody, or during trial. (ER 3271.)

**c. Mental Health**

Counsel initially consulted psychologist Susan Parrish to assist in reviewing materials and brainstorming. (ER 4034.) She did not prepare a report. (ER 3925-

3926, 4034-4035.)

Anne Herring conducted a neuropsychological evaluation of Mitchell prior to trial. (ER 3617.) She concluded that Mitchell was of average intelligence but displayed mild executive functioning difficulties, specifically in planning and strategy formation, due to a tendency to respond impulsively and quickly. (ER 3617-3618.) Although Herring believed that Mitchell's executive functioning deficits stemmed from emotional factors, rather than from traumatic brain injury, a brain scan revealed mild abnormalities that might have resulted from abuse, playing football, or fighting. (ER 3152.) Herring never heard back from defense counsel after preparing her report. (ER 3618.)

Dr. Barry Morenz examined Mitchell twice and provided Bartolomei with a psychiatric evaluation on March 3, 2003. (ER 3135, 3598.) Dr. Morenz spoke to Brandenberger and Ockenfels and reviewed Mitchell's neuropsychological and neurologic evaluations, other medical tests, the indictment, and crime reports. (ER 3135-3136.) But counsel did not provide Dr. Morenz with information regarding Mitchell's alcohol and drug use in the period preceding his offenses. (ER 3597-3598.)

Dr. Morenz concluded that Mitchell was competent to stand trial. (ER 3152.) He also diagnosed Mitchell with depressive disorder not otherwise specified, polysubstance abuse in a controlled environment, a provisional diagnosis of cognitive disorder not otherwise specified, antisocial personality disorder, and a history of head injuries. (ER 3151.) Morenz noted that a PET scan could corroborate the brain abnormalities documented by Herring. (ER 3152.) Morenz concluded that Mitchell's physically and emotionally abusive childhood and lack of a clear ethnic identity shaped his "serious personality problems." (ER 3152.) He further concluded that "subtle brain dysfunction" caused by multiple

head injuries might have contributed to increased impulsivity at the time of the offenses. (ER 3152.) Like Herring, Morenz never heard back from trial counsel after preparing his report. (ER 3152.)

The trial attorneys disregarded Ockenfels's suggestion to consult with and present a mental health expert to testify about Mitchell's background and upbringing to explain his early resort to drug and alcohol abuse. (ER 3308.)

**2. *Counsel's Description of Guilt-Phase Strategy***

Pursuant to the district court's order, trial counsel testified in post-conviction depositions. Counsel stated that the guilt-phase strategy was to argue that Mitchell "didn't do it" but was present "when Johnny Orsinger again went crazy." (ER 4011, 4103, 4126.)

Counsel testified that they did not pursue an intoxication defense because supporting evidence was lacking. (ER 4126.) Sears believed that only Mitchell or Orsinger could have testified to the intoxication. (ER 4129.) Williams admitted that there was evidence of alcohol use but thought an intoxication defense "wasn't even close." (ER 3941, 4011.)

Sears also stated that a more fundamental problem with a diminished capacity defense was its incompatibility with the guilt-phase defense "that Lezmond was a good person led astray under circumstances." (ER 4129.) In Sears's view, presenting evidence of intoxication and blackouts "didn't fit in our minds" with the argument that "everything about this crime, the way it was committed, why it was committed, the senselessness of it, all those things were Johnny Orsinger and not Mr. Mitchell." (ER 4129, 4192.)

Neither Sears nor Williams could remember who on the defense team sought a diminished-capacity instruction or why such a request had been made. (ER 3966, 4168.)

### 3. *Counsel's Description of Penalty-Phase Strategy*

The plan for the penalty phase, according to Bartolomei, was "[t]o present favorable witnesses about Lezmond Mitchell and to have Lezmond there to make the tie between those witnesses and Lezmond." (ER 4099.) Williams stated that the theory of the mitigation case was that there was "some value" to Mitchell's life and that "life in prison is no cake walk." (ER 3962.) The unifying theme of the penalty phase was "a life worth saving," meaning that Mitchell "had potential, . . . could be a leader, . . . had somewhat of a gift as a person." (ER 4076, 4145.) Therefore, Bartolomei wanted the mitigation witnesses to "[t]alk about Lezmond personally and what they knew of him and how they knew him," not to discuss Mitchell's drug use or upbringing. (ER 4075.)

Williams described the mitigation investigation as a search for "[s]omething that . . . would explain this type of behavior." (ER 3938.) By this, Williams meant that he was looking for evidence of insanity, brain damage, or physical and sexual abuse. (ER 3939.) However, Williams admitted that Mitchell's "tough persona" would have prevented him from disclosing any sexual abuse. (ER 3946.)

#### a. Social History

Sears said that the defense would occasionally "move in the direction of trying to emphasize to the sentencing jury the deprivation of Lezmond's background, his isolation, the way in which he was treated by his family, particularly his mother, and his gravitation towards this gang and the way in which they behaved." (ER 4144.) Sears thought that, "in general, those issues were presented to the jury." (ER 4145.)

Williams and Bartolomei, on the other hand, did not consider Mitchell's social history mitigating because his family was educated and employed. (ER 3946, 4102.) Although Williams thought Mitchell's mother was a "piece of

crap," he was not aware of any sexual abuse or chronic physical abuse to present as mitigation. (ER 3946-3947.) Bartolomei's takeaway point from interviews of Mitchell's grandparents was that Mitchell "came from basically a family of educators." (ER 4037.)

**b. Intoxication**

Bartolomei testified that the trial team decided that presenting evidence of intoxication as mitigation was incompatible with the "Lezmond didn't do it" guilt-phase defense and would detract from the "life worth saving" theme of the penalty phase. (ER 4063.) Bartolomei also thought that substance abuse issues were irrelevant given the dates of the crime. (ER 4043.)

Sears believed that, after the attacks of September 11, jurors would consider mental health or substance abuse presentations as "excuses," and he noted that the responses on the juror questionnaires in Mitchell's case were especially harsh. (ER 4149-4150.)

Bartolomei could not explain why, if trial counsel had determined that Mitchell's substance abuse had no value as mitigation, co-counsel Williams decided to question Agent Duncan about intoxication at the end of the penalty phase. (ER 4099.) Bartolomei didn't recall discussing this decision to elicit evidence of intoxication with Williams or Sears beforehand. (ER 4099.)

**c. Mental Health**

Bartolomei testified that while trial counsel initially thought that a "psych defense" based on blackouts or substance abuse was the best approach, Mitchell disputed that version of events. (ER 4049.)

Bartolomei further stated that the psychiatric mitigation route was "dangerous" because it "would have destroyed the positive things we had to present about Lezmond" and opened the door to evidence of antisocial conduct

contained in Morenz's report. (ER 4064-4065, 4101.) In the same vein, Sears stated that there was an "inherent contradiction in presenting either a mental health or substance abuse/mental health component of the mitigation case" because "there was enough positive that we could say about Mr. Mitchell that the jury would look at this as excuses." (ER 4149.) Williams did not recall the particulars of Morenz's report because "Greg [Bartolomei] was primarily dealing with that stuff," and mitigation "was Greg's area of expertise." (ER 3936, 3945.)

Bartolomei wasn't concerned about a family history of mental illness because the Mitchells "seemed like a very bright family." (ER 4059.) In particular, Bartolomei did not think Sherry's mental health issues were relevant because she was "an educator and is an educated woman." (ER 4102.)

#### d. Mitchell's Waiver of Penalty-Phase Appearance

According to Sears, the penalty-phase calculus changed significantly when Mitchell decided to waive his penalty-phase appearance. (ER 4147.) Similarly, Bartolomei thought Mitchell's waiver of penalty-phase appearance hampered the mitigation presentation because the strategy was to have Mitchell "sitting there and watching someone like Dr. Roessel[] make the kind of presentation that he made as a witness." (ER 4073.)

### 4. *Observers' View of Penalty-Phase Preparation*

#### a. Mitigation Witnesses

Mitchell's mitigation witnesses indicated that Mitchell's attorneys did not adequately prepare them to testify. In five-to-ten-minute meetings on the morning they were set to testify, the mitigation witnesses were shown photographs of the victims' decapitated bodies and asked whether they still wanted Mitchell to receive a life sentence. (ER 3193-3194, 3227, 3265, 3286-3287.) Some of the witnesses had never met Mitchell's attorneys before, and none was advised of the

questions he or she would be asked, though some were informed of the general area of inquiry. (ER 3227, 3265, 3286-3287.) Significantly, when Sonja Halsey tried to tell the attorneys about Mitchell's neglectful family, the attorneys told her to discuss only Mitchell's classroom performance. (ER 3266.)

Other mitigation witnesses were selected by happenstance. Ruth Roessel ended up testifying because she was present during the attorneys' interview of her husband. (ER 3236.) She did not really know Mitchell or his family, was never interviewed or otherwise prepared for her testimony, and only learned she would testify the day before she appeared in court. (ER 3236-3237.) Similarly, Tammy Sebahe was chosen as a mitigation witness when she accompanied her mother to an appointment with Mitchell's lawyers; upon deciding that Sebahe's mother could not testify because she suffered from anxiety attacks, counsel simply asked Sebahe a few basic background questions and asked her to testify instead. (ER 3245.)

**b. Experienced Death-Penalty Attorneys**

From the outset, Ockenfels was concerned by the way in which counsel "treated mitigation as distinctly separate from the guilt phase, rather than an integral part of both the guilt and penalty phases of the trial." (ER 3305.) In Ockenfels's experience, the practice among capital defense attorneys was to involve all team members in developing all aspects of the defense, since guilt-phase defenses may bear on penalty-phase issues. (ER 3305-3306.) Further, Ockenfels disagreed with the view, expressed by all three of Mitchell's lawyers, that there was "no mitigation" in the case. (ER 3306.)

This view of inadequate mitigation preparation was also held by Ken Murray, counsel's colleague in the Arizona Federal Public Defender's Office ("Arizona FPD") and previous learned counsel in several federal capital cases.

(ER 3281.) The Arizona FPD did not assign Murray to Mitchell's case, but he consulted with counsel when asked. (ER 3282.) Murray urged counsel to "keep looking for mitigation," but they repeatedly emphasized the bad facts of the case and told Murray there was "no mitigation." (ER 3282-3283.) Murray's opinion was that the mitigation investigation was insufficient or that counsel didn't recognize the mitigation value of information they had gathered. (ER 3283.)

Richard Burr, an adviser to the Federal Death Penalty Resource Counsel and another seasoned death-penalty attorney, consulted with Mitchell's attorneys after being contacted by a concerned Murray. (ER 3267-3268.) In October 2002, Burr advised counsel that considerably more work needed to be done with respect to preparing expert testimony on mental health, and that the work could not be completed by the time of trial, then set for January 28, 2003. (ER 3268.) Burr offered further assistance but was never contacted by Mitchell's attorneys again. (ER 3268-3269.)

**5. *New Evidence***

Section 2255 counsel's investigation turned up additional evidence relevant to the guilt and penalty phases.

**a. Social History**

Mitchell's mother Sherry was the product of a household that was much more violent and dysfunctional than counsel realized, based on their discussions with Mitchell's grandmother Bobbi. George and Bobbi fought frequently with each other and with Sherry, beating her with a belt, hammer, and other objects and choking her. (ER 3187-3188, 3197, 3199, 3250.) Mitchell's uncle, Auska, recalled George threatening to kill Bobbi with a bow and arrow. (ER 3187.) Once Auska was so upset by his parents he told his parents to "just go ahead and kill [him]," at which point Bobbi deliberately reversed a truck in his direction, and

Auska had to jump out of the way to avoid being hit. (ER 3190.) Auska and Sherry compared their mother to Joan Crawford in "Mommy Dearest." (ER 3201.)

Persistent allegations of sexual misconduct contributed to the extreme conflict in Mitchell's family. George had reportedly molested several children on the Reservation and was fired from his school principal post as a result. (ER 3197, 3681, 3684, 3686.) Closer to home, Bobbi frequently accused her daughter and her husband of having a sexual relationship and blamed Sherry for interfering with her and George's relationship; George and Sherry shared a bed during trips to other parts of the Reservation, and people mistook them for husband and wife. (ER 3197-3198.) Bobbi's younger sister and half-sister accused George of raping or molesting them when they were children. (ER 3666, 3678, 3689-3690.) Bobbi also suggested that George had molested the three-year-old child of a neighbor. (ER 3677.)

Hilary Weaver, a doctor of social work with a particular emphasis on Native Americans, was retained by Section 2255 counsel to evaluate social history information that could have been presented at Mitchell's capital trial. (ER 3500-3501.) Weaver concluded that the conflict-ridden family relationships between Bobbi, George, and Sherry that predated Mitchell's birth continued to shape his childhood. (ER 3541.) The frequent moves and shuttling between caregivers prevented Mitchell from developing a sense of stability. (ER 3541.) Bobbi and Sherry's willingness to leave Mitchell for extended periods of time with George, "a man whom they knew sexually preyed on children," exemplified the magnitude of their neglect. (ER 3882, 3884.) In Weaver's view, addiction represented an escape from Mitchell's extremely dysfunctional family and escalated significantly in the summer and fall of 2001, the period preceding the crimes. (ER 3542.)

**b. Intoxication**

Declarations signed by Mitchell's co-defendants, other residents of the Nakai house, and associates of the Nakais recounted rampant drug and alcohol use in the period immediately before and after the killings of Slim and Doe. In the middle of 2001, after graduating from high school and returning from an unsuccessful stint in Phoenix, Mitchell started associating more with the Nakais and less with his high school friends. (ER 3258-3259.) When Mitchell visited his old friends, either Gregory Nakai or Kinlicheenie would pick him up and take him back to the Nakai compound. (ER 3259.) Despite the Reservation's prohibition on alcohol sales, bootleggers were plentiful, and the Nakai house was notorious for having beer and drugs on hand. (ER 3176, 3226, 3290-3291, 3674, 3703.)

Nothing in the record suggests that the Nakais or their associates were unavailable to speak to defense counsel or testify at trial. In fact, during the guilt phase, Bartolomei informed the district court that defense counsel was considering calling "the Nakai brothers" as penalty-phase witnesses. (ER 832.) Even so, counsel did not seek to interview the Nakais or their associates about Mitchell's substance abuse or any other topic. (ER 4001, 4045, 4126.) In his post-conviction declaration, Gregory Nakai stated that Mitchell moved into his house in the summer of 2001 and was part of a group of people who drank beer, ate mushrooms, and smoked marijuana, crystal meth, and cocaine there regularly. (ER 3211-3213.) The residents of the Nakai house "used drugs, and whatever drugs we had, everyday," and the group's use of crystal meth and cocaine, in particular, escalated after August 2001. (ER 3212.) Gregory Nakai stated that he would have provided this information earlier if asked. (ER 3213.) John Hannah, Gregory Nakai's lawyer, said that, if asked, he would have allowed his client to be interviewed by Mitchell's attorneys, and to sign an affidavit regarding enormous

drug and alcohol use at the Nakai house prior to the offenses. (ER 3683.)

Other residents of the Nakai house could have testified to similar effect. Jakegory Nakai stated that he and his brothers, Mitchell, and their friends drank a lot of beer, smoked marijuana, and used crystal meth, cocaine, and ecstasy whenever they could, and that the group's drug use increased between August and November 2001. (ER 3453.) Padrian George stated that through the summer and fall of 2001, all the residents of the Nakai house, including Mitchell, drank a lot of beer and used drugs, including powder and crack cocaine, ecstasy, and methamphetamine, to stay high as long as possible. (ER 3175-3176.) This level of drug use continued until Mitchell's arrest. (ER 3176-3177.) George was arrested at the Nakai house the same morning but was not under indictment. (ER 3175.) Both Jakegory Nakai and George indicated that they would have spoken to Mitchell's counsel about drinking and drug use if asked. (ER 3454, 3177.)

Jimmy Nakai, who visited his brothers' house regularly, corroborated the use of beer, marijuana, crack cocaine, and methamphetamine, as well as the consumption of crack cocaine and methamphetamine in quantities sufficient to sustain an all-day high. (ER 3456-3457.) Dennie Leal, who knew Mitchell through the Nakai brothers, averred that he "partied" with Mitchell and the Nakais six or seven times. (ER 3182.) The partying, which consisted of smoking marijuana and drinking beer or any other available alcohol, "lasted for days, or the whole weekend." (ER 3182.) Bryant Wilson, another visitor to the Nakai house, reported using marijuana, cocaine, methamphetamine, beer, and sometimes hard liquor there in the summer of 2001. (ER 3703.) Mitchell's longtime friend, Herman Tsosie, once saw Mitchell "tweaking" after time spent at the Nakai house; on that occasion, Mitchell told Tsosie he had eaten mushrooms and used cocaine.

(ER 3259.) All of these potential witnesses indicated that they would have provided this information to Mitchell's counsel if asked; Wilson and Tsosie were not under indictment. (ER 3457, 3182, 3260, 3704.)

Section 2255 counsel also uncovered additional evidence of Mitchell's family history of alcoholism and mental illness. Mitchell's father, Foster Hemil, died at age 43 in the Marshall Islands of illnesses related to his alcoholism, including liver failure, chronic liver disease, and chronic active Hepatitis B. (ER 1983, 3179.) Court records from Hemil's 1983 California conviction for second-degree burglary and assault with intent to commit sexual battery indicated that he was drunk at the time of the offense and later had his probation revoked for driving under the influence of alcohol. (ER 2152-2153.) Hemil's probation officer recommended a no-alcohol condition, in light of Hemil's "ongoing alcohol-criminal offense syndrome." (ER 2153.)

**c. Mental Health**

Mitchell's grandmother Bobbi, his primary guardian, had a history of mental illness dating back to the late 1960s. (ER 2229.) Her daughter, Sherry, reported that Bobbi went into "trances" that required psychological treatment and prescription medication. (ER 3202.) In 1976, Bobbi was diagnosed with severe chronic anxiety. (ER 2239.) In 1985, when Mitchell was three years old and in her care, she was diagnosed with "rather severe situational depression of a chronic nature." (ER 2231.) Bobbi's mental health issues manifested themselves in obsessive cleaning and serious interpersonal difficulties at work. (ER 3376, 3155-3163, 3167-3174, 3261-3264.) She was also cruel to the point of being verbally abusive toward the children whose education she supervised, particularly those with behavioral problems. (ER 3160, 3183, 3248-3249, 3263.) This abuse carried over to Bobbi's care of Mitchell, whom she whipped and berated. (ER 3224,

3200.)

After being informed of Mitchell's drug and alcohol use in the months and days before the offenses, as detailed in the declarations obtained by Section 2255 counsel, Dr. Morenz indicated that this additional information could have made a "significant difference" in his diagnosis. (ER 3597.) The multiple eyewitness accounts indicated to Dr. Morenz that Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered," and Dr. Morenz would have been available to testify to this conclusion at trial. (ER 3598.)

