CA NO. 11-99003

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| LEZMOND C. MITCHELL,<br>Petitioner-Appellant,<br>v.<br>UNITED STATES OF AMERICA,<br>Respondent-Appellee. | ) | **DEATH PENALTY CASE**<br>DC No. CV 09-8089-MHM |

# APPELLANT'S OPENING BRIEF

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

SEAN K. KENNEDY
Federal Public Defender
STATIA PEAKHEART
JONATHAN C. AMINOFF
GIA KIM
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4408

Attorneys for Petitioner-Appellant
LEZMOND C. MITCHELL

# TABLE OF CONTENTS

Page

I. QUESTIONS PRESENTED . . . . . 1
   A. CERTIFIED ISSUES . . . . . 1
   B. PROCEDURAL ISSUES . . . . . 1
   C. UNCERTIFIED ISSUES . . . . . 1
II. STATEMENT OF THE CASE . . . . . 3
   A. STATEMENT OF JURISDICTION . . . . . 3
   B. COURSE OF PROCEEDINGS . . . . . 3
   C. CUSTODY STATUS . . . . . 4
III. STATEMENT OF ADDENDUM . . . . . 4
IV. STATEMENT OF FACTS . . . . . 4
   A. APPOINTMENT OF COUNSEL . . . . . 4
   B. EVIDENCE OF INTOXICATION IN DISCOVERY . . . . . 6
   C. SUBSTANCE ABUSE ISSUES IN JURY SELECTION . . . . . 7
      1. Juror Questionnaire . . . . . 7
      2. Voir Dire . . . . . 7
   D. PRETRIAL INDICATIONS OF DEFENSE STRATEGY . . . . . 9
      1. Jury Instructions . . . . . 9
      2. Witness Lists . . . . . 9
      3. Estimates of Length of Trial . . . . . 10
   E. THE GUILT PHASE . . . . . 10
      1. Opening Statements . . . . . 10
      2. The Government’s Case . . . . . 10
      3. The Defense Case . . . . . 13
      4. Jury Instructions . . . . . 13

**TABLE OF CONTENTS (continued)**

**Page**


5. Guilt-Phase Closing Arguments. . . . . . . . . . . . . . . . . . . . . . . . . 14

F. THE PENALTY PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. Mitchell's Waiver of His Penalty-Phase Appearance. . . . . . . 14

2. Gateway Intent and Aggravating and Mitigating Factors. . . . 14

3. Penalty Opening Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4. Government Case: Aggravating Factors. . . . . . . . . . . . . . . . . 15

5. Defense Case: Mitigating Factors. . . . . . . . . . . . . . . . . . . . . . 16

6. Impaired-Capacity Instruction . . . . . . . . . . . . . . . . . . . . . . . . 19

7. Penalty Closing Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . 19

8. Verdicts and Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

G. SECTION 2255 PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1. Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a. Social History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

b. Intoxication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

c. Mental Health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. Counsel's Description of Guilt-Phase Strategy. . . . . . . . . . . . 28

3. Counsel's Description of Penalty-Phase Strategy. . . . . . . . . . 29

a. Social History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

b. Intoxication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

c. Mental Health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

d. Mitchell's Waiver of Penalty-Phase Appearance. . . . . 31

4. Observers' View of Penalty-Phase Preparation. . . . . . . . . . . . 31

a. Mitigation Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

b. Experienced Death-Penalty Attorneys. . . . . . . . . . . . . . 32

## TABLE OF CONTENTS (continued)

**Page**


5. New Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

a. Social History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

b. Intoxication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

c. Mental Health.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

V. SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFIED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VI. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Standard of Review for Certified Claims . . . . . . . . . . . . . . . . . . . . . . . . 40

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A. COUNSEL WAS INEFFECTIVE WITH RESPECT TO INVESTIGATING, PREPARING, AND PRESENTING AN INTOXICATION DEFENSE AT THE GUILT PHASE (CLAIM A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1. Counsel's Failure to Investigate Intoxication Constituted Deficient Performance, Not Strategic Judgment. . . . . . . . . . . . 40

2. Counsel's Failure to Adequately Investigate and Present Evidence of Intoxication Prejudiced Mitchell's Guilt-Phase Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

B. COUNSEL WAS INEFFECTIVE AT THE PENALTY PHASE (CLAIMS B AND D).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

1. Counsel's Deficient Mitigation Investigation Precluded a Fully Informed Decision Regarding Sentencing Strategy and Culminated in a Deficient Penalty-Phase Presentation.. . 49

a. Counsel's Failure to Investigate the Wide Range of Potentially Mitigating Evidence at the Penalty Phase Constituted Deficient Performance.. . . . . . . . . . . 51

b. Counsel's Chosen Mitigation Strategy Was Unreasonable In Its Own Right... . . . . . . . . . . . . . . . . . . . 58

c. To the Extent That Counsel Tried to Present Social History and Intoxication Mitigation, They Did So Deficiently. . . . . . . . . . . . . . . . . . . . . . . . . 61

**TABLE OF CONTENTS (continued)**

**Page**

2. Mitchell Was Prejudiced by Counsel's Failure to Competently Investigate, Prepare, and Present Mitigating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

PROCEDURAL ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

C. THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING AN EVIDENTIARY HEARING.. . . . . . . . . . . . . . . . . . . 74

D. THE DISTRICT COURT ERRED BY NOT PERMITTING MITCHELL'S POST-CONVICTION COUNSEL TO INTERVIEW THE JURORS IN HIS CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

1. Mitchell's Request for Leave to Interview the Trial Jurors.. . 79

2. Mitchell Has Shown Good Cause for Interviewing the Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

3. Even if Mitchell Has Not Shown Good Cause, The District Court Erred by Rigidly Enforcing a Local Rule in Violation of the Section 2255 Rules and the Fifth, Sixth, and Eighth Amendments. . . . . . . . . . . . . . 81

UNCERTIFIED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Standard for Certificate of Appealability. . . . . . . . . . . . . . . . . . . . . . . . . . 85

E. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF FEDERAL-TRIBAL COLLUSION (CLAIM R) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

1. New Facts, Not Developed at Trial Due to Ineffective Assistance of Counsel, Merit Reconsideration of Mitchell's Collusion Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . 86

2. This Court Should Grant an Evidentiary Hearing on Mitchell's Collusion Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . 89

**TABLE OF CONTENTS (continued)**


**Page**

F. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIMS CONCERNING HIS COMPETENCY TO WAIVE HIS PENALTY-PHASE APPEARANCE (CLAIM S). . . . . 92

Standard of Review.. . . . . 92

Discussion.. . . . . 93

1. Waiver of Penalty-Phase Appearance. . . . . 93

2. Substance Abuse and Mental Health Issues at the Time of Waiver of Penalty-Phase Appearance. . . . . 94

3. Post-conviction Depositions of Trial Counsel.. . . . . 96

4. This Court Should Order an Evidentiary Hearing on Mitchell's Claim of Substantive Incompetence and Related Ineffective-Assistance Claim.. . . . . 96

G. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CONFLICT-OF-INTEREST CLAIM (CLAIM C). . . . . 99

Standard of Review.. . . . . 99

Discussion . . . . . 100

1. The Arizona FPD Engaged in Concurrent Representation of Mitchell and an Unnamed Client Involved in Mitchell's Case . . . . . 100

2. The Record Does Not Conclusively Show That Mitchell's Representation Was Unaffected by the Concurrent Representation.. . . . . 101

H. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM CONCERNING THE WEARING OF COMMEMORATIVE BUTTONSBY SPECTATORS AT TRIAL (CLAIM T).. . . . . 103

Standard of Review.. . . . . 103

Discussion.. . . . . 103

1. Evidence Regarding the Buttons in the Trial Record. . . . . 103

**TABLE OF CONTENTS (continued)**

**Page**

2. This Court's Decision on Direct Appeal. . . . . . . . . . . . . . . . 103

3. Section 2255 Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . 103

4. In Light of New Facts Regarding the Wearing of Commemorative Buttons, This Court Should Reconsider Whether Spectator Conduct Deprived Mitchell of a Fair Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

5. Trial Counsel Performed Deficiently by Failing to Object to the Wearing of Buttons by the Victims' Families, and Mitchell Was Prejudiced as a Result. . . . . . . . 109

6. At a Minimum, Mitchell Is Entitled to an Evidentiary Hearing on the Buttons Issue. . . . . . . . . . . . . . . . . . . . . . . . 110

I. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM THAT THE GOVERNMENT VIOLATED *BRADY* BY BELATEDLY DISCLOSING THE NAVAJO NATION'S REQUEST FOR LENIENCY IN MITCHELL'S CASE. . . . . . . . . . . . . . . . . . . . . . . 110

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

1. The Government's Last-Minute Disclosure of the Navajo Nation's Letter.. . . . . . . . . . . . . . . . . . . . . . . . 110

2. This Court's Decision Regarding the Navajo Nation's Letter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

3. New Facts Concerning the *Brady* Claim. . . . . . . . . . . . . . . . 112

4. New Facts Warrant Reconsideration of the *Brady* Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

J. THIS COURT SHOULD GRANT A COA AND RELIEF ON CUMULATIVE ERROR AT THE PENALTY PHASE.. . . . . . . . . . . . . . . . . 114

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

**TABLE OF CONTENTS (continued)**

**Page**

CERTIFICATE OF RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Abdul-Kabir v. Quarterman*,
550 U.S. 233 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Ainsworth v. Woodford*,
268 F.3d 868 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Allen v. Woodford*,
395 F.3d 979 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

*Anderson v. United States*,
318 U.S. 350 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90

*Argo v. United States*,
473 F.2d 1315 (9th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . 88, 105, 112

*Barnett v. United States*,
384 F.2d 848 (5th Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Bean v. Calderon*,
163 F.3d 1073 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 65

*Boyde v. Brown*,
404 F.3d 1159 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 96

*Brady v. Maryland*,
373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111, 113

*Carey v. Musladin*,
549 U.S. 70 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 106, 108

*Caro v. Woodford*,
280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Clark v. American Commerce Nat. Bank*,
974 F.2d 127 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Correll v. Ryan*,
539 F.3d 938 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 53, 59, 64, 69

*Cuyler v. Sullivan*,
446 U.S. 335 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Detrich v. Ryan*,
677 F3.d 958, 980, 985 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 68

**TABLE OF AUTHORITIES (continued)**

**Page**

**FEDERAL CASES**

*Douglas v. Woodford*,
316 F.3d 1079 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 60, 66, 69, 70

*Drope v. Missouri*,
420 U.S. 162 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Duncan v. Ornoski*,
528 F.3d 1222 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 73

*Dusky v. United States*,
362 U.S. 402 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Dziurgot v. Luther*,
897 F.2d 1222 (1st Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Earp v. Ornoski*,
431 F.3d 1158 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 77

*Eddings v. Oklahoma*,
455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Frierson v. Woodford*,
463 F.3d 982 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 53, 54

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) (en banc). . . . . . . . . . . . . . . . . . . . 89, 105, 113

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 61, 64

*Hendricks v. Calderon*,
70 F.3d 1032 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . 55, 62, 64, 109

*Holloway v. United States*,
526 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hovey v. Ayers*,
458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 71, 72

*Jack v. United States*,
435 F.2d 317 (9th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 105

*James v. Ryan*,
__ F.3d __, 2012 WL 639292 (9th Cir. Feb. 29, 2012). . . . . . . . . . . . *passim*

## TABLE OF AUTHORITIES (continued)

**Page**

### FEDERAL CASES

*Jeffries v. Blodgett*,
5 F.3d 1180 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Jeffries v. Wood*,
114 F.3d 1484 (9th Cir. 1997) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Jennings v. Woodford*,
290 F.3d 1006 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Jermyn v. Horn*,
266 F.3d 257 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Johnson v. Baldwin*,
114 F.3d 835 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Johnson v. United States*,
2012 WL 1836282 (N.D. Iowa Mar. 22, 2012). . . . . . . . . . . . . . . . . . *passim*

*Karis v. Calderon*,
283 F.3d 1117 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kaufman v. United States*,
394 U.S. 217 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 89

*Keeney v. Tamayo-Reyes*,
504 U.S. 1, 5 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Lambright v. Schriro*,
490 F.3d 1103 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 56, 63, 71, 74

*Lambright v. Stewart*,
220 F.3d 1022 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Lopez v. United States*,
439 F.2d 997 (9th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Mak v. Blodgett*,
970 F.2d 614 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Martinez v. Ryan*,
132 S. Ct. 1309 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Massaro v. United States*,
538 U.S. 500 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 82

**TABLE OF AUTHORITIES (continued)**

**Page**

**FEDERAL CASES**

*Mayes v. Gibson*,
210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Mayfield v. Woodford*,
270 F.3d 915 (9th Cir. 2001) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Miller-El v. Cockrell*,
537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Mills v. Maryland*,
486 U.S. 367 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Musladin v. Lamarque*,
427 F.3d 653 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 105, 106, 109

*Norris v. Risley*,
878 F.2d 1178 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Norris v. Risley*,
918 F.2d 828 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Padilla v. Kentucky*,
130 S. Ct. 1473 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Penry v. Lynaugh*,
492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Porter v. McCollum*,
130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Rompilla v. Beard*,
545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 57, 64

*Sanchez v. United States*,
50 F.3d 1448 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 114

*Sanders v. United States*,
373 U.S. 1 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98

*Sasser v. United States*,
452 F.2d 1104 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Sears v. Upton*,
130 S. Ct. 3259 (2010). . . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 70, 73

## TABLE OF AUTHORITIES (continued)

**Page**

## FEDERAL CASES

*Seidel v. Merkle*,
146 F.3d 750 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Silva v. Woodford*,
279 F.3d 825 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sinisterra v. United States*,
600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 76

*Siripongs v. Calderon*,
35 F.3d 1308 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Slack v. McDaniel*,
529 U.S. 473 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Smith v. Stewart*,
140 F.3d 1263 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Smith v. Stewart*,
189 F.3d 1004 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Stankewitz v. Woodford*,
365 F.3d 706 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 61

*Stanley v. Schriro*,
598 F.3d 612 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 78

*Strickland v. Washington*,
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Summerlin v. Schriro*,
427 F.3d 623 (9th Cir. 2005) (en banc). . . . . . . . . . . . . . . . . . . . . . . . 52, 72

*Teti v. Bender*,
507 F.3d 50 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Townsend v. Sain*,
372 U.S. 293 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Alvarez-Sanchez*,
511 U.S. 350 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 89, 91

*United States v. Bagley*,
473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

## TABLE OF AUTHORITIES (continued)

**Page**

### FEDERAL CASES

*United States v. Black*,
482 F.3d 1035 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*United States v. Burrows*,
872 F.2d 915 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

*United States v. Bynum*,
362 F.3d 574 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States v. Christakis*,
238 F.3d 1164 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 99, 102

*United States v. Coppola*,
281 F.2d 340 (2d Cir. 1960) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Echeverry*,
759 F.2d 1451 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 48

*United States v. Friedman*,
366 F.3d 975 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*United States v. Heller*,
551 F.3d 1108 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Howard*,
381 F.3d 873 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 97, 99

*United States v. Jackson*,
209 F.3d 1103 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Jackson*,
448 F.2d 539 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Kenyon*,
481 F.3d 1054 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Kohl*,
972 F.2d 294 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Leonti*,
326 F.3d 1111 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 74, 110

*United States v. Manzo*,
675 F.3d 1204 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

## TABLE OF AUTHORITIES (continued)

Page

### FEDERAL CASES

*United States v. Michaud*,
268 F.3d 728 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90, 91

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Nelson*,
297 Fed. Appx. 563 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 77

*United States v. Pierce*,
561 F.2d 735 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Rahm*,
993 F.2d 1405 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Rodrigues*,
347 F.3d 818 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Ward*,
989 F.2d 1015 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Valerio v. Crawford*,
306 F.3d 724 (9th Cir. 2002) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Wallace v. Stewart*,
184 F.3d 1112 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

*Wiggins v. Smith*,
539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor*,
529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 64, 71

*Wong v. Belmontes*,
130 S. Ct. 383 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Woods v. Dugger*,
923 F.2d 1454 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 107, 108, 109

*Woodson v. North Carolina*,
428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

## TABLE OF AUTHORITIES (continued)

**Page**

### FEDERAL STATUTES AND RULES

18 U.S.C. § 3005 . . . . . 5

18 U.S.C. § 3591. . . . . 14, 20, 60

18 U.S.C. § 3592. . . . . 14, 19, 64

18 U.S.C. § 3593. . . . . 108

28 U.S.C. § 1291. . . . . 3

28 U.S.C. § 2253 . . . . . 3, 85

28 U.S.C. § 2255. . . . . 3, 74

Fed. R. App. P. 4. . . . . 3

Fed. R. App. P. 25. . . . . 3

Fed. R. Crim. P. 12.2. . . . . 9

Fed. R. Crim. P. 33 (2002). . . . . 79

Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 12. . . . . 81

### LOCAL RULES

D. Alaska Loc. Civ. R. 83.1(h). . . . . 83

D. Ariz. Loc. Civ. R. 39.2(b).. . . . . 79, 82, 83

D. Ariz. Loc. Crim. R. 24.2. . . . . 79, 83

D. Mont. Loc. Civ. R. 48.1(b). . . . . 83

D. Mont. Loc. Crim. R. 24.2(b). . . . . 83

D. Or. Loc. R. 48-2. . . . . 83

E.D. Wash. Loc. R. 47.1(d). . . . . 83

W.D. Wash. Loc. R. 47(d). . . . . 83

## TABLE OF AUTHORITIES (continued)

**Page**

### MISCELLANEOUS

2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* 41.6d (5th ed. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, cmt. to Guideline 4.1 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003). . . . . . . . . . . . . . . . . . . . . . . . 42

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003). . . . . . . . . . . . . . . . . . . . . . . . 41

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.15.1 (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003). . . . . . . . . . . . . . . . . . . . . . . . 83

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 11.4.1 (1989 ed.). . . . . . . . . . . . . . . . . . . . . . . . . 51

*ABA Standards for Criminal Justice: Prosecution and Defense Function* 4-4.1 (3d ed. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Navajo Nation Title 17-380.A.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

# I.

# QUESTIONS PRESENTED

## A. CERTIFIED ISSUES

1. Did trial counsel's deficient investigation and presentation of an intoxication defense constitute ineffective assistance at the guilt phase?

2. Was trial counsel ineffective at the penalty phase for failing to competently investigate, prepare, and present mitigating evidence of Mitchell's substance abuse, mental health issues, executive functioning deficits, and social history?

## B. PROCEDURAL ISSUES

3. Did the district court abuse its discretion by not granting Mitchell, a death-sentenced federal prisoner, an evidentiary hearing on any of his ineffective-assistance claims, when the trial record contradicted counsel's claims of strategic judgment?

4. Did the district court erroneously apply a local rule requiring a showing of "good cause" to deny Mitchell's request for juror interviews, when (a) application of the rule is inconsistent and inequitable in capital Section 2255 proceedings, and (b) Mitchell satisfied the good cause standard in any event?

## C. UNCERTIFIED ISSUES

5. Did federal and tribal authorities enter into a working arrangement to arrest and imprison Mitchell on minor tribal charges and thereby deprive him of his federal procedural rights to prompt presentment and appointed counsel?

6. Was Mitchell incompetent to waive his appearance at the penalty phase, due to a combination of major depression and heavy use of jail-brewed alcohol, heroin, and antipsychotic medications while in custody?

7. Did the Arizona Federal Public Defender Office's concurrent representation of a client connected to Mitchell's case constitute an actual conflict of interest, and is Mitchell entitled to discovery of the other client's name?

8. Did the wearing of buttons bearing the victims' photographs by spectators threaten Mitchell's right to a fair trial, and was counsel ineffective for not moving for a mistrial or otherwise objecting to the buttons?

9. Is there a reasonable probability that the government's timely disclosure of a letter from the Navajo Nation Attorney General to the United States Attorney's Office, in which the Navajo Nation asked the federal government not to seek the death penalty against Mitchell, would have changed the outcome of Mitchell's penalty phase?

10. Does the cumulative impact of ineffective assistance, prejudicial spectator conduct, and the *Brady* violation involving the Navajo Nation letter require relief with respect to Mitchell's sentence?

# II.

# STATEMENT OF THE CASE

## A. Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 2255. Judgment was entered on September 30, 2010, and the district court issued a certificate of appealability (COA) on three claims. (ER 71-72.)[1] Mitchell's timely motion to alter or amend was denied on December 21, 2010. (ER 79.) Mitchell filed a timely notice of appeal on February 17, 2011. Fed. R. App. P. 4(a). (ER 4199.)

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## B. Course of Proceedings

On November 19, 2002, a second superseding indictment was filed in the District of Arizona charging Mitchell and Johnny Orsinger with carjacking resulting in death, the first-degree murders of Alyce Slim and Jane Doe,[2] felony murder, robbery, and kidnapping. Mitchell was also charged with robbery and firearms offenses in connection with a trading post robbery on the Navajo Reservation. (SER 1-5.)

Mitchell was convicted by a jury of all counts and sentenced to death on the carjacking count, and two consecutive life terms plus 384 months on the remaining counts. (ER 1099-1100.) Orsinger, a juvenile, pled guilty and was sentenced to two consecutive terms of life imprisonment, to run consecutively to four life sentences he was already serving for other convictions. (CR 448.)

---

[1] "ER" refers to the Excerpts of Record, and "SER" refers to the Sealed Excerpts of Record. "CR" refers to the Clerk's Record and is followed by the applicable docket number.

[2] In compliance with Federal Rule of Appellate Procedure 25(a)(5), the minor victim will be referred to as "Jane Doe."

A divided panel of this Court affirmed Mitchell's conviction and sentence, *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007), and the Supreme Court denied Mitchell's petition for certiorari. (ER 1105-1106.)

Before filing this Section 2255 motion to vacate, set aside, or correct Mitchell's sentence, post-conviction counsel sought leave to interview the jurors in his case. (CR 1.) On June 8, 2009, Mitchell filed his initial Section 2255 motion. (CR 9.) After the district court denied his request for juror interviews, Mitchell filed an amended Section 2255 motion. (ER 1-10, 1107-1386.) On September 30, 2010, the district court denied the amended Section 2255 motion, without an evidentiary hearing. (ER 71-73.) The district court denied Mitchell's motion to alter or amend the judgment on December 21, 2010. (ER 79.) This timely appeal followed. (ER 4199.)

### C. CUSTODY STATUS

Mitchell is on federal death row.

## III.

## STATEMENT OF ADDENDUM

Pertinent statutes and rules are set forth in the separately bound addendum.

## IV.

## STATEMENT OF FACTS[3]

### A. APPOINTMENT OF COUNSEL

Mitchell was represented by assistant federal public defenders Jeffrey Williams and Gregory Bartolomei, and John Sears, an attorney in private practice

---

[3] These facts relate only to the certified claims. Facts supporting the procedural and uncertified claims are set forth under those individual claims.

who served as learned counsel.[4] (ER 3916-3917.) Williams and Sears focused on the guilt phase, and Bartolomei focused on the penalty phase. (ER 3917, 4091, 4144.)

Williams was lead counsel. (ER 3996.) Mitchell was Williams's first federal capital client. (ER 3969.) Williams had represented three capital defendants in state court, but he had never tried a penalty phase before a jury. (ER 3970-3973.) Williams cross-examined four of the prosecution's guilt-phase witnesses and conducted the direct examination of one penalty-phase witness. (ER 678, 720, 835, 1008.)

Sears joined Mitchell's defense team several months after Williams and Bartolomei. (ER 4181.) Sears had previously served as learned counsel in two or three federal capital cases, but Mitchell's was his first federal capital case to go to trial. (ER 4120-4121.) Sears had represented approximately six capital defendants in state court,[5] only one of which was ultimately tried as a capital case. (ER 4119, 4181-4182.) As the primary "courtroom presence," Sears conducted voir dire, delivered opening and closing statements in both phases, and cross-examined eleven prosecution witnesses. (ER 678, 720, 779, 835, 863, 931, 984, 1079, 4124.)

Bartolomei, who assumed primary responsibility for developing mitigation, had not tried a murder case and had no capital litigation experience. (ER 4029, 4088, 4091, 4112.) Bartolomei examined all but one of Mitchell's penalty-phase witnesses. (ER 966, 1008.)

---

[4] A federal capital defendant is entitled to two attorneys, "of whom at least 1 shall be learned in the law applicable to capital cases[.]" 18 U.S.C. § 3005.

[5] It is unclear how many of these state cases predated Mitchell's case. (ER 4119.)