Section 2255 counsel consulted a psychiatrist, Pablo Stewart, M.D., to evaluate Mitchell. Mitchell told Dr. Stewart that he had not slept for the three days prior to October 28, 2001, and that he drank malt liquor and used methamphetamine, ecstasy, and a combination of crack cocaine and marijuana before going to Gallup; after returning from Gallup on October 29, he continued drinking and smoking crack cocaine, marijuana, and other drugs until his arrest on November 4. (ER 3390-3391.) Dr. Stewart diagnosed Mitchell with Posttraumatic Stress Disorder ("PTSD"), Substance Dependence, and Substance-Induced Psychotic Disorder ("SIPD") at the time of the offenses. (ER 3419.) Dr. Stewart stated that he or a similar mental health professional would have testified that Mitchell's severe intoxication, SIPD, and PTSD "synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral functioning, which severely impaired his ability to premeditate or intend to commit murder" and "made him unable to appreciate the wrongfulness of his actions." (ER 3419.)

## VII.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's denial, without argument or an evidentiary hearing, of Mitchell's Section 2255 motion to vacate his convictions and death sentence under the Federal Death Penalty Act.

Constitutionally deficient investigation was at the root of counsel's ill-fated guilt-phase defense. Both the defense and the government recognized that drug and alcohol issues might be in play during the trial. But ultimately, the defense unreasonably chose to rely on Mitchell's denials of intoxication and FBI crime-scene photographs to conclude that a diminished-capacity defense was not viable. In post-conviction depositions, counsel sought to frame this incredibly circumscribed investigation as part of a strategic decision to highlight Mitchell's positive qualities, as opposed to unfavorable evidence of substance abuse, and the district court -- without having the opportunity to judge the attorneys' demeanor in a live hearing -- apparently credited their explanations. But counsel's investigation was so limited that any decision they made cannot be considered strategic. Further, the fact that counsel tried to present an intoxication defense, no matter how half-heartedly, undermines their claims of strategic judgment and shows that they had an incentive to seek evidence of intoxication until the moment the district court denied their request for an instruction. Given the stark contradiction between the trial record and counsel's *post hoc* claims, the district court erred in denying this claim without a hearing. Mitchell was prejudiced by the gap between this viable diminished-capacity defense and the weak "mere presence" argument the jury actually heard.

Trial counsel's mitigation investigation, if anything, was even more deficient. The weakness of counsel's mitigation efforts is evidenced by the

shockingly little time they spent visiting Mitchell prior to trial -- less than fifty hours in total, and an average of one hour per month per attorney. Counsel's collective lack of experience in presenting a mitigation case to a jury, and their concomitant conflation of guilt- and penalty-phase defenses, led them to downplay the value of classic mitigating evidence of substance abuse, a troubled childhood, mental illness, and cognitive deficits that did not fall neatly under a statutory mitigating factor, much to the concern of their own mitigation specialist and experienced death-penalty lawyers who consulted on the case. Instead of attempting to gain the sympathy of even one juror through a presentation of the link between Mitchell's difficult childhood, his depression, and his downward spiral into drugs and alcohol in the months before the offenses, counsel's deficient investigation led them to select an anemic "life worth saving" presentation of Mitchell's intelligence and educated family that, predictably, worked to the prosecution's advantage. And again, the district court clearly erred in finding, without a hearing, that counsel strategically chose not to present damaging evidence of intoxication or social history.

This Court should also reverse the district court's pre-filing denial of Mitchell's request to interview the trial jurors in the course of investigating the claims in his Section 2255 motion. The district court relied on a local rule requiring good cause and leave of court prior to contacting jurors. But, aside from the fact that Mitchell has shown good cause by pointing to instances of possible extraneous information or outside influence in the trial record, this idiosyncratic local rule should not be applied to defeat the fact-finding purpose of Section 2255 proceedings, particularly in a capital case.

New facts, developed through just this sort of post-conviction investigation, shed light on claims that were previously before this Court in an abbreviated

fashion on direct appeal. First, Mitchell has provided new evidence of tribal collusion that warrants reconsideration of his claim that his tribal arrest was the product of a working arrangement designed to deprive him of his federal procedural rights -- namely, a court record that specifically links the outcome of Mitchell's tribal criminal damage case to "arrangements" with the United States Attorney's Office. Second, Mitchell has developed additional facts about the spectators' wearing of commemorative buttons during his trial that show how their conduct threatened his right to a fair trial. Third, Mitchell has shown that the government's belated *Brady* disclosure of the Navajo Nation's letter requesting leniency prejudiced his penalty-phase defense by preventing counsel from calling a willing and available representative of the Navajo Nation to testify at his trial.

Two new claims also merit an evidentiary hearing in district court. Mitchell has obtained declarations attesting to his heavy use of jail-brewed alcohol and drugs while in pretrial custody, as well as an expert opinion attesting to the effects of those medications on his competency to make the crucial decision to waive his appearance at the penalty phase. In addition, it is undisputed that the Arizona Federal Public Defender's Office simultaneously represented Mitchell and another client with some connection to Mitchell's case, but has refused to reveal the name of the other client on the grounds of attorney-client privilege. This Court should order disclosure of this client's name to Mitchell and remand for an evidentiary exploring the nature of the conflict and any adverse effect on Mitchell's representation.

## CERTIFIED ISSUES

## VIII.

## ARGUMENT

### Standard of Review for Certified Claims

This Court reviews the denial of a Section 2255 petition, as well as ineffective assistance of counsel claims, de novo. *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003). The district court's factual findings are reviewed for clear error. *United States v. Christakis*, 238 F.3d 1164, 1168 (9th Cir. 2001).

The district court's decision to deny an evidentiary hearing is reviewed for abuse of discretion. *Rodrigues*, 347 F.3d at 823. Where, as here, the district court has denied an evidentiary hearing, this Court must take as true a Section 2255 petitioner's allegations, "unless palpably incredible or patently frivolous." *United States v. Leonti*, 326 F.3d 1111, 1114 (9th Cir. 2003).

### Discussion

### A. COUNSEL WAS INEFFECTIVE WITH RESPECT TO INVESTIGATING, PREPARING, AND PRESENTING AN INTOXICATION DEFENSE AT THE GUILT PHASE (CLAIM A).

To prevail on an ineffective assistance of counsel claim, a defendant must show (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

#### 1. *Counsel's Failure to Investigate Intoxication Constituted Deficient Performance, Not Strategic Judgment.*

At the time of Mitchell's trial, it was well-settled that "in a prosecution for a specific intent crime, intoxication (although voluntary) that precludes formation of

the requisite intent may be established as a defense." *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985). When a defendant offers evidence of intoxication, "his capacity to form specific intent at the time of the offense becomes an element which, like all other elements of the crime, must be proved by the government beyond a reasonable doubt." *Id.* Mitchell was charged with several specific-intent crimes, including carjacking resulting in death (the capital count), first-degree murder, felony murder, and aiding and abetting each of the substantive counts. *Holloway v. United States*, 526 U.S. 1, 11 (1999) (carjacking); *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968) (first-degree murder); *United States v. Lilly*, 512 F.2d 1259, 1261 (9th Cir. 1975) (felony murder-robbery); *United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997) (aiding and abetting). Counsel made a feeble, unsuccessful attempt to elicit evidence of intoxication from the case agent. (ER 839.) But counsel's unreasonable reliance on Mitchell's denials of substance abuse led them to short-circuit any serious investigation of intoxication.

Contrary to the district court's conclusion, counsel did not reasonably investigate an intoxication defense. Deficient performance "is necessarily linked to the practice and expectations of the legal community[.]" *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010). Under prevailing professional norms, counsel's duty to investigate an intoxication defense did not begin and end with Mitchell's denials of substance abuse. Rather, the American Bar Association standards in effect at the time of Mitchell's trial indicate that counsel's "duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt[.]" *ABA Standards for Criminal Justice: Prosecution and Defense Function* 4-4.1 (3d ed. 1993); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing ABA Standard 4-4.1 as benchmark for reasonable

performance). The accepted obligation for defense counsel in death penalty cases was even more explicit: "The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7(A)(1) (rev. ed. Feb. 2003) ("2003 ABA Death Penalty Guidelines").[16] These ABA standards and guidelines are "guides to determining what is reasonable," *Strickland*, 466 U.S. at 688, and "valuable measures of the prevailing professional norms of effective representation[.]" *Padilla*, 130 S. Ct. at 1482.

Although strategic decisions based on information provided by the client may be reasonable and entitled to deference, "counsel must consider all of the defendant's statements, not just those that make his job easier," especially when there are "glaring inconsistencies" in them. *Duncan v. Ornoski*, 528 F.3d 1222, 1239 (9th Cir. 2008). As this Court has noted, "an attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished." *Johnson v. Baldwin*, 114 F.3d 835, 840 (9th Cir. 1997). Here, Mitchell gave four statements to the FBI. Although these statements varied greatly in terms of how incriminating they were, each mentioned drinking, intoxication, or alcohol-induced blackouts during the relevant period. (ER 1882-1897, 1900, 1903.) In a case where even the government repeatedly admitted there was evidence of drinking (ER 102, 513, 516, 1050), effective defense counsel could not simply dismiss Mitchell's prior

[16] The 2003 ABA Death Penalty Guidelines, which superceded the 1989 version, were published during the pretrial phase of Mitchell's case.

statements as untrue and accept his current statements as true.

The investigation counsel did conduct was unreasonably limited in scope. Aside from speaking to Mitchell, counsel's investigation of intoxication consisted solely of looking for evidence of drinking in the FBI's crime-scene photographs. (ER 3967.) However, much of the other key evidence in this case, such as the knives, shovel, and axe, was not recovered from the site where the bodies were found, and there were indications that the defendants had returned to the crime scene, presumably to destroy or hide evidence, the following day. (ER 765-766, 768.) Further, prevailing standards of practice in capital cases recognized that "[t]he assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial[.]" 2003 ABA Death Penalty Guidelines, cmt. to Guideline 4.1, *reprinted in* 31 Hofstra L. Rev. 913, 958 (2003). By contrast, Mitchell's fact investigator was relegated to the role of chauffeur and bodyguard for the mitigation specialist. (ER 3271.) Investigator Brandenberger was unable to point to any substantive guilt-phase investigation he conducted, aside from interviewing Johnny Orsinger's grandmother and, perhaps, interviewing Orsinger himself. (ER 3271.) Brandenberger produced no reports or memoranda of his investigation, and the files received by Section 2255 counsel contained no notes by him. (ER 3270.) That Brandenberger was wholly unaware of any drug use by Mitchell at any time underscores the deficiency of counsel's investigation of intoxication. (ER 3271.)

Counsel's reliance on mitigation specialist Ockenfels also could not replace a thorough factual investigation of intoxication. This is particularly true here, where Ockenfels believed very strongly that Mitchell was in fact intoxicated at the time of the crimes, and advised counsel to follow up with a psychopharmacologist to support this defense. Counsel could not reasonably delegate these investigatory

tasks to Ockenfels and then disregard all of her recommendations. *See Johnson v. United States*, 2012 WL 992109, at *188 (N.D. Iowa Mar. 22, 2012) (finding deficient performance and granting penalty-phase relief in capital Section 2255 case where counsel's "decision not to pursue further testing . . .was not based on any advice of the experts, but contrary to it"). Counsel's dismissal of Ockenfels's opinions and recommendations demonstrates that nothing she could have said would have overcome counsel's reliance on Mitchell's denials of intoxication. But at a minimum, Ockenfels's conclusions "would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Counsel's disregard of Ockenfels was particularly unreasonable because she provided a plausible explanation for the discrepancy between his statements to law enforcement and his statements to counsel. Ockenfels alerted counsel to the possibility that Mitchell was minimizing his substance abuse problems, a phenomenon that she had encountered with other young Native American clients when she practiced as a criminal defense attorney. In fact, Mitchell's personal history, as documented in Ockenfels's report, demonstrated a tendency toward this sort of minimization. He told a counselor in September 1998 that he had "[n]o substance related problems at school or out," even though he had previously been suspended for sniffing keyboard cleaner, his family thought he was a drug addict, and he was later suspended for possession of marijuana paraphernalia. (ER 1648, 1649, 1653, 1770.) Given the weight counsel reportedly placed on Mitchell's denials, and their awareness of Mitchell's desire to maintain a "tough persona" (ER 3946), Ockenfels's warning should have spurred additional investigation of intoxication. "Competent counsel undertaking to represent defendants with unique cultural backgrounds have an obligation at least to consider the effect of that background on their clients' conduct." *Siripongs v. Calderon*, 35 F.3d 1308,

1315 (9th Cir. 1994). Yet there is no indication that counsel took seriously the possibility that Mitchell, like some of Ockenfels's previous Native American clients, was minimizing his substance abuse.

Counsel's request to interview Orsinger, if such a request was made, did not absolve them of the duty to conduct further inquiries regarding intoxication. First, it is disputed whether Orsinger was available for such an interview and whether such an interview actually occurred; Mitchell's attorneys did not think Orsinger was interviewed, but Brandenberger gave conflicting statements on this score. (ER 3929, 4097, 3270-3271, 4112.) In any event, there is no indication that the defense planned to ask Orsinger about drug abuse and intoxication. The defense's proffered line of questioning at trial involved Orsinger's involvement in the "narrative that the government had laid out," beginning with the trip to Gallup and ending with any meetings or conversations between Mitchell and Orsinger after the postmortem mutilation. (ER 884.) The defense did not specifically seek to ask any questions about Mitchell's intoxication, and Orsinger, when invoking his Fifth Amendment right against self-incrimination, did not specifically refuse to answer questions about drinking or using drugs prior to the crimes. (ER 885.) By allowing Orsinger to assert, in essence, an improper "blanket refusal to answer any questions," *United States v. Pierce*, 561 F.2d 735, 741-42 (9th Cir. 1977), counsel missed another opportunity to probe Orsinger's knowledge of intoxication and to get that information before the jury.

Counsel also unreasonably failed to interview other available witnesses regarding Mitchell's alcohol and drug use before and after the offenses. Counsel apparently assumed that the Nakai brothers and their associates were unavailable for interviews because they were under indictment in Mitchell's case or the Sam/Begay murder case. (ER 3929-3930, 4045-4046.) But their assumption was

both unreasonable and wrong. Declarations obtained by Section 2255 counsel indicate that co-defendant Gregory Nakai knew of Mitchell's massive alcohol and drug use in the period immediately before the offenses, and that he and his attorney would have granted Mitchell's counsel an interview on this subject. (ER 3211-3213, 3683.) Because the Sam/Begay murders occurred in August 2001, it was far from clear that those charged only in that case would be unwilling to discuss substance abuse postdating those offenses; rather, Jimmy Nakai and Dennie Leal stated that they would have provided such information if Mitchell's counsel had asked. And several available witnesses were not interviewed despite not being charged in either case. Padrian George, for instance, lived at the Nakai house with Mitchell and was available to testify regarding his firsthand knowledge of Mitchell's drug use in the summer and fall of 2001. (ER 3175-3176.) Even if not exactly contemporaneous with the offenses, the testimony of the Nakai brothers, Leal, and George would have bolstered Mitchell's diminished-capacity defense by providing probative evidence of chronic intoxication in the months and days preceding the offenses. *See United States v. Kenyon*, 481 F.3d 1054, 1071 (8th Cir. 2007) (citing evidence of defendant's abuse of illegal drugs as support for voluntary intoxication defense). By neglecting to interview these available witnesses, counsel also failed to obtain information that Dr. Morenz considered crucial to his psychiatric diagnosis. (ER 3597.)

More fundamentally, trial counsel's failure to investigate, prepare, and present intoxication evidence supporting a diminished-capacity instruction cannot be justified as reasonable strategy. Counsel claimed that they abandoned an intoxication defense early on because it lacked evidentiary support and detracted from the guilt-phase defense of "Lezmond didn't do it." (ER 4063, 4129.) Yet the record shows that, contrary to these representations, trial counsel pursued an

intoxication defense to the end of the guilt phase. As the district court correctly noted, the two defenses were "not necessarily inconsistent" (ER 22-23.) Sears attempted to elicit evidence of drinking from Agent Duncan, but was stymied by a government objection, and Williams renewed the defense's earlier request for an intoxication instruction even after that. (ER 839, 675.) Thus, even if this Court begins with the premise that "under the circumstances, the challenged action[s] might be considered sound trial strategy," *Strickland*, 466 U.S. at 689 (internal quotation marks omitted), Mitchell has overcome that presumption. When the record shows that counsel in fact pursued a course that they claimed they intentionally sought to avoid, counsel's claimed "strategic decision" "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations[.]" *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).

Counsel's requests for a jury instruction supporting a defense they never adequately presented further demonstrate deficient performance. Similarly, in *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), this Court considered the fact that counsel "secured jury instructions for second degree murder and manslaughter, but did not present any evidence at trial to cast doubt on [petitioner's] ability to form the requisite intent for first degree murder" as an indication of deficient performance. *Id.* at 1019; *see also Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998). Here, counsel failed even to secure a jury instruction on diminished capacity due to intoxication, to the surprise of the district court, who thought "that the defense would probably be able to point to something in the record that would support this somehow." (ER 903.) Yet their attempt to present an intoxication defense belies their *post hoc* claims of strategically avoiding an intoxication defense altogether. Until the diminished-capacity instruction was denied, counsel had "every reason to develop the most

powerful" case on intoxication possible. *See Wiggins*, 539 U.S. at 526. Thus, the district court clearly erred by finding that "counsel strategically chose to try to preserve their credibility with the jury by not asserting a [diminished-capacity] defense they thought would fail." (ER 23.)

In *Strickland*, the Supreme Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. With respect to intoxication at the guilt phase, Mitchell's attorneys did neither. Rather, their deficient investigation of intoxication flowed directly into a deficient presentation of the defense at trial, culminating in Sears's concession that evidence to support a diminished-capacity instruction was lacking. (ER 903.) If the diminished-capacity defense was lacking in evidentiary support, as the district court found (ER 22), the cause was inadequate investigation, not strategic judgment. This Court should therefore reverse the district court's determination of competent performance at the penalty phase.

**2. *Counsel's Failure to Adequately Investigate and Present Evidence of Intoxication Prejudiced Mitchell's Guilt-Phase Defense.***

To establish *Strickland* prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Counsel's deficient investigation and presentation of an intoxication defense prejudiced Mitchell by depriving him of his only viable opportunity to

avoid, if not conviction, at least conviction on the specific-intent crimes, including the capital charge of carjacking resulting in death. Had counsel sought the testimony of other important witnesses, such as Gregory Nakai and George, they could have presented additional evidence of Mitchell's chronic intoxication in the period before and after the crimes. Had counsel acted competently by interviewing the residents of the Nakai house and providing Dr. Morenz with evidence of Mitchell's substance abuse preceding the offenses, Dr. Morenz could have testified that Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered." (ER 3598.) Based on the district court's prior ruling that evidence of intoxication was exculpatory, not inculpatory, (ER 1050), there is a reasonable probability that, had counsel objected to Orsinger's blanket invocation of the Fifth Amendment, Orsinger would have testified to the fact that he and Mitchell were heavily intoxicated and had been awake for three days straight during the relevant time period. An intoxication defense would have put specific intent in play as an element to be proved by the government beyond a reasonable doubt, *Echeverry*, 759 F.2d at 1454, and there is a reasonable probability that the jury would have found that Mitchell lacked the required intent for carjacking resulting in death, first-degree murder, felony murder, and aiding and abetting.