Voir dire in Mitchell's trial began on April 1, 2003. (SER 358.) Jail records indicate that in the sixteen months before trial, Sears visited Mitchell for 28 minutes (in May 2002), Williams visited for 8 hours and 5 minutes (last visiting in October 2002), and Bartolomei visited for 39 hours and 40 minutes. (ER 3628-3648.)

### B. Evidence of Intoxication in Discovery

At the very first status hearing, after the government had summarized the allegations, the district court asked whether there was any evidence of drinking. The government acknowledged that at least some of the defendants' statements referred to drinking alcohol. (ER 102.)

In fact, before making his initial appearance in federal court, Mitchell gave four statements to the FBI, all of which mentioned drinking on or about October 28, 2001, the alleged date of the murders:

- On November 4, Mitchell stated that he passed out several times from drinking beer on October 27 and 28. (ER 1897.)
- Later on November 4, Mitchell stated that he and Orsinger were hitchhiking and "partying out somewhere" when they were picked up by the victims. (ER 1882.) Mitchell also mentioned "drinking" twenty-two times and alcohol-induced blackouts and memory loss. (ER 1882-1896.)
- On November 5, Mitchell admitted helping Orsinger stab Slim but "said that he was so drunk (at the time of the murder) that he could not remember how many times" he stabbed her. (ER 1900.)
- On November 29, Mitchell stated that he and Orsinger drank beer before going to Gallup, New Mexico, where they bought liquor. They carried the liquor in a bag as they hitchhiked home. (ER 1902-1903.)

Drugs and drug paraphernalia, along with Mitchell's belongings, were found in the room where Mitchell was arrested. (ER 329-330, 347-352.)

## C. Substance Abuse Issues in Jury Selection

### 1. *Juror Questionnaire*

Mitchell's defense counsel requested that the veniremembers answer six questions about substance abuse. (ER 110.) The government did not object to "advising the jury that the case may involve alcohol and/or drug use" because there was evidence of both. (ER 513, 516.) Sears argued that ascertaining the veniremembers' attitudes toward drugs and alcohol was necessary "because there will be, in our view, evidence of alcohol, substance abuse introduced in this trial through any number of possible witnesses." (ER 514.)

The final juror questionnaire asked whether veniremembers were associated with an organization concerned with substance abuse; whether they, a close friend, or family member had been affected by substance abuse or an alcohol- or drug-related incident; and whether they, a close friend, or family member had been diagnosed with or received treatment for substance abuse. (ER 3486.)

### 2. *Voir Dire*

Sears asked follow-up questions of veniremembers who reported personal experience with substance abuse in their questionnaires.[6] Some of Sears's questions probed veniremembers' general ability to be fair or serve on a case involving evidence of drug or alcohol abuse. (SER 372, 377, 396, 421.) Other, more specific questions tested prospective jurors' openness to guilt-phase defenses and penalty-phase mitigation involving drug or alcohol abuse. For instance, Sears asked J.D. whether her family's substance abuse problems would impact her

---

[6] The seated jurors and alternates' completed questionnaires are located at SER 6-357.

ability to fairly evaluate "evidence about substance abuse in any context, either in connection with the case or somebody trying to explain their life and what happened in their life[.]" (SER 361.) Sears also asked several veniremembers whether their personal history would cause them to judge others "more harshly" if they heard evidence of substance abuse.[7] (SER 366, 390, 402, 411.)

None of the veniremembers indicated they could not be fair if presented with evidence of substance abuse. To the contrary, several stated that their personal history made them particularly understanding of alcoholics or drug users. H.B., for example, stated that his relatives' drug problems would cause him to "have sympathy" for substance abusers. (SER 384-385.) R.A. said that, as a recovering alcoholic, he would not judge substance abusers more harshly because he "understand[s] alcoholics a little better than the average person does." (SER 380.) C.L. stated that she was "accepting of" her father's drinking problem. (SER 402.) T.D. believed that his DUI arrest had "opened [his] eyes" and "saved [his] life." (SER 410-411.)

Likewise, several of the veniremembers selected as jurors or alternates[8] had positive experiences with recovery from substance abuse. When Sears asked seated juror K.B. if evidence of drug or alcohol abuse would shock or offend her, K.B. replied, "[A]ll the years of being around [substance abuse] in my opinion certainly has helped me understand it more. Years of therapy helped me -- help

---

[7] By the last day of voir dire, the government anticipated the defense questioning regarding alcohol and drug abuse by asking two veniremembers whether their personal experiences would affect their views of substance abuse evidence; both said it would not. (SER 418, 424.)

[8] Because the four alternates were not selected until immediately before deliberations began, the guilt phase was tried without the parties knowing which jurors would be seated. (ER 946.)

you understand those diseases better." (SER 414.) Alternate juror L.M. said that his son's imprisonment for drug possession was "the best thing that ever happened to him." (SER 256, 389-390.) Similarly, alternate juror J.M. stated that his stepdaughter's arrest for drug possession would not lead him to judge someone "more harshly because they might have had a problem with alcohol or drugs"; his stepdaughter had "straightened out" and was "doing really good." (SER 405-406.)

## D. Pretrial Indications of Defense Strategy

### 1. *Jury Instructions*

Prior to trial, the defense requested that the district court give Ninth Circuit Model Instruction 6.8 (now Instruction 6.9), which provided: "You may consider evidence of [intoxication] . . . in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the intent required to commit [crime charged]." (ER 527.) Yet the defense did not, at the same time, request an instruction on impaired capacity as a mitigating factor in the penalty phase. (ER 546, 567.)

### 2. *Witness Lists*

Several weeks before trial began, the district court noted that Mitchell had not provided notice of a mental health expert, as required by Federal Rule of Criminal Procedure 12.2. Bartolomei stated that mental health evidence was "still being developed," and that counsel had no plans to introduce any mental health expert evidence in the guilt phase but might present some such evidence in the penalty phase. Bartolomei further stated that the defense would "probably" present a witness "in terms of explaining background and matters along those lines, social history, there would be an expert for that." (ER 598.)

Ultimately, the defense did not call any experts at either phase of Mitchell's trial.

### 3. *Estimates of Length of Trial*

During voir dire, Sears estimated a week-long defense case in the guilt phase and three to four days of penalty-phase mitigation. (SER 374.) But the defense did not present a case at the guilt phase, and by the end of the guilt phase, Sears had revised his mitigation estimate downward to half a day. (ER 951-952.)

## E. THE GUILT PHASE

### 1. *Opening Statements*

The government's theory of the case was that Mitchell and Orsinger killed the victims to obtain a truck for use in the trading post robbery. (ER 685-687.) In the defense's five-minute opening statement, Sears conceded that the crimes were horrible, and that Mitchell was present when they occurred. (ER 680, 688.) But he argued that the killings were committed by Orsinger alone. (ER 688.)

### 2. *The Government's Case*

On Sunday, October 28, 2001, sixty-three-year-old Alyce Slim and her nine-year-old granddaughter, Jane Doe, set off in Slim's pickup truck from Fort Defiance, Arizona, on the Navajo Indian Reservation ("Reservation"), to visit Betty Denison, who lived on the Reservation in Tohatchi, New Mexico, about half an hour away. (ER 689-694.) Slim and Doe were last seen leaving Denison's home at 5:00 p.m. (ER 695.)

Raushandal Combs testified that on the night of October 29, he and Gregory Nakai gave Mitchell and Orsinger a ride to an area near Mitchell's grandfather's house. (ER 765-768.) Orsinger was carrying a big bag. (ER 765.) Orsinger gave Combs directions to a location about twenty-five miles away, near Orsinger's father's residence in Tsaile, Arizona. (ER 767.) Combs and Nakai picked up Mitchell and Orsinger in Tsaile two hours later, at which point Orsinger no longer had the bag. (ER 766, 768.)

On October 31, three armed men wearing Halloween masks and purple gloves robbed the Red Rock Trading Post on the Reservation of $5,542.32 and the employees' purses. (ER 697-698, 702-707, 842.) Witnesses saw one of the robbers pumping gas into a truck matching the description of Slim's truck. (ER 707, 710.)

Cooperating witness Jason Kinlicheenie testified that he, Jakegory Nakai, and Mitchell robbed the trading post. (ER 745-746.) Kinlicheenie further testified that Jakegory Nakai (Gregory's brother) formulated the plan to rob the trading post and discussed it with Gregory and Mitchell. (ER 743-744.) According to Kinlicheenie, Mitchell and Orsinger left on a Friday night for Gallup to obtain a truck for use in the robbery. (ER 744, 753.) When they returned, Mitchell told Kinlicheenie that he had stolen a truck and parked it in the mountains. (ER 744.) Later, he told Kinlicheenie that he and Orsinger had killed a "small" person and an "old lady." (ER 745.) Kinlicheenie saw Mitchell with a silver butterfly knife, which Mitchell said he got at the Gallup mall. (ER 754.)

Slim's truck was recovered on November 1. (ER 714-715.) The interior was burned and bloodstained. (ER 716, 782-786, 788.) The driver's seat was lacerated, and the truck contained burned cleaning materials, clothing, purple latex gloves, Halloween masks, purses, and a bloodstained blanket. (ER 773-776, 781.) Mitchell's fingerprint and palm print were on the truck bed, and he could not be excluded as a DNA contributor to one of the masks. (ER 847-848, 855.)

Following a tip by Jimmy Nakai (Gregory and Jakegory's brother), Mitchell and several others were arrested at the Nakai house on November 4. (ER 789.) During the arrests and ensuing search, a silver butterfly knife fell out of Mitchell's pants, and a black knife was found in another bedroom. (ER 790, 792.) Slim's DNA matched blood found on the silver knife; Mitchell, Slim, and Jakegory Nakai

could not be excluded as contributors to DNA on the black knife. (ER 853-855.)

FBI Agent Raymond Duncan recounted Mitchell's initial, non-incriminating statement on the afternoon of November 4. (ER 825-826.) Agent Trace Kirk testified that later that day, Mitchell admitted to being present while Orsinger killed Slim and Doe and confessed to the trading post robbery. (ER 729-730, 837-838.) At the end of the interview, Mitchell agreed to help law enforcement find the victims' bodies. (ER 730.)

On November 5, Orsinger took the FBI to the crime scene in Tsaile, where the victims' bodies and two large rocks containing Doe's blood were recovered. (ER 730, 812, 815, 828, 856.) Mitchell arrived an hour later and told the FBI where the victims' heads and hands were buried. (ER 727-728, 730.) Two latex gloves were in the hole with the body parts. (ER 816-817.) Mitchell could not be excluded as a contributor of DNA on one of the gloves. (ER 859.)

Slim's cause of death was stab wounds. (ER 882.) Slim's thirty-three wounds were consistent with both knives, and included defensive wounds. (ER 879, 881-882, 886.) Doe's cause of death was blunt-force trauma to the head, consistent with the two rocks found at the scene. (ER 889-890.) The pathologist also noted a very small incised wound on Doe's neck. (ER 886.) The victims' heads and hands had been removed postmortem. (ER 880-881, 889.)

Agent Kirk testified regarding Mitchell's unrecorded November 5 interview at the crime scene. According to Kirk, Mitchell stated that he had participated in stabbing Slim, that he had cut Doe's throat twice, that he told Doe to lay down on the ground and die, and that he and Orsinger took turns dropping rocks on Doe's head. Kirk testified that Mitchell also stated that he dug a hole, that Orsinger used an axe to sever the victims' heads and hands, and that they put the body parts into the hole. (ER 730-731.)

Duncan testified that in the November 29 interview, Mitchell stated that he and Orsinger had hitchhiked to Gallup to buy liquor. (ER 829.) Duncan further testified that alcohol sales are prohibited in Gallup on Sundays. (ER 831.) When Sears attempted to question Duncan regarding Mitchell's reference to drinking on the day of the carjacking, the government's objection was sustained. (ER 839.)

Duncan and Agent Kent Hush testified that on November 29, Mitchell admitted stabbing Slim four or five times and helping Orsinger throw rocks on Doe's head. (ER 797, 830.) According to Duncan, Mitchell also admitted helping Orsinger bury the victims' heads and hands. (ER 830.)

### 3. *The Defense Case*

Defense counsel subpoenaed Orsinger to testify. (ER 860.) Outside the presence of the jury, Orsinger stated that he would invoke his Fifth Amendment privilege against self-incrimination with respect to the carjacking of Slim and Doe. (ER 885). The district court found that there was a basis for Orsinger's invocation, and that Orsinger need not invoke before the jury. (ER 886.) The defense rested without presenting any evidence. (ER 899.)

### 4. *Jury Instructions*

After trial was well underway, the defense again requested an intoxication instruction. (ER 675.) The next day, the government argued that the instruction was unwarranted because "there has been absolutely no evidence of intoxication in this case." (ER 903.) When the district court stated that it included an intoxication instruction "because I knew that the defense would probably be able to point to something in the record that would support this somehow," Sears admitted that the evidence "doesn't support you giving this instruction." (ER 903.) Therefore, the district court did not instruct the jury on intoxication at the guilt phase.

### 5. *Guilt-Phase Closing Arguments*

The government argued in closing that the killings were part of a plan to obtain a truck for use in the trading post robbery. (ER 923-930.)

In closing, Sears urged the jury to question the accuracy of Mitchell's statements and argued that there was not proof beyond a reasonable doubt that Mitchell aided and abetted the killings of Slim and Doe, or that Slim's killing occurred in the District of Arizona. (ER 934-937.) Sears conceded that the evidence might support convictions for felony murder. (ER 938-939.) But he argued that Mitchell's lack of premeditation precluded convictions for carjacking resulting in death and first-degree murder, even if the jury found that he had aided and abetted those crimes, because Orsinger simply "went off." (ER 938, 940.)

The jury returned guilty verdicts on all counts the next day. (ER 950.)

## F. THE PENALTY PHASE

### 1. *Mitchell's Waiver of His Penalty-Phase Appearance*

After the verdicts were read, Mitchell informed the district court that he did not want to appear at the penalty phase. (SER 427.) Defense counsel immediately moved to withdraw. (ER 952.) On the following day, May 9, counsel renewed their motion to withdraw; the district court denied the motion. (SER 433-434.) On May 14, the district court accepted Mitchell's waiver of his appearance at the penalty phase. (SER 443.) Afterward, counsel again moved to withdraw, and the district court again denied their request. (SER 443-444.)

### 2. *Gateway Intent and Aggravating and Mitigating Factors*

In addition to alleging all four "gateway intent factors" under 18 U.S.C. § 3591(a)(2) for each victim, the government alleged the following statutory aggravating factors under 18 U.S.C. § 3592(c): (1) pecuniary gain; (2) heinous, cruel, or depraved manner of committing offense; (3) substantial planning and

premeditation; (4) vulnerability of victims; (5) multiple killings; and (6) the death of [Jane Doe] during the commission and attempted commission of the kidnapping of [Jane Doe]. (ER 980-981, 1065-1066.) The government also alleged the nonstatutory aggravating factor of harm to the victims' families. (ER 981, 1068.)

The defense initially alleged five mitigating factors: (1) Mitchell's lack of a significant prior criminal record; (2) that another person equally culpable in the crime will not be punished by death; (3) that Mitchell would be sentenced to life imprisonment without parole if not executed; (4) that Mitchell had responded well to structured environments and would make an excellent adaptation to prison if sentenced to life without parole; and (5) that other factors in Mitchell's childhood, background, record, character, or any other circumstance mitigated against a death sentence. (ER 981-982.)

**3. *Penalty Opening Statements***

In their penalty opening, the government indicated that it was adopting the guilt-phase evidence to satisfy the gateway intent and statutory aggravating factors, and that the only new evidence was victim-impact testimony from the family. (ER 983-984.)

In the defense penalty opening, Sears told the jury that they would hear why Mitchell's was "a life worth saving," as well as evidence regarding Orsinger's culpability and criminal history, information on the Navajo Nation's anti-death-penalty position, and background on "Lezmond's life up to those fateful days in October of 2001." (ER 984.)

**4. *Government Case: Aggravating Factors***

The government's penalty-phase presentation consisted entirely of victim-impact evidence. Leo Slim testified that the loss of his wife Alyce had hurt him and their children. (ER 986.) Marlene Slim testified that she missed her mother

and daughter greatly. (ER 992.) Slim's other daughters, Geraldine Slim and Kimberly Houston, discussed how they and their children had been harmed by the deaths. (ER 987, 990.) All of Slim's daughters emphasized Slim's crucial role in educating her grandchildren about Navajo culture. (ER 987-991.)

### 5. *Defense Case: Mitigating Factors*

Bartolomei examined the friends, family, and former educators who testified as Mitchell's mitigation witnesses.

The defense's key witness was Robert Roessel, a high school principal and superintendent, who testified that Mitchell was an outstanding athlete and student. (ER 994-996.) Roessel thought that Mitchell, coming from a family of educators, had the potential to teach others in prison, and that his life should be spared. (ER 999.) Roessel last saw Mitchell at his high school graduation in 2000 -- more than a year before the October 2001 crimes -- and had no idea "what happened to him after graduation." (ER 999-1000.)

Some of Roessel's testimony was unfavorable. Roessel recounted how, after graduation, Mitchell had disappointed him by burglarizing his office and stealing a computer and the shotgun used in the trading post robbery. (ER 997, 1001.) Roessel had to intervene so Mitchell could graduate after he allegedly possessed marijuana at school. (ER 996.)

Roessel and his wife Ruth, a teacher, touched on Mitchell's troubled childhood. Roessel testified that Mitchell lacked pride and "didn't know who he was" because he grew up in a home with "no love." (ER 997, 999.) Mitchell never knew his father, and his one-quarter Navajo background was a "liability" on the Reservation. (ER 998-999.) Mitchell's mother and maternal grandparents were professional educators who took little interest in Mitchell's education or Navajo culture. (ER 997-998.) Ruth Roessel alluded to Mitchell's "cold home,"

marked by the absence of his mother and grandmother. (ER 1003.)

At this point, Bartolomei informed the district court that the defense would present seven more witnesses and the videotaped testimony of Mitchell's grandmother. (ER 1004.) Williams, who had not previously examined any penalty-phase witnesses, then spoke up to say that the defense would put on an eighth witness, Agent Duncan. (ER 1004-1005.) Williams proffered Duncan's testimony regarding, *inter alia*, Mitchell's statement "that he consumed what appears to be an enormous amount of alcohol" on the day of the murders. (ER 1005.) The district court ruled that this testimony was admissible at the penalty phase. (ER 1013.)

Next, other educators spoke to Mitchell's intelligence, leadership capabilities, and nonviolent nature. Marty Conrad, Mitchell's football coach, testified that Mitchell was a team leader. (ER 1018-1020.) John Fontes, an assistant high school principal, testified that Mitchell became an excellent student. (ER 1021.) Sonja Halsey, Mitchell's English teacher, testified that he was bright and respectful. (ER 1028.) Both Fontes and Halsey testified that Mitchell tended to withdraw from violence and could teach others in a structured environment, and that Mitchell's mother, Sherry, refused to accept Fontes's calls about Mitchell's marijuana possession incident. (ER 1021-1023, 1028-1030.) Halsey volunteered that she had heard that Mitchell's crimes involved alcohol, which surprised her because she had not known Mitchell to drink alcohol. (ER 1029.)

Several friends and family members testified briefly. Auska Mitchell, Mitchell's uncle, testified that Mitchell was loving and respectful, aside from one incident in which Auska caught Mitchell with a marijuana pipe. (ER 1016.) Auska asked that Mitchell's life be spared because he "was a good kid until he met Johnny Orsinger." (ER 1017.) Lorenzo Reed and Tammy Sebahe described how

Mitchell lived at their home during his senior year of high school; Mitchell did chores and was considered a member of the family. (ER 1025-1026, 1031.) Sebahe had visited Mitchell in pretrial custody and had not seen him create a disturbance. (ER 1032.)

On cross-examination of Mitchell's mitigation witnesses, the government elicited that Mitchell was smart and thoughtful, knew the difference between right and wrong, and wouldn't allow himself to get "dragged into" violent situations. (ER 1000-1001, 1017, 1023, 1030.)

Williams then called Duncan, the case agent, as the last live witness. (ER 1032.) Duncan testified that while Mitchell had no prior felony convictions, Orsinger and Gregory Nakai were convicted of similar charges for the murders of Jasper Sam and David Begay in August 2001, but were not facing the death penalty for those convictions. Orsinger, Gregory Nakai, and others had carjacked and killed Sam and Begay after Sam bought bootleg alcohol from the group. (ER 1035-1036.)

Agent Duncan further testified that Mitchell reported drinking so heavily on the day of the offenses that he passed out and could not remember details of the crimes. (ER 1032-1033.) However, on cross-examination, Duncan testified that he didn't believe Mitchell's report of intoxication because Mitchell was able to take law enforcement to the crime scene. (ER 1037.) Duncan added that while Mitchell had mentioned buying liquor in Gallup on Sunday, October 28, Gallup is in a county that is dry on Sundays. (ER 1042.)

The penalty phase concluded with the videotaped testimony of Bobbi Mitchell, Mitchell's ailing grandmother. (ER 1043.) Bobbi outlined her background, Mitchell's unsettled childhood, and his struggles to fit in as a "half-breed on the Reservation." (ER 1056.) She said she loved Mitchell and asked the

jury to spare his life because "[h]e is so much a teacher and an educator" and had a "talent for music and for other people." (ER 1056.)

**6. *Impaired-Capacity Instruction***

At the close of the penalty-phase evidence, Sears requested an instruction on the statutory mitigating factor of impaired capacity.[9] (ER 1050.) The government objected, noting that the intoxication issue "has obviously been known for a while. It's been in all of the reports about drinking." (ER 1050.) The district court found that there was sufficient evidence to warrant an impaired-capacity instruction, and the jury was so instructed. (ER 1062, 1069.)

**7. *Penalty Closing Arguments***

The government's closing argument focused on the brutality of, and alleged pecuniary motive for, the crimes. (ER 1072.) The government argued that the guilt-phase evidence satisfied the gateway intent factors and aggravating factors for both victims. (ER 1073-1077.) The government further argued that the victim-impact evidence established the nonstatutory aggravating factor of harm to the family. (ER 1077) The government urged the jury to impose a death sentence because "[s]ome crimes are so bad, so horrific, so inexplicable, so unnecessary, that we cannot explain them. We simply punish them." (ER 1078.)

In defense closing, Sears argued that the FDPA's gateway intent factors for death eligibility required the jury "to find unanimously beyond a reasonable doubt

[9] The Federal Death Penalty Act ("FDPA") defines "impaired capacity" as "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1).

that Lezmond Mitchell was the actual killer of both of these people."[10] (ER 1081-1082.) Noting that Orsinger had already carjacked and killed two people by the time he and Mitchell went to Gallup, Sears suggested that Orsinger was the actual killer of both victims. (ER 1080.) Sears also emphasized the lack of proportionality in Orsinger and Gregory Nakai's non-capital sentences. (ER 1082-1083.)

Sears mentioned that Mitchell was "drinking hard" at the time of the murders, but he did not connect this evidence to any mitigating factor. (ER 1080.)

As mitigation, Sears pointed to Mitchell's lack of a criminal record and the positive qualities he exhibited before "[s]omething happened." (ER 1080.) Sears continued, "Let's talk for a minute about what happened. I can't tell you. I can't tell you because we are never going to know. None of us are ever going to know exactly what happened." (ER 1083-1084.) Sears then characterized Bobbi's penalty-phase testimony as epitomizing Mitchell's lack of family support:

> She was my witness. But she spoke for 29 minutes without talking about Lezmond. She talked about

---

[10] These factors are

> that the defendant (A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2).

> herself. And at the end she talked about Lezmond. I know that undercuts the value of what she says, but for God's sake, that's powerful information about what happened to Lezmond. His grandmother who raised him is asked to give a statement to a jury that's concerning whether he should die and she wants to talk about her own resume.

(ER 1084.) Nevertheless, Sears downplayed Mitchell's childhood, stating, "That's an awful way to send somebody out into the world. But people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

After dismissing the effect of Mitchell's background, Sears said, "So what happened? What happened? Lezmond didn't know who he was. He didn't know if he was Navajo. He didn't know if he was Anglo. . . . He was always an outsider." (ER 1084.) Sears also highlighted Orsinger's bad influence on Mitchell and called Mitchell a "jackass" for being present during the murders. (ER 1084.) "Of course it's not fair for Lezmond to breathe the same air if he is the killer," Sears stated. (ER 1085.) But Sears suggested that "maybe some year" Mitchell could help someone by serving as a "negative object lesson" to another inmate or by having a book written about him. (ER 1085.)