In the absence of a viable intoxication defense, counsel was left with a unadorned "Lezmond didn't do it" argument that was hampered by the evidence in the case, including multiple incriminating statements and forensic testimony that linked Mitchell to a knife used to stab Slim. In short, counsel was reduced to disputing the accuracy of Mitchell's confessions and arguing that while Mitchell was present and did nothing to stop the killings, he did not actively participate. (ER 688, 934.) As a fallback, counsel argued that the crimes were not

premeditated because "Johnny went off." (ER 938.) Meanwhile, counsel left a stronger and complementary defense of intoxication on the table, which would have worked with the evidence rather than against it.

## B. Counsel's Failure to Investigate, Prepare, and Present Mitigating Evidence of Substance Abuse, Social History, Mental Health Issues, and Executive Functioning Deficits Resulted in Ineffective Assistance at the Penalty Phase (Claims B and D).[17]

### 1. *Counsel's Deficient Investigation of Mitigation Evidence Precluded a Fully Informed Decision Regarding Sentencing Strategy and Culminated in a Deficient Penalty-Phase Presentation.*

The *Strickland* standard for ineffective assistance applies to the penalty phase of a capital trial. 466 U.S. at 686-87. However, "[b]ecause the evidence presented at each phase of a trial serves a markedly different purpose," this Court "analyze[s] the reasonableness of counsel's efforts to prepare for trial and sentencing differently." *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006). Specifically, "the reasonableness of counsel's investigatory preparatory work at the penalty phase should be examined in a different, more exacting, manner than other parts of the trial." *Id.* Here, counsel's deficient investigation of Mitchell's social history, substance abuse, and mental health issues resulted in a scattershot and self-contradictory penalty-phase presentation that played directly into the hands of the prosecution.

---

[17] The district court considered Claims B and D, which both involved mitigating evidence, together, and certified both for appeal. (ER 37, 72.) Because Claim D's argument regarding mitigation evidence more generally subsumes Claim B's specific focus on addiction and intoxication evidence, Mitchell likewise addresses these issues together on appeal.

None of Mitchell's attorneys had ever tried a penalty phase before a jury, and their inexperience showed. Each attorney had a different conception of the penalty phase, and they often worked at cross purposes. Bartolomei, who was primarily responsible for mitigation and examined all of the friends and family at the penalty phase, was wedded to the "life worth saving" and "family of educators" theme of mitigation. Williams, who had not previously participated in the penalty-phase presentation, came up with the last-minute idea of requesting an impaired-capacity instruction and questioning Agent Duncan to support this mitigating factor -- evidently without consulting Bartolomei beforehand. Williams's failure to coordinate with Bartolomei manifested itself in Halsey's unwittingly damaging testimony, volunteered on direct, that she was surprised to hear that Mitchell's crimes might have been alcohol-related because she had not known him to drink alcohol. (ER 1029.)

Moreover, Sears's opening and closing statements bore little relation to the testimony they bookended. Sears did not mention intoxication in his opening, and he made only passing reference to Mitchell "drinking hard" in closing, which he qualified by noting that the government had cast doubt on Mitchell's access to alcohol. (ER 1080.) Sears's closing barely touched on the "life worth saving" and "family of educators" themes, except to say that Mitchell had once been a "good" person and that "maybe" Mitchell could help someone who was going to be released from prison or have a book written about him. (ER 1083, 1085.) Sears actively undercut the mitigation value of Mitchell's grandmother's testimony by mocking her recounting of her resume, which was presumably important to the "family of educators" theme. (ER 1084.) While Sears stated in his post-conviction deposition that counsel had presented social history evidence (ER 4144-4145), in actuality he raised and rejected Mitchell's troubled childhood

as a mitigating factor virtually in the same breath when he said, "That's an awful way to send somebody out into the world. But people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

This sort of incoherent penalty-phase presentation resulting from "role confusion" "can only be characterized as a deficiency in trial preparation, not a strategic decision." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998). At bottom, this deficiency in trial preparation and the deficient selection of penalty-phase strategy that preceded it can be traced back to counsel's decision to "abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

#### a. Counsel's Failure to Investigate the Wide Range of Potentially Mitigating Evidence at the Penalty Phase Constituted Deficient Performance.

Counsel's deposition testimony evinces a fundamental misunderstanding of what constitutes relevant mitigation evidence in the first place. Williams thought only insanity, brain damage, or chronic physical and sexual abuse would constitute fruitful mitigation. (ER 3939.) But "all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level." *Wallace v. Stewart*, 184 F.3d 1112, 1117 n.5 (9th Cir. 1999); *see also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (under Eighth Amendment, capital sentencer cannot refuse to consider any relevant mitigating evidence). This misconception likely explains why Mitchell's counsel clashed with the mitigation specialist and consulting death-penalty lawyers as to whether there was "no mitigation" in Mitchell's case. This cramped view of mitigation evidence led to counsel's failure

to "fulfill their obligation to conduct a thorough investigation of the defendant's background" for relevant information that could be presented at the penalty phase. *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also* ABA 1989 Death Penalty Guidelines 11.4.1 (penalty-phase investigation "should comprise efforts to discover all reasonably available mitigating evidence"); *Wiggins*, 539 U.S. at 524 (citing ABA Guideline 11.4.1 as evidence of "well-defined norms" of mitigation investigation). The mitigation investigation was also hindered by the very little time counsel spent visiting Mitchell, totaling about 48 hours and averaging about 3 hours per month, which "indicates that there was little direct exchange of information" between them and their client, "and little opportunity . . . to develop the necessary rapport" to represent him in the penalty phase. *Johnson v. United States*, 2012 WL 992109, at *1 n.3.[18] Mitigation specialist Ockenfels spent about eleven hours with Mitchell, barely more than the 10.2 hours found inexcusably low in *Johnson*. *Id.*

This misunderstanding of mitigating evidence carried over into counsel's unreasonable decision to curtail investigation into Mitchell's substance abuse, mental health issues, and social history. This Court has repeatedly emphasized that the broad scope of relevant mitigating evidence necessitates a different, and more thorough, investigation at the penalty phase than at the guilt phase. In *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004), this Court held that trial counsel was not constitutionally ineffective for failing to raise petitioner's drug

[18] In *Johnson*, a federal death-penalty case, counsel spent a total of 114.3 hours visiting their client over the course of 64 months, including a period of time before the filing of capital charges. 2012 WL 992109, at *1 n.3. In granting Section 2255 penalty-phase relief, the district court cited the client contact records as evidence of "Johnson's alarmingly dysfunctional defense team." *Id.* at *1 & n.3.

use at the guilt phase, in accordance with the petitioner's wishes. *Id.* at 719 n.7. Yet it granted an evidentiary hearing on penalty-phase ineffectiveness because it concluded that "[t]he penalty phase . . . is another matter. There, no tactical or strategic reason explains why [counsel] would have failed to investigate or provide evidence of [petitioner's] drug use." *Id.* Similarly, this Court has "cautioned that in presenting a penalty phase mitigation defense based on mental health, counsel should not merely rely on competency evaluations conducted at the guilt phase, which are prepared for a different purpose." *Summerlin v. Schriro*, 427 F.3d 623, 642 (9th Cir. 2005) (en banc). "A defendant who is mentally competent for trial may nonetheless suffer a mental illness that is severe enough to mitigate his culpability." *James v. Ryan*, __ F.3d __ , 2012 WL 639292, at *33 (9th Cir. Feb. 29, 2012) (amended op.). In other words, even if counsel reasonably foregoes an intoxication or mental-health defense at the guilt phase, they must reassess the value of such evidence at the penalty phase. Here, that did not happen.

Counsel claimed that they made a strategic decision to stop investigating Mitchell's history of substance abuse in light of his denials of intoxication on the day of the crimes and their desire to focus on Mitchell's positive attributes and lack of direct responsibility for the murders. These claims of informed strategy fail for three reasons. First, a proper understanding of the mitigating potential of intoxication and addiction evidence would have led competent counsel to expand their investigation of substance abuse beyond Mitchell's intoxication on the day of the crimes. Regular use of addictive substances in high doses can be relevant to the statutory mitigator of impaired capacity. *Correll v. Ryan*, 539 F.3d 938, 955 (9th Cir. 2008). But the jury was also instructed on a catchall mitigation factor on "other factors in Mitchell's childhood, background, record, character, or any other circumstance mitigated against a death sentence." (ER 981-982.) This Court has

held that "drug use from an early age" is "an important mitigating factor" at the penalty phase even if the evidence is insufficient to show that a defendant "lacked the requisite mental state for the crime." *Frierson*, 463 F.3d at 993. Therefore, investigation of Mitchell's history of substance abuse would be relevant not only to the statutory mitigator of impaired capacity but also to mitigation not rising to the level of impaired capacity -- a point that the district court failed to consider when faulting the post-conviction declarations for not including "specific information about any substances [Mitchell] consumed on the day of or before the offense." (ER 52.) But counsel did not pursue Ockenfels's suggestion of consulting a psychopharmacologist, nor did they interview the other residents of the Nakai house, who could have informed them of the quantity and nature of alcohol and drugs Mitchell was abusing on a regular basis before the offenses.

Second, counsel simply could not have made an informed strategic decision not to present evidence of substance abuse when their underlying investigation was itself unreasonable. *Wiggins*, 539 U.S. at 523. As described above, *supra* pp. 52-53, counsel unreasonably failed to interview available witnesses who could speak not only to Mitchell's substance abuse before and after the offenses, but also to the wide availability of bootleg alcohol in the area. As in the guilt phase, counsel limited their investigation of substance abuse to talking to their client and looking at evidence gathered by the FBI -- here, the memoranda of Mitchell's statements. Yet even though one of the statements indicated that Mitchell and Orsinger purchased liquor before going to the Gallup mall (ER 1902), counsel did not follow up on this lead by investigating the availability of alcohol in Gallup on Sundays, or the presence of bootleggers in the area who would sell to underage purchasers any day of the week. Counsel's unreasonably narrow focus on the family, teachers, and friends who had known Mitchell during his high-school days

distracted them from interviewing the people he was living with at the time of the offenses. Further, family members may be unreliable reporters of substance abuse, *see, e.g.*, *Frierson*, 463 F.3d at 994 n.12, especially when the family members who testified had not lived with Mitchell recently.

Third, counsel actively elicited evidence of Mitchell "drinking hard" from Agent Duncan at the penalty phase and therefore could not have made a reasonable strategic decision to curtail investigation of intoxication earlier. *See Wiggins*, 539 U.S. at 526. The district court thus clearly erred when it found that counsel made a strategic decision not to present any evidence of Mitchell's "drug and alcohol dependence" and "intoxication at the time of the crime" because those mitigation routes were not viable. (ER 55-56.) Unlike in the guilt phase, where the diminished-capacity instruction was denied for lack of supporting evidence, counsel succeeded in having the jury instructed on "impaired capacity," defined as "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1). Although the impaired-capacity instruction was requested late in the penalty phase, it undeniably formed one leg of counsel's mitigation strategy, and counsel therefore had every reason to keep pursuing evidence of intoxication and substance abuse. Again, the discrepancy between trial counsel's claimed strategy and the trial record reveals counsel's claim of tactical decision making to be a "*post hoc* rationalization." *Wiggins*, 539 U.S. at 526-27.

Because "chronic drug abuse itself evinces, as well as exacerbates, serious mental illness," *James*, 2012 WL 639292, at *25, counsel's deficient investigation of substance abuse tainted the equally inadequate investigation of Mitchell's

mental health. Counsel performed deficiently by not providing their psychiatric expert, Dr. Morenz, with information regarding Mitchell's history of substance abuse. The district court erroneously relied on *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) (as amended), to conclude that counsel had no affirmative duty to provide Dr. Morenz with background information unless he requested it. While this may be true at the guilt phase, the same is not true at the penalty phase, where "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002); *Wallace*, 184 F.3d at 1117 & n.5. "This duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Caro*, 280 F.3d at 1255. Counsel could not compile an accurate picture of Mitchell's mental health when Dr. Morenz was not provided with background information that he found crucial to a diagnosis. Further, failing to investigate a family history of mental illness because the Mitchells appeared to be "bright" and well-educated was itself unreasonable. (ER 4059, 4102.) Bobbi Mitchell's medical history makes clear that being educated and intelligent does not preclude crippling anxiety, depression, and obsessive tendencies, and the district court erred by finding that Bobbi had never been diagnosed with mental illness. (ER 46.) Counsel's inadequate investigation of the paternal side of Mitchell's family failed to uncover the fact that Mitchell's father died from alcoholism-related diseases at age 43, and that his criminal history was strongly linked to alcohol abuse, which could have provided a biological basis for Mitchell's addiction.

Counsel's social history investigation was also deficient. Although Mitchell's uncle Auska could have testified to the emotional and physical abuse in

the Mitchell family, and provided Section 2255 counsel with a vivid description of his violent, dysfunctional upbringing, Bartolomei thought that Auska "did not have a problem with his upbringing." (ER 4041.) Ockenfels's betrayal of Mitchell's mother's trust meant that her social history report lacked an important perspective on Mitchell's grandparents as caretakers, particularly Bobbi's mental-health issues and the accusations of incest and molestation against George. Because they failed to interview Bobbi's friends and colleagues, counsel did not learn that despite being an educator by profession, Bobbi was notoriously cruel to children. The Eighth Circuit, faced with a similar record of inadequate mitigation investigation in a capital Section 2255 case where counsel's videotaped interviews of relatives "did not delve into issues of abuse or family discord," but instead merely portrayed the defendant as "a good worker and a good person," recently remanded for an evidentiary hearing because the record did not conclusively establish that counsel's performance was competent. *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). Here, as in *Wiggins,* "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. Further investigation "would have destroyed the benign conception" of Mitchell's peaceful upbringing in a "family of educators." *Cf. Rompilla*, 545 U.S. at 391. And as for the evidence of abuse that Ockenfels did discover, even if counsel had strategic reasons for not presenting Ockenfels as a penalty-phase witness, "failure to investigate the abuse through other family members and witnesses was error of constitutional magnitude." *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002)

In short, counsel's failure to investigate and "to prepare evidence relating to his family history, mental health, and substance abuse problems resulted in an

egregious failure to uncover and present a raft of potentially compelling mitigation evidence." *Silva v. Woodford*, 279 F.3d 825, 850 (9th Cir. 2002). Counsel's purported tactical reasons for abandoning their investigation at an unreasonably early juncture do not hold up when viewed against the record. Counsel could not credibly voice a concern about opening the door to unflattering substance abuse evidence when they themselves tried to introduce evidence of intoxication at both phases of trial. Sears's stated unwillingness to provide "excuses" to a jury purportedly hardened by the events of September 11 is belied by his mention of Mitchell's "drinking hard" and "terrible, terrible" childhood in closing. (ER 1080, 1084.) Even setting aside the questionable relationship between the September 11 attacks and mitigation evidence relating to a defendant's troubled history, Sears had conducted voir dire on substance abuse issues, and at least three of those selected as jurors and alternates expressed especial sympathy for substance abusers or positive experiences with recovery from addiction. And any purported fear of introducing "double edge" evidence is contradicted by the fact that it was defense counsel who elicited evidence of the most serious act in Mitchell's limited criminal history, an uncharged robbery of Roessel's office, on direct examination in the penalty phase.

To the extent that counsel claimed that they chose the "life worth saving" argument because it was the only theory consistent with the "Lezmond didn't do it" defense, the Supreme Court's decision in *Wiggins* is instructive. In *Wiggins*, the Supreme Court noted that at the penalty phase, "direct responsibility" and traditional mitigation strategies are "not necessarily mutually exclusive." 539 U.S. at 535. Further, the Supreme Court found that Wiggins's counsel could not have formed a reasonable "strategic decision" to focus on their client's lack of direct responsibility for the murder, because their argument and evidence instead

reflected a "shotgun" approach to the sentencing proceedings that, "[f]ar from focusing exclusively on petitioner's direct responsibility," resulted instead in "a halfhearted mitigation case." *Id.* at 526. The *Wiggins* Court concluded that counsel's "partial presentation of a mitigation case suggest[s] that their incomplete investigation was the result of inattention, not reasoned strategic judgment." *Id.* at 534; *see also Detrich v. Ryan*, __ F.3d __, 2012 WL 1526132, at *15 (9th Cir. May 2, 2012) (same). Mitchell's penalty phase, likewise, was a mishmash of several "halfhearted" mitigation cases, including last-minute evidence of intoxication, a "life worth saving" presentation that hurt as much as it helped, vague social history evidence based on the testimony of lay witnesses like Roessel and Mitchell's grandmother, and closing argument that sought to establish the fact of Mitchell's "terrible" childhood by highlighting his grandmother's careerist tendencies. As in *Wiggins*, counsel's "incomplete investigation" of these multiple theories must be attributed to deficient performance, not strategic judgment, and the district court erred in concluding otherwise.

**b. In Addition to Being Unreasonable Because It Was Based on Deficient Investigation, Counsel's Chosen Mitigation Strategy Was Unreasonable In Itself.**

Counsel's penalty-phase presentation proves that "[c]ertain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." *Silva*, 279 F.3d at 846. Even assuming *arguendo* that counsel strategically decided to focus solely on a "life worth saving" mitigation strategy, that choice was unreasonable in light of the identity of the victims and how they died. This Court has held that "limiting the scope of a penalty phase presentation to evidence that the defendant is a good person who has done good deeds is, in and of itself, unreasonable where there is an extreme

unlikelihood that any testimony about the defendant's character would be sufficient to humanize him." *Hamilton v. Ayers*, 583 F.3d 1100, 1122 (9th Cir. 2009); *see also Correll*, 539 F.3d at 945 (describing "anemic strategy" of primarily seeking mitigation that would show that petitioner was a "good person" who had "done good deeds"). Similarly, "[i]t is difficult to imagine what kind of standard . . . would allow counsel to rely almost solely on testimony that [petitioner] was artistic and had academic potential to present a mitigating case, while failing to present *any* evidence of . . . substantial abuse to the jury for consideration in making a life or death determination[.]" *Karis*, 283 F.3d at 1139. Competent counsel could not have reasonably thought that testimony regarding Mitchell's academic potential, leadership abilities, willingness to help with chores, and educated family would be so compelling as to justify foregoing an in-depth presentation of their client's difficult childhood, mental health issues, and later descent into substance abuse. Counsel's claimed decision to focus on Mitchell's positive qualities was particularly deficient in light of Mitchell's decision to waive his penalty-phase appearance; as Bartolomei explained, it was important to showcase Mitchell's humanity by having him present as the mitigation witnesses spoke favorably about him. (ER 4073, 4099.)

Counsel indicated that they chose the "life worth saving" theme because it dovetailed with the "Lezmond didn't do it" defense presented at the guilt phase. Yet clinging primarily to a "lingering doubt" defense at the penalty phase, when the defense had conceded Mitchell's presence and the jury had just soundly rejected a similar defense at the guilt phase, was "not a viable option." *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). In *Johnson*, likewise, the district court granted Section 2255 relief because it concluded that where defense counsel had conceded the defendant's presence or participation in each of the five charged

murders, and conviction at the guilt phase was likely, "any reasonable counsel would have sought to explain and mitigate Johnson's presence and/or participation with evidence of her mental health and mental state *at the time of the offenses*," and that the failure to do so, if strategic, "was the worst strategic decision by any defense counsel that I have ever seen in my entire career." 2012 WL 992109, at *180. Mitchell's counsel made the same mistake in failing to introduce evidence of their client's substance abuse, mental illness, and cognitive impairments causing increased impulsivity, which may have been caused by traumatic brain injury and could have provided a mitigating explanation for his presence at and participation in the crimes. (ER 3152.)