Sears also quoted from the Navajo Nation Attorney General's letter requesting leniency, arguing that it was important that "the Navajo people, the nation with the most at stake in this case," didn't want Mitchell to face the death penalty. (ER 1086.) Sears concluded with a plea for mercy, as he asked the jury to embrace "the possibility that if Lezmond Mitchell lives on, he might help someone else[.] Maybe he won't. Maybe he will. But isn't it worth a chance?" (ER 1086-1087.)

In rebuttal, the government argued that Orsinger's juvenile status undermined the defense's proportionality argument. (ER 1088.) The government also disputed the defense's argument that Mitchell had to be the actual killer to satisfy the gateway intent factors. (ER 1088-1089.) The prosecutor mocked the mitigation evidence by asking, "[I]s that how you come to cause this kind of death, your mother's not in the picture?" (ER 1089.) Although the government acknowledged the Navajo Nation's position was not to be "taken lightly," it contended that Mitchell had "completely rejected" Navajo values through his actions. (ER 1090.) Portraying Mitchell as intelligent and remorseless, the government argued that the jury should show no mercy to Mitchell because he had shown no mercy to the victims. (ER 1090-1091.)

**8.** ***Verdicts and Sentencing***

On May 20, 2003, the jury recommended the death sentence. (ER 1096.) The jury found all gateway intent factors and statutory and nonstatutory aggravators true for both victims. (ER 1095-1097.) The jury unanimously found the following mitigating factors: Mitchell lacked a significant prior record, another person equally culpable will not be punished by death, and Mitchell would be sentenced to life imprisonment without possibility of release if not sentenced to death. (ER 1096-1097.) Two jurors found that Mitchell had responded well to structured environments and would adapt well to prison, one juror found impaired capacity, and six jurors found Mitchell's background or any other circumstance of the offense to be a mitigating factor. (ER 1096-1097.) Seven jurors wrote in that they found the Navajo Nation letter mitigating. (SER 452, 460.)

On September 15, 2003, the district court imposed the death sentence on the carjacking count, and two life sentences plus 384 months on the remaining counts. (ER 1100.)

## G. SECTION 2255 PROCEEDINGS

The parties presented additional information concerning trial counsel's investigation and preparation in declarations, exhibits, and depositions filed in these Section 2255 proceedings.

### 1. *Investigation*

#### a. Social History

Mitchell's trial counsel hired a mitigation specialist, Vera Ockenfels. (ER 3305.) Ockenfels, an attorney with capital-defense experience, communicated primarily with Bartolomei and had little meaningful contact with Williams or Sears. (ER 3305.) The defense's fact investigator, Karl Brandenberger, drove Ockenfels to her appointments and "kept her safe on the reservation" but did not interview any mitigation witnesses. (ER 3270-3271.)

Ockenfels conducted a social history investigation, which entailed interviewing Mitchell's caretakers, extended family, teachers, and treatment providers and gathering supporting documentation. (ER 3306.) Although Ockenfels contacted most of Mitchell's friends, Bartolomei spoke to Mitchell, Mitchell's grandparents, Mitchell's uncle, and former educators. (ER 4038-4043.)

The defense failed to enlist Mitchell's mother Sherry in their mitigation efforts. Ockenfels sought Sherry's insights into the family's history of mental illness but alienated her by revealing personal information to Mitchell that Sherry expressly instructed her not to disclose. (ER 3204-3205.) As a result, counsel did not obtain a social history from Mitchell's mother, and heard only Mitchell's grandmother's sanitized account of his upbringing. (ER 3205, 4039.)

In a draft social history report, Ockenfels detailed Mitchell's family history, education, behavioral issues, mental health and medical history, cultural identity issues, substance abuse history, and criminal history. (ER 3089-3134.) Ockenfels

characterized Mitchell's childhood as marked by abandonment, instability, isolation, and abuse. (ER 3099-3108.) Mitchell never knew his father, an exchange student from the Marshall Islands, and Sherry often left him with his maternal grandparents while she pursued her career. (ER 3098-3108.) When Mitchell lived with Sherry, the result was interpersonal conflict, as well as physical and verbal abuse. (ER 3101-3103.) Mitchell's grandmother, likewise, was frequently absent due to employment off the Reservation and when present, she was physically and verbally abusive to Mitchell, as she had been to Sherry. (ER 3097, 3101.) Mitchell's grandfather was distant and uninterested. (ER 3102.) Mitchell's mother and grandparents had graduate degrees in education and worked as teachers and school administrators, but they showed a pronounced lack of interest in Mitchell's education and well-being. (ER 3096, 3098, 3104.)

Mitchell, who was one-quarter Navajo, lacked strong ties to Navajo culture. (ER 3093, 3120-3123.) Mitchell's mixed racial background, inability to speak Navajo, and the relative education of his family isolated him from his peers and extended family on the Reservation. (ER 3094, 3103, 3113 n.37.)

Mitchell started displaying behavioral problems indicative of Attachment Disorder and Attention Deficit Disorder in kindergarten, and they persisted through his childhood. (ER 3112-3115.) At age seventeen, Mitchell underwent counseling with Dr. Edward Fields, who documented Mitchell's suicidal ideation and drug use and diagnosed him as a "very troubled young man" who needed "intensive psychotherapy" to avoid "anti-social behavior that could produce serious law encounters." (ER 3117-3118.) Mitchell never received the recommended treatment. (ER 3119.)

Ockenfels catalogued Mitchell's long history of substance abuse: an arrest for public intoxication a year before the crimes; regular use of alcohol, marijuana,

cocaine, and crack; increasingly heavy use of crystal meth and alcohol in the period preceding the offenses; and a referral for alcohol treatment in jail shortly after his arrest. (ER 3124-3126.) The public intoxication arrest stemmed from a rollover accident in which the driver was killed and Mitchell was the passenger. (ER 3124.)

Ockenfels described Mitchell's lack of direction after graduation, when, unemployed and without a stable place to live, he moved from city to city and job to job. (ER 3111.) Upon returning to the Reservation in August 2001, he started living at the Nakai house, drinking heavily, doing drugs, and staying up for days at time. (ER 3125, 3131.)

Ockenfels recommended that the trial team consult a mental health expert, such as a forensic psychologist, to present Mitchell's social history in a compelling manner to the jury. (ER 3308.) Despite Bartolomei's pretrial representation to the court that the defense would "probably" present such an expert during the penalty phase (ER 598), no expert of any kind testified on Mitchell's behalf at trial.

**b. Intoxication**

All three defense counsel stated in depositions that Mitchell told them that he was not under the influence of drugs or alcohol at the time of the crimes. (ER 3942, 4031-4032, 4128.) Trial counsel did not see any evidence of drinking in the FBI's crime-scene photographs. (ER 3967.)

Bartolomei told Ockenfels that the defense would not pursue intoxication evidence because Mitchell had denied being drunk or high at the time of the killings. Ockenfels advised Bartolomei that it was not uncommon for capital clients to falsely deny alcohol and drug use. Further, drawing upon her experience as a criminal defense attorney in New Mexico, Ockenfels emphasized that it is not

uncommon for young Native American clients to minimize or deny their addiction to alcohol and drugs to their attorneys. Nevertheless, relying on Mitchell's alleged denials, trial counsel did not do any additional investigation of intoxication. (ER 3307-3308.)

Ockenfels concluded that Mitchell was addicted to drugs and alcohol and that his substance abuse affected his mental state at the time of the killings. She therefore recommended that the trial team consult with a psychopharmacologist or other expert to determine whether Mitchell was "tweaking" from drug use and/or sleep deprivation or in a fugue state during the killings. Trial counsel did not pursue this line of investigation. (ER 3306-3307.)

Ockenfels also recommended that trial counsel interview co-defendant Orsinger about alcohol and drug use. (ER 3308.) It is disputed whether this interview occurred. Williams and Bartolomei recalled that Orsinger's attorney would not allow an interview. (ER 3929, 4097.) Defense investigator Brandenberger gave conflicting hearsay statements as to whether he interviewed Orsinger, but the file obtained by post-conviction counsel contains no record of this interview, or any notes by Brandenberger whatsoever. (ER 3270-3271, 4112.) Orsinger could not remember whether he was interviewed by Brandenberger, but he stated in a post-conviction declaration that by the time he and Mitchell arrived in Gallup, they had been awake for several days drinking and using drugs, including marijuana laced with cocaine and methamphetamine. (ER 3218.)

Trial counsel did not recall seeking to interview co-defendant Gregory Nakai or any other residents of the Nakai house regarding Mitchell's drug and alcohol use. (ER 4001, 4045, 4127.)

Bartolomei knew that Mitchell was "partying a lot" but wasn't sure whether he had "a problem" with drugs and alcohol. (ER 4043.) Williams knew Mitchell

smoked marijuana and drank alcohol but "never got the impression that he was addicted to . . . meth or cocaine." (ER 3932.) Sears knew generally that Mitchell had a history of substance abuse. (ER 4134.) Investigator Brandenberger had no knowledge of Mitchell using drugs at any time. (ER 3271.)

**c. Mental Health**

Counsel initially consulted psychologist Susan Parrish to assist in reviewing materials, but she did not prepare a report. (ER 3925-3926, 4034-4035.)

Anne Herring conducted a neuropsychological evaluation of Mitchell. (ER 3617.) She concluded that Mitchell was of average intelligence but displayed mild executive functioning difficulties, specifically in planning and strategy formation, due to a tendency to respond impulsively and quickly. (ER 3617-3618.) Although Herring believed that Mitchell's executive functioning deficits stemmed from emotional factors, rather than from traumatic brain injury, a brain scan revealed mild abnormalities that might have resulted from abuse, playing football, or fighting. (ER 3152.) Herring never heard back from defense counsel after preparing her report. (ER 3618.)

Dr. Barry Morenz performed a psychiatric evaluation. (ER 3135.) Morenz examined Mitchell twice, spoke to Brandenberger and Ockenfels, and reviewed Mitchell's neuropsychological and neurologic evaluations, other medical tests, the indictment, and crime reports. (ER 3135-3136.) Counsel did not provide Morenz with information regarding Mitchell's alcohol and drug use in the period preceding his offenses. (ER 3597-3598.)

Morenz concluded that Mitchell was competent to stand trial. (ER 3152.) He also diagnosed Mitchell with depressive disorder, polysubstance abuse in a controlled environment, a provisional diagnosis of cognitive disorder, antisocial personality disorder, and a history of head injuries. (ER 3151.) Morenz advised

that a PET scan could corroborate the brain abnormalities Herring found. (ER 3152.) Morenz concluded that Mitchell's abusive childhood and lack of a clear ethnic identity shaped his "serious personality problems" and that "subtle brain dysfunction" caused by multiple head injuries might have contributed to increased impulsivity at the time of the offenses. (ER 3152.) Like Herring, Morenz never heard back from trial counsel after preparing his report. (ER 3598.)

The trial attorneys disregarded Ockenfels's suggestion to consult with and present a mental health expert to testify about Mitchell's background and explain his early resort to substance abuse. (ER 3308.)

**2. *Counsel's Description of Guilt-Phase Strategy***

In post-conviction depositions, counsel stated that the guilt-phase strategy was to argue that Mitchell "didn't do it" but was present "when Johnny Orsinger again went crazy." (ER 4011, 4103, 4126.)

Counsel testified that they did not pursue an intoxication defense because supporting evidence was lacking. (ER 4126.) Sears believed that only Mitchell or Orsinger could have testified to the intoxication. (ER 4129.) Williams admitted that there was evidence of alcohol use but thought an intoxication defense "wasn't even close." (ER 3941, 4011.)

Sears also stated that a more fundamental problem with a diminished-capacity defense was its incompatibility with the guilt-phase defense "that Lezmond was a good person led astray under circumstances." (ER 4129.) In Sears's view, intoxication evidence "didn't fit" with the argument that Orsinger, and not Mitchell, was the prime mover behind the crimes. (ER 4129, 4192.)

Neither Sears nor Williams could remember who on the defense team sought a diminished-capacity instruction or why such a request had been made. (ER 3966, 4168.)

### 3. *Counsel's Description of Penalty-Phase Strategy*

The plan for the penalty phase, according to Bartolomei, was "[t]o present favorable witnesses about Lezmond Mitchell and to have Lezmond there to make the tie between those witnesses and Lezmond." (ER 4099.) Williams stated that the mitigation case was that there was "some value" to Mitchell's life and that "life in prison is no cake walk." (ER 3962.) The unifying theme of the penalty phase was "a life worth saving," meaning that Mitchell "had potential, . . . could be a leader, . . . had somewhat of a gift as a person." (ER 4076, 4145.) Therefore, Bartolomei wanted the mitigation witnesses to "[t]alk about Lezmond personally and what they knew of him and how they knew him," not to discuss Mitchell's drug use or upbringing. (ER 4075.)

Williams described the mitigation investigation as a search for "[s]omething that . . . would explain this type of behavior," by which he meant evidence of insanity, brain damage, or physical and sexual abuse. (ER 3938-3939.) However, Williams admitted that Mitchell's "tough persona" would have prevented him from disclosing any sexual abuse. (ER 3946.)

#### a. Social History

Sears believed the defense attempted to show the jury "the deprivation of Lezmond's background, his isolation, the way in which he was treated by his family, particularly his mother, and his gravitation towards this gang and the way in which they behaved." (ER 4144-4145)

Williams and Bartolomei, on the other hand, did not consider Mitchell's social history mitigating because his family was educated and employed. (ER 3946, 4102.) Although Williams considered Mitchell's mother a "piece of crap," he was not aware of any sexual abuse or chronic physical abuse to present as mitigation. (ER 3946-3947.) Bartolomei's takeaway point from interviews of

Mitchell's grandparents was that Mitchell came from "a family of educators." (ER 4037.)

**b. Intoxication**

Bartolomei testified that trial counsel decided that presenting evidence of intoxication as mitigation was incompatible with the "Lezmond didn't do it" guilt-phase defense and would detract from the "life worth saving" theme of the penalty phase. (ER 4063.) Bartolomei also thought that substance abuse issues were irrelevant given the dates of the crime. (ER 4043.)

Sears believed that, after the September 11 attacks, jurors would consider mental health or substance abuse presentations "excuses," and he noted that the responses on the juror questionnaires were especially harsh. (ER 4149-4150.)

Bartolomei could not explain why, if trial counsel had determined that Mitchell's substance abuse had no value as mitigation, co-counsel Williams decided to question Agent Duncan about intoxication at the end of the penalty phase. Bartolomei didn't recall discussing this decision to elicit evidence of intoxication with Williams or Sears beforehand. (ER 4099.)

**c. Mental Health**

Bartolomei testified that while trial counsel initially thought that a "psych defense" based on blackouts or substance abuse was the best approach, Mitchell disputed that version of events. (ER 4049.)

Bartolomei further stated that the psychiatric mitigation route was "dangerous" because it "would have destroyed the positive things we had to present" and opened the door to evidence of antisocial conduct in Morenz's report. (ER 4064-4065, 4101.) Similarly, Sears stated that he saw an "inherent contradiction" in presenting both mental health mitigation and "positive" information about Mitchell. (ER 4149.) Williams didn't recall the particulars of

Morenz's report because "Greg [Bartolomei] was primarily dealing with that stuff," and mitigation "was Greg's area of expertise." (ER 3936, 3945.)

Bartolomei wasn't concerned about a family history of mental illness because the Mitchells "seemed like a very bright family" (ER 4059), and Sherry, in particular, was "an educator and . . . educated." (ER 4102.)

**d. Mitchell's Waiver of Penalty-Phase Appearance**

According to Sears, the penalty-phase calculus changed significantly when Mitchell decided to waive his penalty-phase appearance. (ER 4147.) Similarly, Bartolomei thought Mitchell's waiver of penalty-phase appearance hampered the mitigation presentation because the strategy involved Mitchell "sitting there and watching someone like Dr. Roessel[] make the kind of presentation that he made as a witness." (ER 4073.)

***4. Observers' View of Penalty-Phase Preparation***

**a. Mitigation Witnesses**

Mitchell's mitigation witnesses indicated that counsel did not adequately prepare them to testify. In five-to-ten-minute meetings on the morning they were set to testify, the mitigation witnesses were shown photographs of the victims' bodies and asked whether they still wanted Mitchell to receive a life sentence. (ER 3193-3194, 3227, 3265, 3286-3287.) Some of the witnesses had never met Mitchell's attorneys before, and none was advised of the questions counsel planned to ask. (ER 3227, 3265, 3286-3287.) Significantly, when Halsey tried to bring up Mitchell's neglectful family, counsel told her to discuss only Mitchell's classroom performance. (ER 3266.)

Other mitigation witnesses were selected by happenstance. Ruth Roessel ended up testifying because she was present during counsel's interview of her husband, even though she did not really know Mitchell or his family and was

never interviewed or otherwise prepared for her testimony. (ER 3236-3237.) Sebahe was chosen as a mitigation witness when she accompanied her mother to an appointment with Mitchell's lawyers; upon deciding that Sebahe's mother would not make a good witness, counsel simply asked Sebahe a few background questions and asked her to testify instead. (ER 3245.)

**b. Experienced Death-Penalty Attorneys**

From the outset, Ockenfels was concerned by counsel's treatment of mitigation "as distinctly separate from the guilt phase, rather than an integral part of both the guilt and penalty phases of the trial." (ER 3305.) In Ockenfels's experience, the practice among death-penalty attorneys was to involve all team members in developing all aspects of the defense, since guilt-phase defenses may bear on penalty-phase issues. (ER 3305-3306.) Further, Ockenfels disagreed with the view, expressed by all of Mitchell's lawyers, that there was "no mitigation" in the case. (ER 3306.)

This view of inadequate mitigation preparation was also held by Ken Murray, counsel's colleague in the Arizona Federal Public Defender's Office ("Arizona FPD") and previous learned counsel in several federal capital cases, who consulted on Mitchell's case when asked. Trial counsel repeatedly emphasized the bad facts of the case and told Murray there was "no mitigation." Murray thought that the mitigation investigation was insufficient or that counsel didn't recognize the mitigation value of information they had gathered. (ER 3281-3283.)

Richard Burr, an adviser to the Federal Death Penalty Resource Counsel and another seasoned death-penalty attorney, consulted with Mitchell's attorneys after being contacted by a concerned Murray. In October 2002, Burr advised counsel that considerably more work needed to be done with respect to preparing expert

testimony on mental health, and that the work could not be completed by the time of trial, then set for January 2003. Burr offered further assistance but was never contacted by Mitchell's attorneys again. (ER 3267-3269.)

**5. *New Evidence***

Post-conviction counsel's investigation uncovered additional evidence relevant to the guilt and penalty phases.

**a. Social History**

Mitchell's mother Sherry was raised in a household that was much more violent and dysfunctional than counsel realized, based on their discussions with Mitchell's grandmother Bobbi. George and Bobbi fought frequently with each other and with Sherry, beating and choking her. (ER 3187-3188, 3197, 3199, 3250.) Mitchell's uncle, Auska, recalled George threatening to kill Bobbi with a bow and arrow. (ER 3187.) Once Auska was so upset by his parents he told them to "just go ahead and kill [him]," at which point Bobbi deliberately reversed a truck in his direction, and Auska had to jump out of the way to avoid being hit. (ER 3190.) Auska and Sherry compared their mother to Joan Crawford in "Mommy Dearest." (ER 3201.)

Persistent allegations of sexual abuse exacerbated the extreme conflict in Mitchell's family. George was reportedly fired from a school principal post because he molested children. (ER 3197, 3681, 3684, 3686.) Closer to home, Bobbi frequently accused her daughter and her husband of having an incestuous relationship; George and Sherry shared a bed during trips to other parts of the Reservation, and people mistook them for husband and wife. (ER 3197-3198.) Bobbi's younger sister and half-sister accused George of raping or molesting them when they were children. (ER 3666, 3678, 3689-3690.) Bobbi also suggested that George had molested the three-year-old child of a neighbor. (ER 3677.)

Hilary Weaver, a doctor of social work, was retained by post-conviction counsel to evaluate social history information that could have been presented at Mitchell's trial. (ER 3500-3501.) Weaver concluded that the conflict-ridden family relationships between Bobbi, George, and Sherry that predated Mitchell's birth continued to shape his childhood. (ER 3541.) The frequent shuttling between caregivers prevented Mitchell from developing a sense of stability. (ER 3541.) Bobbi and Sherry's willingness to leave Mitchell for extended periods of time with George, "a man whom they knew sexually preyed on children," exemplified the magnitude of their neglect. (ER 3882, 3884.) In Weaver's view, Mitchell's addiction represented an escape from his extremely dysfunctional family and escalated significantly in the months preceding the crimes. (ER 3542.)

**b. Intoxication**

Declarations signed by Mitchell's co-defendants, other residents of the Nakai house, and associates of the Nakais recounted rampant drug and alcohol use in the period immediately before and after the killings. In the middle of 2001, after returning from an unsuccessful stint in Phoenix, Mitchell started associating more with the Nakais and less with his high school friends. (ER 3258-3259.) When Mitchell visited his old friends, either Gregory Nakai or Kinlicheenie would pick him up and take him back to the Nakai compound. (ER 3259.) Despite the Reservation's prohibition on alcohol sales, bootleggers were plentiful, and the Nakais were notorious for having beer and drugs on hand. (ER 3176, 3226, 3290-3291, 3674, 3703.)

Nothing in the record suggests that the Nakais or their associates were unavailable to speak to defense counsel or testify at trial. In fact, during the guilt phase, Bartolomei informed the district court that defense counsel was considering calling "the Nakai brothers" as penalty-phase witnesses. (ER 832.) Even so,

counsel did not seek to interview the Nakais or their associates about Mitchell's substance abuse or any other topic. (ER 4001, 4045, 4126.) In his post-conviction declaration, Gregory Nakai stated that Mitchell moved into his house in the summer of 2001 and was part of a group of people who drank beer, ate mushrooms, and smoked marijuana, crystal meth, and cocaine there regularly. (ER 3211-3213.) The group's use of crystal meth and cocaine, in particular, escalated after August 2001. (ER 3212.) Gregory stated that he would have provided this information earlier if asked, and his attorney stated that he would have allowed Gregory to be interviewed by Mitchell's attorneys, and to sign an affidavit regarding enormous drug and alcohol use at the Nakai house prior to the offenses. (ER 3213, 3683.)

Other residents of the Nakai house could have testified to similar effect. Jakegory Nakai stated that he and his brothers, Mitchell, and their friends drank a lot of beer, smoked marijuana, and used crystal meth, cocaine, and ecstasy whenever they could, and that the group's drug use increased between August and November 2001. (ER 3453.) Padrian George stated that through the summer and fall of 2001, all the residents of the Nakai house, including Mitchell, drank beer and used drugs, including powder and crack cocaine, methamphetamine, and ecstasy, to stay high as long as possible. (ER 3175-3176.) This level of drug use continued until Mitchell's arrest. (ER 3176-3177.) Both Jakegory Nakai and George indicated that they would have spoken to Mitchell's counsel about drinking and drug use if asked. (ER 3454, 3177.) George was arrested at the Nakai house the same morning but was not under indictment. (ER 3175.)

Jimmy Nakai corroborated the use of beer, marijuana, crack cocaine, and methamphetamine, as well as the consumption of crack cocaine and methamphetamine in quantities sufficient to sustain an all-day high. (ER 3456-

3457.) Dennie Leal, who knew Mitchell through the Nakai brothers, averred that he "partied" with Mitchell and the Nakais. (ER 3182.) The "partying," which consisted of smoking marijuana and drinking alcohol, "lasted for days, or the whole weekend." (ER 3182.) Bryant Wilson, another visitor to the Nakai house, reported using marijuana, cocaine, methamphetamine, beer, and sometimes hard liquor there in the summer of 2001. (ER 3703.) Mitchell's friend, Herman Tsosie, once saw Mitchell "tweaking" after eating mushrooms and using cocaine at the Nakai house. (ER 3259.) All of these potential witnesses indicated that they would have provided this information to Mitchell's counsel if asked; Wilson and Tsosie were not under indictment. (ER 3457, 3182, 3260, 3704.)

Post-conviction counsel also discovered evidence of Mitchell's family history of alcoholism. Mitchell's father, Foster Hemil, died at age 43 of alcohol-related liver disease. (ER 1983, 3179.) Court records from Hemil's 1983 California conviction for burglary and assault with intent to commit sexual battery indicated that he was drunk at the time of the offense and later had his probation revoked for driving under the influence. (ER 2152-2153.) Hemil's probation officer recommended a no-alcohol condition, in light of Hemil's "ongoing alcohol-criminal offense syndrome." (ER 2153.)