Here, Mitchell's counsel thought it "pretty clear from the outset that [Mitchell's case] was going to be getting to the death phase" (ER 3936), but they did not adjust their penalty-phase strategy accordingly. Rather, Mitchell's counsel's devotion to the "mere presence" or "lingering doubt" defense led them to select the unreasonable strategy of seeking to avoid the gateway intent factors based on a misstatement of law. Counsel argued in closing that Mitchell was not death-eligible unless he had inflicted the fatal wounds. (ER 1079-1081). But as the government pointed out (ER 1088-1089), the defense's interpretation was not supported by the FDPA's text, as two of the gateway intent factors clearly do not require proof beyond a reasonable doubt that Mitchell was the actual killer. 18 U.S.C. § 3591(a)(2). Finally, by closing with a plea for mercy, after failing to present readily available mitigation evidence of the petitioner's "troubled childhood, his history of substance abuse, and his mental and emotional problems," counsel capped off the deficient presentation by making "essentially an argument against the death penalty in general to a jury that had at voir dire already indicated no opposition to the death penalty." *Ainsworth v. Woodford*, 268 F.3d

868, 875 (9th Cir. 2001)

**c. To the Extent That Counsel Tried to Put Issues of Mitchell's Social History and Substance Abuse Before the Jury, They Did So Deficiently.**

Mitchell's counsel compounded their deficient investigation and selection of mitigation theories by preparing and presenting those theories inadequately. "[T]he failure to prepare a mitigation witness adequately can render a penalty phase presentation deficient." *Hamilton*, 583 F.3d at 1121. Mitchell's penalty-phase witnesses met with counsel only briefly, usually for a few minutes on the day they were scheduled to testify, and these meetings mostly consisted of being shown photographs of the victims' bodies and being asked whether they still wanted to testify. *See Ainsworth*, 268 F.3d at 874 (noting defense counsel's ten-minute interview of mitigation witness as instance of "minimal preparation for the penalty phase proceedings"). Inadequate preparation of penalty-phase witnesses led to Roessel contributing to evidence in aggravation, and to Halsey undermining the impaired capacity defense that counsel had not yet decided to present. This lack of preparation also prevented counsel from eliciting information regarding Mitchell's deprived background, aside from some generalities regarding his "cold home" and failure to know "who he was." *See James*, 2012 WL 639292, at *26 (failure to prepare testimony of petitioner's adoptive mother resulted in "banal observations" about kindness to pets and cleanliness and failure to elicit testimony about chronic drug abuse). The inadequate investigation and preparation of penalty-phase witnesses is underscored by the fact that at least two of Mitchell's mitigation witnesses ended up testifying only because of a "chance meeting" with counsel when they accompanied other anticipated witnesses to interviews. *See Stankewitz*, 365 F.3d at 721.

Counsel's unreasonably limited investigation contributed to counsel's blunders in presenting evidence of intoxication at the penalty phase. Even before defense counsel belatedly sought an impaired-capacity instruction, one of the mitigation witnesses had expressed her skepticism that the crime was alcohol-related. And counsel was totally unprepared for Agent Duncan's testimony that he didn't believe that Mitchell had passed out from drinking because Gallup was a dry county, even though Duncan had already given identical testimony about alcohol sales in Gallup during the guilt phase. Because counsel had insufficiently investigated Mitchell's history of substance abuse, and had not interviewed the numerous witnesses who could testify to rampant bootlegging on the Navajo Reservation, they had no ready response to that point.

Counsel also failed to test Agent Duncan's theory that Mitchell could not have been drinking because he was later able to direct law enforcement to the site of the bodies -- a view adopted by the district court in ruling on Mitchell's Section 2255 motion. (ER 52.) However, prosecution witness Raushandal Combs had testified that he helped Mitchell and Orsinger return to the crime scene the day after the killings. (ER 765-768.) Thus, even under the government's theory of the case, Mitchell could have learned the route to Orsinger's uncle's property in Tsaile on this return trip. But counsel simply left the jury with the impression that not only was Mitchell sober at the time of the offenses, he had actively lied to law enforcement about it.

With respect to social history evidence, Mitchell's counsel, like defense counsel in *Wiggins*, primed jurors to hear evidence of a "difficult life" but then failed to introduce any substantial evidence of his life history. 539 U.S. at 515, 526, 536. This Court has found deficient performance where "counsel knew of his client's difficult life, had the opportunity to present mitigating evidence, and

squandered it." *Hendricks*, 70 F.3d at 1045. Counsel's "cursory or 'abbreviated' presentation" of Mitchell's troubled background, based on passing references to Mitchell's "cold home" and not knowing "who he was," did not discharge their constitutional duty of effective assistance. *Lambright*, 490 F.3d at 1120. In particular, it was unreasonable to argue in closing that Mitchell had an "awful" childhood primarily by undermining their own presentation of the videotaped testimony of Mitchell's visibly ill grandmother, who had spoken about Mitchell's good qualities and asked the jury to spare her grandson's life. Yet that is exactly what Sears did, criticizing the grandmother for discussing her resume when she was merely responding to co-counsel Bartolomei's line of questioning. (ER 1084.) It was also unreasonable for Sears to jettison the social history mitigation altogether by saying that "people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

The wording of the mitigating factors presented to the jury exemplifies the unfocused and deficient nature of Mitchell's penalty-phase presentation. Capital sentencing juries "must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual[.]" *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "[I]t follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence[.]" *Johnson*, 2012 WL 992109, at *168. But most of the mitigating factors submitted to the jury in Mitchell's case simply tracked the FDPA's statutory language and failed to provide this necessary guidance to the jurors. For instance, the verdict form asked the jury to find "impaired capacity," even though Sears never mentioned the term "impaired capacity" when referring

to Mitchell's drinking in closing. (SER 451, 460, ER 1080.) It is also telling that counsel never submitted a mitigating instruction pertaining to the Navajo Nation letter, and that seven jurors had to write in this factor themselves. (SER 452, 460.) Despite their claimed reliance on a mere presence defense, counsel did not request a mitigating factor on "relatively minor" participation. 18 U.S.C. § 3592(a)(3). This haphazard assortment of mitigating factors, in conjunction with a penalty-phase presentation filled with false starts, constituted deficient performance.

**2. *Mitchell Was Prejudiced by Counsel's Failure to Competently Investigate, Prepare, and Present Mitigating Evidence.***

"Prejudice is established if 'there is a reasonable probability that at least one juror would have struck a different balance' between life and death." *Hamilton*, 583 F.3d at 1131 (internal quotation marks and citation omitted). Whether "a jury could have heard it all and still have decided on the death penalty . . . is not the test." *Rompilla*, 545 U.S. at 393. Therefore, "it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll*,539 F.3d at 951-52. Because the decision to impose a death sentence "is not an ordinary legal determination which turns on the establishment of hard facts" and is instead "a uniquely moral decision in which bright line rules have a limited place," this Court undertakes the prejudice inquiry with regard to "the law's sensitivity to failures in the penalty phase of a death penalty case." *Hendricks v. Calderon*, 70 F.3d at 1044.

In assessing prejudice, this Court must "evaluate the totality of the evidence -- 'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98). For this reason, counsel's presentation of "what could be described as a

superficially reasonable mitigation theory during the penalty phase," such as the "life worth saving" theme put forth by Mitchell's counsel, does not foreclose relief. *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (per curiam). This Court must necessarily "'speculate' as to the effect of the new evidence -- regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears*, 130 S. Ct. at 3266-67. Further, even if a theory is reasonable "in the abstract," that "does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the defendant. *Id.* at 3265.

As discussed above, *supra* pp. 67-68, the mitigation evidence adduced at trial was "anemic" at best and damaging at worst. Such "humanizing, rather than explanatory mitigation evidence," which "consisted primarily of testimony that at some points in his life [petitioner] had been nice to some people and that some people cared for him," is of limited mitigation value in the face of extensive aggravating circumstances. *Allen v. Woodford*, 395 F.3d 979, 1007 (9th Cir. 2005); *see also Hovey v. Ayers*, 458 F.3d 892, 930 (9th Cir. 2006) (finding prejudice at penalty phase when petitioner's mitigation case rested largely "on the unremarkable testimony of his family and friends that he had been a well-meaning, introspective, and harmless young man"). Most of the defense's penalty witnesses, particularly the former teachers and coaches, had lost touch with Mitchell and had seen him at most once since his graduation in 2000, well before the crimes took place. Further, the defense's star penalty witness, Roessel, testified on direct that since he last saw Mitchell, the upstanding young man he used to know had betrayed his trust by burglarizing his office and stealing the shotgun used in the trading post robbery. Such testimony from witnesses whose knowledge of the defendant "was neither deep nor contemporaneous with his

crimes" was not mitigating. *Allen*, 395 F.3d at 1007.

Mitchell has shown prejudice from the fact that the federal habeas proceedings paint a "family portrait . . .far different from the unfocused snapshot" presented at trial. *Bean*, 163 F.3d at 1081. The penalty phase witnesses' isolated references to a "cold home" and "no love" barely skimmed the surface of Mitchell's dysfunctional family history, which was punctuated by abandonment, physically and verbal abusive caretakers, and persistent allegations of incest and child molestation. In *Douglas*, this Court found prejudice where counsel introduced some social history, but only in "a cursory manner that was not particularly useful or compelling." 316 F.3d at 1090. Further, counsel's vague social history argument "lacked force without some expert testimony to back it up." *Id.* Although Roessel stated Mitchell was "a person who didn't know who he was" (ER 999), he had difficulty explaining this concept on cross: as a lay witness he lacked not only deep knowledge of Mitchell's family history but also the education and training in psychology, child development, and/or mental health to present these issues in a compelling and informed manner to the jury. Mitchell's penalty-phase defense thus suffered from counsel's failure to present a forensic psychologist or similar social history expert, as Ockenfels recommended, despite Bartolomei's representation to the district court that the defense would likely do so.

Mitchell was further prejudiced by counsel's ineffectual investigation and presentation of substance abuse and related mental health evidence. In *Allen*, this Court contrasted "humanizing" evidence, amounting to testimony that the petitioner "could be pleasant," with more potent evidence that "portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur." *Id.* at 1005,

1007. It is indisputable that counsel made a belated attempt to introduce impaired capacity as a mitigating factor. Yet the sum total of substance abuse evidence before the jury was a couple indications that Mitchell used marijuana, Halsey's volunteered statement on direct that she had not known Mitchell to use alcohol, and Agent Duncan's testimony that while Mitchell had told the FBI of heavy drinking and blackouts on the day of the crimes, Duncan didn't credit this information because Mitchell was able to lead law enforcement to the bodies, and because Gallup was located in a county where alcohol sales were prohibited on Sundays. Counsel's deficient investigation and presentation prevented them from rebutting Duncan's testimony and bolstering the sparse evidence of substance abuse with testimony from Mitchell's associates at the Nakai house, who had witnessed firsthand his escalating drug use in the weeks before the crimes, and documentary evidence of Mitchell's longstanding abuse of alcohol and drugs.

Mental health evidence tying together Mitchell's despair and increased drug use in the months before the murders could also have changed the outcome of the penalty phase. In closing, Sears argued that "something happened" to transform Mitchell from a respectful and nonviolent young man with a "life worth saving" to a defendant in a capital trial. But instead of providing the jury with a convincing narrative of post-graduation unemployment and drifting verging on homelessness, relapse into depression, and escalating substance abuse, Sears effectively threw up his hands and told the jury that he had no explanation for the change in Mitchell because "people come from bad backgrounds all the time and never get involved in anything like this." (ER 1083-1084.) In *James*, this Court found prejudicial counsel's limiting of intoxication evidence at the penalty phase to drug use at the time of the offenses, reasoning that had counsel "developed evidence of James's long-term drug use, he could have presented a coherent account of James's

emotional and psychological deterioration during 1981, fueled by drug abuse, that culminated in Maya's murder." *James*, 2012 WL 639292, at *34. In *James*, there was a significant disparity between the "meager mitigation evidence" actually presented at trial and the "detailed picture of [petitioner's] troubled childhood, his mental illness, and his downward spiral of depression and drug abuse in the year before [the] murder" developed by federal habeas counsel. *Id.* at *26. Mitchell's counsel not only failed to provide a much-needed "coherent account" of his "downward spiral"; they actively pointed out that an explanation for the brutal crimes was lacking.

In contrast to the defense's broken promise of explaining "Lezmond's life up to those fateful days in October of 2001" (ER 984), the mental health evidence marshaled by Section 2255 counsel could have contributed to the jury's understanding of Mitchell's character and conduct. Dr. Morenz was unaware of Mitchell's long history of substance abuse, and he stated that this additional information could have changed his diagnosis because Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered." (ER 3598.) Although the district court dismissed Dr. Morenz's post-conviction declaration as "highly equivocal" (ER 52), it is no more equivocal than expert opinions in cases where petitioners have been granted relief or an evidentiary hearing, and the district court erred in disregarding it. *See Stanley v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010); *see also United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993) ("Experts ordinarily deal in probabilities, in "coulds" and "mights." . . . . It is the rare expert who is willing to opine conclusively about a past occurrence."). The district court also erred in completely discounting the mitigation value of Mitchell's executive functioning deficits. (ER 56.) *See Detrich*, 2012 WL 1526132, at *17, *21

(holding that evidence of "mild neuropsychological deficits" "would have added significant mitigating weight" by explaining "both the mindset that led [petitioner] to commit this crime and the cause of that mindset"). In addition, Dr. Stewart's report, which diagnosed Mitchell with Posttraumatic Stress Disorder, Substance Dependence, and Substance-Induced Psychotic Disorder at the time of the offenses, would have provided the jury with the explanatory missing link between Mitchell's prior positive contacts with family, friends, and teachers, and his more recent association with Orsinger and the Nakais and his conduct in this case. (RT 3419.)

Further, the district court erred by considering Morenz's mental health evidence only insofar as it established the statutory mitigator of impaired capacity. (ER at 51-52, 55.) The Supreme Court has held that even if mental health expert testimony falls short of establishing a statutory mitigator, a habeas court must consider the evidence's relevance to nonstatutory mitigation and should not "discount entirely the effect that his testimony might have had on the jury[.]" *Porter v. McCollum*, 130 S.Ct. 447, 455 (2009). Similarly, this Court has noted that "even where the facts discovered on habeas review do not rise to the level of statutory mitigation, we have held that a reasonable probability existed that this information could have affected the sentence." *Correll*, 539 F.3d at 952. In *Douglas*, this Court held that even if evidence of serious mental illness and possible organic impairment "were not enough to negate an element of the underlying offense, it could have invoked sympathy from at least one member of the jury at the penalty phase, particularly when considered in connection with additional sociological history evidence discussed above." 316 F.3d at 1090.

The fact that the social history or mental health evidence may have revealed unfavorable, as well as favorable, information does not lessen its mitigating effect.

The district court cited evidence of Mitchell's behavioral problems and animal abuse in Ockenfels's and Morenz's reports. (ER 56-57.) However, the district court erroneously concluded that counsel could not have presented Mitchell's social history without disclosing the damaging information in Ockenfels's report. (ER 56.) Ockenfels's draft social history report was prepared for counsel's eyes only, and Sears testified that he typically did not call the mitigation specialist as a witness. (ER 3309, 4152.) In *Karis*, this Court held that while it was reasonable not to a call a mental health expert as a penalty-phase witness because there was damaging evidence in the expert's report, the failure to investigate and present "the highly relevant information of an abusive childhood" through other witnesses was prejudicial, because "[a] 'reasonable probability' exists that a jury would find this information important in understanding the root of Karis's criminal behavior and his culpability." 283 F.3d at 1136, 1141. Similarly, although Herring's neuropsychological findings were included in Morenz's report, counsel could have called Herring herself to testify to the results of her testing, without opening the door to other information in Morenz's report. (ER 3167-3168.)

In any event, so-called damaging evidence can be "dehumanizing or mitigating," depending on the context given for the fact. *Correll*, 539 F.3d at 954 n.8, 955. And the Supreme Court has stated that "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive -- perhaps in support of a cognitive deficiency mitigation theory." *Sears*, 130 S. Ct. at 3264 (per curiam). In *Sears*, the Supreme Court concluded that while evidence of petitioner's "profound personality disorder" "might not have made [him] any more likable to the jury, . . . it might well have helped the jury understand [him], and his horrendous acts -- especially in light of his purportedly stable upbringing." *Id.* at 3264; *see also Smith v. Stewart*, 140 F.3d 1263, 1269-71 (9th Cir. 1998)

(antisocial personality and long history of drug use are mitigating). That Mitchell reacted to his unsettled and abusive childhood by acting out in school, forming a three-person "gang" with his friends in middle school to make up for his lack of a stable family, and abusing animals when "high" is completely consistent with a mitigation presentation that placed Mitchell's antisocial and violent conduct in the context of his troubled childhood and substance abuse. (ER 3116, 3119, 3129-3130.)

In short, the type of social history, substance abuse, mental health, and cognitive ability evidence counsel failed to present is "precisely the type of evidence [this Court has] found critical for a jury to consider when deciding whether to impose a death sentence." *Douglas*, 316 F.3d at 1090. A defendant's "troubled history" is "relevant to assessing a defendant's moral culpability," *Wiggins*, 539 U.S. at 535, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*,536 U.S. 304 (2002) (internal quotation marks and citation omitted). Although this mitigation evidence might not have directly countered the aggravating factors alleged by the prosecution, it still could have affected the sentence imposed. "Mitigation evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

"Heinous crimes do not make mitigating evidence irrelevant." *Hovey*, 458 F.3d at 930 (finding deficient performance at penalty phase prejudicial in case where petitioner kidnapped and killed eight-year-old girl and kidnapped another

young girl). To the contrary, this Court has "held consistently that even in cases involving particularly heinous murders, a defendant can be prejudiced by an attorney's failure to investigate and present mitigating evidence." *Lambright*, 490 F.3d at 1127; *see also James*, 2012 WL 639292, at *36 (finding deficient performance at penalty phase prejudicial in spite of petitioner's commission of "appalling" hate crime); *Silva*, 279 F.3d at 828, 849 (finding deficient performance at penalty phase prejudicial in case involving "undeniably horrific circumstances" and "gruesome abduction, robbery, and murder"); *Smith*, 189 F.3d 1004, 1013-14 (9th Cir. 1999) (finding deficient performance at penalty phase prejudicial despite "horrific nature" of petitioner's crimes, which involved killing of two teenage hitchhikers); *Johnson*, 2012 WL 992109, at *3, *206 (granting penalty-phase relief in Section 2255 case involving convictions for murders of five victims, including two children).