**c. Mental Health**

Mitchell's grandmother Bobbi, his primary guardian, had a history of mental illness dating back to the late 1960s. (ER 2229.) Sherry reported that Bobbi went into "trances" that required psychological treatment and prescription medication. (ER 3202.) In 1976, Bobbi was diagnosed with severe chronic anxiety. (ER 2239.) In 1985, when Mitchell was three years old and in Bobbi's care, she was diagnosed with "rather severe situational depression of a chronic nature." (ER 2231.) Bobbi's mental health issues manifested themselves in obsessive cleaning

and serious interpersonal difficulties at work. (ER 3376, 3155-3163, 3167-3174, 3261-3264.) She was also verbally abusive toward the children whose education she supervised, particularly those with behavioral problems. (ER 3160, 3183, 3248-3249, 3263.) This abuse carried over to Bobbi's care of Mitchell, whom she whipped and berated. (ER 3224, 3200.)

After being informed of Mitchell's drug and alcohol use in the months and days before the offenses, as detailed in the declarations obtained by post-conviction counsel, Dr. Morenz indicated that this additional information could have made a "significant difference" in his diagnosis. (ER 3597.) The multiple eyewitness accounts indicated to Morenz that Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered," and Morenz would have been available to testify to this conclusion at trial. (ER 3598.)

Post-conviction counsel consulted a psychiatrist, Pablo Stewart, to evaluate Mitchell. Mitchell told Dr. Stewart that he had not slept for the three days prior to the crimes, and that he drank malt liquor and used methamphetamine, ecstasy, and a combination of crack cocaine and marijuana before going to Gallup. (ER 3390-3391.) Stewart diagnosed Mitchell with Posttraumatic Stress Disorder ("PTSD"), Substance Dependence, and Substance-Induced Psychotic Disorder ("SIPD") at the time of the offenses. (ER 3419.) Stewart stated that he or a similar mental health professional would have testified that Mitchell's severe intoxication, SIPD, and PTSD "synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral functioning, which severely impaired his ability to premeditate or intend to commit murder" and "made him unable to appreciate the wrongfulness of his actions." (ER 3419.)

# V.

# SUMMARY OF ARGUMENT

This Court should reverse the district court's denial, without an evidentiary hearing, of Mitchell's Section 2255 motion to vacate his convictions and death sentence under the Federal Death Penalty Act.

At a minimum, Mitchell's certified claims of ineffective assistance meet the low threshold for an evidentiary hearing. Constitutionally deficient investigation doomed Mitchell's guilt-phase defense. Despite readily available evidence of Mitchell's intoxication, counsel unreasonably chose to rely solely on Mitchell's denials and FBI crime-scene photographs to rule out a diminished-capacity defense. But counsel's investigation was so limited that any decision they made cannot be considered strategic, and their failed attempt to present evidence of intoxication undermines their claims of strategic judgment. A hearing is required to resolve the stark contradiction between the record and counsel's *post hoc* claims, and to determine whether Mitchell was prejudiced by the failure to competently investigate and present a diminished-capacity defense.

Trial counsel's mitigation investigation was, if anything, even more deficient. Counsel's collective lack of experience in presenting a mitigation case to a jury led them to downplay the value of classic mitigating evidence of substance abuse, mental illness, cognitive deficits, and a troubled background, much to the concern of their own mitigation specialist and experienced death-penalty lawyers who consulted on the case. Instead of attempting to gain the sympathy of even one juror by portraying Mitchell's difficult childhood, his depression, and his downward spiral into drugs and alcohol in the months before the offenses, counsel's deficient investigation led them to select an anemic "life worth saving" presentation of Mitchell's intelligence and educated family that,

predictably, worked to the prosecution's advantage. Again, the district court clearly erred in concluding, without a hearing, that counsel's feeble performance resulted from strategic judgment, not inadequate investigation.

The district court also erred by denying Mitchell's request for juror interviews. Mitchell showed the required good cause, and the local rule's idiosyncratic "good cause" standard should not be applied to defeat the fact-finding purpose of Section 2255 proceedings, particularly in a capital case.

New facts, developed through just this sort of post-conviction investigation, shed light on claims that were raised on direct appeal. First, Mitchell has provided new evidence of federal-tribal collusion to deprive him of his federal procedural rights -- namely, a court record that specifically links the outcome of Mitchell's tribal criminal damage case to "arrangements" with the United States Attorney's Office. Second, Mitchell has demonstrated that courtroom spectators' wearing of buttons commemorating the victims threatened his right to a fair trial. Third, Mitchell has shown that the government's belated disclosure of the Navajo Nation's letter requesting leniency prejudiced his penalty-phase defense by preventing counsel from calling a representative of the Nation to testify at his trial.

Two other claims also warrant an evidentiary hearing. Mitchell has presented evidence of his heavy use of jail-brewed alcohol and drugs during trial, as well as an expert opinion attesting to the impact on his competency to make the crucial decision to waive his penalty-phase appearance. In addition, the Arizona Federal Public Defender's Office simultaneously represented Mitchell and another client connected to Mitchell's case, but refused to reveal the other client's name on grounds of attorney-client privilege. This Court should order disclosure and remand for an evidentiary hearing exploring the nature of the conflict and any adverse effect on Mitchell's representation.

## CERTIFIED ISSUES

## VI.

## ARGUMENT

### Standard of Review for Certified Claims

This Court reviews the denial of a Section 2255 petition, as well as ineffective assistance of counsel claims, de novo. *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003). The district court's factual findings are reviewed for clear error. *United States v. Christakis*, 238 F.3d 1164, 1168 (9th Cir. 2001).

The district court's denial of an evidentiary hearing is reviewed for abuse of discretion. *Rodrigues*, 347 F.3d at 823. Where, as here, the district court has denied an evidentiary hearing, this Court must take as true a Section 2255 petitioner's allegations, "unless palpably incredible or patently frivolous." *United States v. Leonti*, 326 F.3d 1111, 1114 (9th Cir. 2003).

### Discussion

### A. COUNSEL WAS INEFFECTIVE WITH RESPECT TO INVESTIGATING, PREPARING, AND PRESENTING AN INTOXICATION DEFENSE AT THE GUILT PHASE (CLAIM A).

To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

#### 1. *Counsel's Failure to Investigate Intoxication Constituted Deficient Performance, Not Strategic Judgment.*

At the time of Mitchell's trial, it was well-settled that "in a prosecution for a specific intent crime, intoxication (although voluntary) that precludes formation of the requisite intent may be established as a defense." *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985). When a defendant offers evidence of

intoxication, "his capacity to form specific intent at the time of the offense becomes an element which, like all other elements of the crime, must be proved by the government beyond a reasonable doubt." *Id.* Mitchell was charged with several specific-intent crimes, including the capital count of carjacking resulting in death. *See Holloway v. United States*, 526 U.S. 1, 11 (1999). Yet counsel's unreasonable reliance on Mitchell's denials of substance abuse led them to short-circuit any serious investigation of intoxication.

Contrary to the district court's conclusion, counsel did not reasonably investigate an intoxication defense. Deficient performance "is necessarily linked to the practice and expectations of the legal community[.]" *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010). Under prevailing professional norms, counsel's duty to investigate an intoxication defense did not begin and end with Mitchell's denials of substance abuse. Rather, the American Bar Association standards in effect at the time of Mitchell's trial indicate that counsel's "duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt[.]" *ABA Standards for Criminal Justice: Prosecution and Defense Function* 4-4.1 (3d ed. 1993); *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7(A)(1) (rev. ed. Feb. 2003) ("2003 ABA Death Penalty Guidelines"). These ABA standards and guidelines are "guides to determining what is reasonable," *Strickland*, 466 U.S. at 688, and "valuable measures of the prevailing professional norms of effective representation[.]" *Padilla*, 130 S. Ct. at 1482; *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Although strategic decisions based on information provided by the client may be reasonable and entitled to deference, "counsel must consider all of the defendant's statements, not just those that make his job easier," especially when

confronted with "glaring inconsistencies." *Duncan v. Ornoski*, 528 F.3d 1222, 1239 (9th Cir. 2008). As this Court has noted, "an attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished." *Johnson v. Baldwin*, 114 F.3d 835, 840 (9th Cir. 1997). Mitchell gave four statements to the FBI. Although these statements varied greatly in terms of how incriminating they were, each mentioned drinking, intoxication, or alcohol-induced blackouts during the relevant period. (ER 1882-1897, 1900, 1903.) In a case where even the government repeatedly admitted there was evidence of drinking (ER 102, 513, 516, 1050), effective defense counsel could not simply dismiss Mitchell's earlier statements as untrue and accept his later statements as true.

The investigation counsel did conduct was unreasonably limited in scope. Aside from speaking to Mitchell, counsel's investigation of intoxication consisted solely of looking for evidence of drinking in the FBI's crime-scene photographs. (ER 3967.) However, much of the other key evidence in this case, such as the knives, was not recovered from the site where the bodies were found, and Combs's testimony indicated that the defendants had returned to the crime scene, presumably to destroy or remove evidence, the following day. (ER 765-766, 768.) Further, prevailing standards of practice in capital cases recognized that "[t]he assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial[.]" 2003 ABA Death Penalty Guidelines, cmt. to Guideline 4.1, *reprinted in* 31 Hofstra L. Rev. 913, 958 (2003). By contrast, Mitchell's fact investigator was relegated to the role of chauffeur and bodyguard for the mitigation specialist. (ER 3271.) Investigator Brandenberger could not identify any substantive guilt-phase investigation he conducted, aside from interviewing Johnny Orsinger's

grandmother and, perhaps, interviewing Orsinger himself. (ER 3271.) Brandenberger produced no reports of his investigation, and the files received by post-conviction counsel contained no notes by him. (ER 3270.) That Brandenberger was wholly unaware of any drug use by Mitchell underscores the deficiency of counsel's investigation of intoxication. (ER 3271.)

Counsel's reliance on mitigation specialist Ockenfels could not replace a thorough factual investigation of intoxication. This is particularly true here, where Ockenfels believed very strongly that Mitchell was in fact intoxicated at the time of the crimes, and advised counsel to follow up with a psychopharmacologist to support this defense. Counsel could not reasonably delegate these investigatory tasks to Ockenfels and then disregard all of her recommendations. *See Johnson v. United States*, 2012 WL 1836282, at *180 (N.D. Iowa Mar. 22, 2012) (finding deficient performance and granting penalty-phase relief in capital Section 2255 case where counsel's decision not to pursue further investigation "was not based on any advice of the experts, but contrary to it"). Counsel's dismissal of Ockenfels's recommendations demonstrates that nothing she could have said would have overcome counsel's reliance on Mitchell's denials of intoxication. But at a minimum, Ockenfels's conclusions "would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Counsel's disregard of Ockenfels was particularly unreasonable because she provided a plausible explanation for the "glaring inconsistencies" in his statements. Ockenfels alerted counsel to the possibility that Mitchell was minimizing his substance abuse problems, a phenomenon that she had encountered with other young Native American clients. In fact, Mitchell's personal history, as documented in Ockenfels's report, demonstrated a tendency toward minimization. He told a counselor in September 1998 that he had "[n]o substance related

problems at school or out," even though he had previously been suspended for sniffing keyboard cleaner, his family thought he was a drug addict, and he was later suspended for possession of marijuana paraphernalia. (ER 1648, 1649, 1653, 1770.) Given the weight counsel reportedly placed on Mitchell's denials, and their awareness of Mitchell's desire to maintain a "tough persona" (ER 3946), Ockenfels's warning should have spurred additional investigation of intoxication. "Competent counsel undertaking to represent defendants with unique cultural backgrounds have an obligation at least to consider the effect of that background on their clients' conduct." *Siripongs v. Calderon*, 35 F.3d 1308, 1315 (9th Cir. 1994). Yet there is no indication that counsel took seriously the possibility that Mitchell, like some of Ockenfels's previous Native American clients, was minimizing his substance abuse.

Counsel's request to interview Orsinger, if such a request was made, did not absolve them of the duty to further investigate intoxication. First, it is disputed whether Orsinger was available for such an interview and whether such an interview actually occurred; Mitchell's attorneys did not think Orsinger was interviewed, but Brandenberger gave conflicting statements on this score. (ER 3929, 4097, 3270-3271, 4112.) In any event, there is no indication that the defense planned to ask Orsinger about intoxication. The defense's proffered line of questioning at trial involved Orsinger's involvement in the "narrative that the government had laid out," beginning with the trip to Gallup and ending with any meetings or conversations between Mitchell and Orsinger after the postmortem mutilation. (ER 884.) The defense did not specifically seek to ask any questions about Mitchell's intoxication, and Orsinger, when invoking his Fifth Amendment right against self-incrimination, did not specifically refuse to answer questions about drinking or using drugs prior to the crimes. (ER 885.) By allowing

Orsinger to assert, in essence, an improper "blanket refusal to answer any questions," *United States v. Pierce*, 561 F.2d 735, 741-42 (9th Cir. 1977), counsel missed another opportunity to probe Orsinger's knowledge of intoxication and to get that information before the jury.

Counsel also unreasonably failed to interview other available witnesses regarding Mitchell's alcohol and drug use before and after the offenses. Counsel apparently assumed that the Nakais and their associates were unavailable for interviews because they were under indictment in Mitchell's case or the Sam/Begay murder case. (ER 3929-3930, 4045-4046.) But their assumption was both unreasonable and wrong. Declarations obtained by post-conviction counsel indicate that co-defendant Gregory Nakai knew of Mitchell's massive alcohol and drug use in the period immediately before the offenses, and that he and his attorney would have granted Mitchell's counsel an interview on this subject. (ER 3211-3213, 3683.) It was far from clear that those charged only in the Sam/Begay case would decline to discuss substance abuse postdating those offenses, which occurred in August 2001; rather, Jimmy Nakai and Dennie Leal stated that they would have provided such information if Mitchell's counsel had asked. (ER 3457, 3182.) And several available witnesses were not interviewed despite not being charged in either case. Padrian George, for instance, lived at the Nakai house with Mitchell and was available to testify regarding his firsthand knowledge of Mitchell's drug use in the summer and fall of 2001. (ER 3175-3176.) Even if not exactly contemporaneous with the offenses, the testimony of the Nakais, Leal, and George would have bolstered Mitchell's diminished-capacity defense by providing probative evidence of chronic intoxication in the months and days preceding the offenses. *See United States v. Kenyon*, 481 F.3d 1054, 1071 (8th Cir. 2007) (citing evidence of defendant's abuse of illegal drugs as support for voluntary

intoxication defense). By neglecting to interview these available witnesses, counsel also failed to obtain information that Morenz considered crucial to his psychiatric diagnosis. (ER 3597.)

Counsel's failure to investigate, prepare, and present intoxication evidence supporting a diminished-capacity instruction cannot be justified as reasonable strategy. Counsel claimed that they abandoned an intoxication defense early on because it lacked evidentiary support and detracted from the guilt-phase defense of "Lezmond didn't do it." (ER 4063, 4129.) Yet the record shows that, contrary to these representations, counsel pursued an intoxication defense to the end of the guilt phase. Sears attempted to elicit evidence of drinking from Agent Duncan, but was stymied by a government objection, and Williams renewed the defense's earlier request for an intoxication instruction even after that. (ER 839, 675.) Thus, even if this Court begins with the premise that counsel's actions "'might be considered sound trial strategy,'" *Strickland*, 466 U.S. at 689, Mitchell has overcome that presumption. When the record shows that counsel in fact pursued a course that they claimed they intentionally sought to avoid, counsel's claimed "strategic decision" "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations[.]" *Wiggins*, 539 U.S. at 526-27.

Counsel's requests for a jury instruction lacking evidentiary support further demonstrate deficient performance. In *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), this Court considered the fact that counsel "secured jury instructions for second degree murder and manslaughter, but did not present any evidence at trial to cast doubt on [petitioner's] ability to form the requisite intent for first degree murder" as evidence of deficient performance. *Id.* at 1019; *see also Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998). Here, counsel failed even to secure

a jury instruction on diminished capacity due to intoxication, to the apparent surprise of the district court. (ER 903.) But their attempt to present an intoxication defense belies their *post hoc* claims of strategically avoiding an intoxication defense altogether. Until the diminished-capacity instruction was denied, counsel had "every reason to develop the most powerful" case on intoxication possible. *See Wiggins*, 539 U.S. at 526. Therefore, the district court clearly erred by finding that "counsel strategically chose to try to preserve their credibility with the jury by not asserting a [diminished-capacity] defense they thought would fail." (ER 23.)

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. With respect to an intoxication defense, Mitchell's attorneys did neither. Rather, their deficient investigation of intoxication flowed directly into a deficient presentation of the defense at trial, culminating in Sears's concession that evidence to support a diminished-capacity instruction was lacking. (ER 903.) If the diminished-capacity defense lacked evidentiary support, as the district court found (ER 22), the cause was inadequate investigation, not strategic judgment. The district court thus erred by finding competent performance at the guilt phase.

**2. *Counsel's Failure to Adequately Investigate and Present Evidence of Intoxication Prejudiced Mitchell's Guilt-Phase Defense.***

To establish *Strickland* prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Counsel's deficient investigation and presentation of an intoxication defense prejudiced Mitchell by depriving him of his only viable opportunity to avoid, if not conviction, at least conviction on the specific-intent crimes, including the capital charge of carjacking resulting in death. Had counsel sought the testimony of other important witnesses, such as Gregory Nakai and George, they could have presented additional evidence of Mitchell's chronic intoxication in the period before and after the crimes. Had counsel acted competently by interviewing the residents of the Nakai house and providing Dr. Morenz with evidence of Mitchell's substance abuse preceding the offenses, Morenz could have testified that Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered." (ER 3598.) Given the district court's prior ruling that intoxication evidence was exculpatory, not inculpatory (ER 1050), there is a reasonable probability that, had counsel objected to Orsinger's blanket invocation of privilege, Orsinger would have testified to the fact that he and Mitchell were heavily intoxicated and had been awake for three days straight during the relevant time period. An intoxication defense would have put specific intent in play as an element to be proved by the government beyond a reasonable doubt, *Echeverry*, 759 F.2d at 1454, and there is a reasonable probability that the jury would have found that Mitchell lacked the required intent for conviction.

Without a viable intoxication defense, counsel was left with a unadorned "Lezmond didn't do it" argument that was hampered by the trial evidence, including multiple incriminating statements and forensic testimony linking Mitchell to a knife used to stab Slim. In short, counsel was reduced to disputing the accuracy of Mitchell's confessions and arguing that while Mitchell was present and did nothing to stop the killings, either he did not actively participate or the

crimes weren't premeditated. (ER 688, 934, 938.) Counsel's failure to thoroughly investigate the stronger and complementary intoxication defense, which would have worked with the evidence rather than against it, should undermine this Court's confidence in the outcome of Mitchell's guilt phase.

## B. COUNSEL WAS INEFFECTIVE AT THE PENALTY PHASE (CLAIMS B AND D).

### 1. *Counsel's Deficient Mitigation Investigation Precluded a Fully Informed Decision Regarding Sentencing Strategy and Culminated in a Deficient Penalty-Phase Presentation.*

The *Strickland* standard for ineffective assistance applies to the penalty phase of a capital trial. 466 U.S. at 686-87. However, "[b]ecause the evidence presented at each phase of a trial serves a markedly different purpose," this Court "analyze[s] the reasonableness of counsel's efforts to prepare for trial and sentencing differently." *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006). Specifically, "the reasonableness of counsel's investigatory preparatory work at the penalty phase should be examined in a different, more exacting, manner than other parts of the trial." *Id.* Here, counsel's deficient investigation of Mitchell's substance abuse, mental health issues, and social history resulted in a scattershot and self-contradictory penalty-phase presentation that played directly into the hands of the prosecution.

None of Mitchell's attorneys had ever tried a penalty phase before a jury, and their inexperience showed. Each attorney had a different conception of the penalty phase, and they often worked at cross purposes. Bartolomei, who bore primary responsibility for investigating and presenting mitigation evidence, favored the "life worth saving" and "family of educators" themes. Williams, who had not previously participated in the penalty-phase presentation, devised the last-minute idea of requesting an impaired-capacity instruction and questioning Agent

Duncan to support this mitigating factor -- evidently without consulting Bartolomei beforehand. Williams's failure to coordinate with Bartolomei resulted in Halsey's unwittingly damaging testimony, volunteered on direct, that she was surprised to hear that Mitchell's crimes might have been alcohol-related because she had not known him to drink alcohol. (ER 1029.)

Moreover, Sears's opening and closing statements bore little relation to the testimony they bookended. Sears didn't mention intoxication in his opening, and he made only passing reference to Mitchell "drinking hard" in closing, which he qualified by noting that the government had cast doubt on Mitchell's access to alcohol. (ER 1080.) Sears's closing barely touched on the "life worth saving" theme and "family of educators" themes. (ER 1083.) Sears undercut the mitigation value of Mitchell's grandmother's testimony by criticizing her recounting of her resume, which was presumably important to the "family of educators" theme. (ER 1083.) While Sears stated in his post-conviction deposition that counsel had presented social history evidence (ER 4144-4145), in actuality he raised and rejected Mitchell's "awful" childhood as a mitigating factor virtually in the same breath when he said that "people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

This sort of incoherent penalty-phase presentation resulting from "role confusion" "can only be characterized as a deficiency in trial preparation, not a strategic decision." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998). At bottom, this deficiency in trial preparation and the deficient selection of penalty-phase strategy that preceded it can be traced back to counsel's decision to "abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

**a. Counsel's Failure to Investigate the Wide Range of Potentially Mitigating Evidence at the Penalty Phase Constituted Deficient Performance.**

Counsel's deposition testimony evinces a fundamental misunderstanding of what constitutes relevant mitigation evidence. Williams thought only insanity, brain damage, or chronic physical and sexual abuse would constitute fruitful mitigation. (ER 3939.) But "all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level." *Wallace v. Stewart*, 184 F.3d 1112, 1117 n.5 (9th Cir. 1999); *see also Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982). This misconception explains why Mitchell's counsel clashed with the mitigation specialist and consulting death-penalty lawyers as to whether there was "no mitigation" in Mitchell's case. This cramped view of mitigation evidence led to counsel's failure to "fulfill their obligation to conduct a thorough investigation of the defendant's background" for relevant information that could be presented at the penalty phase. *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also* ABA 1989 Death Penalty Guidelines 11.4.1; *Wiggins*, 539 U.S. at 524. The mitigation investigation was also hindered by the little time counsel spent visiting Mitchell, totaling about 48 hours and averaging about 3 hours per month, which "indicates that there was little direct exchange of information" between them and their client, "and little opportunity . . . to develop the necessary rapport" to represent him in the penalty phase. *Johnson v. United States*, 2012 WL 1836282, at *1 n.3.[11] Mitigation specialist Ockenfels

[11] In *Johnson*, counsel spent a total of 114.3 hours visiting their client over 64 months, including a period before capital charges were filed. 2012 WL 1836282, at *1 n.3. In granting Section 2255 penalty-phase relief, the district

spent about 11 hours with Mitchell (ER 3628-3648), barely more than the 10.2 hours found inexcusably low in *Johnson*. *Id.*

This misunderstanding of mitigating evidence colored counsel's unreasonable decision to curtail investigation into Mitchell's substance abuse, mental health issues, and executive functioning deficits. This Court has emphasized that the broad scope of relevant mitigation necessitates a more thorough investigation at the penalty phase than at the guilt phase. In *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004), this Court held that counsel was not ineffective for failing to raise drug use at the guilt phase, in accordance with their client's wishes. *Id.* at 719 n.7. Yet it granted an evidentiary hearing on penalty-phase ineffectiveness because "[t]he penalty phase . . . is another matter. There, no tactical or strategic reason explains why [counsel] would have failed to investigate or provide evidence of [petitioner's] drug use." *Id.* Similarly, this Court has "cautioned that in presenting a penalty phase mitigation defense based on mental health, counsel should not merely rely on competency evaluations conducted at the guilt phase, which are prepared for a different purpose." *Summerlin v. Schriro*, 427 F.3d 623, 642 (9th Cir. 2005) (en banc). "A defendant who is mentally competent for trial may nonetheless suffer a mental illness that is severe enough to mitigate his culpability." *James v. Ryan*, 2012 WL 639292, at *33 (9th Cir. Feb. 29, 2012). In other words, even if counsel reasonably foregoes an intoxication or mental health defense at the guilt phase, they must reassess the value of such evidence at the penalty phase. Here, that did not happen.