Indeed, this Court has held that "prejudice is 'especially likely'" when the circumstances of the instant crime -- as opposed to a long and violent criminal history -- "constituted the vast majority of the aggravation case." *Earp v. Ornoski*, 431 F.3d 1158, 1180 (9th Cir. 2005) (as amended) (internal citation omitted). The prosecution's reliance on the guilt-phase evidence and victim-impact testimony at the penalty phase show that the circumstances of the instant crime, rather than aspects of Mitchell's criminal history, constituted the entirety of the aggravation case. Indeed, all of the jurors found that Mitchell's lack of a significant prior criminal record was a mitigating factor. (ER 1097.) Although the jury did not hear of Mitchell's minor prior contacts with law enforcement, he "does not have a record of violent conduct that could have been introduced . . . to offset [a] powerful mitigating narrative." *Wiggins*, 539 U.S. at 537; *see also Bean*, 163 F.3d at 1081 (prior burglary conviction and altercation in which petitioner allegedly

fired shotgun were "scant evidence of aggravating factors"). Specifically, nothing in Mitchell's criminal history suggested "a proclivity for violence against adult, male prisoners or prison personnel, were he sentenced to life without parole instead of death." *Hovey*, 458 F.3d at 930. *Cf. Wong v. Belmontes*, 130 S. Ct. 383, 389 (2009) (per curiam) (finding no prejudice because mental state mitigation evidence would have opened the door to evidence that defendant had committed another murder).

Other aspects of Mitchell's case indicate that the outcome of the penalty phase was far from a foregone conclusion. The Arizona United States Attorney's Office did not recommend seeking the death penalty. Rather, the capital prosecution was required by then-Attorney General John Ashcroft. (ER 3075.) *Cf. Summerlin*, 427 F.3d at 641 (fact that initial prosecutor offered plea agreement to lesser sentence "is indicative of the fact that this was not a clear-cut capital case"); *James*, 2012 WL 639292, at *36 (same). In addition, the Attorney General of the Navajo Nation had asked the federal government not to seek the death penalty in Mitchell's case -- which involved a crime committed on the Navajo Reservation, as well as Navajo victims and defendants -- a fact that seven jurors found mitigating. (ER 969; SER 452, 460.) Shortly after trial, Marlene Slim, Slim's daughter and Doe's mother, testified before the Public Safety Committee of the Navajo Nation Council that she had asked the federal prosecutor to seek a sentence of life without parole, and that her request was "ignored and dishonored." (ER 3741.)

The length of deliberations and serious proportionality argument further demonstrate a reasonable probability that a competent penalty-phase presentation, backed by thorough investigation, could have prevented Mitchell from being sentenced to death. Mitchell's jury deliberated for a day and a half before

returning its penalty-phase verdict. (ER 42.) *See Mayfield v. Woodford*, 270 F.3d 915, 932 (9th Cir. 2001) (en banc) (holding it reasonably probable that result of penalty phase would have been different absent counsel's deficient performance due in part to "the duration of the jury's deliberations," which was four hours plus one full day); *see also Mayes v. Gibson*, 210 F.3d 1284, 1290 (10th Cir. 2000) (fact that jury deliberated for over six hours indicated its uncertainty about death penalty). The jury also unanimously found it mitigating that Orsinger, who was equally culpable, would not be sentenced to death. (ER 1097.) The fact that Orsinger's juvenile status rendered him statutorily ineligible for the death penalty despite his convictions for two carjackings resulting in deaths and four first-degree murders presented a strong proportionality argument against the death penalty for Mitchell, who was barely out of his teens at the time of the offenses. *See Silva*, 279 F.3d at 849 (considering the fact that accomplice was sentenced to life without parole despite being convicted of additional murder as factor in prejudice analysis).

Prejudice also arose because the deficient mitigation performance was "probably actually harmful" to Mitchell's penalty-phase presentation. *Duncan*, 528 F.3d at 1246 (internal quotation marks and citation omitted). The "life worth saving" theory was not only weak on its own terms, but also gave the prosecution more fodder for closing argument by emphasizing that Mitchell was reared in a "family of educators." As in *Sears*, "[t]he prosecutor ultimately used the evidence of [a] purportedly stable and advantaged upbringing against him during the State's closing argument." 130 S. Ct. at 3262; *see also Boyde v. Brown*, 404 F.3d 1159, 1178 (9th Cir. 2005) ("The jury, left to wonder how Boyde learned to commit such violent acts, could not look to his childhood as an explanation -- his parents' testimony and counsel's deficiency took care of that -- but must instead have

concluded that he grew violent *despite* his childhood.") And as in *Karis*, defense counsel's portrayal of Mitchell "as intelligent without any indication of his violent and abusive childhood afforded the prosecution a very effective argument." 283 F.3d at 1139. Finally, the defense's last-minute attempt to establish the impaired-capacity mitigator solely through Agent Duncan resulted in nothing more than allowing the case agent to testify that he didn't believe Mitchell's account of drinking. (ER 1037.)

"[B]oth this court and the Supreme Court have consistently held that counsel's failure to present readily available evidence of childhood abuse, mental illness, and drug addiction is sufficient to undermine confidence in the result of a sentencing proceeding, and thereby to render counsel's performance prejudicial." *Lambright*, 490 F.3d at 1121. Mitchell's counsel, inexperienced and confused regarding the proper scope of mitigation in a capital case and blinded by the educational credentials of Mitchell's otherwise neglectful and abusive caretakers, failed to investigate and present such classic mitigation evidence at trial. Because there is a reasonable probability that at least one juror would have struck a different balance between life and death had such information been presented, this Court should reverse the judgment of the district court and remand with instructions to grant the writ with respect to Mitchell's death sentence.

## PROCEDURAL ISSUES

### C. THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING AN EVIDENTIARY HEARING ON THE CERTIFIED CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL IN THIS CAPITAL CASE.[19]

At a minimum, this Court should remand for an evidentiary hearing on Mitchell's claims in district court. Pursuant to statute, a district court "shall" grant "a prompt hearing" on a Section 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). An evidentiary hearing is required where petitioner has "made specific allegations that, if true, state a claim on which relief could be granted" *Leonti*, 326 F.3d at 1116 (internal citation marks and citation omitted); *see also United States v. Chacon-Palomares*, 208 F.3d 1157, 1159 (9th Cir. 2000) (granting evidentiary hearing where allegations "might establish a right to relief"). In other words, denial of an evidentiary hearing is proper only when a petitioner's allegations, "viewed against the record, either do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989); *see also United States v. Baumann*, 692 F.2d 565, 571 (9th Cir. 1982) (holding that a Section 2255 "hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims"). This Court has described this showing as a "low threshold," *Howard*, 381 F.3d at 883, and has granted a

---

[19] The district court's certificate of appealability certifies only the merits of the ineffective assistance of counsel claims raised in Claims A, C, and D. (ER 72.) However, because this Court must resolve whether the district court erred in not granting an evidentiary hearing on these claims before determining their merits, "the COA encompasses [petitioner's] claim challenging the denial of the evidentiary hearing." *United States v. Howard*, 381 F.3d 873, 877 n.3 (9th Cir. 2004).

hearing even when "it appears quite improbable that [petitioner's] motion is in fact meritorious." *Lopez v. United States*, 439 F.2d 997, 999 (9th Cir. 1971).

An evidentiary hearing was also required because Mitchell's claims of ineffective assistance necessarily depend in large part on occurrences outside the courtroom, and thus outside of the record and district court's recollection. *See Burrows*, 872 F.2d at 917 ("An evidentiary hearing is usually required if the motion states a claim based on matters outside the record or events outside the courtroom."); *Baumann*, 692 F.2d at 581 (remanding for Section 2255 evidentiary hearing where "claim of ineffective assistance of counsel relate[d] to events which, by definition, occurred outside the trial courtroom"). When the alleged claim involves ineffective assistance of counsel, the district court must hold an evidentiary hearing "unless something in the record conclusively shows that [counsel] was not ineffective." *Burrows*, 872 F.2d at 917. For the reasons stated above, the record does not conclusively show that counsel was not ineffective. Although counsel claimed that strategic choices underlay their decision to forego a diminished capacity defense and to focus only on a "life worth saving" mitigation case, and the district court credited these claims (ER 55), the trial record reveals that counsel in fact tried to present evidence of intoxication at both phases of trial and raised vague aspects of Mitchell's social history at the penalty phase. These major discrepancies, standing alone, warrant a hearing. Without holding a hearing, the district court also resolved a number of other important factual disputes based on the paper record alone: (1) whether Mitchell was intoxicated at the time of the offenses (ER 22 & n.6, 52); (2) whether Mitchell's mother stopped cooperating through no fault of the defense team (ER 44); (3) whether counsel adequately investigated the paternal side of Mitchell's family (ER 44 n.12); (4) whether Mitchell's grandmother was ever diagnosed with mental illness (ER 46);

(5) whether psychologist Dr. Parrish did not prepare a report because she diagnosed Mitchell as sociopathic, or because she was only consulting (ER 46); (6) whether counsel supplied Dr. Morenz with adequate background information (ER 48); (7) whether Dr. Morenz asked Mitchell if he was intoxicated at the time of the offenses. (ER 50); and (8) whether Orsinger failed to provide sufficiently specific information regarding the drugs and alcohol he and Mitchell ingested before the offenses (ER 52).

Applying these standards, the Eighth Circuit has remanded two capital Section 2255 cases for evidentiary hearings. For instance, in *Sinisterra*, the Eighth Circuit held that an evidentiary hearing on petitioner's claim of ineffective assistance of counsel at the penalty phase was required where the record "does not affirmatively refute the factual assertions underlying the claims," "does not conclusively show that Sinisterra's attorneys acted within the range of competence demanded of attorneys in criminal cases," and "does not affirmatively refute Sinisterra's claim that he suffered prejudice as a result of the alleged ineffective assistance of counsel." 600 F.3d at 907. In *Sinisterra*, the district court did not hold an evidentiary hearing but, similar to here, instead directed the petitioner's trial attorneys to submit affidavits regarding the ineffectiveness claims. *Id.* at 905. Sinisterra's attorneys had presented live mitigation witnesses at the penalty phase, as well as videotaped interviews with Sinisterra's family in Colombia, but presented no evidence of Sinisterra's mental health, capacity, or abusive childhood. *Id.* at 904-05. In *United States v. Nelson*, 297 Fed. Appx. 563 (8th Cir. 2008) (unpublished op.), another federal death penalty case, the Eighth Circuit remanded for an evidentiary hearing on several claims of ineffectiveness of counsel, including allegations of failing to conduct adequate mitigation and mental health investigation, because "issues regarding the ineffectiveness of counsel often

require a hearing to consider evidence not disclosed on the face of the trial record." *Id.* at 565. The Eighth Circuit concluded that "a fair and just determination" of some of Nelson's ineffective assistance of counsel claims "required an evidentiary hearing to be held." *Id.*

This emphasis on district court fact development underlies the Supreme Court's decision in *Massaro v. United States*, 538 U.S 500 (2003), which holds that an ineffective assistance claim may always be brought in Section 2255 proceedings even if not raised on direct appeal. *Id.* at 509. The *Massaro* Court reasoned that "ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Id.* at 505. Therefore, the Supreme Court envisioned a procedure under which the district court "may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance." *Id.* As the Supreme Court has explained, "[w]here an unresolved factual dispute exists, demeanor evidence is a significant factor in adjudging credibility. And questions of credibility, of course, are basic to resolution of conflicts in testimony." *Townsend v. Sain*, 372 U.S. 293, 322 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992). Here, the district court apparently credited counsel's claims of strategy, even though these claims conflicted with the trial record as to which defenses were actually presented at the guilt and penalty phases. It was error for the district court to resolve these claims "without taking the opportunity to listen to [the attorneys], test [their] story, and gauge [their] demeanor." *Earp*, 431 F.3d at 1169-70. Deciding ineffective assistance claims purely on the basis of counsel's deposition testimony was not what the Supreme Court intended when it encouraged such claims to be brought in

Section 2255 proceedings in district court.

Unlike a capital Section 2254 petitioner, who has had an opportunity to develop the factual bases of his ineffective assistance claims in state court, Mitchell seeks his first opportunity to make a record in federal court. Under this Court's pre-AEDPA precedent, "in a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Karis*, 283 F.3d at 1127. This is still good law in Mitchell's case because AEDPA did not change the standard for granting evidentiary hearings in Section 2255 proceedings. *Teti v. Bender*, 507 F.3d 50, 61 n.4 (1st Cir. 2007) (citing 2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* § 41.6d (5th ed. 2005)). In *Stanley*, a Section 2254 case, this Court explained that it was granting an evidentiary hearing on a "colorable" claim of ineffective assistance in a capital case, stating, "We simply cannot in good conscience continue to send men to their deaths without ensuring that their cases were not prejudiced by inadequate legal representation at any phase of the proceedings." 598 F.3d at 615. Likewise, Mitchell's death sentence should not be affirmed solely on the basis of counsel's depositions, which contradict each other and the trial record, as his claims of ineffective assistance are at least sufficiently colorable to warrant full factual development at a hearing.

## D. THE DISTRICT COURT ERRED BY NOT PERMITTING MITCHELL'S SECTION 2255 COUNSEL TO INTERVIEW THE TRIAL JURORS IN HIS CASE.

### Standard of Review

This Court generally reviews the district court's application of a local rule for abuse of discretion. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). However, to the extent the district court's decision implicated questions of

statutory interpretation and constitutional law, this Court should review the denial of juror interviews de novo. *Cf. United States v. Ward*, 989 F.2d 1015, 1016 (9th Cir. 1992); *United States v. Kohl*, 972 F.2d 294, 297 (9th Cir. 1992).

**Discussion**

**1. *Mitchell's Request for Leave to Interview the Trial Jurors***

Prior to filing Mitchell's Section 2255 motion, federal habeas counsel moved for authorization to interview the jurors in his case. (CR 1.) Leave of court was required pursuant to a District of Arizona rule that prohibits attorneys from contacting jurors after trial unless they submit written interrogatories to the district court "within the time granted for a motion for a new trial"[20] and show "good cause" for the interview. D. Ariz. Loc. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2. The government opposed the motion. (CR 18.)

The district court denied Mitchell's request to interview the trial jurors on two grounds. First, it indicated that Mitchell had not followed the local rule's procedures regarding submitting proposed interrogatories and an affidavit, and filing within the time granted for a motion for a new trial. (ER 2.) Alternatively, the district court concluded that Mitchell had not shown "good cause" for contacting the jurors. (ER 2-3.)

**2. *Mitchell Has Shown Good Cause for Interviewing the Jurors.***

Several occurrences during Mitchell's capital trial constituted "good cause" for interviewing the jurors to ensure that they were not exposed to prejudicial extraneous information or outside influence. First, the jury indicated an

---

[20] At the time of Mitchell's trial, the time for filing a motion for a new trial was generally seven days after the verdict, or three years if the motion for a new trial is "grounded on newly discovered evidence." Fed. R. Crim. P. 33(b) (2002). The jury delivered its penalty-phase verdict on May 20, 2003, so the latest possible date for filing a motion for a new trial was May 20, 2006.

inclination toward independent research when they sent the district court a note asking, "Are we allowed to consult detailed maps of this location to familiarize ourself [sic] with the aspects of this case?" (ER 741.) Although the district court later admonished the jury not to conduct any independent research, it did not make a record as to whether any juror had already done so. (ER 776.) The next day, a juror asked the bailiff whether the jury could ask questions of the witnesses, another indication of the jury's desire to go beyond the evidence presented at trial. (ER 780.) The following week, defense counsel noted that a juror was looking into the courtroom while preliminary matters were being discussed, but no record was made as to what he or she might have heard. (ER 885.) This series of events justified post-conviction interviews to ascertain whether any juror had seen or heard any extrinsic or inadmissible information.

Second, juror L.M., who was ultimately selected as an alternate, reported that he heard three men talking about Mitchell's case in the courthouse. (ER 776, 946.) L.M. was not wearing his juror badge because he was on his way to the juror room. (ER 776.) Although L.M. told the district court he only heard the name of the case (ER 776), Mitchell was entitled to question not only L.M., but the other jurors, regarding possible extraneous information or outside influence they encountered while walking without their juror badges in the courthouse. In *United States v. Jackson*, 209 F.3d 1103 (9th Cir. 2000), a Section 2255 appeal, this Court ordered a hearing on a claim of possible jury tampering arising from a statement given by a juror to a defense investigator three years after trial. *Id.* at 1108. As here, the district court had questioned the juror about a threatening phone call during trial, and the juror said that he thought the call was unrelated to the trial. *Id.* at 1107-08. But his later statement expressed the belief that there was a "'fifty-fifty' chance that the threat came from a defendant." *Id.* at 1109. In spite

of -- indeed, because of -- the discrepancy between the juror's voir dire testimony and his subsequent statement to the defense investigator, this Court ordered a hearing to determine whether any juror's perception of possible jury tampering violated the defendant's Sixth Amendment right to a fair trial. *Id.* at 1110.

Finally, it was undisputed that members of the victims' family were wearing commemorative buttons during part of the trial.[21] (ER 904.) In *Norris v. Risley*, 878 F.2d 1178 (9th Cir. 1989), this Court ordered an evidentiary hearing at which jurors were called to testify as to whether they saw "Women Against Rape" buttons worn by spectators at trial or passed through the spectators "as they entered and exited the courtroom." *Id.* at 1183. If a hearing was warranted in *Norris*, Mitchell has at least shown good cause for the less burdensome and intrusive procedure of voluntary juror interviews.

**3. *Even if Mitchell Has Not Shown Good Cause, The District Court Erred by Rigidly Enforcing a Local Rule in Violation of the Rules Governing Section 2255 Cases, and the Fifth, Sixth, and Eighth Amendments.***

The Rules Governing Section 2255 Proceedings for the United States District Courts provide that "[t]he Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provision or these rules, may be applied to a proceeding under these rules." Rule 12, Section 2255 Rules. The accompanying Advisory Committee's Note refers to the analogous discussion in the commentary to Rule 12 of the Section 2254 rules, which explains that the rule

> permits the court considering the petition to use any of the rules of

[21] Mitchell's claim regarding these buttons can be found in the uncertified claims section of the brief, *infra* pp. 116-124.

> civil procedure (unless inconsistent with these rules of habeas corpus) when in its discretion the court decides they are appropriate under the circumstances of the particular case. The court does not have to rigidly apply rules which would be inconsistent or inequitable in the overall framework of habeas corpus.

Advisory Committee's Note to § 2254 Rule 12. Here, the district court erred by rigidly applying a local rule, not even a full-fledged Federal Rule of Civil or Criminal Procedure, to deny post-conviction counsel the opportunity to interview the trial jurors in Mitchell's case. By its terms, Local Rule 39.2(b) contains a time limit -- fourteen days in the usual case, three years in the case of newly discovered evidence -- that, as a practical matter, is virtually impossible for a capital Section 2225 movant to meet. Mitchell's direct appeal was not decided until September 5, 2007, 502 F.3d at 931, more than four years after the verdict in this case, and his petition for certiorari was not denied until June 9, 2008 (ER 1105-1106), more than five years after the verdict. Counsel on direct appeal has no incentive to request juror interviews because this Court "generally will not consider facts outside the record developed before the district court." *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (internal quotation marks and citation omitted). Just as Section 2255 proceedings, and not direct appeal, are the preferred forum for developing the extra-record facts necessary to support most ineffective assistance claims, *Massaro*, 538 U.S. at 504-06, claims of extraneous prejudicial information or outside influence arising from juror interviews require factual development and are therefore more efficiently litigated in collateral proceedings. And because any Section 2255 motion raising ineffective assistance of trial counsel is necessarily raised by successor counsel, it is unreasonable to expect the Section 2255 investigation to begin years before the case is final on direct review

and before successor counsel has even been appointed. Application of the local rule is thus "inconsistent or inequitable" in the Section 2255 context.