Counsel claimed that they made a strategic decision to stop investigating Mitchell's history of substance abuse in light of his denials and their desire to

---

court cited the client contact records as evidence of "Johnson's alarmingly dysfunctional defense team." *Id.* at *1 & n.3.

focus on Mitchell's positive attributes and lack of direct responsibility for the murders. These claims of informed strategy fail for three reasons. First, a proper understanding of the mitigating potential of intoxication and addiction evidence would have led competent counsel to expand their investigation of substance abuse beyond Mitchell's intoxication on the day of the crimes. Regular use of addictive substances in high doses can be relevant to the statutory mitigator of impaired capacity. *Correll v. Ryan*, 539 F.3d 938, 955 (9th Cir. 2008). The jury was also instructed on a catchall mitigation factor on "other factors in Mitchell's childhood, background, record, character, or any other circumstance mitigated against a death sentence." (ER 981-982.) And "drug use from an early age" is "an important mitigating factor" at the penalty phase even if the evidence is insufficient to show that a defendant "lacked the requisite mental state for the crime." *Frierson*, 463 F.3d at 993. Therefore, investigation of Mitchell's history of substance abuse would be relevant not only to the statutory mitigator of impaired capacity but also to mitigation not rising to the level of impaired capacity -- a point that the district court failed to consider when faulting Mitchell's post-conviction declarations for not specifying which substances Mitchell ingested "on the day of or before the offense." (ER 52.) But counsel did not pursue Ockenfels's suggestion of consulting a psychopharmacologist, nor did they interview the other residents of the Nakai house, who could have informed them of the quantity and nature of the substances Mitchell was abusing on a regular basis before the offenses.

Second, counsel simply could not have made an informed strategic decision not to present evidence of substance abuse when their underlying investigation was itself unreasonable. *Wiggins*, 539 U.S. at 523. As described above, counsel unreasonably failed to interview available witnesses who could speak not only to

Mitchell's substance abuse before and after the offenses, but also to the wide availability of bootleg alcohol in the area. As in the guilt phase, counsel limited their investigation of substance abuse to talking to their client and reviewing evidence gathered by the FBI. Yet even though one of the statements indicated that Mitchell and Orsinger purchased liquor in Gallup (ER 1902), counsel did not follow up on this lead by investigating the availability of alcohol in Gallup on Sundays, or the presence of bootleggers in the area who would sell to underage purchasers any day of the week. Counsel's unreasonably narrow focus on the family, teachers, and friends who had known Mitchell during high school distracted them from interviewing the people he lived with at the time of the offenses. Further, family members may be unreliable reporters of substance abuse, *see, e.g.*, *Frierson*, 463 F.3d at 994 n.12, especially when they had not lived with Mitchell recently. Counsel's inadequate investigation failed to discover that Mitchell's father suffered from alcoholism, and that his criminal history was strongly linked to alcohol abuse, which could have provided a biological basis for Mitchell's addiction.

Third, because counsel actively elicited evidence of Mitchell "drinking hard" from Agent Duncan at the penalty phase, they could not have made a reasonable strategic decision to curtail investigation of intoxication earlier. *See Wiggins*, 539 U.S. at 526. The district court thus clearly erred when it found that counsel made a strategic decision not to present any evidence of Mitchell's "drug and alcohol dependence" and "intoxication at the time of the crime." (ER 55-56.) Unlike in the guilt phase, where the diminished-capacity instruction was denied for lack of supporting evidence, counsel succeeded in having the jury instructed on "impaired capacity." Although the impaired-capacity instruction was requested late in the penalty phase, it undeniably formed one leg of counsel's mitigation

strategy, and counsel therefore had every reason to keep pursuing evidence of intoxication and substance abuse. Again, the discrepancy between trial counsel's claimed strategy and the record reveals counsel's claim of tactical decision making to be a "*post hoc* rationalization." *Wiggins*, 539 U.S. at 526-27.

Because "chronic drug abuse itself evinces, as well as exacerbates, serious mental illness," *James*, 2012 WL 639292, at *25, counsel's deficient investigation of substance abuse tainted their equally inadequate mental health investigation. Counsel performed deficiently by not informing Dr. Morenz of Mitchell's history of substance abuse. The district court erroneously relied on *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995), to conclude that counsel had no affirmative duty to provide Morenz with background information unless he requested it. (ER 48.) While this may be true at the guilt phase, it is not true at the penalty phase, *Wallace*, 184 F.3d at 1117 & n.5, where "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). "This duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Id.* at 1255. Counsel could not compile an accurate picture of Mitchell's mental health when they failed to provide their psychiatric expert with background information he found crucial to a diagnosis. Further, failing to investigate a family history of mental illness because the Mitchells appeared to be "bright" and well-educated was itself unreasonable. (ER 4059, 4102.) Bobbi Mitchell's history shows that being educated does not preclude crippling anxiety and depression, and the district court erred by finding that Bobbi had never been diagnosed with mental illness, and by concluding that such information would not have impacted counsel's sentencing strategy. (ER 46 & n.13.)

Counsel also failed to pursue "tantalizing indications" in the mental health experts' reports that would lead a reasonable attorney to investigate further. *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007). Neuropsychologist Herring and psychiatrist Morenz noted Mitchell's executive functioning deficits resulting in increased impulsivity, and Morenz advised counsel that additional testing could corroborate an organic basis for Mitchell's brain abnormalities, possibly stemming from his history of head injuries. (ER 3617-3618, 3151-3152.) Yet counsel never explored the neuropsychological angle as possible mitigation. (ER 3618, 3598.)

Finally, counsel's social history investigation was also deficient. Although Mitchell's uncle Auska could have testified to the emotional and physical abuse in the Mitchell family, and provided post-conviction counsel with a vivid description of his violent, dysfunctional upbringing, Bartolomei thought that Auska "did not have a problem with his upbringing." (ER 4041.) Ockenfels's betrayal of Mitchell's mother's trust meant that her social history lacked an important perspective on Mitchell's grandparents as caretakers, particularly Bobbi's mental health issues and the accusations of incest and molestation against George. Because they failed to interview Bobbi's friends and colleagues, counsel did not learn that despite being an educator by profession, Bobbi was notoriously cruel to children. The Eighth Circuit, faced with a similar record of inadequate mitigation investigation in a capital Section 2255 case where counsel's interviews "did not delve into issues of abuse or family discord," but instead merely portrayed the defendant as "a good worker and a good person," recently remanded for an evidentiary hearing because the record did not conclusively establish that counsel's performance was competent. *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). Here, "counsel abandoned their investigation of petitioner's

background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Further investigation "would have destroyed the benign conception" of Mitchell's peaceful upbringing in a "family of educators." *Cf. Rompilla*, 545 U.S. at 391. As for the evidence of abuse that Ockenfels did discover, even if counsel had strategic reasons for not putting Ockenfels on the stand, "failure to investigate the abuse through other family members and witnesses was error of constitutional magnitude." *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002).

In short, counsel's failure to investigate and "to prepare evidence relating to his family history, mental health, and substance abuse problems resulted in an egregious failure to uncover and present a raft of potentially compelling mitigation evidence." *Silva v. Woodford*, 279 F.3d 825, 850 (9th Cir. 2002). Counsel's claimed reasons for abandoning their investigation at an unreasonably early juncture do not hold up when viewed against the record. Counsel could not credibly voice a concern about opening the door to unflattering substance-abuse evidence when they themselves tried to introduce intoxication evidence at both phases of trial. Sears's stated unwillingness to provide "excuses" to a jury purportedly inured to mitigation evidence by the September 11 attacks is belied by his references to Mitchell's "drinking hard" and "terrible" childhood in closing. (ER 1080, 1084.) In addition, Sears had conducted voir dire on substance-abuse issues, and at least three jurors and alternates expressed sympathy for substance abusers or positive experiences with recovery from addiction. And any purported fear of introducing "double edge" evidence is contradicted by the fact that it was defense counsel who elicited evidence of the most serious act in Mitchell's criminal history, an uncharged burglary of Roessel's office, on direct examination in the penalty phase.

*Wiggins* refutes counsel's claim that they chose the "life worth saving" argument because it was the only theory consistent with the "mere presence" defense. In *Wiggins*, the Supreme Court explained that at the penalty phase, "direct responsibility" and traditional mitigation strategies are "not necessarily mutually exclusive." 539 U.S. at 535. The Supreme Court determined that Wiggins's counsel could not have formed a reasonable "strategic decision" to focus on their client's lack of direct responsibility for the murder, because their argument and evidence instead reflected a "shotgun" approach to the sentencing proceedings that, "[f]ar from focusing exclusively on petitioner's direct responsibility," resulted instead in "a halfhearted mitigation case." *Id.* at 526. The *Wiggins* Court concluded that counsel's "partial presentation of a mitigation case suggest[s] that their incomplete investigation was the result of inattention, not reasoned strategic judgment." *Id.* at 534. Mitchell's penalty phase, likewise, was a mishmash of several "halfhearted" mitigation cases, including eleventh-hour evidence of intoxication, a "life worth saving" presentation that hurt as much as it helped, vague social history evidence based on the testimony of lay witnesses, and closing argument that sought to establish the fact of Mitchell's "terrible" childhood by highlighting his grandmother's careerist tendencies. As in *Wiggins*, counsel's "incomplete investigation" of these multiple theories must be attributed to deficient performance, not strategic judgment, and the district court erred in concluding otherwise.

**b. Counsel's Chosen Mitigation Strategy Was Unreasonable In Its Own Right.**

Counsel's penalty-phase presentation proves that "[c]ertain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." *Silva*, 279 F.3d at 846. Even assuming

*arguendo* that counsel strategically decided to focus on a "life worth saving" mitigation strategy, that choice was unreasonable given the circumstances of the offense. This Court has held that "limiting the scope of a penalty phase presentation to evidence that the defendant is a good person who has done good deeds is, in and of itself, unreasonable where there is an extreme unlikelihood that any testimony about the defendant's character would be sufficient to humanize him." *Hamilton v. Ayers*, 583 F.3d 1100, 1122 (9th Cir. 2009); *see also Correll*, 539 F.3d at 945-46 (describing "anemic strategy" of portraying capital defendant as "good person" who had "done good deeds"). Similarly, "[i]t is difficult to imagine what kind of standard . . . would allow counsel to rely almost solely on testimony that [petitioner] was artistic and had academic potential to present a mitigating case, while failing to present *any* evidence of . . . substantial abuse to the jury for consideration in making a life or death determination[.]" *Karis*, 283 F.3d at 1139. Competent counsel could not have reasonably thought that testimony regarding Mitchell's academic and artistic potential, leadership abilities, assistance with chores, and educated family would be so compelling as to justify foregoing an in-depth presentation of their client's difficult childhood, mental health issues, executive functioning deficits, and descent into substance abuse. Counsel's claimed decision to focus on Mitchell's positive qualities was particularly deficient in light of Mitchell's decision to waive his penalty-phase appearance; as Bartolomei explained, it was important to showcase Mitchell's humanity by having him present as the mitigation witnesses spoke favorably about him. (ER 4073, 4099.)

Counsel indicated that they chose the "life worth saving" theme because it dovetailed with the "Lezmond didn't do it" defense presented at the guilt phase. Yet clinging primarily to a "lingering doubt" defense at the penalty phase, when

the defense had conceded Mitchell's presence and the jury had just soundly rejected a similar defense at the guilt phase, was "not a viable option." *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). In *Johnson*, the district court granted Section 2255 relief because it concluded that where defense counsel had conceded the defendant's presence or participation in the charged murders, and conviction at the guilt phase was likely, "any reasonable counsel would have sought to explain and mitigate Johnson's presence and/or participation with evidence of her mental health and mental state *at the time of the offenses*," and that the failure to do so, if strategic, "was the worst strategic decision" it had ever seen. 2012 WL 1836282, at *181. Mitchell's counsel made the same mistake in failing to introduce evidence of their client's substance abuse, mental illness, and cognitive impairments, which may have been caused by traumatic brain injury and could have provided a mitigating explanation for his presence at and participation in the crimes.

Here, Mitchell's counsel thought it "pretty clear from the outset that [Mitchell's case] was going to be getting to the death phase" (ER 3936), but they did not shape their penalty-phase strategy accordingly. Rather, Mitchell's counsel's devotion to the "mere presence" defense led them to select the unreasonable strategy of seeking to avoid the gateway intent factors by misstating the law. Counsel argued in closing that Mitchell was not death-eligible unless he had inflicted the fatal wounds. (ER 1079-1081). But as the government pointed out (ER 1088-1089), two of the FDPA's gateway intent factors clearly do not require proof beyond a reasonable doubt that Mitchell was the actual killer. 18 U.S.C. § 3591(a)(2). Finally, by closing with a plea for mercy, after failing to present readily available mitigation evidence of Mitchell's "troubled childhood, his history of substance abuse, and his mental and emotional problems," counsel

capped off the deficient presentation by making "essentially an argument against the death penalty in general to a jury that had at voir dire already indicated no opposition to the death penalty." *Ainsworth v. Woodford*, 268 F.3d 868, 875 (9th Cir. 2001).

**c. To the Extent That Counsel Tried to Present Social History and Intoxication Mitigation, They Did So Deficiently.**

Mitchell's counsel compounded their deficient investigation and selection of mitigation theories by inadequately preparing the theories they did present. "[T]he failure to prepare a mitigation witness adequately can render a penalty phase presentation deficient." *Hamilton*, 583 F.3d at 1121. Mitchell's penalty-phase witnesses met with counsel only briefly, usually for a few minutes on the day they testified, and these meetings consisted primarily of being shown photographs of the victims' bodies and being asked whether they still wanted to testify. *See Ainsworth*, 268 F.3d at 874 (counsel's ten-minute interview of mitigation witness was evidence of "minimal preparation for the penalty phase proceedings"). Inadequate witness preparation led to Roessel contributing aggravating evidence, and to Halsey undermining the impaired-capacity defense that counsel had not yet decided to present. This lack of preparation also prevented counsel from eliciting information regarding Mitchell's deprived background, aside from some generalities regarding his "cold home" and failure to know "who he was." *See James*, 2012 WL 639292, at *26 (deficient witness preparation resulted in "banal observations" about kindness to pets and cleanliness and failure to elicit testimony about chronic drug abuse). It is telling that at least two of Mitchell's mitigation witnesses ended up testifying only because of a "chance meeting" with counsel when they accompanied other prospective witnesses to interviews. *See Stankewitz*, 365 F.3d at 721.

Counsel's unreasonably limited investigation contributed to their blunders in presenting evidence of intoxication at the penalty phase. Even before defense counsel belatedly sought an impaired-capacity instruction, one of the mitigation witnesses had expressed doubt that the crime was alcohol-related. And counsel was unprepared for Agent Duncan's testimony that he didn't believe that Mitchell had passed out from drinking because Gallup prohibits alcohol sales on Sundays, even though Duncan had given identical testimony in the guilt phase. Because counsel had insufficiently investigated Mitchell's history of substance abuse, and had not interviewed the numerous witnesses who could testify to rampant bootlegging on the Reservation, they had no ready response to that point.

Counsel also failed to test Agent Duncan's theory that Mitchell could not have been drinking because he was later able to direct law enforcement to the site of the bodies -- a view adopted by the district court in ruling on Mitchell's motion. (ER 52.) However, prosecution witness Raushandal Combs had testified that he helped Mitchell and Orsinger return to the crime scene the day after the killings. (ER 765-768.) Thus, even under the government's theory of the case, Mitchell could have learned the route to Orsinger's uncle's property in Tsaile on this return trip. But counsel simply left the jury with the impression that Mitchell was not only sober at the time of the offenses, he had actively lied to law enforcement about it.

With respect to social history evidence, Mitchell's counsel, like defense counsel in *Wiggins*, primed jurors to hear evidence of a "difficult life" but then failed to introduce any substantial evidence of his background. 539 U.S. at 515, 526, 536. This Court has found deficient performance where "counsel knew of his client's difficult life, had the opportunity to present mitigating evidence, and squandered it." *Hendricks*, 70 F.3d at 1045. Counsel's "cursory or 'abbreviated'

presentation" of Mitchell's troubled background, based on passing references to Mitchell's "cold home" and not knowing "who he was," did not discharge their duty of effective assistance. *Lambright*, 490 F.3d at 1120. In particular, it was unreasonable to argue in closing that Mitchell had an "awful" childhood by undermining their own presentation of the videotaped testimony of Mitchell's visibly ill grandmother, who had described Mitchell's good qualities and asked the jury to spare his life. Yet that is exactly what Sears did, criticizing Bobbi for discussing her resume when she was merely responding to co-counsel Bartolomei's line of questioning. (ER 1084.) It was also unreasonable for Sears to jettison the social history mitigation altogether by saying that "people come from bad backgrounds all the time and never get involved in anything like this." (ER 1084.)

The wording of the mitigating factors submitted to the jury exemplifies the unfocused and deficient nature of Mitchell's penalty-phase presentation. Capital sentencing juries "must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual[.]" *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "[I]t follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence[.]" *Johnson*, 2012 WL 1836282, at *169. Most of the mitigating factors in Mitchell's case simply tracked the FDPA's language and failed to provide this necessary guidance to the jury. For instance, the verdict form asked the jury to find "impaired capacity," even though Sears never mentioned the term "impaired capacity" when referring to Mitchell's drinking in closing. (SER 451, 460; ER 1080.) It is also striking that counsel never submitted

a mitigating instruction pertaining to the Navajo Nation letter, and that seven jurors had to write in this factor themselves. (SER 452, 460.) Despite their claimed reliance on a mere presence defense, counsel did not request an instruction on "relatively minor" participation. 18 U.S.C. § 3592(a)(3). This haphazard assortment of mitigating factors is a testament to counsel's deficient and halfhearted mitigation presentation.

**2. *Mitchell Was Prejudiced by Counsel's Failure to Competently Investigate, Prepare, and Present Mitigating Evidence.***

"Prejudice is established if 'there is a reasonable probability that at least one juror would have struck a different balance' between life and death." *Hamilton*, 583 F.3d at 1131 (internal quotation marks and citation omitted). Whether "a jury could have heard it all and still have decided on the death penalty . . . is not the test." *Rompilla*, 545 U.S. at 393. Therefore, "it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll*, 539 F.3d at 951-52. Because the decision to impose a death sentence "is not an ordinary legal determination which turns on the establishment of hard facts" and is instead "a uniquely moral decision in which bright line rules have a limited place," this Court undertakes the prejudice inquiry with regard to "the law's sensitivity to failures in the penalty phase of a death penalty case." *Hendricks*, 70 F.3d at 1044.

In assessing prejudice, this Court must "evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams*, 529 U.S. at 397-98. For this reason, counsel's presentation of "what could be described as a superficially reasonable mitigation theory during the penalty phase," such as the "life worth saving" theme put forth by Mitchell's counsel, does not foreclose relief. *Sears v. Upton*, 130 S. Ct. 3259,

3266 (2010). Even if a theory is reasonable "in the abstract," that "does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the defendant. *Id.* at 3265.

The mitigation evidence adduced at Mitchell's trial was "anemic" at best and damaging at worst. Such "humanizing, rather than explanatory mitigation evidence," which "consisted primarily of testimony that at some points in his life [petitioner] had been nice to some people and that some people cared for him," is of limited mitigation value in the face of extensive aggravating circumstances. *Allen v. Woodford*, 395 F.3d 979, 1007 (9th Cir. 2005); *see also Hovey v. Ayers*, 458 F.3d 892, 930 (9th Cir. 2006) (finding prejudice when petitioner's mitigation case rested largely "on the unremarkable testimony of his family and friends that he had been a well-meaning, introspective, and harmless young man"). Most of the defense's penalty witnesses had seen Mitchell at most once since his graduation in 2000, well before the crimes took place. Further, the defense's star penalty witness, Roessel, testified on direct that since he last saw Mitchell, the upstanding young man he used to know had betrayed his trust by burglarizing his office and stealing the shotgun used in the trading post robbery. Such testimony from witnesses whose knowledge of the defendant "was neither deep nor contemporaneous with his crimes" was hardly mitigating. *Allen*, 395 F.3d at 1007.

Mitchell has shown prejudice from the fact that the federal habeas proceedings paint a "family portrait . . .far different from the unfocused snapshot" presented at trial. *Bean*, 163 F.3d at 1081. The penalty phase witnesses' isolated references to a "cold home" and "no love" barely skimmed the surface of Mitchell's dysfunctional family history, which was punctuated by abandonment, physically and verbal abusive caretakers, and persistent allegations of incest. In

*Douglas*, this Court found prejudice where counsel introduced some social history, but only in "a cursory manner that was not particularly useful or compelling." 316 F.3d at 1090. Here, counsel's vague social history argument "lacked force without some expert testimony to back it up." *Id.* Although Roessel stated Mitchell was "a person who didn't know who he was" (ER 999), he had difficulty explaining this concept on cross: as a lay witness he lacked the education and training to present these issues in a compelling and informed manner to the jury. Mitchell's penalty-phase defense thus suffered from counsel's failure to present a forensic psychologist or similar social history expert, as Ockenfels recommended, despite Bartolomei's representation to the court that the defense would likely do so.

Mitchell was further prejudiced by counsel's ineffectual investigation and presentation of substance abuse and related mental health evidence. In *Allen*, this Court contrasted "humanizing" evidence, amounting to testimony that the petitioner "could be pleasant," with more potent evidence that "portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease[.]" *Id.* at 1005, 1007. The record reveals counsel's belated attempt to introduce impaired capacity as a mitigating factor. Yet the sum total of substance abuse evidence before the jury was unimpressive: a couple mentions of marijuana use, Halsey's volunteered statement on direct that she had not known Mitchell to drink alcohol, and Agent Duncan's testimony that he didn't believe Mitchell's report of intoxication at the time of the offenses. Counsel's deficient investigation and presentation prevented them from rebutting Duncan's testimony and bolstering this sparse evidence of substance abuse with testimony from Mitchell's associates at the Nakai house, who had witnessed his escalating drug use in the weeks before the crimes, and documentary evidence of Mitchell's longstanding abuse of alcohol and drugs.

Mental health evidence tying together Mitchell's despair and increased drug use in the months before the murders could also have changed the outcome of the penalty phase. In closing, Sears argued that "something happened" to transform Mitchell from a respectful and nonviolent young man to a defendant in a capital trial. But instead of providing the jury with a convincing narrative of post-graduation unemployment and drifting verging on homelessness, relapse into depression, and escalating substance abuse, Sears effectively threw up his hands and told the jury that he had no explanation for Mitchell's transformation. (ER 1083-1084.) In *James*, this Court found prejudicial counsel's narrow focus on drug use at the time of the offenses, reasoning that had counsel "developed evidence of James's long-term drug use, he could have presented a coherent account of James's emotional and psychological deterioration during 1981, fueled by drug abuse, that culminated in Maya's murder." 2012 WL 639292, at *34. In *James*, there was a significant disparity between the "meager mitigation evidence" actually presented at trial and the "detailed picture of [petitioner's] troubled childhood, his mental illness, and his downward spiral of depression and drug abuse in the year before [the] murder" developed by post-conviction counsel. *Id.* at *26. Mitchell's counsel not only failed to provide a much-needed "coherent account" of his "downward spiral"; they pointed out that an explanation for the brutal crimes was lacking.

The mental health evidence marshaled by post-conviction counsel could have helped the jury comprehend Mitchell's character and conduct. Dr. Morenz was unaware of Mitchell's long history of substance abuse, and he stated that this additional information could have changed his diagnosis because Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered." (ER 3598.) Although the

district court dismissed Morenz's declaration as "highly equivocal" (ER 52), it is no more equivocal than expert opinions in cases where petitioners have been granted an evidentiary hearing, and the district court erred in disregarding it. *See Stanley v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010); *see also United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993) ("Experts ordinarily deal in probabilities, in "coulds" and "mights." . . . . It is the rare expert who is willing to opine conclusively about a past occurrence."). The district court also erred in completely discounting the mitigation value of Mitchell's executive functioning deficits. (ER 56.) *See Detrich v. Ryan*, 677 F3.d 958, 980, 985 (9th Cir. 2012) (holding that evidence of "mild neuropsychological deficits" "would have added significant mitigating weight" by explaining "both the mindset that led [petitioner] to commit this crime and the cause of that mindset"). In addition, Dr. Stewart's report, which diagnosed Mitchell with PTSD, Substance Dependence, and Substance-Induced Psychotic Disorder at the time of the offenses, would have provided the jury with the explanatory missing link between Mitchell's prior positive contacts with family, friends, and teachers, and his conduct in this case. (ER 3419.)