Application of the District of Arizona rule, with its "good cause" standard, is particularly inequitable in the Section 2255 context because the rule is an outlier, both in this circuit and in the nation at large. Of the 31 districts where there is currently a federal death sentence in place, at most six require a showing of good cause before counsel can contact jurors after trial; seventeen others require leave of court; and eight do not require leave of court for post-trial juror contact.[22] None of the 30 other jurisdictions with a federal death sentence imposes any sort of time limit on juror interviews. Of the fifteen district courts in the Ninth Circuit, only two -- the District of Arizona and the District of Montana -- require a "good cause" showing. D. Ariz. Loc.. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2; D. Mont. Loc. Civ. R. 48.1(b); D. Mont. Loc. Crim. R. 24.2(b). Five other district courts require leave of court without a "good cause" showing. D. Alaska Loc. Civ. R. 83.1(h); D. Or. Loc. R. 48-2; E.D. Wash. Loc. R. 47.1(d); W.D. Wash. Loc. R. 47(d). Eight district courts in the Ninth Circuit impose no post-trial restrictions on juror contacts whatsoever.[23] And had the crimes occurred just over the state line, in the Navajo Reservation in New Mexico, Mitchell would not need to seek leave of court or show good cause before attempting to interview the trial jurors. Section 2255 and its accompanying rules do not contemplate this sort of inconsistent and inequitable treatment of similarly situated federal prisoners, in violation of the Fifth Amendment's due process and equal protection guarantees.

---

[22] In the interest of brevity, the citation and text for each of these local rules can be found at pages 3-26 of the separately bound Statutory Addendum.

[23] The District of Nevada's rule applies only to contacts prior to the conclusion of deliberations. D. Nev. Loc. R. 48-1.

Application of the local rule also conflicts with the duty of post-conviction counsel in a capital case to conduct "an aggressive investigation of all aspects of the case." ABA 2003 Death Penalty Guidelines 10.15.1(E)(4). The commentary to the ABA Death Penalty Guidelines explains that post-conviction counsel must conduct a "thorough, independent investigation" because "the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case." 31 Hofstra L. Rev. 913, 1086 (2003). "Juror misconduct" is one important reason for conducting additional post-conviction investigation. *Id.* Therefore, it is not surprising that interviewing the jurors and alternate jurors is a routine part of a thorough habeas investigation in a capital case. (ER 3467.) Although the constitutional right to effective assistance of counsel in collateral proceedings is an open question, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012), Mitchell submits that he has a Sixth Amendment right to effective assistance in these Section 2255 proceedings, especially for claims that could not have previously been raised on direct review. Indeed, because this Court has relied in part on a juror declaration to evaluate whether a petitioner was prejudiced by ineffective assistance of counsel at the penalty phase, *see Silva*, 279 F.3d at 850, competent post-conviction counsel would seek to obtain declarations from the seated jurors and alternates.

Even if Sixth Amendment concerns do not trump the local rule, the Eighth Amendment's requirements do. The Supreme Court's capital punishment jurisprudence has proceeded on "the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long," and that there is "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Mills v. Maryland*, 486 U.S. 367,

376 (1988) ("In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."). This Court has granted habeas relief in a capital case where post-conviction interview of jurors uncovered a meritorious claim of extraneous information that affected the fundamental fairness of the trial. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1189-90 (9th Cir. 1993) (in capital case, remanding for evidentiary hearing on allegations of juror misconduct revealed in affidavits); *Jeffries v. Wood*, 114 F.3d 1484, 1490-91 (9th Cir. 1997) (en banc) (in capital case, granting writ of habeas corpus where one juror informed other jurors of defendant's prior armed robbery conviction), *overruled on other grounds by Gonzalez v. Arizona*, __ F.3d __, 2012 WL 1293149, at *2 n.4 (9th Cir. Apr. 17, 2012) (en banc). The heightened need for reliability of death sentences demands that the particular requirements of the local rule give way to the need for accurate fact-finding in Section 2255 proceedings, and the constitutional concerns relating to effective assistance of counsel and the reliability of death sentences.

## UNCERTIFIED ISSUES

### Standard for Certificate of Appealability

To obtain a certificate of appealability, an applicant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This is a "modest standard" that should not be conflated with the standard to obtain a writ of habeas corpus. *Lambright v. Stewart*, 220 F.3d 1022, 1024-25 (9th Cir. 2000). Rather, a certificate of appealability (COA) should issue if an applicant can show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). A claim "can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003).

In a capital case, this Court may properly consider the "nature of the penalty" in determining whether to issue a COA. *Lambright*, 220 F.3d at 1025 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). Because Mitchell has been sentenced to death, this Court must resolve in his favor "any doubt about whether he has met the standard for a COA." *Valerio v. Crawford*, 306 F.3d 724, 767 (9th Cir. 2002) (en banc).

**Discussion**

## E. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF FEDERAL-TRIBAL COLLUSION TO DEPRIVE HIM OF HIS FEDERAL PROCEDURAL RIGHTS TO PROMPT PRESENTMENT AND APPOINTED COUNSEL (CLAIM R).

**Standard of Review**

Whether a collusive arrangement between federal and tribal authorities caused Mitchell's confessions to be made is a factual finding, *United States v. Alvarez-Sanchez*, 511 U.S. 350, 360 (1994), and is therefore reviewed for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

**Discussion**

### 1. *New Facts, Not Developed at Trial Due to Ineffective Assistance of Counsel, Merit Reconsideration of Mitchell's Collusion Claim.*

On direct appeal, Mitchell argued that his statements should be suppressed because they were the product of federal-tribal collusion to arrest him on tribal

charges and thereby deprive him of his federal procedural rights to prompt presentment and appointed counsel. 502 F.3d at 960-63. Mitchell and Orsinger had filed suppression motions challenging the voluntariness of their respective statements, and Orsinger had filed a supplemental motion arguing that his statements should be suppressed because there existed a "working arrangement" between federal and tribal authorities to deprive Orsinger of the rights afforded to juveniles under federal law. (ER 80-87, 521-524.)

This Court held that Mitchell had not joined Orsinger's collusion motion, based on counsel's failure "to adduce evidence and elicit a ruling that would have determined these issues discretely as to [Mitchell]." 502 F.3d at 960. It also found that Mitchell "developed no record that distinguishes his situation from Orsinger's; indeed, he developed no record on the point at all." *Id.* at 961. The Court further concluded that, regardless of whether Mitchell had preserved the collusion issue, he had not demonstrated the requisite "actual collaboration." *Id.* at 960-62. The dissenting opinion, on the other hand, argued that the record proved deliberate intent to deprive Mitchell of his federal procedural rights. *Id.* at 997-1003. In doing so, the dissent assumed, based on suggestions in the murky record, that Mitchell's tribal warrant was for robbery.[24] *Id.* at 999 & n.4.

Thus, on direct appeal, this Court lacked crucial facts about the course of Mitchell's tribal proceedings, including such basic information as the specific charge for which Mitchell was arrested, because counsel had failed to develop such evidence. 502 F.3d at 961, 999 & n.4. Section 2255 counsel's investigation did not locate any record of an armed robbery warrant or complaint filed against Mitchell in tribal court. (ER 3897-3898.) However, Section 2255 counsel

---

[24] Agent Purscell thought the tribal warrants were for robbery or assault but was not certain. (ER 614.)

discovered that before the instant offenses were committed, on September 19, 2001, Mitchell had been charged with criminal damage under Navajo Nation Title 17-380.A.1, for allegedly kicking a tribal police car. (ER 3707.) Newly obtained court records indicate that on November 7, 2001, three days after Mitchell was arrested at the Nakai house, he pled guilty to the criminal damage charge in tribal court; the tribal judgment further states that Mitchell's sentence was "deferred until sentencing hearing," and that Mitchell would be "committed to the custody of the keeper of the Navajo jail" at Window Rock "until this judgment has been satisfied." (ER 3708.) On January 24, 2002, the Navajo Nation court granted the Nation's request for an "Order of Indefinite Continuance" "until such time [as] the Navajo Nation makes arrangements with the United States Attorneys Office for the proper disposition of this case." (ER 3709.) Finally, in October 2003, five months after Mitchell was convicted and sentenced to death, the Navajo Nation requested and was granted closure of the tribal case due to Mitchell's federal conviction and "long term federal incarceration." (ER 3710-3711.)

Court records obtained by Section 2255 counsel also show that Jason Kinlicheenie pled guilty to the trading post robbery in tribal court on November 5, 2001, six days after it occurred. (ER 3735.) The Navajo Nation pre-sentence report indicates that Kinlicheenie clearly implicated Mitchell as a co-perpetrator of the robbery. (ER 3727.)

Kathleen Bowman, the longtime Public Defender of the Navajo Nation, reviewed Mitchell's and Kinlicheenie's tribal court records and signed a post-conviction declaration that sheds light on the collusion issue. First, she determined that Mitchell's tribal custody pending sentencing from November 7 (the date he pled guilty to criminal damage in tribal court) to November 29 (the date he was arrested on a federal warrant) violated Navajo law because the

criminal damage charge was not punishable by jail time. (ER 3895-3897.) Second, Bowman pointed out that the practical effect of pursuing the criminal damage charge instead of the tribal armed robbery charge was to deprive Mitchell of an attorney. Bowman stated that, contrary to this Court's understanding of Navajo criminal procedure, 502 F.3d at 960 n.3, the Navajo Nation provides attorneys for indigent defendants charged with offenses carrying possible jail time: in other words, Mitchell would have been appointed counsel for the more serious charge of tribal armed robbery, but not for the less serious criminal damage charge. (ER 3898-3900.) Third, Bowman concluded that if there was sufficient evidence to charge Mitchell with tribal armed robbery, there was sufficient evidence to charge him with federal armed robbery, because the elements of the offenses are identical. (ER 3900-3901.)

Section 2255 counsel also provided evidence of collusion more generally, based on statements by high-ranking Navajo Nation prosecutors and defense attorneys. Bowman quoted a Navajo prosecutor who described how Navajo investigators answer to the United States Attorney's Office. (ER 3902.) Levon Henry, the Navajo Nation attorney general who wrote the letter requesting that the United States government not seek the death penalty against Mitchell, stated that it was not uncommon "for the FBI to join the Nation police in arresting a member of the Nation, and for the FBI to walk into the tribal jail and interrogate the arrestee about a federal (non-tribal) crime." (ER 3714.)

In light of this new evidence, the district court erred in declining to reconsider the collusion issue on the merits simply because it had been raised and rejected on direct appeal. (ER 68.) This Court has held that questions previously decided on direct appeal cannot be relitigated in a Section 2255 proceeding "except to the extent appellant proffered new evidence." *Argo v. United States*,

473 F.2d 1315, 1317 (9th Cir. 1973). Similarly, in *Kaufman v. United States*, 394 U.S. 217 (1969), the Supreme Court reasoned that federal prisoners should be able to relitigate claims on collateral review if "new law has been made or facts uncovered relating to the constitutional claim since the trial and appeal." *Id.* at 230 (internal quotation marks and citation omitted). The district court thus erred by disregarding this well-established exception to the relitigation bar for issues raised and rejected on direct appeal. Indeed, in *Jack v. United States*, 435 F.2d 317 (9th Cir. 1970), this Court stated that a district court "would be compelled, even in the face of [a prior adverse] appellate determination, to hold an evidentiary hearing" in a Section 2255 proceeding when presented with new facts relating to the constitutional claim. *Id.* at 319 & n.2. The new facts on collusion, which include documentary proof of the Navajo Nation "mak[ing] arrangements with the United States Attorneys Office for the proper disposition" of Mitchell's *tribal* case (ER 3709), mandate an evidentiary hearing here.

**2. *This Court Should Grant an Evidentiary Hearing on Mitchell's Collusion Claim Because The Record Does Not Conclusively Show That There Was No Federal-Tribal Working Arrangement to Deprive Him of His Federal Procedural Rights.***

Although the prompt presentment requirement generally does not arise until a person is arrested for a federal offense, *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358-59 (1994), "[t]he relevant delay may . . . be calculated from the time of arrest by state or local authorities on state charges 'if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate [him] in violation of [his] right to a prompt federal presentment.'" *United States v. Michaud*, 268 F.3d 728, 734 (9th Cir. 2001) (quoting *Alvarez-Sanchez*, 511 U.S. at 359). In *Anderson v. United*

*States*, 318 U.S. 350 (1943), the Supreme Court held that confessions obtained during state pretrial detention were inadmissible as the product of "a working arrangement between the federal officers" and local law enforcement "which made possible the abuses" of repeated interrogation in custodial secrecy, even though "the federal officers themselves were not formally guilty of illegal conduct," and the federal arraignments occurred promptly after the federal arrests. *Id.* at 356. The defendant has the burden to prove the existence of collusion, which "requires proof of a deliberate intent to deprive a defendant of . . . federal procedural rights." *Michaud*, 268 F.3d at 734-35.

The previously undiscovered information concerning Mitchell's tribal court proceedings differs sharply from the factual and legal assumptions underlying this Court's decision on direct appeal and warrants an evidentiary hearing. In view of the fact that Kinlicheenie pled guilty to the trading post robbery on November 5, the timing of the federal arrest provides strong evidence of collusion. In *Michaud*, by contrast, this Court found the state-federal cooperation to be unobjectionable because federal agents obtained an arrest warrant and took the steps necessary to prosecute the defendant federally as soon as they gathered "sufficient evidence" from the search of the defendant's van. 268 F.3d at 734-35. Here, the federal indictment was not obtained until November 21, sixteen days after Kinlicheenie pled guilty and implicated Mitchell in the process. Even after the arrest warrant was issued on November 23, federal authorities let Mitchell languish in tribal custody -- custody that was illegal under tribal law --for six more days before arresting him.

Further, the fact that a sentencing on Mitchell's criminal damage charge was never even scheduled and was instead indefinitely continued "until such time the Navajo Nation makes arrangements with the United States Attorneys Office for

the proper disposition of this case" (ER 3079) speaks to the deep involvement of federal authorities in tribal authorities' decision to pursue tribal charges against Mitchell. In determining whether collusion existed, "it is important whether or not state officials will proceed with further action on the state charge independent of the outcome of the federal investigation." *Barnett v. United States*, 384 F.2d 848, 858 (5th Cir. 1967). Here, tribal authorities explicitly treated the tribal charge as subsidiary to and dependent on Mitchell's federal prosecution, only dismissing the charge in light of Mitchell's federal conviction and incarceration. (ER 3710-3711.) Particularly when viewed against the backdrop of Navajo Nation investigators' deference to the United States Attorney's Office described by the Navajo Attorney General and Public Defender, this collaboration goes far beyond "the routine cooperation" between local and federal authorities at issue in *Alvarez-Sanchez*, where local authorities executing a warrant to search for drugs simply alerted the United States Secret Service of counterfeit Federal Reserve notes discovered during the search. 511 U.S. at 352.

In addition, the record unequivocally shows that an assistant United States attorney ("AUSA") participated in the pre-arrest briefing by conference call and recommended tribal arrests, in a message relayed by the FBI agents to the Navajo criminal investigators at the briefing. (ER 607, 616.) *Cf. United States v. Jackson*, 448 F.2d 539, 545 (5th Cir. 1971) (state detention did not count for purposes of Rule 5(a) and *McNabb-Mallory* because defendant's arrest on vagrancy charges was "without inducement or request by the federal authorities"); *United States v. Coppola*, 281 F.2d 340, 343 (2d Cir. 1960) (en banc) (no collusion where state arrests "were exclusively planned and executed by the Buffalo police without any suggestion or participation by the F.B.I."). Federal and tribal authorities also shared significant amounts of information and proceeded together almost every

step of the way, at least until the FBI took over and began interviewing Mitchell without Navajo law enforcement being present.[25] *Cf. Michaud*, 268 F.3d at 735 (no evidence of actual collusion where "the exchange of information between federal and state investigators was sparse").

Given the AUSA's central role in instigating the tribal arrests, and the new evidence of the Navajo Nation "mak[ing] arrangements with the United States Attorneys Office for the proper disposition" of Mitchell's minor tribal criminal damage charge (ER 3709), the focus of an evidentiary hearing on collusion should be federal and tribal *prosecutors*' intent to avoid having Mitchell "lawyer up" after being appointed counsel in federal court.[26] In the course of ruling on Orsinger's collusion motion, the district court credited FBI agents' testimony that they did not intend to deprive the defendants of their federal procedural rights (ER 669), but that finding does not resolve the question of a higher-level working arrangement between federal and tribal prosecutor's offices. By arranging Mitchell's arrest on a tribal warrant for criminal damage, rather than on a tribal or federal warrant for robbery, federal and tribal authorities ensured that Mitchell, who was indigent (ER 90-91), would not be appointed counsel in either court.

For all of the above reasons, the record does not conclusively show that Mitchell's arrest and tribal custody were not the product of a federal-tribal working arrangement to deprive him of his federal procedural rights, and this Court should order a hearing to resolve the factual disputes concerning Mitchell's

---

[25] FBI agents conducted all four interviews of Mitchell. Navajo criminal investigators were present for all or part of the first two interviews on November 4, but not for the interviews on November 5 and November 29. (ER 1881-1905.)

[26] Significantly, just minutes after giving a fourth statement to the FBI, Mitchell's only question at his initial appearance in federal court was, "when will I be able to speak to my lawyer?" (ER 97.)

tribal proceedings and the degree of collusion between federal and tribal authorities with respect to those proceedings.

### F. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF INEFFECTIVE ASSISTANCE REGARDING HIS SUBSTANTIVE INCOMPETENCY AT THE TIME HE WAIVED HIS PENALTY-PHASE APPEARANCE (CLAIM S).

**Standard of Review**

The Court reviews claims of ineffective assistance de novo, *Rodrigues*, 347 F.3d at 823, and a district court's competency determination for clear error, *United States v. Friedman*, 366 F.3d 975, 980 (9th Cir. 2004).

**Discussion**

#### 1. *Waiver of Penalty-Phase Appearance*

After the verdicts were read on May 8, 2003, Mitchell asked to speak to the district court. (ER 952.) At sidebar, Williams informed the district court that Mitchell did not want to assist in or be present at the penalty phase, contrary to defense counsel's advice, and that defense counsel was consequently moving to withdraw. (ER 952.) After the courtroom was cleared, Mitchell informed the district court that he did not want to be present for the penalty phase but had no problems with his lawyers. (ER 952.) The district court told Mitchell to think over his decision until the following day. (ER 952.)