Further, the district court erred by considering Morenz's mental health evidence only insofar as it established the statutory mitigator of impaired capacity. (ER 51-52, 55.) The Supreme Court has held that even if mental health expert testimony falls short of establishing a statutory mitigator, a habeas court must consider the evidence's relevance to nonstatutory mitigation and should not "discount entirely the effect that [the] testimony might have had on the jury[.]" *Porter v. McCollum*, 130 S.Ct. 447, 455 (2009). Similarly, this Court has noted that "even where the facts discovered on habeas review do not rise to the level of statutory mitigation, we have held that a reasonable probability existed that this

information could have affected the sentence." *Correll*, 539 F.3d at 952. In *Douglas*, this Court held that even if evidence of serious mental illness and possible organic impairment "were not enough to negate an element of the underlying offense, it could have invoked sympathy from at least one member of the jury at the penalty phase, particularly when considered in connection with additional sociological history evidence discussed above." 316 F.3d at 1090.

The fact that the social history or mental health evidence may have revealed unfavorable, as well as favorable, information does not lessen its mitigating effect. The district court cited evidence of Mitchell's behavioral problems and animal abuse in Ockenfels's and Morenz's reports. (ER 56-57.) However, the district court erroneously concluded that counsel could not have presented Mitchell's social history without disclosing the damaging information in Ockenfels's report. (ER 56.) In *Karis*, this Court held that while it was reasonable not to a call a mental health expert as a penalty-phase witness because there was damaging evidence in the expert's report, the failure to investigate and present "the highly relevant information of an abusive childhood" through other witnesses was prejudicial, because "[a] 'reasonable probability' exists that a jury would find this information important in understanding the root of Karis's criminal behavior and his culpability." 283 F.3d at 1136, 1141. Therefore, counsel could have relied on Ockenfels's sources as penalty-phase witnesses and exhibits without calling her to the stand. Similarly, although Herring's neuropsychological findings were included in Morenz's report, counsel could have called Herring herself to testify to the results of her testing, without opening the door to other information in Morenz's report.

In any event, so-called damaging evidence can be "dehumanizing or mitigating," depending on the context given for the fact. *Correll*, 539 F.3d at 954

n.8, 955. And "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive -- perhaps in support of a cognitive deficiency mitigation theory." *Sears*, 130 S. Ct. at 3264. In *Sears*, the Supreme Court concluded that while evidence of petitioner's "profound personality disorder" "might not have made [him] any more likable to the jury, . . . it might well have helped the jury understand [him], and his horrendous acts -- especially in light of his purportedly stable upbringing." *Id.* at 3264; *see also Smith v. Stewart*, 140 F.3d 1263, 1269-71 (9th Cir. 1998) (antisocial personality and long history of drug use are mitigating). That Mitchell reacted to his unsettled and abusive childhood by acting out in school, forming a three-person "gang" with friends in middle school, and abusing animals when "high" is completely consistent with a mitigation presentation that placed Mitchell's antisocial and violent conduct in the context of his troubled childhood and substance abuse. (ER 3116, 3119, 3129-3130.)

In short, the type of social history, substance abuse, mental health, and cognitive ability evidence counsel failed to present is "precisely the type of evidence [this Court has] found critical for a jury to consider when deciding whether to impose a death sentence." *Douglas*, 316 F.3d at 1090. A defendant's "troubled history" is "relevant to assessing a defendant's moral culpability," *Wiggins*, 539 U.S. at 535, "'because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Although this mitigation evidence might not have directly countered the aggravating factors alleged by the prosecution, it still could have affected the sentence imposed. "Mitigation evidence unrelated to dangerousness may alter the

jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

"Heinous crimes do not make mitigating evidence irrelevant." *Hovey*, 458 F.3d at 930 (finding prejudice in case where petitioner kidnapped and killed eight-year-old girl and kidnapped another young girl). To the contrary, this Court has "held consistently that even in cases involving particularly heinous murders, a defendant can be prejudiced by an attorney's failure to investigate and present mitigating evidence." *Lambright*, 490 F.3d at 1127; *see also James*, 2012 WL 639292, at *36 (finding prejudice in spite of petitioner's commission of "appalling" hate crime); *Silva*, 279 F.3d at 828, 849 (finding prejudice in case involving "gruesome abduction, robbery, and murder"); *Smith v. Stewart*, 189 F.3d 1004, 1013-14 (9th Cir. 1999) (finding prejudice despite "horrific nature" of petitioner's crimes, which involved killing of two teenage hitchhikers); *Johnson*, 2012 WL 1836282, at *3, *207 (granting penalty-phase relief in Section 2255 case involving convictions for murders of five victims, including two children).

Indeed, this Court has held that "prejudice is 'especially likely'" when the circumstances of the instant crime -- as opposed to a long and violent criminal history -- "constituted the vast majority of the aggravation case." *Earp v. Ornoski*, 431 F.3d 1158, 1180 (9th Cir. 2005). The prosecution's reliance on the guilt-phase evidence and victim-impact testimony at the penalty phase show that the circumstances of the instant crime, rather than aspects of Mitchell's criminal history, constituted the aggravation case. Indeed, all of the jurors found that Mitchell's lack of a significant prior criminal record was a mitigating factor. (ER 1097.) Mitchell "does not have a record of violent conduct that could have been introduced . . . to offset [a] powerful mitigating narrative." *Wiggins*, 539 U.S. at 537. Nothing in Mitchell's criminal history suggested "a proclivity for violence

against adult, male prisoners or prison personnel, were he sentenced to life without parole instead of death." *Hovey*, 458 F.3d at 930. *Cf. Wong v. Belmontes*, 130 S. Ct. 383, 389 (2009) (finding no prejudice because mental state mitigation evidence would have opened the door to evidence that defendant had committed another murder).

Other aspects of Mitchell's case indicate that a death sentence was not a foregone conclusion. The Arizona United States Attorney's Office did not recommend seeking the death penalty. Rather, the capital prosecution was required by then-Attorney General John Ashcroft. (ER 3075.) *Cf. Summerlin*, 427 F.3d at 641 (fact that initial prosecutor offered plea agreement to lesser sentence "is indicative of the fact that this was not a clear-cut capital case"); *James*, 2012 WL 639292, at *36 (same). In addition, the Navajo Nation Attorney General had asked the federal government not to seek the death penalty in Mitchell's case -- which involved a crime committed on the Navajo Reservation, as well as Navajo victims and defendants -- a fact that seven jurors found mitigating. (ER 969; SER 452, 460.) Shortly after trial, Marlene Slim, Slim's daughter and Doe's mother, testified before the Navajo Nation Council that she had asked the federal prosecutor to seek a sentence of life without parole, and that her request was "ignored and dishonored." (ER 3741.)

The length of deliberations and serious proportionality argument further demonstrate a reasonable probability that a competent penalty-phase presentation, backed by thorough investigation, could have resulted in a life sentence. Mitchell's jury deliberated for a day and a half before returning its penalty-phase verdict. (ER 42.) *See Mayfield v. Woodford*, 270 F.3d 915, 932 (9th Cir. 2001) (en banc) (finding prejudice due in part to "the duration of the jury's deliberations," which was four hours plus one full day); *see also Mayes v. Gibson*,

210 F.3d 1284, 1290 (10th Cir. 2000) (over six hours of deliberation indicated jury's uncertainty about death penalty). The jury also unanimously found it mitigating that Orsinger, who was equally culpable, would not be sentenced to death. (ER 1097.) The fact that Orsinger's age made him statutorily ineligible for the death penalty despite his convictions for four first-degree murders presented a strong proportionality argument against the death penalty for Mitchell, who was barely out of his teens at the time of the offenses. *See Silva*, 279 F.3d at 849.

Prejudice also arose because the deficient mitigation performance was "probably actually harmful" to Mitchell's penalty-phase presentation. *Duncan*, 528 F.3d at 1246. The "life worth saving" theory was not only weak on its own terms, but also gave the prosecution fodder for closing argument by emphasizing that Mitchell was reared in a "family of educators." As in *Sears*, "[t]he prosecutor ultimately used the evidence of [a] purportedly stable and advantaged upbringing against him during the State's closing argument." 130 S. Ct. at 3262; *see also Boyde v. Brown*, 404 F.3d 1159, 1178 (9th Cir. 2005) ("The jury, left to wonder how Boyde learned to commit such violent acts, could not look to his childhood as an explanation -- his parents' testimony and counsel's deficiency took care of that -- but must instead have concluded that he grew violent *despite* his childhood.") And as in *Karis*, defense counsel's portrayal of Mitchell "as intelligent without any indication of his violent and abusive childhood afforded the prosecution a very effective argument." 283 F.3d at 1139. Finally, the defense's feeble attempt to establish the impaired-capacity mitigator solely through the case agent backfired by resulting in testimony suggesting that Mitchell was a liar. (ER 1037.)

"[B]oth this court and the Supreme Court have consistently held that counsel's failure to present readily available evidence of childhood abuse, mental illness, and drug addiction is sufficient to undermine confidence in the result of a

sentencing proceeding, and thereby to render counsel's performance prejudicial." *Lambright*, 490 F.3d at 1121. Mitchell's inexperienced counsel, confused regarding the scope of mitigation in a capital case and blinded by the educational credentials of Mitchell's otherwise neglectful and abusive caretakers, failed to investigate and present such classic mitigation evidence at trial. Because there is a reasonable probability that at least one juror would have struck a different balance between life and death had such information been presented, this Court should reverse the judgment of the district court with respect to Mitchell's death sentence.

## PROCEDURAL ISSUES

### C. THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING AN EVIDENTIARY HEARING.[12]

At a minimum, this Court should remand for an evidentiary hearing on Mitchell's claims. A district court "shall" grant "a prompt hearing" on a Section 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). An evidentiary hearing is required where a petitioner has "'made specific allegations that, if true, state a claim on which relief could be granted'" *Leonti*, 326 F.3d at 1116. Denial of an evidentiary hearing is proper only when a petitioner's allegations, "viewed against the record, either do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989). This is a "low threshold," *Howard*, 381 F.3d at 883, and this Court has granted a hearing

[12] Although the district court's COA certifies only the merits of Mitchell's ineffective-assistance claims (ER 72), this Court assumes that "the COA encompasses [petitioner's] claim challenging the denial of the evidentiary hearing." *United States v. Howard*, 381 F.3d 873, 877 n.3 (9th Cir. 2004).

even when "it appears quite improbable that [petitioner's] motion is in fact meritorious." *Lopez v. United States*, 439 F.2d 997, 999 (9th Cir. 1971).

When the alleged claim involves ineffective assistance, which often depends on "facts which occurred out of the courtroom and off the record," the district court must hold an evidentiary hearing "unless something in the record conclusively shows that [counsel] was not ineffective." *Burrows*, 872 F.2d at 917. For the reasons stated above, the record does not conclusively show that counsel effectively investigated, prepared, and presented Mitchell's case. Although counsel claimed they strategically decided to forego a diminished-capacity defense and to focus on a "life worth saving" mitigation case, and the district court credited these claims (ER 55), the trial record shows that counsel tried, albeit ineffectively, to present evidence of intoxication at both phases of trial and raised vague social history arguments at the penalty phase. Mitchell has also submitted substantial evidence that he was prejudiced by counsel's failure to do the following: conduct a thorough investigation of intoxication; investigate classic mitigation relating to substance abuse, mental health, cognitive deficits, and a troubled childhood; consult recommended experts; provide vital background information to their psychiatric expert; formulate a coherent and compelling mitigation theory based on reasonable investigation; and adequately prepare penalty-phase witnesses to support the chosen theory.

The district court also resolved a number of other important factual disputes on the basis of the paper record: (1) whether Mitchell was intoxicated at the time of the offenses (ER 22 & n.6, 52); (2) whether Mitchell's mother stopped cooperating through no fault of the defense team (ER 44); (3) whether counsel adequately investigated the paternal side of Mitchell's family (ER 44 n.12); (4) whether Mitchell's grandmother was ever diagnosed with mental illness (ER 46);

(5) whether psychologist Dr. Parrish did not prepare a report because she diagnosed Mitchell as sociopathic, or because she was only consulting (ER 46); (6) whether counsel supplied Dr. Morenz with adequate background information (ER 48); (7) whether Morenz asked Mitchell if he was intoxicated at the time of the offenses (ER 50); and (8) whether Orsinger provided specific information regarding the drugs and alcohol he and Mitchell ingested before the offenses (ER 52).

The Eighth Circuit's remands for evidentiary hearings in two capital Section 2255 cases are instructive. In *Sinisterra*, the Eighth Circuit ordered an evidentiary hearing on petitioner's claim of penalty-phase ineffective assistance because the record "does not affirmatively refute the factual assertions underlying the claims," "does not conclusively show that Sinisterra's attorneys acted within the range of competence demanded of attorneys in criminal cases," and "does not affirmatively refute Sinisterra's claim that he suffered prejudice as a result of the alleged ineffective assistance of counsel." 600 F.3d at 907. In *Sinisterra*, the district court did not hold an evidentiary hearing but, similar to here, directed the petitioner's trial attorneys to submit affidavits regarding the ineffective-assistance claims. *Id.* at 905. Sinisterra's attorneys had presented humanizing "good person" evidence at the penalty phase, but they presented no evidence of Sinisterra's mental health, capacity, or abusive childhood. *Id.* at 904-07. In *United States v. Nelson*, 297 Fed. Appx. 563 (8th Cir. 2008) (unpublished op.), another federal death penalty case, the Eighth Circuit remanded for an evidentiary hearing on several ineffective-assistance claims, including allegations of inadequate mitigation and mental health investigation, because "issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record." *Id.* at 565. The Eighth Circuit concluded

that "a fair and just determination" of some of Nelson's ineffective assistance claims "required an evidentiary hearing to be held." *Id.*

This emphasis on district court fact development underlies the Supreme Court's decision in *Massaro v. United States*, 538 U.S. 500 (2003), which holds that an ineffective-assistance claim may be brought in Section 2255 proceedings even if not raised on direct appeal. *Id.* at 509. The *Massaro* Court reasoned that "ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Id.* at 505. The Supreme Court envisioned a procedure under which the district court "may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance." *Id.* As the Supreme Court has explained, "[w]here an unresolved factual dispute exists, demeanor evidence is a significant factor in adjudging credibility. And questions of credibility, of course, are basic to resolution of conflicts in testimony." *Townsend v. Sain*, 372 U.S. 293, 322 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992). It was error for the district court to credit counsel's claims of strategy, which conflicted with the trial record's account of the defenses and mitigating factors actually presented at trial, "without taking the opportunity to listen to [the attorneys], test [their] story, and gauge [their] demeanor." *Earp*, 431 F.3d at 1169-70. Deciding ineffective-assistance claims purely on the basis of counsel's deposition testimony was not what the Supreme Court intended when it encouraged such claims to be brought in Section 2255 proceedings in district court.

Unlike a capital Section 2254 petitioner, who has had an opportunity to develop the factual bases of his ineffective-assistance claims in state court,

Mitchell seeks his first and only opportunity to make a record in federal court. Under this Court's pre-AEDPA precedent, "in a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Karis*, 283 F.3d at 1127. This standard applies here because AEDPA did not change the standard for granting evidentiary hearings in Section 2255 proceedings. *Teti v. Bender*, 507 F.3d 50, 61 n.4 (1st Cir. 2007) (citing 2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* § 41.6d (5th ed. 2005)). In *Stanley*, this Court granted an evidentiary hearing on a "colorable" claim of ineffective assistance in a capital case, stating, "We simply cannot in good conscience continue to send men to their deaths without ensuring that their cases were not prejudiced by inadequate legal representation at any phase of the proceedings." 598 F.3d at 615. Likewise, Mitchell's convictions and death sentence should not be affirmed solely on the basis of counsel's depositions, which contradict each other and the record, as his ineffective-assistance claims are at least sufficiently colorable to warrant full factual development at a hearing.

### D. THE DISTRICT COURT ERRED BY NOT PERMITTING MITCHELL'S POST-CONVICTION COUNSEL TO INTERVIEW THE JURORS IN HIS CASE.

**Standard of Review**

This Court generally reviews the district court's application of a local rule for abuse of discretion. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). However, to the extent the district court's decision implicated questions of statutory interpretation and constitutional law, this Court should review the denial of juror interviews de novo. *Cf. United States v. Ward*, 989 F.2d 1015, 1016 (9th Cir. 1992); *United States v. Kohl*, 972 F.2d 294, 297 (9th Cir. 1992).

## Discussion

### 1. *Mitchell's Request for Leave to Interview the Trial Jurors*

Prior to filing Mitchell's Section 2255 motion, post-conviction counsel sought leave to interview the jurors in his case. (CR 1.) Leave of court was required by a District of Arizona rule that prohibits attorneys from contacting jurors after trial unless they submit written interrogatories to the district court "within the time granted for a motion for a new trial"[13] and show "good cause" for the interview. D. Ariz. Loc. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2.

The district court denied the request for juror interviews because Mitchell had not submitted proposed interrogatories and a supporting affidavit, or filed within the time granted for a motion for a new trial, as required by the local rule. (ER 2.) Alternatively, the district court concluded that Mitchell had not shown "good cause" for contacting the jurors. (ER 2-3.)

### 2. *Mitchell Has Shown Good Cause for Interviewing the Jurors.*

Several occurrences during Mitchell's trial constituted "good cause" for interviewing the jurors to ensure that they were not exposed to prejudicial extraneous information or outside influence. First, the jury indicated an inclination toward independent research when they sent the district court a note asking, "Are we allowed to consult detailed maps of this location to familiarize oursel[ves] with the aspects of this case?" (ER 741.) Although the district court later admonished the jury not to conduct any independent research, it did not make a record as to whether any juror had already done so. (ER 776.) The next day, a

[13] At the time of Mitchell's trial, a motion for a new trial had to be filed within seven days after the verdict, or three years if "grounded on newly discovered evidence." Fed. R. Crim. P. 33(b) (2002). The jury delivered its penalty-phase verdict on May 20, 2003, so the latest possible date for filing a new-trial motion was May 20, 2006.

juror asked the bailiff whether the jury could ask questions of the witnesses, another indication of the jury's desire to go beyond the evidence presented at trial. (ER 780.) The following week, defense counsel noted that a juror was looking into the courtroom while preliminary matters were being discussed, but no record was made as to what he or she might have heard. (ER 885.) These events justified post-conviction interviews to ascertain whether any juror had seen or heard any extrinsic or inadmissible information.

Second, alternate juror L.M. reported that he heard three men discussing Mitchell's case in the courthouse. (ER 776, 946.) L.M. was not wearing his juror badge because he was on his way to the juror room. (ER 776.) Although L.M. told the district court he only heard the name of the case (ER 776), Mitchell was entitled to question not only L.M., but the other jurors, regarding possible extraneous information or outside influence they encountered while walking without their juror badges in the courthouse. In *United States v. Jackson*, 209 F.3d 1103 (9th Cir. 2000), this Court ordered a Section 2255 hearing on a jury tampering claim arising from a statement given by a juror to a defense investigator three years after trial. *Id.* at 1108. In *Jackson*, the district court had questioned the juror about a threatening phone call during trial, and the juror said he thought the call was unrelated to the trial. *Id.* at 1107-08. But the juror later stated that he believed there was a "'fifty-fifty' chance that the threat came from a defendant." *Id.* at 1109. Because of the discrepancy between the juror's voir dire testimony and his subsequent statement to the defense investigator, this Court ordered a hearing to determine whether "the juror (or other jurors)" believed that the call was designed to hang the jury. *Id.* at 1110. *Jackson* demonstrates why the district court's voir dire of L.M. does not obviate the need for juror interviews. Rather, the L.M. incident constitutes "good cause" for post-conviction investigation.

Finally, members of the victims' family wore commemorative buttons during trial. (ER 904.) In *Norris v. Risley*, 878 F.2d 1178 (9th Cir. 1989), this Court ordered an evidentiary hearing at which jurors were called to testify as to whether they saw buttons worn by spectators or passed through the spectators "as they entered and exited the courtroom." *Id.* at 1183. If a hearing was warranted in *Norris*, Mitchell has shown good cause for the less burdensome and intrusive procedure of voluntary juror interviews.

**3. *Even if Mitchell Has Not Shown Good Cause, The District Court Erred by Rigidly Enforcing a Local Rule in Violation of the Section 2255 Rules and the Fifth, Sixth, and Eighth Amendments.***

The Rules Governing Section 2255 Proceedings for the United States District Courts provide that "[t]he Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provision or these rules, may be applied to a proceeding under these rules." Rule 12, Section 2255 Rules. The commentary refers to the analogous discussion in the commentary to Rule 12 of the Section 2254 rules, which explains that the rule

> permits the court considering the petition to use any of the rules of civil procedure (unless inconsistent with these rules of habeas corpus) when in its discretion the court decides they are appropriate under the circumstances of the particular case. The court does not have to rigidly apply rules which would be inconsistent or inequitable in the overall framework of habeas corpus.

Advisory Committee's Note to § 2254 Rule 12. Here, the district court erred by rigidly applying a local rule, not even a full-fledged federal rule, to deny post-conviction counsel the opportunity to interview the jurors in Mitchell's case.

Local Rule 39.2(b)'s time limit -- fourteen days in the usual case, three years in the case of newly discovered evidence -- is practically impossible for a capital Section 2225 movant to meet. Mitchell's direct appeal was not decided until September 5, 2007, 502 F.3d at 931, more than four years after the verdict, and his petition for certiorari was not denied until June 9, 2008 (ER 1105-1106), more than five years after the verdict. Counsel on direct appeal has no incentive to request juror interviews because this Court "generally will not consider facts outside the record developed before the district court." *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (internal quotation marks and citation omitted). Just as Section 2255 proceedings, and not direct appeal, are the preferred forum for developing the extra-record facts necessary to support most ineffective- assistance claims, *Massaro*, 538 U.S. at 504-06, claims of extraneous prejudicial information or outside influence require factual development and are therefore more efficiently litigated in collateral proceedings. And because any Section 2255 motion raising ineffective assistance of trial counsel is necessarily raised by successor counsel, it is unreasonable to expect the Section 2255 investigation to begin years before the case is final on direct review and before successor counsel has even been appointed. Application of the local rule is thus "inconsistent or inequitable" in the Section 2255 context.

Application of the local rule, with its "good cause" standard, is particularly inequitable in the Section 2255 context because Arizona's rule is an outlier, both in this circuit and in the nation at large. Of the 31 districts where there is currently a federal death sentence in place, at most six require a showing of good cause before counsel can contact jurors after trial; seventeen others require leave of

court; and eight do not require leave of court for post-trial juror contact.[14] None of the 30 other jurisdictions with a federal death sentence imposes any sort of time limit on juror interviews. Of the fifteen district courts in the Ninth Circuit, only two -- the District of Arizona and the District of Montana -- require a "good cause" showing. D. Ariz. Loc.. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2; D. Mont. Loc. Civ. R. 48.1(b); D. Mont. Loc. Crim. R. 24.2(b). Five other district courts require leave of court without a "good cause" showing. D. Alaska Loc. Civ. R. 83.1(h); D. Or. Loc. R. 48-2; E.D. Wash. Loc. R. 47.1(d); W.D. Wash. Loc. R. 47(d). Eight district courts in the Ninth Circuit impose no post-trial restrictions on juror contacts whatsoever. And had the crimes occurred just over the state line, on the Navajo Reservation in New Mexico, Mitchell would not need to seek leave of court or show good cause before conducting juror interviews. Section 2255 and its accompanying rules do not contemplate this sort of inconsistent and inequitable treatment of similarly situated federal prisoners, in violation of the Fifth Amendment's due process and equal protection guarantees.

Application of the local rule also conflicts with the duty of post-conviction counsel in a capital case to conduct "an aggressive investigation of all aspects of the case." ABA 2003 Death Penalty Guidelines 10.15.1(E)(4). The commentary to the ABA Death Penalty Guidelines explains that post-conviction counsel must conduct a "thorough, independent investigation" of, *inter alia*, juror misconduct, because "the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case." 31 Hofstra L. Rev. 913, 1085-86 (2003). Therefore, it is not surprising that interviewing the jurors and alternates is a routine part of a thorough habeas investigation in a capital case. (ER 3467.)

---

[14] In the interest of brevity, the citation and text for each of these local rules can be found at pages 3-26 of the separately bound Statutory Addendum.