The next day, in another sealed proceeding, Mitchell reiterated his wish to waive his appearance at the penalty phase. (SER 430.) When the district court asked him to explain his reasons, he said, "I just don't want to be here" and "I don't see no benefit or any relevance to me being here." (SER 430.) He added that he thought that the jury had "already made their decision." (SER 431.) Defense counsel Sears stated that while it appeared that a defendant might be able

to waive his appearance at capital sentencing, the breakdown in communication would make it difficult for counsel to continue to represent him. (SER 432.) Williams added that Mitchell had refused to speak to him that day, and Sears noted that Mitchell had hinted at waiving his penalty phase appearance even before the verdicts were read. (SER 433.) The district court denied Sears's renewed motion to withdraw because it found no irreconcilable conflict between Mitchell and his attorneys. (SER 433-434.)

On the next court day, May 13, the day before the penalty phase was set to begin, Williams informed the court that Mitchell would not dress properly for court. (SER 436.) At sidebar, Sears informed the district court that Mitchell stated he would not talk to his attorneys about the appearance issue or any other issue, and that the communication breakdown continued. (SER 438.) Sears stated that while Mitchell had previously indicated he might testify at the penalty phase, "now whether it's out of despair or hopelessness or depression or whatever it is motivating him, he's gone so far in the other direction." (SER 438.) Sears stated that they would attempt to persuade Mitchell to come to court, but that he was being uncommunicative and resistant. (SER 438.)

On the morning of May 14, the day the penalty phase began, the district court took Mitchell's waiver of his appearance at the penalty phase. Mitchell, who was dressed in his jail clothes, indicated that he refused to dress for court and had not changed his mind about waiving his appearance. (SER 441.) Upon questioning from the district court, Mitchell indicated that his health was fine, that he had not taken any medications recently, that he had graduated from high school with a "C" average, and that he had held jobs as a dishwasher and concession stand worker after high school. (SER 441.) Mitchell stated that this was the first time he had been on trial for a criminal offense, that he felt that he had been able

to follow the proceedings, and that he understood how aggravating and mitigating factors would be presented during the penalty phase. (SER 442.) Mitchell further stated that no threats or promises had influenced his decision not to be present at the penalty phase. (SER 442.)

The district court found that Mitchell's decision not to be present during the penalty phase was knowing, intelligent, and voluntary. (SER 443.) The district court further found that Mitchell appeared to be "alert and in good health," and that there was no suggestion that he was incompetent to waive his presence. (SER 443.) Noting that Mitchell had refused to discuss his waiver of appearance with his attorneys that day or the day before, Sears moved to withdraw for a third time, a request the district court denied. (SER 443.)

**2. *Substance Abuse and Mental Health Issues at the Time of Waiver of Penalty-Phase Appearance***

Jail records indicate that Mitchell was referred for alcohol treatment shortly after his arrest, but he received no treatment. (ER 3117 n.40)

_____Dr. Morenz's report to trial counsel, dated March 3, 2003, indicated that Mitchell was caught making "hooch" (jail-brewed alcohol) at the Madison Street Jail. (ER 3137.) Mitchell also told Morenz he had been using heroin, cocaine, methamphetamine, and the occasional psychotropic medication at the Madison Street Jail. (ER 3137.) In October 2002, he indicated that he would stay up for three or four days and then sleep for three or four days. (ER 3137.) He indicated that his only enjoyment was "get[ting] high." (ER 3137.) Although Dr. Morenz found Mitchell competent to stand trial, he also diagnosed him with, *inter alia*, depressive disorder and polysubstance abuse in a controlled environment, and recommended that Mitchell receive antidepressants for his "significant depressive symptoms." (ER 3151-3152) Dr. Morenz also noted that Mitchell may have

suffered from a major depressive disorder in the past. (ER 3151.)

Eric DeLuca, a fellow inmate in closed custody at Madison Street Jail from April 2002 to April 2003, discussed Mitchell's drug use in a declaration obtained by Section 2255 counsel. (ER 3164.) DeLuca saw Mitchell regularly getting high on drugs or hooch during this period. (ER 3164.) DeLuca explained how the inmates made hooch from fermented citrus fruit and mints purchased through the commissary. (ER 3165.) DeLuca saw Mitchell purchase and use heroin regularly, in quantities sufficient to get high on nearly a daily basis. (ER 3164-3165.)

Samuel Stone, another inmate at Madison Street Jail, stated that drugs were freely available in custody, and that Mitchell drank hooch and used heroin, marijuana, cocaine, and crystal meth regularly. (ER 3694, 3696.) Stone recounted how meth was smuggled into the jail on cards, how drugs were obtained through a hole in the wall, and the procedures for making "hooch." (ER 3694-3696.) Stone was sentenced and transferred to prison before Mitchell's trial ended. (ER 3696.)

Dr. Stewart, Mitchell's post-conviction psychiatric expert, concluded that Mitchell's use of hooch, heroin, Artane, Prozac, and other antipsychotic medications while in custody "could have seriously inhibited Mr. Mitchell's ability to make reasoned decisions," and that "sufficient evidence existed to initiate an inquiry into Lezmond Mitchell's ability to assist his counsel, to make reasoned decisions, including the waiver of presence at his penalty phase." (ER 3418-3419.)

### 3. *Post-conviction Depositions of Trial Counsel*

None of Mitchell's attorneys doubted his competency, either generally or at the time of his waiver of his appearance at the penalty phase. (ER 3935, 3956, 3959, 4070-4071, 4134, 4142.)

Mitchell's attorneys never thought Mitchell was under the influence of

drugs or alcohol. (ER 3934, 4049, 4143.) Sears had no knowledge that Mitchell used drugs or alcohol while in pretrial custody until the Section 2255 motion was filed. (ER 4134.) Williams thought Mitchell mentioned having access to alcohol and drugs in Madison Street Jail. (ER 3933-3934.) Bartolomei was surprised to see Morenz's report of Mitchell's drug and alcohol use in jail but didn't recall discussing the issue with his client. (ER 4086-4087.)

### 4. *This Court Should Order an Evidentiary Hearing on Mitchell's Claims of Substantive Incompetence and Related Ineffective Assistance of Counsel Claim.*

The standard for competency to stand trial is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted). "Clearly, an attorney would render ineffective assistance of counsel if he or she failed to inquire into a defendant's competency and failed to request a competency hearing, despite indicia of incompetence that would provide reasonable counsel 'reason to doubt' the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense." *Jermyn v. Horn*, 266 F.3d 257, 300 (3d Cir. 2001).

Mitchell's allegations are "sufficiently specific to meet the low threshold for an evidentiary hearing" on his claims of substantive incompetency and counsel's ineffectiveness in handling the competency issue after he waived his penalty-phase appearance. *Howard*, 381 F.3d at 883. Dr. Morenz's pretrial report mentions Mitchell's statements regarding alcohol and drug use at Madison Street Jail, which should have put counsel on notice of possible competency issues. *Id.* at 881

("Howard's statement that he was under the influence of a strong narcotic was sufficient to trigger an inquiry into his competence to plead guilty unless his counsel possessed some other knowledge suggesting that Howard was competent."). The fact that Mitchell was referred for alcohol treatment at one facility and was disciplined for brewing alcohol in another facility also points to the need for a competency hearing. *See Sanders v. United States*, 373 U.S. 1, 20 (1963) (relying in part on fact that petitioner received medical treatment for withdrawal in jail in granting evidentiary hearing on competency). Yet Mitchell's attorneys were either not aware of or were oddly unconcerned by his substance abuse prior to and during trial. The district court never asked Mitchell whether he was under the influence of drugs or alcohol when she took his waiver of appearance. (SER 441.) Further, Mitchell presented specific, credible evidence corroborating his claims of heavy alcohol and drug use while in pretrial custody. He presented declarations from two fellow inmates at the Madison Street Jail who witnessed his alcohol and drug use during trial and confirmed the wide availability of drugs and alcohol in the facility. (ER 3164-3165, 3694-3696.) *Cf. Sasser v. United States*, 452 F.2d 1104, 1106 (9th Cir. 1972) (evidentiary hearing not required where petitioner "merely made the bald assertion that he was under the influence of a drug," without specifying how he managed to obtain the drug while in custody).

In addition, Dr. Morenz's pretrial diagnosis of significant depressive symptoms and other mental health issues, in conjunction with Mitchell's sudden decision to waive his appearance during penalty phase, should have alerted counsel to the need for a competency hearing. Sears told the district court that while Mitchell had previously considered testifying, "now whether it's out of despair or hopelessness or depression or whatever is motivating him, he's gone so

far in the other direction." (SER 438.) Counsel thus recognized that a mental health issue, such as depression, may have provoked Mitchell's decision to waive his penalty-phase appearance. Yet counsel made no serious inquiry to ascertain the impetus for Mitchell's decision and instead merely attempted, repeatedly, to withdraw from the case.

The value of counsel's observations is further limited by the fact that they had spent so little time with Mitchell, both in general and during the crucial period when he was deciding whether to waive his penalty appearance. As the Supreme Court has explained, "[w]hether or not petitioner was under the influence of narcotics would not necessarily have been apparent to the trial judge," who saw him only briefly. *Sanders*, 373 U.S. at 20. The same is true of counsel in this case, whose post-waiver contact with Mitchell was so limited as to render them unable to determine whether Mitchell "lack[ed] the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). In view of the lack of rapport previously developed between Mitchell and his attorneys, it was hardly surprising that Mitchell repeatedly declined to talk to his attorneys about the waiver issue. Sears and Williams, the two attorneys who were litigating the waiver issue and repeatedly moving to withdraw as counsel, had spent less than nine hours visiting him prior to trial.[27] (SER 432, 438, 443.) Given the paucity of attorney-client contact, counsel did not have a baseline from which to determine whether Mitchell was drunk, high, or depressed. At most,

[27] Bartolomei, who had spent four times as much times with Mitchell as Sears and Williams combined, missed the first hearing on the penalty-phase waiver of appearance because he was taking the videotaped deposition of Bobbi Mitchell. (SER 428, 430.) He was also absent from the second hearing on the issue. (ER 955, SER 436.)

counsel's testimony proves that Mitchell *did not* consult with counsel and assist with preparing his defense; it does not establish his capacity to do so.

As in *Howard*, that Mitchell "could have been rendered incompetent, and specifically and credibly claims to have been so, is sufficient to tip the scales in favor of an evidentiary hearing" on substantive incompetence. 381 F.3d at 881. Because counsel performed deficiently by not investigating Mitchell's competency after he waived his penalty-phase appearance, and Mitchell would be prejudiced by waiving his penalty-phase appearance or standing trial while incompetent, he is also entitled to a hearing on counsel's ineffective assistance. *Id.* at 881-83. The question is whether the record "conclusively" establishes that Mitchell was competent during the penalty phase of his trial and therefore not entitled to any relief. *Id.*; *see also Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir. 1990) (granting an evidentiary hearing on a Section 2255 movant's competency to waive his appearance at trial even though it was "highly unlikely that, given Dziurgot's status as a New York tax attorney, he did not realize what he was doing when he waived his right to be present," because such a claim was not "inherently incredible"). Mitchell has raised a sufficiently detailed and controverted issue of substance abuse to warrant an evidentiary hearing on his substantive incompetency claim.

## G. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CONFLICT-OF-INTEREST CLAIM (CLAIM C).

### Standard of Review

This Court reviews Sixth Amendment claims regarding the right to counsel, including conflict-of-interest claims, de novo. *United States v. Christakis*, 238 F.3d 1164, 1168 (9th Cir. 2001).

## Discussion

### 1. *The Arizona Federal Public Defender Office's Concurrent Representation of Mitchell and an Unnamed Client Involved in Mitchell's Case*

Celia Rumann and Michael O'Connor represented Mitchell on direct appeal. (ER 3238.) Rumann was an assistant federal public defender ("AFPD") at the Arizona FPD at the time. (ER 3238.) In August 2007, during the course of the direct appeal, Rumann learned that Karen Wilkinson, another AFPD in the same office, had withdrawn from a case because her client had some relationship to Mitchell's case. (ER 3214, 3238.) Rumann sent an email to Wilkinson and Jon Sands, the Federal Public Defender for the District of Arizona, requesting information about the conflict and indicating that Wilkinson said she had been instructed not to discuss the matter with Rumann. (ER 3239.)

During a conference call with Sands, Rumann, and Bartolomei, O'Connor told Sands that the Arizona FPD had an obligation to reveal the nature of the conflict, but Sands and Bartolomei refused to reveal even the name of Wilkinson's client. (ER 3214.) Neither O'Connor nor Rumann were ever told the name of Karen Wilkinson's client, the extent of the conflict, when the conflict was discovered, or how long it had existed before it was discovered. (ER 3215.) Rumann was later informed by another AFPD, possibly Wilkinson, of an ethical wall created between her and Mitchell's trial attorneys. (ER 3240.)

Mitchell's attorneys gave conflicting information regarding the conflict. Sears knew nothing about the conflict of interest at the time. (ER 4173.) AFPD Williams thought the conflict occurred before the trial, not when Mitchell's case was on appeal. (ER 4003.) Williams couldn't recall who the conflict involved or what impact it had. (ER 4003.) AFPD Bartolomei initially refused to answer any

questions about the conflict on the basis of attorney-client privilege -- not Mitchell's privilege, but the privilege of Wilkinson's client. (ER 4077-4078, 4103-4104.) However, Bartolomei later testified that he didn't know the name of the client, that he learned of the issue when Mitchell's case was on direct appeal, and that the Arizona FPD withdrew from the other case. (ER 4103, 4105-4106.) Neither Bartolomei nor Williams knew of an ethical wall between them and Rumann. (ER 4005, 4082.)

### 2. *The Record Does Not Conclusively Show That Mitchell's Representation Was Unaffected by the Concurrent Representation.*

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[I]n order to be entitled to a hearing on a conflict of interest Sixth Amendment claim, a habeas petitioner has the burden of alleging specific facts which, if true, would indicate that: (1) an attorney's relationship to a third party influenced the attorney not to pursue a particular litigation strategy, and (2) the foregone litigation strategy would have been a viable alternative." *Rodrigues,* 347 F.3d at 824.

It is undisputed that the Arizona FPD engaged in concurrent representation of Mitchell and another client who had some relationship to Mitchell's case. Trial counsel's refusal to disclose the name of the other client, based on an unjustified assertion of attorney-client privilege, prevented Mitchell from developing the facts to support his conflict-of-interest claim. This Court has held that "the identity of the client . . . and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." *Clark v. American Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Because the attorney-

client privilege "has the effect of withholding relevant information from the factfinder, it is applied only when necessary to achieve its limited purpose of encouraging full and frank disclosure by the client to his or her attorney." *Id.* Requring the Arizona FPD to reveal the other client's name would not chill such "full and frank disclosure." The Arizona FPD represents clients under the Criminal Justice Act, 18 U.S.C. § 3006A, and the general purpose of the work they perform is no secret. Therefore, Mitchell's counsel had no basis for asserting the attorney-client privilege and refusing to name Wilkinson's client in the deposition.

An evidentiary hearing is required because the record does not conclusively show that Mitchell was represented by conflict-free counsel. The district court based its conclusion to the contrary on an erroneous finding regarding the timing of the conflict. The record is clear that Bartolomei did not *learn* of the conflict until Mitchell's case was on appeal, but it is unclear when the conflict first arose or how long it lasted; Williams thought that the conflict arose before trial, which supported Mitchell's claim. In addition, it has not been conclusively established that Mitchell's representation was not affected by the Arizona FPD's concurrent representation of the other client. Although Mitchell's trial attorneys disavowed any knowledge of the other client, as a client of the FPD he was also represented by Federal Public Defender Sands. (ER 4106.) The district court's reasoning that Sands could not have affected Mitchell's pretrial representation because he was not appointed as Federal Public Defender until December 2003, months after Mitchell's May 2003 conviction, is also flawed because counsel's deposition testimony showed that Sands enlisted Sears to join the trial team as learned counsel. (ER 4122.) Therefore, regardless of his title at the time, Sands clearly had supervisory authority over the Phoenix office of the Arizona FPD before Mitchell's trial took place and could have prohibited Wilkinson from disclosing

information about her former client, as Mitchell alleged.

At a minimum, Mitchell is entitled to disclosure of the other client's name to develop the factual bases of his conflict claim. Counsel's unwarranted assertion of attorney-client privilege should not preclude an evidentiary hearing in which the identity of the other client, the nature of the conflict, and any adverse impact on Mitchell's representation could easily be established. *See Christakis*, 238 F.3d at 1169-71 (granting Section 2255 evidentiary hearing to develop "full extent" of conflict and resulting adverse effect).

## H. This Court Should Grant a COA and Relief on Mitchell's Claim Concerning the Wearing of Commemorative Buttons by the Victims' Families at Trial (Claim T).

**Standard of Review**

Whether spectator conduct deprived Mitchell of a fair trial is a mixed question of law and fact reviewed de novo. *Norris v. Risley*, 918 F.2d 828, 830 (9th Cir. 1990). The related claim of ineffective assistance is also reviewed de novo. *Rodrigues*, 347 F.3d at 823.

**Discussion**

### 1. *Evidence Regarding the Buttons in the Trial Record*

On Tuesday, May 6, 2003, the day the defense rested in the guilt phase, the parties discussed whether penalty-phase witnesses should be allowed into the courtroom during guilt closing. (ER 904.) In connection with that discussion, Sears stated, "There were some members of the victim's family apparently that were here last week and we looked around and they are wearing buttons. I don't know if the Court saw them. They are wearing buttons with the pictures of Alyce Slim and [Jane Doe] in the courtroom. And we asked the government and they cooperated apparently to stop that." (ER 904.) Trial counsel did not move for a

mistrial or formally object to the wearing of the buttons. (ER 904.)

**2. *This Court's Decision on Direct Appeal***

On direct appeal, and reviewing for plain error, this Court held that, based on the sparse record before it, there was no evidence to suggest that the wearing of the buttons threatened Mitchell's right to a fair trial. 502 F.3d at 971-72.

**3. *Section 2255 Proceedings***

In Claim T of his Section 2255 motion, Mitchell argued that the wearing of buttons by the victim's family was so inherently prejudicial as to threaten his right to a fair trial. (ER 1339-1341.) In addition, Mitchell contended that trial counsel performed deficiently by failing to object to the commemorative buttons in a timely manner and by failing to create a record regarding the buttons. (ER 1342-1343.) Mitchell also argued that the wearing of the buttons during his trial resulted in a miscarriage of justice. (ER 1344.)

In their 2010 depositions, which were taken in the course of the Section 2255 proceedings, all three of Mitchell's trial attorneys recalled the victims' family's buttons. Williams described them as campaign-style buttons, about the circumference of a soda can, with photographs of the victims and text reading "In memory of" or the like. (ER 3968, 3987.) Williams thought he must have seen the buttons as the family was entering or leaving the courtroom because one had to be "fairly close" to see them. (ER 3987-3988.) Bartolomei remembered the buttons bearing Doe's photo and being two to three inches across. (ER 4094-4095.) Sears, likewise, recalled that the buttons bore Doe's photo. (ER 4178.)

The courtroom was small, containing just five rows on each side, and the victims' family members sat on the same side of the courtroom as the jury, within the jury's view. (ER 4094.) At least six to ten family members attended the trial regularly. (ER 4094, 4178.)