Although the constitutional right to effective assistance of counsel in post-conviction proceedings is an open question, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012), Mitchell submits that he has a Sixth Amendment right to effective assistance in these Section 2255 proceedings, especially for claims that could not have previously been raised on direct review. Indeed, because this Court has relied in part on a juror declaration to evaluate whether a petitioner was prejudiced by ineffective assistance at the penalty phase, *see Silva*, 279 F.3d at 850, competent post-conviction counsel would seek to obtain declarations from the seated jurors and alternates.

Even if Sixth Amendment concerns do not trump the local rule, the Eighth Amendment's requirements do. The Supreme Court's capital punishment jurisprudence has proceeded on "the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long," and that there is "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Mills v. Maryland*, 486 U.S. 367, 376 (1988) ("In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."). This Court has granted habeas relief in a capital case where post-conviction interview of jurors uncovered a meritorious claim of extraneous information that affected the fundamental fairness of the trial. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1189-90 (9th Cir. 1993); *Jeffries v. Wood*, 114 F.3d 1484, 1490-91 (9th Cir. 1997) (en banc). Thus, the local rule's idiosyncratic requirements must give way to the need for accurate fact-finding in Section 2255 proceedings, and the constitutional concerns relating to effective assistance of counsel and the reliability of death sentences.

## UNCERTIFIED ISSUES

### Standard for Certificate of Appealability

To obtain a certificate of appealability, an applicant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This is a "modest standard" that should not be conflated with the standard for granting a writ of habeas corpus. *Lambright v. Stewart*, 220 F.3d 1022, 1024-25 (9th Cir. 2000). Rather, a COA should issue if an applicant can show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). A claim "can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003).

Because Mitchell has been sentenced to death, this Court must resolve in his favor "any doubt about whether he has met the standard for a COA." *Valerio v. Crawford*, 306 F.3d 724, 767 (9th Cir. 2002) (en banc); *Lambright*, 220 F.3d at 1025 (same).

### E. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIM OF FEDERAL-TRIBAL COLLUSION (CLAIM R).

### Standard of Review

Whether a collusive arrangement between federal and tribal authorities caused Mitchell's confessions to be made is a factual finding, *United States v. Alvarez-Sanchez*, 511 U.S. 350, 360 (1994), and is therefore reviewed for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

## Discussion

### 1. *New Facts, Not Developed at Trial Due to Ineffective Assistance of Counsel, Merit Reconsideration of Mitchell's Collusion Claim.*

On direct appeal, Mitchell argued that his statements should be suppressed because they were the product of federal-tribal collusion to arrest him on tribal charges and thereby deprive him of his federal procedural rights to prompt presentment and appointed counsel. 502 F.3d at 960-63. Mitchell and Orsinger had filed suppression motions challenging the voluntariness of their respective statements, and Orsinger had filed a supplemental motion arguing that his statements should be suppressed because there existed a "working arrangement" between federal and tribal authorities to deprive Orsinger of the rights afforded to juveniles under federal law. (ER 80-87, 521-524.)

This Court held that Mitchell had not joined Orsinger's collusion motion, based on counsel's failure "to adduce evidence and elicit a ruling that would have determined these issues discretely as to [Mitchell]." 502 F.3d at 960. It also found that Mitchell "developed no record that distinguishes his situation from Orsinger's; indeed, he developed no record on the point at all." *Id.* at 961. The Court further concluded that, regardless of whether Mitchell had preserved the collusion issue, he had not demonstrated the requisite "actual collaboration." *Id.* at 960-62. The dissenting opinion, on the other hand, argued that the record proved deliberate intent to deprive Mitchell of his federal procedural rights. *Id.* at 997-1003. In doing so, the dissent assumed, based on suggestions in the murky record, that Mitchell's tribal warrant was for robbery. *Id.* at 999 & n.4. Thus, on direct appeal, this Court lacked basic information about Mitchell's tribal proceedings, including the specific charge for which Mitchell was arrested, because counsel had failed to develop such evidence. 502 F.3d at 961, 999 & n.4.

Post-conviction counsel's investigation did not locate any record of a tribal armed-robbery warrant or complaint filed against Mitchell. (ER 3897-3898.) However, post-conviction counsel discovered that before the instant offenses, on September 19, 2001, Mitchell had been charged with criminal damage under Navajo Nation Title 17-380.A.1, for allegedly kicking a tribal police car. (ER 3707.) Newly-obtained court records indicate that on November 7, 2001, three days after Mitchell was arrested at the Nakai house, he pled guilty to the criminal damage charge in tribal court; the tribal judgment indicates that Mitchell's sentence was "deferred until sentencing hearing," and that Mitchell would be "committed to the custody of the keeper of the Navajo jail . . . until this judgment has been satisfied." (ER 3708.) On January 24, 2002, the tribal court granted the Navajo Nation's request for an "Order of Indefinite Continuance" "until such time [as] the Navajo Nation makes arrangements with the United States Attorneys Office for the proper disposition of this case." (ER 3709.) In October 2003, five months after Mitchell was convicted and sentenced to death, the Navajo Nation requested and was granted closure of the tribal case due to Mitchell's federal conviction and "long term federal incarceration." (ER 3710-3711.)

Court records obtained by post-conviction counsel also show that Jason Kinlicheenie pled guilty to the trading post robbery in tribal court on November 5, 2001, six days after it occurred. (ER 3735.) The Navajo Nation pre-sentence report indicates that Kinlicheenie clearly implicated Mitchell as a co-perpetrator of the robbery. (ER 3727.)

Kathleen Bowman, the longtime Public Defender of the Navajo Nation, provided a post-conviction declaration that sheds light on the collusion issue. First, she determined that Mitchell's tribal custody pending sentencing from November 7 (the date he pled guilty to criminal damage in tribal court) to

November 29 (the date he was arrested on a federal warrant) violated Navajo law because the criminal damage charge was not punishable by jail time. (ER 3895-3897.) Second, Bowman pointed out that the practical effect of pursuing the criminal damage charge instead of the tribal armed robbery charge was to deprive Mitchell of an attorney. Bowman stated that, contrary to this Court's understanding of Navajo criminal procedure in Mitchell's direct appeal, 502 F.3d at 960 n.3, the Navajo Nation provides counsel for indigent defendants charged with offenses carrying possible jail time: that is, Mitchell would have been appointed counsel for the more serious charge of tribal armed robbery, but not for the less serious criminal damage charge. (ER 3898-3900.)

Post-conviction counsel also provided evidence of collusion more generally. Bowman quoted a Navajo prosecutor who described how Navajo investigators answer to the United States Attorney's Office. (ER 3902.) Levon Henry, the Navajo Nation attorney general who wrote the letter requesting that the United States government not seek the death penalty against Mitchell, stated that it was not uncommon "for the FBI to join the Nation police in arresting a member of the Nation, and for the FBI to walk into the tribal jail and interrogate the arrestee about a federal (non-tribal) crime." (ER 3714.)

In light of this new evidence, the district court erred in declining to reconsider the collusion issue simply because it had been raised and rejected on direct appeal. (ER 68.) Questions previously decided on direct appeal cannot be relitigated in a Section 2255 proceeding "except to the extent appellant proffered new evidence." *Argo v. United States*, 473 F.2d 1315, 1317 (9th Cir. 1973). Similarly, in *Kaufman v. United States*, 394 U.S. 217 (1969), the Supreme Court reasoned that federal prisoners should be able to relitigate claims on collateral review if "new law has been made or facts uncovered relating to the constitutional

claim since the trial and appeal." *Id.* at 230 (internal quotation marks and citation omitted). The district court erred by disregarding this well-established exception to the relitigation bar for issues raised and rejected on direct appeal. Indeed, in *Jack v. United States*, 435 F.2d 317 (9th Cir. 1970), this Court stated that a district court "would be compelled, even in the face of [a prior adverse] appellate determination, to hold an evidentiary hearing" in a Section 2255 proceeding when presented with new facts relating to the constitutional claim. *Id.* at 319 & n.2. Reconsideration is also warranted because the new facts -- including documentary proof of the Navajo Nation "mak[ing] arrangements with the United States Attorneys Office for the proper disposition" of Mitchell's *tribal* case (ER 3709) -- reveal that this Court's prior decision on collusion was "clearly erroneous" and that "its enforcement would work a manifest injustice." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).

### 2. *This Court Should Grant an Evidentiary Hearing on Mitchell's Collusion Claim.*

Although the prompt presentment requirement generally does not arise until a person is arrested for a federal offense, *Alvarez-Sanchez*, 511 U.S. at 358-59, "[t]he relevant delay may . . . be calculated from the time of arrest by state or local authorities on state charges 'if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate [him] in violation of [his] right to a prompt federal presentment.'" *United States v. Michaud*, 268 F.3d 728, 734 (9th Cir. 2001) (quoting *Alvarez-Sanchez*, 511 U.S. at 359). In *Anderson v. United States*, 318 U.S. 350 (1943), the Supreme Court held that confessions obtained during state pretrial detention were inadmissible as the product of "a working arrangement" between federal and local law enforcement that enabled repeated interrogation in

custodial secrecy, even though "the federal officers themselves were not formally guilty of illegal conduct," and the federal arraignments occurred promptly after the federal arrests. *Id.* at 356. A finding of collusion "requires proof of a deliberate intent to deprive a defendant of . . . federal procedural rights." *Michaud*, 268 F.3d at 735.

The previously undiscovered information concerning Mitchell's tribal court proceedings differs sharply from the factual and legal assumptions underlying this Court's decision on direct appeal and warrants an evidentiary hearing. Mitchell was not indicted federally until November 21, sixteen days after Kinlicheenie pled guilty to the trading post robbery in tribal court and implicated Mitchell in the process. Even after the arrest warrant was issued on November 23, federal authorities let Mitchell languish in tribal custody – custody that was illegal under tribal law -- for six more days before arresting him. In *Michaud*, by contrast, this Court found the state-federal cooperation to be unobjectionable because federal agents obtained an arrest warrant and took the steps necessary to prosecute the defendant federally as soon as they gathered "sufficient evidence" from the search of the defendant's van. 268 F.3d at 734-35.

Further, the indefinite continuance of sentencing on Mitchell's criminal damage charge "until such time the Navajo Nation makes arrangements with the United States Attorneys Office for the proper disposition of this case" speaks to the deep involvement of federal authorities in tribal authorities' decision to pursue tribal charges against Mitchell. In determining whether collusion existed, "it is important whether or not state officials will proceed with further action on the state charge independent of the outcome of the federal investigation." *Barnett v. United States*, 384 F.2d 848, 858 (5th Cir. 1967). Here, tribal authorities explicitly treated the tribal charge as an adjunct to Mitchell's federal prosecution, only

dismissing the charge in light of Mitchell's federal conviction and incarceration. (ER 3710-3711.) Particularly when viewed against the backdrop of Navajo Nation investigators' deference to the United States Attorney's Office described by the Navajo Attorney General and Public Defender, this collaboration goes far beyond "the routine cooperation" between local and federal authorities at issue in *Alvarez-Sanchez*, where local authorities simply alerted the Secret Service of counterfeit Federal Reserve notes discovered during a search for drugs. 511 U.S. at 352.

In addition, the record shows that an assistant United States attorney ("AUSA") participated in the pre-arrest briefing by conference call and recommended tribal arrests, in a message relayed by the FBI agents to the Navajo criminal investigators at the briefing. (ER 607, 616.) *Cf. United States v. Jackson*, 448 F.2d 539, 545 (5th Cir. 1971) (state detention did not trigger federal procedural protections because defendant's arrest on vagrancy charges was "without inducement or request by the federal authorities"); *United States v. Coppola*, 281 F.2d 340, 343 (2d Cir. 1960) (en banc) (no collusion where state arrests "were exclusively planned and executed by the Buffalo police without any suggestion or participation by the F.B.I."). Federal and tribal authorities also shared significant amounts of information and proceeded together almost every step of the way, at least until the FBI took over and began interviewing Mitchell without Navajo law enforcement being present.[15] *Cf. Michaud*, 268 F.3d at 735 (no evidence of actual collusion where "the exchange of information between federal and state investigators was sparse").

Given the AUSA's central role in instigating the tribal arrests, and the new

[15] Navajo criminal investigators were present for all or part of the FBI's November 4 interviews, but not for the November 5 and November 29 interviews. (ER 1881-1905.)

evidence of the Navajo Nation "mak[ing] arrangements with the United States Attorneys Office for the proper disposition" of Mitchell's minor tribal criminal damage charge (ER 3709), the focus of an evidentiary hearing on collusion should be federal and tribal *prosecutors*' intent to avoid having Mitchell "lawyer up" after being appointed counsel in federal court.[16] In ruling on Orsinger's collusion motion, the district court credited FBI agents' testimony that they did not intend to deprive the defendants of their federal procedural rights (ER 669), but that finding does not settle the question of a higher-level working arrangement between federal and tribal prosecutors. By arranging Mitchell's arrest on a tribal warrant for criminal damage, rather than on a tribal or federal warrant for robbery, federal and tribal authorities ensured that Mitchell would not be appointed counsel in either court.

Because the record does not conclusively show that Mitchell's arrest and tribal custody were not the product of a federal-tribal working arrangement to deprive him of his federal procedural rights, this Court should order an evidentiary hearing on Mitchell's collusion claim.

### F. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CLAIMS CONCERNING HIS COMPETENCY TO WAIVE HIS PENALTY-PHASE APPEARANCE (CLAIM S).

#### Standard of Review

The Court reviews claims of ineffective assistance de novo, *Rodrigues*, 347 F.3d at 823, and a district court's competency determination for clear error, *United States v. Friedman*, 366 F.3d 975, 980 (9th Cir. 2004).

---

[16] Significantly, just minutes after giving a fourth statement to the FBI, Mitchell's only question at his initial appearance in federal court was, "when will I be able to speak to my lawyer?" (ER 97.)

## Discussion

### 1. *Waiver of Penalty-Phase Appearance*

After the verdicts were read, Mitchell asked to speak to the district court. At sidebar, Williams informed the district court that Mitchell did not want to assist in or be present at the penalty phase, contrary to defense counsel's advice, and that defense counsel was consequently moving to withdraw. Mitchell informed the district court that he did not want to be present for the penalty phase but had no problems with his lawyers. The district court told Mitchell to consider his decision overnight. (ER 952.)

The next day, Mitchell reiterated his wish to waive his appearance at the penalty phase. (SER 430.) When the district court asked him to explain his reasons, he said, "I just don't want to be here" and "I don't see no benefit or any relevance to me being here." (SER 430.) He added that he thought that the jury had "already made their decision." (SER 431.) Sears stated that while it appeared that a defendant might be able to waive his appearance at capital sentencing, the communication breakdown would make it difficult for counsel to continue to represent Mitchell. (SER 432.) Williams added that Mitchell had refused to speak to him that day. (SER 433.) The district court denied Sears's renewed motion to withdraw because it found no irreconcilable conflict between Mitchell and his attorneys. (SER 433-434.)

On the next court day, Williams informed the court that Mitchell would not dress for court. (SER 436.) Sears informed the district court that Mitchell stated he would not talk to his attorneys about the appearance issue or any other topic, and that the communication breakdown continued. (SER 438.) Sears stated that while Mitchell had previously indicated he might testify at the penalty phase, "now whether it's out of despair or hopelessness or depression or whatever it is

motivating him, he's gone so far in the other direction." (SER 438.) Sears stated that they would attempt to persuade Mitchell to come to court, but that he was being uncommunicative and resistant. (SER 438.)

On the day the penalty phase began, the district court took Mitchell's waiver of his appearance. Mitchell indicated that he refused to dress for court and had not changed his mind about waiving his appearance. Upon questioning from the district court, Mitchell indicated that his health was fine, that he had not taken any medications recently, that he had graduated from high school, and that he had held jobs after graduation. Mitchell stated that this was the first time he had been on trial, that he had been able to follow the proceedings, that he understood how aggravating and mitigating factors would be presented during the penalty phase, and that no threats or promises had influenced his decision to waive his presence. (SER 441-442.)

The district court found that Mitchell's decision not to be present during the penalty phase was knowing, intelligent, and voluntary. The district court further found that Mitchell appeared to be alert and healthy, and that there was no suggestion that he was incompetent to waive his presence. Noting that Mitchell had refused to discuss his waiver of appearance with his attorneys that day or the day before, Sears moved to withdraw for a third time, a request the district court denied. (SER 443.)

#### 2. *Substance Abuse and Mental Health Issues at the Time of Waiver of Penalty-Phase Appearance*

Jail records indicate that Mitchell was referred for alcohol treatment shortly after his arrest, but he received no treatment. (ER 3117 n.40)

Dr. Morenz's report to trial counsel indicated that Mitchell was caught making "hooch" (jail-brewed alcohol) at the Madison Street Jail. Mitchell also

told Morenz he had been using heroin, cocaine, methamphetamine, and the occasional psychotropic medication at the Madison Street Jail. In October 2002, Mitchell indicated that he would stay up for three or four days and then sleep for three or four days, and that his only enjoyment was "get[ting] high." (ER 3137.)

Although Morenz found Mitchell competent to stand trial, he also diagnosed him with, *inter alia*, depressive disorder and polysubstance abuse in a controlled environment, and recommended that Mitchell receive antidepressants for his "significant depressive symptoms." Morenz also noted that Mitchell may have suffered from a major depressive disorder in the past. (ER 3151-3152.)

Eric DeLuca, a fellow inmate in closed custody at Madison Street Jail from April 2002 to April 2003, discussed Mitchell's drug use in a post-conviction declaration. DeLuca saw Mitchell regularly getting high on drugs or hooch during this period. DeLuca explained how the inmates made hooch from fermented citrus fruit and mints purchased through the commissary. DeLuca saw Mitchell purchase and use heroin regularly, in quantities sufficient to get high on nearly a daily basis. (ER 3164-3165.)

Samuel Stone, another inmate at Madison Street Jail, stated that drugs were freely available in custody, and that Mitchell drank hooch and used heroin, marijuana, cocaine, and crystal meth regularly. Stone recounted how meth was smuggled into the jail on cards, how drugs were obtained through a hole in the wall, and the procedures for making "hooch." Stone was sentenced and transferred to prison before Mitchell's trial ended. (ER 3694-3696.)

Dr. Stewart, Mitchell's post-conviction psychiatric expert, concluded that Mitchell's use of hooch, heroin, Artane, Prozac, and other antipsychotic medications while in custody "could have seriously inhibited Mr. Mitchell's ability to make reasoned decisions," and that "sufficient evidence existed to

initiate an inquiry into Lezmond Mitchell's ability to assist his counsel, to make reasoned decisions, including the waiver of presence at his penalty phase." (ER 3418-3419.)

**3. *Post-conviction Depositions of Trial Counsel***

None of Mitchell's attorneys doubted his competency, either generally or at the time of his waiver of his appearance at the penalty phase. (ER 3935, 3956, 3959, 4070-4071, 4134, 4142.)

Mitchell's attorneys never thought Mitchell was under the influence of drugs or alcohol. (ER 3934, 4049, 4143.) Sears didn't know that Mitchell used drugs or alcohol while in pretrial custody. (ER 4134.) Williams thought Mitchell mentioned having access to alcohol and drugs in Madison Street Jail. (ER 3933-3934.) Bartolomei was surprised to see Morenz's report of Mitchell's drug and alcohol use in custody but didn't recall discussing the issue with Mitchell. (ER 4086-4087.)

**4. *This Court Should Order an Evidentiary Hearing on Mitchell's Claim of Substantive Incompetence and Related Ineffective-Assistance Claim.***

This Court should order an evidentiary hearing on Mitchell's specific, non-frivolous claims regarding his incompetence to waive his penalty-phase appearance, or "substantive" incompetence claim. *See Boyde*, 404 F.3d at 1165 n.6. The standard for competency to stand trial is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted). In addition, counsel is ineffective "if he or she failed to inquire into a defendant's competency and failed

to request a competency hearing, despite indicia of incompetence that would provide reasonable counsel 'reason to doubt' the defendant's ability to understand the proceedings, communicate with counsel, and assist in his own defense." *Jermyn v. Horn*, 266 F.3d 257, 300 (3d Cir. 2001).

Mitchell's allegations are "sufficiently specific to meet the low threshold for an evidentiary hearing" on his claims of substantive incompetence and counsel's ineffectiveness in handling the issue of his competency to waive his penalty-phase appearance. *Howard*, 381 F.3d at 883. Dr. Morenz's pretrial report includes Mitchell's statements regarding alcohol and drug use at Madison Street Jail, which should have put counsel on notice of possible competency issues. *Id.* at 881. Mitchell's referral for alcohol treatment and disciplinary action for brewing alcohol while in custody also point to the need for a competency hearing. *See Sanders v. United States*, 373 U.S. 1, 20 (1963) (relying in part on fact that petitioner received medical treatment for withdrawal in jail in granting evidentiary hearing on competency). Yet Mitchell's attorneys were either unaware of or oddly unconcerned by his substance abuse during trial. The district court never asked Mitchell whether he was under the influence of drugs or alcohol when taking his waiver of appearance. (SER 441.) Further, Mitchell presented specific, credible evidence corroborating his claims of heavy alcohol and drug use while in pretrial custody. He presented declarations from two fellow inmates who witnessed his alcohol and drug use during trial and confirmed the wide availability of drugs and alcohol in the facility. (ER 3164-3165, 3694-3696.) *Cf. Sasser v. United States*, 452 F.2d 1104, 1106 (9th Cir. 1972) (evidentiary hearing not required where petitioner "merely made the bald assertion that he was under the influence of a drug," without specifying how he obtained the drug while in custody).

Morenz's pretrial diagnosis of significant depressive symptoms and other

mental health issues, combined with Mitchell's sudden decision to waive his appearance during penalty phase, should have alerted counsel to the need for a competency hearing. Sears told the district court that while Mitchell had previously considered testifying, "now whether it's out of despair or hopelessness or depression or whatever is motivating him, he's gone so far in the other direction." (SER 438.) Counsel thus recognized that a mental health issue, such as depression, may have provoked Mitchell's decision to waive his penalty-phase appearance. Yet counsel made no serious inquiry to ascertain the impetus for Mitchell's decision and instead merely attempted, repeatedly, to withdraw from the case.

The value of counsel's observations is further limited by the fact that they had spent so little time with Mitchell. As the Supreme Court has explained, "[w]hether or not petitioner was under the influence of narcotics would not necessarily have been apparent to the trial judge," who saw him only briefly. *Sanders*, 373 U.S. at 20. The same is true of counsel in this case, whose post-waiver contact with Mitchell was so limited as to render them unable to determine whether Mitchell "lack[ed] the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). In addition, Sears and Williams, the two attorneys who were litigating the waiver issue and repeatedly moving to withdraw as counsel, had spent less than nine hours visiting him prior to trial.[17] (SER 432, 438, 443.) Given the lack of rapport previously developed between Mitchell and his attorneys, it was hardly surprising that Mitchell

---

[17] Bartolomei, who had spent four times as much times with Mitchell as Sears and Williams combined, was absent from the first two hearings on the penalty-phase waiver of appearance. (ER 955; SER 428, 430, 436.)

repeatedly declined to talk to his attorneys about the waiver issue. Given the paucity of attorney-client contact, counsel did not have a baseline from which to determine whether Mitchell was drunk, high, or depressed. At most, counsel's testimony proves that Mitchell *did not* consult with counsel and assist with preparing his defense; it does not establish his capacity to do so.

As in *Howard*, that Mitchell "could have been rendered incompetent, and specifically and credibly claims to have been so, is sufficient to tip the scales in favor of an evidentiary hearing" on substantive incompetence. 381 F.3d at 881. Because counsel performed deficiently by not investigating Mitchell's competency, and Mitchell would be prejudiced by waiving his penalty-phase appearance or standing trial while incompetent, he is also entitled to a hearing on counsel's ineffective assistance. *Id.* at 881-83. The question is whether the record "conclusively" establishes that Mitchell was competent during the penalty phase of his trial and therefore not entitled to any relief. *Id.*; *see also Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir. 1990) (granting an evidentiary hearing on a Section 2255 movant's competency to waive his trial appearance even though it was "highly unlikely that, given Dziurgot's status as a New York tax attorney, he did not realize what he was doing when he waived his right to be present," because such a claim was not "inherently incredible"). Mitchell has raised a sufficiently detailed and controverted issue of substance abuse to warrant an evidentiary hearing on his substantive incompetence claim.