Trial counsel was less certain about the timing and duration of the button-wearing. None of Mitchell's lawyers knew when the victims' families first wore the buttons. During trial, Sears stated on the record that trial counsel had noticed the buttons "last week," meaning the week of April 28 to May 2, 2003. (ER 904.) During his deposition, Sears distinctly remembered seeing the buttons on the day the government presented the graphic crime-scene photographs of the victims' bodies, which was Thursday, May 1, 2003. (ER 4178, 813-814.) Williams, on the other hand, thought the buttons must have been worn early in the trial, perhaps shortly after jury selection, because he "probably would have" moved for a mistrial if it had occurred later. (ER 3967-3968, 3986-3987.) Both Sears and Williams indicated that they had informally raised the issue of the buttons with the government, and that the issue was resolved relatively quickly. (ER 904, 3968.)

#### 4. *In Light of New Facts Indicating That the Buttons Could Have Been Seen by the Jury and Were Worn During a Key Portion of the Trial, This Court Should Reconsider Whether the Wearing of Such Buttons Deprived Mitchell of a Fair Trial.*

The district court erred by declining to consider the buttons issue on the merits because it was previously raised and rejected on direct appeal. (ER 35 n.9.) The new facts adduced in Section 2255 proceedings, which flesh out the virtually nonexistent record created by trial counsel, justify reconsideration of this claim. *See Argo v. United States*, 473 F.2d 1315, 1317 (9th Cir. 1973). And in *United States v. Manzo*, 675 F.3d 1204 (9th Cir. 2012), this Court recently granted Section 2255 relief on a claim that it had "summarily rejected" on direct appeal simply because the prior decision was clearly erroneous, even in the apparent absence of any new evidence bearing on the claim. *Id.* at 1211 n.3. As in *Manzo*, this Court's prior summary rejection of the claim being relitigated in question was

clearly erroneous. 502 F.3d at 971-72. The new evidence regarding the visibility, timing, and duration of the button-wearing reveals a high likelihood that this conduct threatened Mitchell's right to a fair trial.

This Court has held that spectator conduct, such as the wearing of buttons, can threaten a defendant's right to a fair trial. In *Norris v. Risley* ("*Norris I*"), 878 F.2d 1178 (9th Cir. 1989), this Court explained that the relevant test is whether the spectator conduct created an "unacceptable risk of impermissible factors coming into play" and was thus "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Id.* at 1182 (internal quotation marks omitted). Even if the spectator conduct is not inherently prejudicial, it may nevertheless require reversal if a defendant can show "actual prejudice." *Musladin v. Lamarque*, 427 F.3d 653, 659 (9th Cir. 2005), *vacated on other grounds by Carey v. Musladin*, 549 U.S. 70 (2006).

Both *Norris* and *Musladin* involved cases in which courtroom spectators wore buttons during trial. In *Norris*, a pre-AEDPA state habeas case, three women were wearing "Women Against Rape" buttons at any given time during the petitioner's trial on charges of kidnapping and sexual intercourse without consent; the women wore the buttons both inside and outside the courtroom, and the women sat approximately sixteen feet from the nearest juror's chair. *Norris v. Risley* ("*Norris II*"), 918 F.2d 828, 831 (9th Cir. 1990). This Court described the buttons, which were two and one-half inches in diameter, as "large," and concluded that their content and visibility created an unacceptable risk of impermissible factors coming into play. *Id.* at 830-31. This Court reasoned that the buttons "conveyed an implied message encouraging the jury to find Norris guilty," thereby undermining the presumption of innocence and rights of confrontation. *Id.* Although this Court acknowledged that it could "never fully

know the extent to which the buttons influenced any juror," it concluded that the buttons "tainted Norris's right to a fair trial" and reversed the district court's denial of habeas relief accordingly. *Id.* at 834.

Similarly, in *Musladin*, a post-AEDPA state habeas case, this Court relied heavily on *Norris* to conclude that the wearing of buttons by the victim's family during a murder trial deprived the petitioner of a fair trial. 427 F.3d at 654. In *Musladin*, at least three members of the victim's family sat in the front row of the gallery and wore buttons bearing photographs of the deceased. *Id.* at 655. The buttons were "several inches in diameter" and "very noticeable," and the family sat "directly behind the prosecution and in clear view of the jury." 427 F.3d at 655; *see also Musladin*, 549 U.S. at 72 n.1 (buttons were "apparently two to four inches in diameter and displayed only a photograph" of the victim). Although the Supreme Court reversed *Musladin* due to the lack of "clearly established federal law," or Supreme Court holdings, regarding spectators' courtroom conduct, 549 U.S. at 77, as required for habeas relief under AEDPA, this Court is not similarly constrained on Section 2255 review.

The risk of impermissible factors coming into play was at least as high in Mitchell's case as in *Norris* and *Musladin*. The size of the button was virtually identical to the size of the buttons described as "large" and "very noticeable" in those cases. The buttons in Mitchell's case included both an image of one or both victims (as in *Musladin*) and text (as in *Norris*). The number of family members wearing the buttons (six to ten) exceeded the number of buttons in *Norris* (three), and the courtroom was small. The positioning of the spectators, in direct view of the jury, was the same as in *Musladin*. Further, Williams stated that he saw the buttons as the family was entering or leaving the courtroom. Therefore, even if the jury could not see the buttons from where they sat (which has not been

proven), it is possible that they saw them in the courthouse. The record shows that jurors walked through the courthouse to reach the jury room, and that one alternate heard people mention Mitchell's case by name. (ER 741, 776.)

The family members' conduct was inherently or actually prejudicial. Although the duration of the button-wearing is not clear on this record, Williams thought the buttons were worn early during the trial, while Sears thought they were worn on May 1, the third of five days on which guilt-phase evidence was presented. In *Norris I*, this Court concluded that if the petitioner could prove his allegations regarding the wearing of "Women Against Rape" buttons, "one reasonable inference is that the women's purpose was to be sure that he was convicted." 878 F.2d at 1183. The Eleventh Circuit noted the expressive purpose of similar spectator conduct in a capital case involving the killing of a prison guard, where it held that the presence of uniformed prison guards in the audience, in conjunction with extensive pretrial publicity, deprived the petitioner of a fair trial:

> The officers in this case were there for one reason: they hoped to show solidarity with the killed correctional officer. In part, it appears that they wanted to communicate a message to the jury. The message of the officers is clear in light of the extensive pretrial publicity. The officers wanted a conviction followed by the imposition of the death penalty. The jury could not help but receive the message.

*Woods v. Dugger*, 923 F.2d 1454, 1459-60 (11th Cir. 1991). The wearing of buttons by the victims' family in a capital murder trial, especially when the family members later testify at the penalty phase, conveys an equally clear message regarding the desired result.

The wearing of buttons prejudiced Mitchell in the guilt phase because it

interjected impermissible considerations of victim impact into the case before Mitchell had been convicted, thereby defeating the purpose of bifurcated proceedings under the FDPA. 18 U.S.C. § 3593(b). It is also significant that the buttons were worn on the day the crime-scene photographs were shown to the jury. The district court required the government to crop Doe's facial features from the crime-scene photographs on the ground that they were unduly prejudicial. (ER 866.) When arguing in favor of anatomical diagrams that depicted Doe's facial features, the government argued that the diagrams would not "in any shape or form connote the same type of emotion that a photograph would." (ER 866.) The district court agreed that a diagram "is not as graphic and compelling as a photograph. . . . I think it's very different to show the actual photos as opposed to a diagram even when there's facial features included in it." (ER 867.) The district court thus recognized the powerful impact of juxtaposing crime-scene photographs with photographs depicting the facial features of the victims.

The wearing of buttons also prejudiced the penalty phase. As Justice Souter wrote in *Musladin*:

> [O]ne could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations. . . . [T]he buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and a call for some response for those who see them.

*Musladin*, 549 U.S. at 82 (Souter, J., concurring in judgment). As in *Woods*, the message of the buttons indicated that the family wanted "a conviction followed by the imposition of the death penalty." 923 F.2d at 1460. In *Norris I*, this Court emphasized that jurors are "extremely likely to be impregnated by the environing atmosphere," 878 F.2d at 1182 (internal quotation marks omitted), and the

spectators' implicit message regarding the result the jury should reach would have renewed salience at the penalty phase, where the decision to impose the death penalty does not turn on "hard facts." *Hendricks*, 70 F.3d at 1044. The possibility of prejudice is heightened by the fact that the parties and district court agreed that the prosecution witnesses would not be allowed to offer their view of the appropriate sentence, and the district court specifically prohibited the defense from eliciting such testimony from the mitigation witnesses. (ER 978.) Therefore, even if this Court concludes that the spectator's wearing of buttons did not affect the guilt phase, it should nevertheless grant penalty-phase relief on this basis.

**5. *Trial Counsel Performed Deficiently by Failing to Object to the Wearing of Buttons by the Victims' Families, and Mitchell Was Prejudiced as a Result.***

In light of this Court's case law on spectator conduct, trial counsel performed deficiently in failing to object to the wearing of buttons by the victims' family. Although *Musladin* postdated Mitchell's trial, this Court's decisions in *Norris I* and *II* should have alerted competent counsel to the unacceptable risk of impermissible factors created by this sort of spectator conduct. Indeed, Williams stated in his deposition that he would have likely moved for a mistrial if the button-wearing had occurred later in the trial, and not shortly after jury selection. But the record developed by Section 2255 counsel shows that the buttons were worn in the middle of the guilt phase, on the crucial day when graphic crime-scene photos of the victims' bodies were presented to the jury. (ER 4178.) For the reasons described above, Mitchell was prejudiced by trial counsel's failure to create a record on the buttons -- of the sort developed in these Section 2255 proceedings -- and by failing to move for a mistrial or otherwise formally object to the buttons.

### 6. *At a Minimum, Mitchell Is Entitled to an Evidentiary Hearing on the Buttons Issue.*

Under *Norris I*, Mitchell has alleged sufficient facts to warrant an evidentiary hearing on the victims' family's wearing of buttons. In *Norris*, this Court ordered an evidentiary hearing to resolve key facts, including "the number of [spectators], the visibility of the buttons, [and] whether the jurors passed through the women as they entered and exited the courtroom[.]" 878 F.2d at 1183. Although the record is already far more developed here in terms of the number and visibility of the buttons, Mitchell is, at the very least, entitled to an evidentiary hearing on this issue because he has "made specific allegations that, if true, state a claim on which relief could be granted" *Leonti*, 326 F.3d at 1116 (internal citation marks and citation omitted). This is not a futile undertaking: Mitchell's trial counsel remembered details about the buttons in depositions conducted seven years after trial, and in *Norris II*, three of six jurors remembered seeing the buttons more than six years after Norris's trial. 918 F.2d at 831.

## I. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM THAT THE GOVERNMENT VIOLATED *BRADY* BY BELATEDLY DISCLOSING THE NAVAJO NATION'S REQUEST FOR LENIENCY IN MITCHELL'S CASE.

**Standard of Review**

This Court reviews claims of *Brady* violations de novo. *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).

**Discussion**

### 1. *The Government's Last-Minute Disclosure of the Navajo Nation's Letter.*

On the morning of May 14, 2003, the first day of the penalty phase, Sears informed the district court that just the day before, the government had turned over

a January 2002 letter from the Attorney General of the Navajo Nation to the United States Attorney's Office indicating that the tribe believed that capital punishment was not appropriate in Mitchell's case. (ER 968-969.) Sears argued that the Navajo Nation letter was *Brady* material that should have been disclosed earlier. (ER 969-970.) The government stated that it had never suggested that the Navajo Nation favored the death penalty in this case, that the Nation's opinion was not relevant, and that the letter was disclosed not pursuant to a *Brady* obligation but out of an abundance of caution. (ER 972.) Sears argued that the defense should be allowed to use the Navajo Nation letter as an exhibit and "to talk about it." (ER 973.) The district court ruled that the Navajo Nation letter would be admitted because the case involved victims and defendants who were enrolled members of the Nation, the offense occurred on Nation land, the letter constituted a recommendation of leniency, and "the Navajo Nation specifically stated that its cultural and religious values do not support the concept of capital punishment." (ER 975.)

Sears mentioned the Navajo Nation's position in his opening, quoted portions of the letter in closing, and argued that the Navajo Nation's position was relevant to "the question of whether the death penalty is necessary and appropriate in this case." (ER 984, 1085-1086.) The defense did not present a witness to testify regarding the letter. In rebuttal penalty closing, the government argued that "while the defendant is a member of the Navajo Nation, those values the [Navajo] Attorney General spoke of, the community and the harmony, he completely rejected by this act." (ER 1090.) Seven jurors found the Navajo Nation letter to be mitigating -- more jurors than found that Mitchell had responded well to structured environments (two), impaired capacity (one), or other mitigating factors in his childhood or background (six) -- even though counsel had not provided the jury

with a mitigating factor targeted to the letter. (ER 1097; SER 452, 460.)

**2. *This Court's Decision Regarding the Navajo Nation Letter***

On direct appeal, Mitchell argued that the late disclosure of the Navajo Nation letter violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the letter was not provided at a time when the disclosure would be of value to his penalty-phase defense. 502 F.3d at 989. Although this Court found that the Navajo Nation was "certainly" favorable and material, it concluded that Mitchell had not shown prejudice because he had not shown how his mitigation approach would have been different, or that the letter "disclosed anything about the Tribe's opposition to capital punishment, or about its failure to opt in to the federal death penalty, that he didn't already know." *Id.* Further, this Court found there was no reasonable probability of a different result because Mitchell's trial attorneys made "effective use" of the letter, and seven jurors deemed it mitigating. *Id.*

**3. *New Facts Concerning the* Brady *Claim***

In his Section 2255 deposition, Sears testified that, prior to receiving the letter, Mitchell's trial team had formed the impression that the Navajo Nation, under new leadership, "was for the first time reassessing in a serious way their view on capital punishment." (ER 4176.) In view of the changed leadership, Sears decided not to present a Navajo Nation representative at the penalty phase because he thought "the tribe's position was not going to be helpful now and . . . it wouldn't do us much good to bring on people connected with tribal leadership who were no longer in office." (ER 4176.) Sears further stated that Mitchell's trial lawyers "probably should have asked for a continuance when we were handed materials just at the beginning of the penalty phase" "to see if we could do something more than what we were able to do at the penalty phase with that information." (ER 4175, 4177.)

Mitchell's trial lawyers were mistaken about the tribe's position. Louis Denetsosie, Attorney General for the Navajo Nation at the time of Mitchell's trial, stated that, if asked (and he was not), he or another representative of tribal government would have testified at Mitchell's penalty phase in May 2003 regarding the Nation's steadfast anti-death penalty position. (ER 3662-3663.) Denetsosie succeeded Levon Henry, author of the Navajo Nation letter, in January 2003. (ER 3662.)

**4. *The District Court's Ruling on the Navajo Nation Claim in the Section 2255 Motion***

The district court denied the Navajo Nation claim as "successive," because it had previously been rejected on direct appeal. (ER 68.)

**5. *New Facts Warrant Reconsideration of the Navajo Nation Letter Brady Claim.***

In light of the new facts presented in the Section 2255 motion, the district court erred by declining to consider the Navajo Nation letter issue on the merits. Relitigation of this *Brady* claim is warranted because Mitchell has provided new facts in support of the claim, *Argo*, 473 F.2d at 1317, and the new evidence demonstrates that the decision on direct appeal was clearly erroneous, *Manzo*, 675 F.3d at 1211 n.3.

Under *Brady v. Maryland*, the government is required to disclose evidence that is favorable to the defense and "material either to guilt or to punishment." 373 U.S. 83, 87 (1963). Evidence is material within the meaning of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

The new facts concerning the Navajo Nation Attorney General Office's willingness to send a tribal representative to testify to the continuing validity of the views outlined in the January 2002 letter, as well as trial counsel's failure to ascertain the tribe's position before coming to the conclusion that "the tribe's position was not going to be helpful now" (ER 4176), undermine confidence in the outcome of the penalty phase. On direct appeal, this Court faulted Mitchell for not showing how his approach to mitigation would have been different had the letter been disclosed earlier. 502 F.3d at 989. The new evidence, which was not fully developed on direct appeal due to ineffective assistance of trial counsel, shows that the mitigation presentation could have been bolstered by presenting a live witness to speak to the tribe's view of the appropriateness of capital punishment in Mitchell's case, which involved Navajo victims, Navajo defendants, and occurred on the Navajo Reservation.

There is a reasonable probability that a more fully developed investigation and presentation of the issues raised in the Navajo Nation letter would have changed the outcome of the penalty phase. Sears admitted that counsel should have taken a continuance to make more persuasive use of the information in the letter. (ER 4175, 4177.) Although the letter was admitted into evidence as an exhibit, it was mostly discussed during opening and closing argument. But as the district court instructed the jury, "arguments and statements by lawyers are not evidence. The lawyers are not witnesses." (ER 1063.) Moreover, the Navajo Nation letter and the themes it raised was a unique facet of Mitchell's mitigation case. Even the government admitted that the views of the Navajo Nation were not to be "taken lightly," and the letter offered counsel's best response to the prosecution's victim-impact evidence concerning the importance of grandmothers in Navajo culture. (ER 1090.) Even though trial counsel did not decide to pursue

the Navajo Nation angle until receiving the letter right before the penalty phase began, the jurors evidently found the Nation's letter to be more mitigating than many of the mitigation routes that counsel actively pursued. Mitchell has shown the *Brady* materiality this Court found lacking on direct appeal: he has shown how his mitigation approach would have been different, and he has shown that the Nation's letter conflicted with counsel's mistaken views regarding the Nation's position on the death penalty.

### J. This Court Should Grant a COA and Relief on Cumulative Error at the Penalty Phase.

**Standard of Review**

This Court reviews each of the claims underlying Mitchell's cumulative error claim de novo. *Rodrigues*, 347 F.3d at 823 (ineffective assistance); *Sanchez*, 50 F.3d at 1453 (*Brady* violation); *Norris II*, 918 F.2d at 830 (spectator conduct).

**Discussion**

In the event this Court finds the certified claims of penalty-phase ineffective assistance insufficient to warrant a grant of relief or an evidentiary hearing, it should nevertheless grant relief or an evidentiary hearing on cumulative error at the penalty phase. *Silva*, 279 F.3d at 834 (granting COA on cumulative error because "cumulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel"); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (considering prejudice arising from ineffective assistance "cumulatively" with "other significant errors" not relating to ineffective assistance). The prejudicial effect of counsel's inadequate investigation and presentation of mitigation evidence at the penalty phase was compounded by the prosecution's belated disclosure of the Navajo Nation letter and heightened by the

wearing of commemorative buttons by the victim's family earlier during the trial. This Court should grant the writ with respect to Mitchell's sentence accordingly.

## IX.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

May 11, 2012

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

By: s/ *Gia Kim*

GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies she is unaware of any pending case presenting an issue related to those raised in this brief.

DATED: May 11, 2012

s/ *Gia Kim*
GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 36,973 words.

DATED: May 11, 2012

s/ *Gia Kim*
GIA KIM
Deputy Federal Public Defender

# CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2012, I electronically filed **Appellant's Opening Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*Lynn Evangelista*
Lynn Evangelista