## G. THIS COURT SHOULD GRANT A COA AND AN EVIDENTIARY HEARING ON MITCHELL'S CONFLICT-OF-INTEREST CLAIM (CLAIM C).

### Standard of Review

This Court reviews Sixth Amendment claims regarding the right to counsel, including conflict-of-interest claims, de novo. *Christakis*, 238 F.3d at 1168.

## Discussion

### 1. *The Arizona FPD Engaged in Concurrent Representation of Mitchell and an Unnamed Client Involved in Mitchell's Case.*

Celia Rumann and Michael O'Connor represented Mitchell on direct appeal. (ER 3238.) Rumann was an assistant federal public defender ("AFPD") at the Arizona FPD at the time. (ER 3238.) During the direct appeal, Rumann learned that Karen Wilkinson, another AFPD in the same office, had withdrawn from a case because her client had some relationship to Mitchell's case. (ER 3214, 3238.) Rumann sent an email to Wilkinson and Jon Sands, the Federal Public Defender for the District of Arizona, requesting information about the conflict and indicating that Wilkinson said she had been instructed not to discuss the matter with Rumann. (ER 3239.)

During a conference call on the conflict issue, Sands and Bartolomei refused to reveal the name of Wilkinson's client. (ER 3214.) Neither O'Connor nor Rumann ever learned the name of Wilkinson's client, or the extent, timing, and duration of the conflict. (ER 3215.) Rumann was later informed by another AFPD, possibly Wilkinson, of an ethical wall created between her and Mitchell's trial attorneys. (ER 3240.)

The timing of the conflict was unclear. Sears knew nothing about the conflict of interest at the time. (ER 4173.) AFPD Williams thought the conflict occurred before the trial, not when Mitchell's case was on appeal, but couldn't remember any details. (ER 4003.) AFPD Bartolomei initially refused to answer any questions about the conflict on the basis of attorney-client privilege -- not Mitchell's privilege, but the privilege of Wilkinson's client. (ER 4077-4078, 4103-4104.) However, Bartolomei later testified that he didn't know the other client's name, that he learned of the issue when Mitchell's case was on direct

appeal, and that the Arizona FPD withdrew from the other case. (ER 4103, 4105-4106.) Neither Bartolomei nor Williams knew of an ethical wall between them and Rumann. (ER 4005, 4082.)

**2. *The Record Does Not Conclusively Show That Mitchell's Representation Was Unaffected by the Concurrent Representation.***

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[I]n order to be entitled to a hearing on a conflict of interest Sixth Amendment claim, a habeas petitioner has the burden of alleging specific facts which, if true, would indicate that: (1) an attorney's relationship to a third party influenced the attorney not to pursue a particular litigation strategy, and (2) the foregone litigation strategy would have been a viable alternative." *Rodrigues,* 347 F.3d at 824.

It is undisputed that the Arizona FPD engaged in concurrent representation of Mitchell and another client who had some relationship to Mitchell's case. Trial counsel's refusal to disclose the name of the other client, based on an unjustified assertion of attorney-client privilege, prevented Mitchell from developing the facts to support his conflict-of-interest claim. This Court has held that "the identity of the client . . . and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." *Clark v. American Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Because the attorney-client privilege "has the effect of withholding relevant information from the factfinder, it is applied only when necessary to achieve its limited purpose of encouraging full and frank disclosure by the client to his or her attorney." *Id.* Requiring the Arizona FPD to reveal the other client's name would not chill such

"full and frank disclosure." Therefore, Mitchell's counsel had no basis for asserting attorney-client privilege and refusing to name Wilkinson's client in the deposition.

An evidentiary hearing is required because the record does not conclusively show that Mitchell was represented by conflict-free counsel. The district court based its conclusion to the contrary on an erroneous finding regarding the timing of the conflict. The record shows that Bartolomei did not *learn* of the conflict until Mitchell's case was on appeal, but it is unclear when the conflict first arose or how long it lasted; Williams thought that the conflict arose before trial, which supported Mitchell's claim. In addition, it has not been conclusively established that Mitchell's representation was not affected by the Arizona FPD's concurrent representation of the other client. Although Mitchell's trial attorneys disavowed any knowledge of the other client, as a client of the FPD he was also represented by Federal Public Defender Sands. (ER 4106.) The district court's reasoning that Sands could not have affected Mitchell's pretrial representation because he was not appointed as Federal Public Defender until December 2003, months after Mitchell's conviction (ER 64), is flawed because counsel's deposition testimony showed that Sands enlisted Sears to join the trial team as learned counsel. (ER 4122.) Therefore, regardless of his title, Sands had supervisory authority over Mitchell's case before trial took place and could have prohibited Wilkinson from disclosing information about her former client, as Mitchell alleged.

At a minimum, Mitchell is entitled to disclosure of the other client's name to develop the factual bases of his conflict claim. Counsel's unwarranted assertion of attorney-client privilege should not preclude an evidentiary hearing in which the other client's identity, the nature of the conflict, and any adverse impact on Mitchell's representation could readily be established. *See Christakis*, 238 F.3d at

1169-71 (granting Section 2255 evidentiary hearing to develop "full extent" of conflict and resulting adverse effect).

## H. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM CONCERNING THE WEARING OF COMMEMORATIVE BUTTONS BY SPECTATORS AT TRIAL (CLAIM T).

**Standard of Review**

Whether spectator conduct deprived Mitchell of a fair trial is a mixed question of law and fact reviewed de novo. *Norris v. Risley*, 918 F.2d 828, 830 (9th Cir. 1990). The related ineffective-assistance claim is also reviewed de novo. *Rodrigues*, 347 F.3d at 823.

**Discussion**

### 1. *Evidence Regarding the Buttons in the Trial Record*

On the day the defense rested in the guilt phase, Sears stated, "There were some members of the victim's family apparently that were here last week and we looked around and they are wearing buttons. I don't know if the Court saw them. They are wearing buttons with the pictures of Alyce Slim and [Jane Doe] in the courtroom. And we asked the government and they cooperated apparently to stop that." Trial counsel did not move for a mistrial or formally object to the wearing of the buttons. (ER 904.)

### 2. *This Court's Decision on Direct Appeal*

On direct appeal, and reviewing for plain error, this Court held that, based on the sparse record before it, there was no evidence to suggest that the wearing of the buttons threatened Mitchell's right to a fair trial. 502 F.3d at 971-72.

### 3. *Section 2255 Proceedings*

In their post-conviction depositions, all of Mitchell's trial attorneys recalled the buttons. The buttons were two to three inches across, about the circumference

of a soda can and similar to campaign buttons. (ER 3987, 4095.) They displayed the victims' photographs and text reading "In memory of" or the like. (ER 904, 3968, 4094-4095, 4178.) Williams thought he saw the buttons as the family was entering or leaving the courtroom because one had to be "fairly close" to see them. (ER 3987-3988.)

The courtroom was small, containing just five rows on each side. (ER 4094.) At least six to ten family members attended the trial regularly, sitting on the same side of the courtroom as the jury, within the jury's view. (ER 4094, 4178.)

None of Mitchell's lawyers knew when the spectators first wore the buttons. During trial, Sears stated that trial counsel had noticed the buttons "last week," meaning the week of April 28 to May 2, 2003. (ER 904.) During his deposition, Sears distinctly remembered seeing the buttons on the day the government presented the graphic crime-scene photographs of the victims' bodies -- May 1. (ER 4178, 813-814.) Williams, however, thought the buttons must have been worn early in the trial, because he "probably would have" moved for a mistrial if it had occurred later. (ER 3967-3968, 3986-3987.) Both Sears and Williams indicated that they had informally raised the buttons issue with the government, and that the problem was resolved relatively quickly. (ER 904, 3968.)

#### 4. *In Light of New Facts Regarding the Wearing of Commemorative Buttons, This Court Should Reconsider Whether Spectator Conduct Deprived Mitchell of a Fair Trial.*

The district court erred by declining to consider the buttons issue on the merits because it was previously raised and rejected on direct appeal. (ER 35 n.9.) The new facts adduced in post-conviction proceedings, which flesh out the virtually nonexistent record created by trial counsel, justify reconsideration of this

claim. *See Argo*, 473 F.2d at 1317; *Jack*, 435 F.2d at 319 & n.2. And in *United States v. Manzo*, 675 F.3d 1204 (9th Cir. 2012), this Court recently granted Section 2255 relief on a claim that it had "summarily rejected" on direct appeal simply because the prior decision was clearly erroneous, even in the apparent absence of any new evidence bearing on the claim. *Id.* at 1211 n.3. As in *Manzo*, this Court's prior summary rejection of the claim being relitigated in question was clearly erroneous. 502 F.3d at 971-72. The new evidence regarding the visibility, timing, and duration of the button-wearing reveals a high likelihood that this conduct threatened Mitchell's right to a fair trial, and that failure to reconsider the prior clearly erroneous decision would result in manifest injustice. *Gonzalez*, 677 F.3d at 389 n.4.

This Court has held that spectator conduct, such as the wearing of buttons, can threaten a defendant's right to a fair trial. In *Norris v. Risley* ("*Norris I*"), 878 F.2d 1178 (9th Cir. 1989), this Court explained that the relevant test is whether the spectator conduct created an "unacceptable risk of impermissible factors coming into play" and was thus "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Id.* at 1182 (internal quotation marks omitted). Even if the spectator conduct is not inherently prejudicial, it may nevertheless require reversal if a defendant can show "actual prejudice." *Musladin v. Lamarque*, 427 F.3d 653, 659 (9th Cir. 2005), *vacated on other grounds by Carey v. Musladin*, 549 U.S. 70 (2006).

Both *Norris* and *Musladin* involved cases in which courtroom spectators wore buttons during trial. In *Norris*, a pre-AEDPA state habeas case, spectators wore "Women Against Rape" buttons during the petitioner's trial on charges of kidnapping and sexual intercourse without consent; the spectators wore the buttons both inside and outside the courtroom and sat approximately sixteen feet

from the nearest juror. *Norris v. Risley* ("*Norris II*"), 918 F.2d 828, 831 (9th Cir. 1990). This Court described the buttons, which were two and one-half inches in diameter, as "large," and concluded that their content and visibility created an unacceptable risk of impermissible factors coming into play. *Id.* at 830-31. This Court reasoned that the buttons "conveyed an implied message encouraging the jury to find Norris guilty," thereby undermining the presumption of innocence and rights of confrontation and cross-examination. *Id.* Although this Court acknowledge it could "never fully know the extent to which the buttons influenced any juror," it concluded that the buttons "tainted Norris's right to a fair trial" and reversed the district court's denial of habeas relief accordingly. *Id.* at 834.

Similarly, in *Musladin*, a post-AEDPA state habeas case, this Court relied heavily on *Norris II* to conclude that the wearing of buttons by the victim's family during a murder trial deprived the petitioner of a fair trial. 427 F.3d at 654. In *Musladin*, at least three members of the victim's family sat in the front row of the gallery and wore buttons bearing photographs of the deceased. *Id.* at 655. The buttons were "several inches in diameter" and "very noticeable," and the family sat "directly behind the prosecution and in clear view of the jury." 427 F.3d at 655; *see also Musladin*, 549 U.S. at 72 n.1 (buttons were "apparently two to four inches in diameter" and displayed victim's photograph). Although the Supreme Court reversed *Musladin* due to the lack of "clearly established federal law," or Supreme Court holdings, regarding spectators' courtroom conduct, as required for habeas relief under AEDPA, 549 U.S. at 77, this Court is not similarly constrained on Section 2255 review.

The risk of impermissible factors coming into play was at least as high in Mitchell's case as in *Norris* and *Musladin*. The buttons were the same size as those described as "large" and "very noticeable" in those cases. The buttons

included both an image of the victims (as in *Musladin*) and text (as in *Norris*). The number of family members wearing the buttons (six to ten) exceeded the number of buttons in *Norris* (three), and the courtroom was small. The positioning of the spectators, in direct view of the jury, was the same as in *Musladin*. Further, Williams stated that he saw the buttons as the family was entering or leaving the courtroom. Therefore, even if jurors could not see the buttons from where they sat (which has not been proven), it is possible that they saw them in the courthouse, as the jurors walked through the courthouse to reach the jury room. (ER 776.)

The spectators' conduct was inherently or actually prejudicial. Although the duration of the button-wearing is not clear on this record, Williams thought the buttons were worn early in trial, while Sears thought they were worn on May 1, the third of five days on which guilt-phase evidence was presented. In *Norris I*, this Court concluded that if the petitioner could prove his allegations regarding the wearing of "Women Against Rape" buttons, "one reasonable inference is that the women's purpose was to be sure that he was convicted." 878 F.2d at 1183. The Eleventh Circuit noted the expressive purpose of similar spectator conduct in a capital case involving the killing of a prison guard, where it held that the presence of uniformed prison guards in the courtroom and pretrial publicity deprived the petitioner of a fair trial: "The officers . . . wanted to communicate a message to the jury. The message of the officers is clear in light of the extensive pretrial publicity. The officers wanted a conviction followed by the imposition of the death penalty. The jury could not help but receive the message." *Woods v. Dugger*, 923 F.2d 1454, 1459-60 (11th Cir. 1991). The wearing of buttons by the victims' family in a capital murder trial, especially when the family members later testify at the penalty phase, conveys an equally clear message regarding the desired result.

The wearing of buttons prejudiced Mitchell in the guilt phase because it interjected impermissible considerations of victim impact into the case prior to conviction, thereby defeating the purpose of bifurcated proceedings under the FDPA. 18 U.S.C. § 3593(b). It is significant that the buttons were worn on the day the crime-scene photographs were shown to the jury. The district court required the government to crop Doe's facial features from the crime-scene photographs because they were unduly prejudicial. (ER 866.) When arguing in favor of anatomical diagrams that depicted Doe's facial features, the government argued that the diagrams would not "in any shape or form connote the same type of emotion that a photograph would." (ER 866.) The district court agreed that a diagram "is not as graphic and compelling as a photograph. . . . I think it's very different to show the actual photos as opposed to a diagram even when there's facial features included in it." (ER 867.) The district court thus recognized the powerful impact of juxtaposing crime-scene photographs with photographs depicting the victims' facial features.

The wearing of buttons also prejudiced the penalty phase. As Justice Souter wrote in *Musladin*:

> [O]ne could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations. . . . [T]he buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and a call for some response for those who see them.

*Musladin*, 549 U.S. at 82 (Souter, J., concurring in judgment). As in *Woods*, the message of the buttons indicated that the family wanted "a conviction followed by

the imposition of the death penalty." 923 F.2d at 1460. In *Norris I*, this Court emphasized that jurors are "extremely likely to be impregnated by the environing atmosphere," 878 F.2d at 1182 (internal quotation marks omitted), and the spectators' message regarding the desired result would have renewed salience at the penalty phase, where the decision to impose the death penalty does not turn on "hard facts." *Hendricks*, 70 F.3d at 1044. The possibility of prejudice is heightened by the fact that the penalty-phase witnesses at Mitchell's trial were not permitted to testify to their opinion of the appropriate sentence. (ER 978.) Therefore, even if this Court concludes that the spectators' wearing of buttons did not affect the guilt phase, it should nevertheless grant penalty-phase relief on this basis.

**5. *Trial Counsel Performed Deficiently by Failing to Object to the Wearing of Buttons by the Victims' Families, and Mitchell Was Prejudiced as a Result.***

Trial counsel performed deficiently in failing to object to the wearing of buttons by the victims' family. Although *Musladin* postdated Mitchell's trial, this Court's decisions in *Norris I* and *II* should have alerted competent counsel to the unacceptable risk of impermissible factors created by this sort of spectator conduct. Indeed, Williams stated in his deposition that he would have likely moved for a mistrial if the button-wearing had occurred later in the trial, and not shortly after jury selection. But the record developed by post-conviction counsel shows that the buttons were worn in the middle of the guilt phase, on the crucial day when graphic crime-scene photos of the victims' bodies were shown to the jury. (ER 4178.) For the reasons described above, Mitchell was prejudiced by trial counsel's failure to create a record on the buttons and by failing to move for a mistrial or otherwise object to the buttons.

### 6. *At a Minimum, Mitchell Is Entitled to an Evidentiary Hearing on the Buttons Issue.*

Under *Norris I*, Mitchell has alleged sufficient facts to warrant an evidentiary hearing on the spectators' wearing of buttons. In *Norris I*, this Court ordered an evidentiary hearing to ascertain "the number of [spectators], the visibility of the buttons, [and] whether the jurors passed through the women as they entered and exited the courtroom[.]" 878 F.2d at 1183. Although the record here is already far more developed than in *Norris I*, Mitchell is, at the very least, entitled to an evidentiary hearing on this issue because he has made specific allegations that, if true, state a claim on which relief could be granted." *Leonti*, 326 F.3d at 1116. This is not a futile undertaking: Mitchell's attorneys remembered details about the buttons seven years after trial, and in *Norris II*, three of six jurors remembered seeing the buttons six years after trial. 918 F.2d at 831.

## I. THIS COURT SHOULD GRANT A COA AND RELIEF ON MITCHELL'S CLAIM THAT THE GOVERNMENT VIOLATED *BRADY* BY BELATEDLY DISCLOSING THE NAVAJO NATION'S REQUEST FOR LENIENCY IN MITCHELL'S CASE.

**Standard of Review**

This Court reviews *Brady* claims de novo. *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).

**Discussion**

### 1. *The Government's Last-Minute Disclosure of the Navajo Nation's Letter.*

On the first day of the penalty phase, Sears informed the district court that just the day before, the government had turned over a January 2002 letter from the Navajo Nation Attorney General to the United States Attorney's Office indicating that the tribe believed that capital punishment was not appropriate in Mitchell's

case. (ER 968-969.) Sears argued that the letter was *Brady* material that should have been disclosed earlier. (ER 969-970.) The government stated that it had never suggested that the Navajo Nation favored the death penalty in this case, that the Nation's opinion was not relevant, and that the letter was disclosed not pursuant to a *Brady* obligation but out of an abundance of caution. (ER 972.) The district court admitted the letter because the victims and defendants were enrolled members of the Navajo Nation, the offense occurred on Navajo land, and the letter recommended leniency. (ER 975.)

Sears mentioned the Navajo Nation's position in his opening, quoted from the letter in closing, and argued that the Navajo Nation's position was relevant to "the question of whether the death penalty is necessary and appropriate in this case." (ER 984, 1085-1086.) The defense did not present a witness to testify regarding the letter. Seven jurors found the Navajo Nation letter to be mitigating -- more jurors than found that Mitchell had responded well to structured environments (two), impaired capacity (one), or other mitigating factors in his childhood or background (six) -- even though counsel had not provided the jury with a mitigating factor targeted to the letter. (ER 1097; SER 452, 460.)

**2. *This Court's Decision Regarding the Navajo Nation's Letter***

On direct appeal, Mitchell argued that the late disclosure of the Navajo Nation letter violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the letter was not provided at a time when the disclosure would be of value to his penalty-phase defense. 502 F.3d at 989. Although this Court found that the letter was favorable and material, it concluded that Mitchell had not shown prejudice because he had not shown how his mitigation approach would have been different, or that the letter "disclosed anything about the Tribe's opposition to capital punishment, or about its failure to opt in to the federal death penalty, that he didn't already know."

*Id.* Further, this Court found there was no reasonable probability of a different result because Mitchell made "effective use" of the letter, and seven jurors deemed it mitigating. *Id.*

### 3. *New Facts Concerning the* **Brady** *Claim*

In his post-conviction deposition, Sears testified that, prior to receiving the letter, Mitchell's trial team had formed the impression that the Navajo Nation, under new leadership, "was for the first time reassessing in a serious way their view on capital punishment." (ER 4176.) Sears decided not to present a Navajo Nation representative at the penalty phase because he thought "the tribe's position was not going to be helpful now and . . . it wouldn't do us much good to bring on people connected with tribal leadership who were no longer in office." (ER 4176.) Sears further stated that Mitchell's trial lawyers "probably should have asked for a continuance when we were handed materials just at the beginning of the penalty phase" "to see if we could do something more than what we were able to do at the penalty phase with that information." (ER 4175, 4177.)

Trial counsel was mistaken about the tribe's position. Navajo Nation Attorney General Louis Denetsosie stated that, if asked (and he was not), he or another representative of tribal government would have testified at Mitchell's penalty phase regarding the Nation's steadfast anti-death penalty position. Denetsosie succeeded Levon Henry, author of the Navajo Nation letter, in January 2003. (ER 3662-3663.)

### 4. *New Facts Warrant Reconsideration of the* **Brady** *Claim.*

The district court denied the Navajo Nation claim as "successive," because it had previously been rejected on direct appeal. (ER 68.) Relitigation of this *Brady* claim is warranted because Mitchell has provided new facts in support of the claim, *Argo*, 473 F.2d at 1317, and the new evidence demonstrates that the prior decision

was clearly erroneous and would result in manifest injustice. *Gonzalez*, 677 F.3d at 689 n.4.

Under *Brady*, the government is required to disclose evidence that is favorable to the defense and "material either to guilt or to punishment." 373 U.S. at 87. Evidence is material within the meaning of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

The new facts concerning the Navajo Nation Attorney General's willingness to send a tribal representative to testify to the continuing validity of the views outlined in the January 2002 letter, as well as trial counsel's failure to ascertain the tribe's position before coming to the conclusion that it would be unhelpful, undermine confidence in the outcome of the penalty phase. On direct appeal, this Court faulted Mitchell for not showing how his approach to mitigation would have been different had the letter been disclosed earlier. 502 F.3d at 989. The new evidence, which was not previously developed due to ineffective assistance of trial counsel, shows that the mitigation presentation could have been bolstered by presenting a live witness to testify to the tribe's view of the appropriateness of capital punishment in Mitchell's case, which involved Navajo victims and defendants, and occurred on Navajo land.

There is a reasonable probability that a more fully developed investigation and presentation of the issues raised in the Navajo Nation letter would have changed the outcome of the penalty phase. Sears admitted that counsel should have taken a continuance to make more persuasive use of the information in the letter. (ER 4175, 4177.) Although the letter was admitted into evidence as an

exhibit, it was only discussed during opening and closing argument. But as the district court instructed the jury, "arguments and statements by lawyers are not evidence. The lawyers are not witnesses." (ER 1063.) The Navajo Nation letter was a unique aspect of Mitchell's mitigation case. Even the government admitted that the Navajo Nation's views were not to be "taken lightly," and the letter offered counsel's best response to the prosecution's victim-impact evidence concerning the importance of grandmothers in Navajo culture. (ER 1090.) Even though trial counsel did not decide to pursue the Navajo Nation angle until receiving the letter right before the penalty phase began, the jury evidently found the Nation's letter to be more mitigating than many of the mitigation routes that counsel actively pursued. Mitchell has shown the *Brady* materiality this Court found lacking on direct appeal: he has shown how his mitigation approach would have been different, and he has shown that the Nation's letter conflicted with counsel's mistaken views regarding the Nation's position on the death penalty.

### J. THIS COURT SHOULD GRANT A COA AND RELIEF ON CUMULATIVE ERROR AT THE PENALTY PHASE.

**Standard of Review**

This Court reviews each of the claims underlying Mitchell's cumulative error claim de novo. *Rodrigues*, 347 F.3d at 823 (ineffective assistance); *Sanchez*, 50 F.3d at 1453 (*Brady* violation); *Norris II*, 918 F.2d at 830 (spectator conduct).

**Discussion**

If this Court finds the certified claims of penalty-phase ineffective assistance insufficient to warrant a grant of relief or an evidentiary hearing, it should nevertheless grant relief or an evidentiary hearing on cumulative error at the penalty phase. *Silva*, 279 F.3d at 834 (granting COA on cumulative error because "cumulative prejudice from trial counsel's deficiencies may amount to sufficient

grounds for a finding of ineffectiveness of counsel"); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (considering prejudice arising from ineffective assistance "cumulatively" with "other significant errors" not relating to ineffective assistance). The prejudicial effect of counsel's inadequate investigation and presentation of mitigation at the penalty phase was compounded by the prosecution's belated disclosure of the Navajo Nation letter and the wearing of commemorative buttons by the victim's family. This Court should grant the writ with respect to Mitchell's sentence accordingly.

## VII.
## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

June 27, 2012

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

By: s/ *Gia Kim*

GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies she is unaware of any pending case presenting an issue related to those raised in this brief.

DATED: June 27, 2012

s/ *Gia Kim*
GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(c) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 32,991 words. On June 6, 2012, the Court issued an order permitting appellant to file a brief not exceeding 33,000 words.

DATED: June 27, 2012

s/ *Gia Kim*
GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2012, I electronically filed **Appellant's Opening Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*Lynn Evangelista*
Lynn Evangelista