**C.A. No. 11-99003**

D. Ct. No. CV-09-8089-PCT-MHM

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

LEZMOND C. MITCHELL,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

# BRIEF OF APPELLEE

JOHN S. LEONARDO
United States Attorney
District of Arizona

CHRISTINA M. CABANILLAS
Appellate Chief

VINCENT Q. KIRBY
Assistant U.S. Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Attorneys for Appellee

Submitted via ECF: October 25, 2012

# I. TABLE OF CONTENTS

Page

I. Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

II. Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

III. Statement of Jurisdiction

A. District Court Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Appellate Court Jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . 1

C. Timeliness of Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D. Bail Status.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V. Statement of the Case

A. Nature of the Case; Course of Proceedings. . . . . . . . . . . 5

B. Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI. Summary of Arguments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VII. Arguments

A. Certified Issues: Counsel Was Not Ineffective with Respect to Deciding Not to Present an Intoxication Defense During the Guilt Phase (Claim A) Nor During the Presentation of Mitigation Evidence in the Penalty Phase (Claims B and D) Nor Can Mitchell Establish Any Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B. Procedural Issues:

1. The Court Did Not Abuse It's Discretion by Denying a Request for an Evidentiary Hearing. . . . . . . . . . . . . . . 78

2. The Court Did Not Err by Denying Mitchell's Post-Conviction Request to Interview Trial Jurors. . . . . . . . . 81

VIII. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

IX. Statement of Related Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
X. Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
XI. Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

# II. TABLE OF AUTHORITIES

## CASES

*Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 64

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Babbit v. Calderon,* 151 F.3d 1170 (9th Cir. 1988). . . . . . . . . . . . . . . . . . 55, 64, 68

*Baca v. Knowles*, 258 Fed. App'x 958 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . 64

*Beardslee v. Woodford*, 358 F.3d 560 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . 66, 70

*Bobby v. Van Hook*, 558 U.S. 4 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . 64, 68, 76

*Bowling v. Parker,* 344 F.3d 487 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 48

*Cox v. Ayers*, 613 F.3d 883 (9th Cir. 2010). . . . . . . . . . . . . . . . . . 42, 60, 70, 74, 78

*Crittenden v. Ayers*, 624 F.3d 943 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 69

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). . . . . . . . . . . . . . . . . . . . 34-35, 61, 67

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Edwards v. Ayers*, 542 F.3d 759 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . 41, 66, 69

*Fairbank v. Ayers*, 650 F.3d 1243 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 59

*Florida v. Nixon*, 543 U.S. 175 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . . 81

*Gerlaugh v. Stewart*, 129 F.3d 1027 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 73

*Gonzales v. Knowles*, 515 F.3d 1006 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . 34, 77

*Harrington v. Richter*, 131 S. Ct. 770 (2011). . . . . . . . . . . . . . 33-35, 61, 69, 73, 77

*Heishman v. Ayers*, 621 F.3d 1030 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 57, 78

*Hill v. Mitchell,* 400 F.3d 308 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hill v. United States*, 368 U.S. 424 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Knowles v. Mirzayance*, 556 U.S. 111 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . 56

*Landrigan v. Stewart*, 272 F.3d 1221 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 47

*Leavitt v. Arave*, 646 F.3d 605 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Lenz v. Washington,* 444 F.3d 295 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 49

*Lockhart v. McCree*, 476 U.S. 162 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Mitchell v. United States,* 553 U.S. 1094 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Pizzuto v. Arave*, 385 F.3d 1247 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 72

*Rich v. Calderon*, 187 F.3d 1064 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 79

*Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Rose v. McNeil*, 634 F.3d 1224 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 64

*Rupe v. Wood*, 93 F.3d 1434 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . 31, 33-35, 38, 47, 61, 77

*Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . 79

*United States v. Johnson*, 988 F.2d 941 (9th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . 79

*United States v. Christakis,* 238 F.3d 1164 (9th Cir. 2001). . . . . . . . . . . . . . . . . . 30

*United States v. Cronic*, 466 U.S. 648 (1984).. . . . . . . . . . . . . . . . . . . . . . 31-32, 41

*United States v. Kenyon*, 481 F.3d 1054 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . 40

*United States v. Leonti*, 326 F.3d 1111 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 79

*United States v. McMullen,* 98 F.3d 1155 (9th Cir. 1996). . . . . . . . . . . . . 30, 78-79

*United States v. Mitchell,* 502 F.3d 931 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . 7-8

*United States v. Moore*, 682 F.2d 853 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . 39, 63

*United States v. Sinisterra*, 600 F.3d 900 (8th Cir. 2009). . . . . . . . . . . . . . . . . . 80

*United States v. Washington*, 819 F.2d 221 (9th Cir. 1987). . . . . . . . . . . . . . . 36, 41

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 64

*West v. Ryan*, 608 F.3d 477 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 68

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004). . . . . . . . . . . 47, 60, 62, 64-65

*Wong v. Belmontes*, 558 U.S. 15 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 77-78

*Yarborough v. Gentry*, 540 U.S. 1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**STATUTES**

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2253(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 30-31, 79

**RULES**

Fed. R. App. P. 4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ninth Circuit Rule 22-1(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 82

## III. STATEMENT OF JURISDICTION

### A. District Court Jurisdiction

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 2255 based on the filing of a Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Civ-CR 9.) [1/]

### B. Appellate Court Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a) based on the district court's entry of the final Judgment and Certificate of Appealability on September 30, 2010. A Motion to Reconsider was denied December 21, 2010. (Civ-CR 56, 66; ER 74.)

### C. Timeliness of Appeal

Following the entry of the final judgment Petitioner-Appellant Lezmond C. Mitchell (hereinafter "Mitchell" or "defendant") filed a notice of appeal on February 17, 2011. (Civ-CR 69.) The notice was timely pursuant to Fed. R. App. P. 4(a).

---

[1/] "Civ-CR" refers to the Clerk's Record in the Section 2255 civil proceeding (CV 09-08089-PCT-MHM) and is followed by the pertinent document number(s). "App-CR" refers to the Clerk's Record in the direct appeal of this matter (C.A. 03-99010). "CR" refers to the Clerk's Record in the underlying criminal case (CR 01-1062-PCT-MHM. "RT" refers to the Reporter's Transcript and is followed by the relevant page number(s). The abbreviation "ER" refers to the Excerpts of Record and will be followed by the relevant page number(s).

**D.** **Bail Status**

Mitchell is currently in the custody of the Bureau of Prisons under a sentence of death.

# IV. ISSUES PRESENTED

## A. CERTIFIED ISSUES

Whether Counsel Was Ineffective for (1) Failing to Investigate, Prepare and Present an Intoxication Defense During the Guilt Phase; and (2) Failing to Investigate, Prepare and Present Certain Mitigation Evidence During the Penalty Phase.

## B. PROCEDURAL ISSUES

1. Whether the District Court Abused its Discretion by Not Granting an Evidentiary Hearing on Mitchell's Section 2255 Claims?

2. Whether the District Court Erroneously Applied a Local Rule Requiring a Showing of "Good Cause" to Deny Mitchell's Habeas Counsel's Request to Interview the Trial Jurors.

## C. UNCERTIFIED ISSUES

1. Whether Tribal and Federal Law Enforcement Authorities Engaged in Actual Collusion to Deprive Mitchell of His Federal Procedural Rights?

2. Whether Mitchell Was Incompetent to Waive His Appearance During the Penalty Phase of the Case?

3. Whether the Arizona Federal Public Defender's Office's Subsequent Representation of a Client Related to Mitchell's Case After Conviction Constitutes an Actual Conflict of Interest?

4. Whether Mitchell Was Denied His Right to a Fair Trial Due to Wearing of Buttons Depicting the Victims Early in the Proceedings?

5. Whether Earlier Disclosure of the Navajo Nation Letter to the United States Attorney's Office Asking the Government Not to Seek Death Would Have Changed the Outcome?

6. Whether the Cumulative Impact of Ineffective Assistance of Counsel, Prejudicial Spectator Conduct and Late Disclosure of the Navajo Nation Letter Require Relief with Respect to Mitchell's Sentence?

## V. STATEMENT OF THE CASE

### A. Nature of the Case; Course of Proceedings.

#### 1. Trial Court Proceedings

On November 21, 2001, a grand jury in Phoenix, Arizona, returned a redacted, eleven-count indictment charging Lezmond Mitchell (defendant), Jason Kinlicheenie and Gregory Nakai with Premeditated First Degree Murder, Counts 1 and 5; Armed Carjacking, Count 2; Felony Murder–Robbery, Count 3; Robbery, Counts 4, 8 and 10; Felony Murder–Kidnaping, Count 6; Kidnaping, Count 7; and Use of a Firearm During a Crime of Violence, Counts 9 and 11. (CR 1; ER 4219.) The name of the juvenile murder victim was redacted from this indictment and all further court pleadings. (CR 2; ER 4219.)

On November 29, 2001, defendant made his initial appearance, was arraigned and had counsel appointed to represent him. Defendant was ordered temporarily detained. On December 4, 2001, defendant was ordered detained as a danger pending trial. (CR 3, 5; ER 4219.)

On July 2, 2002, a superseding indictment was returned naming Johnny Orsinger as a co-defendant in Counts 1 through 7. (CR 47; ER 4222.)

On August 13, 2002, the government filed a Redacted Notice of Intent to Seek the Death Penalty against defendant, based on the charge of Armed Carjacking which

resulted in a death, a violation of 18 U.S.C. § 2119, as charged in Count 2 of the superseding indictment. (CR 87; ER 4224.)

On November 19, 2002, a second superseding indictment was returned. The grand jury made special findings in this indictment in support of the death penalty against defendant. (CR 130; ER 4229.)

On April 1, 2003, the court severed co-defendant Johnny Orsinger from defendant's trial. Lezmond Mitchell was the only defendant to proceed to trial before District Judge Mary H. Murguia. (CR 267; ER 4241.) On May 8, 2003, following a 19-day trial, defendant was convicted on all counts, including Armed Carjacking as charged in Count 2. (CR 311; ER 4245.) Defendant was eligible for the death penalty by virtue of his conviction for Count 2. (CR 87; ER 4224.)

On May 14, 2003, the penalty phase began before the same jury, and on May 20 that jury returned a recommendation of a sentence of death as to each victim. (CR 327; ER 4246.)

On September 15, 2003, defendant was sentenced to death on Count 2 and to life imprisonment on Counts 1, 3, 6 and 7. A life sentence also was imposed on Count 5 and ordered to run consecutively to the life sentences imposed on Counts 1, 3, 6 and 7. A sentence of 300 months was imposed on Count 11 and ordered to run consecutively to the sentence imposed on Count 9. A sentence of 180 months was

imposed in Counts 4, 8 and 10. Finally, an 84 month sentence was imposed on Count 9 and ordered to run consecutively to the sentence imposed on Count 5. Defendant also was ordered to serve a period of supervised release of 60 months, assessed $1,100, and ordered to pay restitution of $22,069.19. (CR 425; ER 4251.)

**2. The Direct Appeal**

Mitchell filed a direct appeal challenging his conviction and sentence. It was argued and submitted to this Court on February 15, 2007. *United States v. Mitchell,* 502 F.3d 931 (9th Cir. 2007).

On September 5, 2007, this Court issued a published decision affirming the conviction of Mitchell and upholding his sentence of death. *Mitchell,* 502 F.3d at 931. In rejecting Mitchell's challenges, this Court held: (1) Federal Death Penalty Act (FDPA) extended to car jacking committed by defendant, a Native American against other Native Americans in Indian Country; (2) Major Crimes Act did not preclude federal court's exercise of jurisdiction over a Native American charged with federal car jacking resulting in death; (3) imposition of death sentence for a Native American convicted of car jacking resulting in death did not violate the right of free exercise of religion; (4) excusal for cause of a jury member based on the juror's perceived inability to set aside religious opposition to the death penalty was warranted; (5) exclusion of jurors, based on their expressed inability to apply the law

impartially in part because of their Navajo traditional religion and culture, did not violate the Religious Freedom Restoration Act (RFRA) or the American Indian Religious Freedom Act; (6) joinder of robbery and car-jacking counts was permissible and declining to sever them was not manifestly prejudicial; (7) probative value of post-mortem decapitation and dismemberment and photographs depicting it were not outweighed by the potential for undue prejudice; (8) district judge's ex parte meetings with the United States marshal were not stages of the trial implicating defendant's right to be present at critical stages of the proceeding; (9) jury instruction on pecuniary gain was warranted; and (10) defendant could waive right of presence at penalty phase of capital murder trial. *Mitchell,* 502 F.3d at 931. The Court denied Mitchell's subsequent petition for rehearing. (App-CR 127.) The United States Supreme Court denied his petition for certiorari on June 9, 2008. *See Mitchell v. United States,* 553 U.S. 1094 (2008) (ER 1105.)

### 3. The Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255

On June 8, 2009, Mitchell filed a Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255 (hereinafter "Motion"). (Civ-CR 9.) An Amended Motion was finally filed on December 23, 2009. (Civ-CR 30, 42; ER 1107.) Mitchell alleged a number of ineffective assistance

of counsel claims: (A) failure to investigate, prepare and present evidence of intoxication at the guilt phase; (B) failure to investigate, prepare and present evidence of addiction and intoxication at the penalty phase; (C) conflict of interest; (D) failure with respect to the penalty imposed; (E) failure to challenge the voluntariness of Mitchell's statements; (F) failure to challenge the medical examiner; (G) failure to challenge DNA evidence; (H) failure to properly conduct jury selection; (I) error by the trial court in excluding venire persons; (J) error by trial court permitting hardship dismissals; (K) error by trial court in failing to permit post conviction interviews of jurors; (L) error by trial court in conducting voir dire; (M) cumulative errors during jury selection; (N) error by trial court in transferring location of trial and severing co-defendant; (O) systematic exclusion of Native Americans from the jury; (P) inadequacy of jury questionnaire; (Q) failure of prosecution to produce Brady information prior to sentencing phase; (R) collusion between federal and local law enforcement; (S) incompetency of Mitchell at sentencing phase; (T) victims' family misconduct regarding buttons; (U) failure of counsel to trifurcate the proceedings; (V) manner of execution violated Eighth Amendment (later reserved for the future); (W, X, Y) constitutional concerns regarding the death penalty; (Z) failure of appellate counsel; and, (AA) cumulative constitutional errors warrant new trial.

### 4. The District Court's Denial of the Section 2255 Motion

The section 2255 Motion was denied by the district court on September 30, 2010. [2/] (ER 11; Civ-CR 56.) A subsequent Motion to Reconsider was denied December 21, 2010. (ER 74; Civ-CR 66.)

*a. Intoxication Defense (Claim A)*

The district court rejected Mitchell's arguments that his counsel were ineffective by failing to present an intoxication defense. The court found that "counsel reasonably investigated the viability of an intoxication defense." (ER 17; Civ-CR 56.) Counsel reviewed crime scene photographs, spoke with Mitchell who denied using drugs or alcohol at the time, enlisted a social historian, had Mitchell psychiatrically evaluated and attempted to call the co-defendant at trial but the co-defendant asserted his Fifth Amendment privilege. Given the weakness of the intoxication defense, the court found that the tactical decisions to blame the co-defendant and to try to maintain credibility with the jury were reasonable. (ER 23; Civ-CR 56.)

---

[2/] The District Court handled the entire Motion on its own as there was no Magistrate Judge involved.

*b. Custodial Statements (Claim E)*

The court rejected the claim that counsel failed to challenge the voluntariness of Mitchell's statements on the basis of mental deficiencies and cultural heritage. The court found the record established nothing more than a "paucity of evidence suggesting that Mitchell suffered from mental deficiencies or that his Navajo heritage impacted his ability to understand his rights . . ." Counsel was not deficient for deciding not to raise these additional grounds. (ER 25, Civ-CR 56.)

*c. Medical Examiner/DNA Evidence (Claims D & G)*

The court found no ineffective assistance of counsel nor any prejudice in Mitchell's claim that counsel failed to properly challenge the Medical Examiner or the DNA evidence as there was no dispute as to cause of death and no dispute that Mitchell was involved on some level. (ER 27, 30; Civ-CR 56.)

*d. Jury Selection (Claim H)*

The court found no error in regard to venire persons 55, 59 and 83 as they did not sit on the final panel. The court found that Mitchell failed to demonstrate any deficiencies on the part of counsel in failing to strike Jurors 43, 48 and 51 based on their opinions regarding the death penalty. The court rejected the argument that counsel failed to rehabilitate prospective jurors who opposed the death penalty. Appellate counsel was not ineffective for declining to argue that venire persons 3, 22

and 24 were improperly excused on the basis of race. The court noted that the appellate court upheld their removal based on their opposition to the death penalty. (ER 31-34; Civ-CR 56.)

*e. Buttons Worn by Victims' Family (Claim T)*

Buttons worn by family members of the victims were properly handled by counsel with the assistance of the government with no apparent prejudice. (ER 35; Civ-CR 56.)

*f. Trial Trifurcation (Claim U)*

In regards to the trial trifurcation argument, the court found no case law mandating such a proceeding and Mitchell could not establish any prejudice in this case that the jury would have reached a different conclusion after separate hearings. (ER 35-37; Civ-CR 56.)

*g. Cumulative Effect (Claim BB)*

Because the court found counsel effective, there was no cumulative prejudicial effect. (ER 37; Civ-CR 56.)

*h. Mitigation Evidence (Claims B & D)* [3/]

After reviewing the depositions of counsel, the mitigation reports that were compiled and the difficult facts of the case, the court found counsel to have made "a

---

[3/] The Court combined Mitchell's B and D issues.

significant effort, based on a reasonable investigation, to present a sympathetic portrait of Petitioner and to focus the jury's attention on reasons to spare Petitioner's life." (ER 37-59; Civ-CR 56.)

*i. Mental Competency (Claim S)*

The district court noted that this Court concluded that there was no reasonable doubt as to Mitchell's competency. Mitchell tried to raise new information that he was drinking and abusing drugs while incarcerated. The court found that the two inmates who claimed to have witnessed Mitchell using drugs and alcohol in jail while he awaited trial were not in the same jail as Mitchell during the penalty phase. Furthermore, counsel in their depositions stated without question that they never observed Mitchell under the influence of any substance. There was no reason for counsel to seek a competency evaluation at that point in the trial. (ER 60-62; Civ-CR 56.)

*j. Conflict of Interest (Claim C)*

The alleged conflict of interest by a member of the Federal Public Defenders Office occurred long after the conviction and is not supported by any specific factual detail. More importantly, Mitchell was unable to demonstrate how it might have adversely influenced appellate counsel. (ER 62-65; Civ-CR 56.)

*k. Issues Previously Raised on Appeal*

The court found that Claims I, N, O, Q, R, W, X and Z were previously raised on direct appeal and therefore the Court declined to reconsider them. (ER 69; Civ-CR 56.)

*l. Failure to Raise Issues on Appeal*

The court also found that Claims J, L, M, and P (related to jury selection) were procedurally barred by failure to raise them on direct appeal and would not have succeeded in any event. (ER 70; Civ-CR 56.)

*m. Request to Interview Jurors (Claim K)*

Finally, the denial of Mitchell's request to interview jurors occurred during a post-conviction proceeding rather than trial or sentencing and is therefore not a proper subject for habeas proceedings. (ER 70; Civ-CR 56.)

*n. Certificates Of Appealability*

The court granted three Certificates of Appealability finding that reasonable jurists could debate its resolution of these claims: Claim A–failure to present an intoxication defense during the guilt phase; Claim B–failure to present intoxication and addiction evidence at sentencing; and Claim D–failure to present evidence of social history and executive functioning deficits at sentencing. (ER 72; Civ-CR 56.)

## B. Statement of Facts.

*a. The Plan to Get a Truck to Use in a Robbery*

Lezmond Mitchell, Johnny Orsinger, Gregory Nakai, Jakegory Nakai, and Jason Kinlicheenie concocted a plan to rob a trading post located on the Navajo Reservation in Arizona. (RT 4/30/03 2778; ER 743.) As part of the plan, according to Kinlicheenie, Lezmond Mitchell ("defendant") agreed to travel to Gallup, New Mexico, with Johnny Orsinger to steal a truck to use during the robbery. (RT 4/30/03 2779-80; ER 744.) Orsinger and defendant left for Gallup on October 27, 2002. When he returned, defendant told Kinlicheenie that he had gotten a truck and had parked it in the mountains. (RT 4/30/03 2782-83; ER 744-45.) Defendant said that they had "taken out" an old lady and a small person to get the truck. (RT 4/30/03 2783; ER 745.)

*b. The Discovery of the Bodies*

On November 4, 2001, approximately six days after they were last seen alive, the headless, handless, nearly nude bodies of 63 year old Alyce Slim and her nine year old grand-daughter (the juvenile victim) were discovered near Tsaile, Arizona, in the mountains of the Navajo Indian Reservation. (RT 4/30/03 2584, ER 693; RT 5/1/03 3024, ER 806.) Their severed heads and hands were later discovered, along with a pair of latex gloves, buried near the bodies. DNA found on the gloves

did not exclude defendant as its source. (RT 5/1/03 3055, 3058; ER 813-14; RT 5/2/03 3219; ER 855.)

Ms. Slim had been savagely stabbed, receiving approximately 33 wounds to her neck and upper body. (RT 5/6/03 3336, 3287-3303; ER 886, 874-878.) She also suffered approximately 16 wounds to her hands consistent with defensive injuries, such as trying to parry or grab the knife. The injuries she suffered were consistent with infliction by two attackers from two different directions. (RT 5/6/03 3305-09; ER 878-79.)

The juvenile victim ("Jane Doe") suffered multiple fractures that shattered her skull into many small pieces. (RT 5/6/03 3342; ER 887.) Her brain suffered hemorrhaging and bruising indicating very forceful impacts to her head. (RT 5/6/03 3344; ER 888.) The damage was similar to that seen in a body ejected from a high speed car crash, and could have been caused by rocks or boulders weighing at least 20 pounds. (RT 5/6/03 3347-48; ER 889.) Jane Doe also had neck wounds consistent with a sharp object being drawn across the skin. (RT 5/6/03 3338-39; ER 886-87.)

Both victims had suffered apparent *post mortem* chopping wounds that severed their heads and hands. (RT 5/6/03 3313, 3322; ER 880, 882.)

*c. The Last Hours for Ms. Slim and Jane Doe*

On Sunday, October 28, 2001, Alyce Slim and her nine year old granddaughter, Jane Doe, left their home in Fort Defiance, Arizona, to travel to Tohatchi, New Mexico, so Ms. Slim could seek the assistance of Betty Dennison to treat some of her ailments. (RT 4/29/03 2568-2571; ER 689-90.) Jane Doe did not wish to go but her mother persuaded her to go along. (RT 4/29/03 2572-73; ER 690-91.)

Ms. Slim met with Ms. Dennison at approximately 4:00 pm in Tohatchi. Ms. Dennison could not help Ms. Slim's particular leg problems, but she knew a medicine lady named Marie Dale, whom she thought might help. (RT 4/29/03 2587-88, 2593; ER 694, 696.) The three traveled to Twin Lakes, New Mexico, where Ms. Slim made an appointment for the next evening with Ms. Dale. (RT4/30/03 2596; ER 696.)

The trio returned to Ms. Dennison's house to drop her off at approximately 5:00 p.m. (RT 4/29/03 2589; ER 695.) Ms. Slim and her granddaughter then left. (RT 4/29/03 2590; ER 695.)

*d. A Search for Ms. Slim and Jane Doe*

Later that evening, Jane Doe's mother, Marlene, became concerned that the two had not returned, and tried to call her mother (Ms. Slim) on her cell phone. (RT 4/29/03 2576; ER 691.) The next morning she tried to call her mother's house,

but got no answer. (RT 4/29/03 2577; ER 692.) She later drove to her mother's house. No one was there, and it appeared that no one had spent the night there. (RT 4/29/03 2578; ER 692.) She checked at Jane Doe's elementary school, finding the little girl had not been there. (RT 4/29/03 2578; ER 692.) She considered calling the police but decided to wait. (RT 4/29/03 2580; ER 692.) Tuesday morning, Marlene drove to the bus barn where her mother was a school bus driver, and discovered that her mother failed to report for work. (RT 4/29/03 2580; ER 692.) Eventually, Marlene called the police and filed a missing persons report. (RT 4/29/03 2581; ER 693.) Police found the bodies of Ms. Slim and Jane Doe, but not before the trading post had been robbed.

*e. The Trading Post Robbery*

On Wednesday, October 31, 2001, Charlotte Yazzie was working at the Red Rock Trading Post located in Arizona on the Navajo Indian Reservation. (RT 4/29/03 2599-2600; ER 697.) As she mopped the floor, a male wearing a mask ran into the store, came up behind her, said "This is a stickup," and struck her in the head with a gun. (RT 4/29/03 2606; ER 699.) Another male also wearing a mask joined the first gunman. (RT 4/29/03 2608-09; ER 699-700.) One of them forced Ms. Yazzie to open the registers. (RT 4/29/03 2615; ER 701.)

Another trading post employee, Kimberly Allen, saw Charlotte struck with the gun. (RT 4/29/03 2634; ER 706.) The second armed robber, carrying a rope, grabbed Ms. Allen, pushed her against the counter, and demanded the combination to the safe. When Ms. Allen told him she didn't know the combination, he threatened, "If you lie to me or don't cooperate with us, we are going to kill you." (RT 4/29/03 2636; ER 706.) He then forced her to turn on the gas pumps. As she did so, she observed a beige, double-cab Chevrolet pickup truck at the pumps and another male standing nearby. (RT 4/29/03 2637; ER 707.)

A third masked robber joined the two in the store. All wore purple latex gloves. (RT 4/29/03 2615, 2635; ER 701, 706.) They took Ms. Yazzie into a back room and demanded more money. She told them where to find it, and the robbers took cash and coins. (RT 4/29/03 2617; ER 702.) They tied up the two women with rope and pointed guns at their heads. Ms. Yazzie was convinced they were going to be shot. (RT 4/29/03 2621; ER 703.) The heavy-set male told them they would be shot if they did anything wrong. (RT 4/29/03 2622; ER 703.)

The two women were locked in the backroom and escaped only after another woman came into the store. (RT 4/29/03 2623-24; ER 703.) In total, the robbers took $5,530 and Ms. Yazzie's purse. (RT 4/29/03 3166, 2625; ER 842, 704.)

A customer saw two masked gunman in the Trading Post, at least one wearing purple gloves. (RT 4/29/03 2647-49; ER 709-10.) Someone took down the license number of an extended cab pickup and gave it to the people at the Trading Post. (RT 4/29/03 2651, 2653; ER 710, 711.) Another witness saw the getaway truck and gave the license number to the police when they arrived who promptly broadcast a description of the truck and the license number. (RT 4/29/03 2660, 2665; ER 712, 714.)

*f. The Discovery of the Getaway Vehicle–Ms. Slim's Pickup*

On Thursday, November 1, 2001, a Navajo Tribal Police officer located an abandoned pickup truck near Wheatfills, Arizona, on the Navajo Indian Reservation. (RT 4/29/03 2668-69; ER 714-15.) The license number of the truck matched the one seen during the Trading Post robbery. When the officer opened the door he noticed that the interior had been partially burned and smelled of fuel. (RT 4/29/03 2673-74; ER 716.) Purple gloves, clothes and masks were found inside the truck. (RT 4/3/03 2903-04; ER 775.) The truck was later identified as Ms. Slim's pickup truck.

*g. The Scientific Evidence from the Truck*

Defendant's palm print was found on the truck. (RT 5/2/03 3190; ER 848.) The masks found in the truck yielded DNA evidence. Defendant could not be excluded as a contributor of the DNA. (RT 5/2/03 3217; RT 4/29/03 2792; ER 855,

747.) Samples taken from various locations in the truck including the floor mat, rear seat, driver's seat, windows and armrest were identified as Ms. Slim's blood. (RT 5/2/03 3205-11; ER 852-53.)

*h. The Trading Post Robbery Arrests*

On the morning of Sunday, November 4, 2001, based on tips and investigation at the scene of the robbery, Tribal arrest warrants were served. Defendant was found and arrested at the residence of Gregory Nakai. (RT 4/30/03 2698; ER 723.) Defendant had been sleeping and was only wearing a shirt and boxer-type underwear when arrested. (RT 5/1/03 2960; ER 790.) When asked where his pants were so they could be brought to him, he said they were in the bedroom between a door and the bunk bed. (RT 5/1/03 2962; ER 790.) As an agent picked up the pants to bring them to defendant, a silver-handled butterfly knife fell out of the pants and onto the floor. Ms. Slim's blood was later found on the knife. Defendant's wallet was in the pants. (RT 5/1/03 2967, 2977; ER 791, 794; RT 5/2/03 3215; ER 854.)

During a consent search of the residence, a newspaper detailing the robbery of the trading post was seized along with a police scanner tuned to the Chinle police department frequency, police radio codes and a $200 money wrapper. (RT 5/1/03 2979, 2982-2983, 3017; ER 794, 795, 804.) A blood-stained, black-handled butterfly knife also was found. DNA analysis demonstrated that Ms. Slim could not be

excluded as the source of the blood. (RT 5/1/03 2965, 2972; RT 5/2/03 3211-12; ER 791, 793, 853-54.) Also found in the residence was Ms. Slim's cell phone. (RT 5/1/03 2986, 3101; ER 796, 825.) DNA evidence was found on the earpiece of the phone, and defendant could not be excluded as a possible contributor of that DNA. (RT 5/2/03 3216; ER 855.)

*i. Defendant's First Admission*

Defendant was advised of his rights on Sunday following his arrest, and flipped a nickel to decide whether he would talk to the investigators. (RT 5/1/03 3108; ER 827.) Initially, he claimed that he had been drinking heavily and blacked out several times but had no involvement with the murders. (ER 1897-99.) Subsequently, Mitchell adamantly denied to his counsel that he was under the influences of any substances. (ER 3924, 3927, 3941, 4031, 4049, 4060, 4128.) Later, while still claiming to be excessively drunk, he admitted that he was present during the murders of Ms. Slim and juvenile Jane Doe, but blamed the murders on 16-year-old Johnny Orsinger. (ER 1882-88.) Defendant confirmed that he had participated in the robbery of the trading post. He explained that during the robbery he wore a mask and was armed with a 12-gauge shot gun. He took money and tied up one of the clerks. (RT 4/30/03 2722-23; ER 729-30.) Later, he offered to assist the agents in finding the bodies of Ms. Slim and Jane Doe. (RT 4/29/03 2723; ER 730.) The

fact of Mitchell's claimed intoxication at the time of the offense was not introduced at trial because he did not testify and the trial court precluded the defense from introducing this evidence through the agents as inadmissible hearsay. (ER 4237; CR 230.)

*j. Orsinger's Arrest and the Pace of the Investigation Picks Up*

The next day, co-defendant Johnny Orsinger was arrested. He agreed to take agents to the bodies of Ms. Slim and Jane Doe. (RT 4/30/03 2724; ER 730.) When Orsinger had difficulties finding the location, agents called for defendant to be brought out to assist. Orsinger led the agents to the bodies shortly before defendant arrived. (RT 5/1/03 3110; ER 827.)

*k. Defendant's Second Admission*

At the bodies' discovery site, defendant was reminded of his Miranda warnings and agreed to talk. (RT 5/1/03 3112-13; ER 828.) Agents told him that they had interviewed Orsinger. (RT 4/30/03 2726-27; ER 730.) Defendant, in a measured response, stated that he had stabbed the "old lady" and that the "evidence would probably show or witnesses would say that he had cut the throat of the young girl twice." (RT 4/30/03 2727; ER 731.) Defendant further conceded that he told Jane Doe to "lay down and die," and then he and Orsinger dropped large rocks or boulders on her head as she lay on the ground. (RT 4/30/03 2727; ER 731.)

Defendant explained that they took the body of Ms. Slim from the rear of the truck and dragged her away to the woods. He recounted that after Orsinger found a shovel and an axe, defendant dug a hole while Orsinger severed the heads and hands. They dropped the severed body parts into the hole and buried them. (RT 4/30/03 2728; ER 731.) Later they burned the victim's clothing, jewelry, glasses and any other identifiable items. (RT 4/30/03 2728; ER 731.) Defendant said he and Orsinger went to a nearby stream where they washed the blood from the knives, their faces and hands. (RT 4/30/03 2729; ER 731.) Defendant said the next day he washed the knives with alcohol to remove any blood. (RT 4/30/03 2729; ER 731.)

Jane Doe's neck bore an incised wound consistent with a sharp object being drawn across the skin (RT 5/6/03 3337-38; ER 886), as described by defendant. Twenty pound rocks containing blood and hair were found near the bodies. (RT 5/1/03 3086, 3114; ER 821, 828.) Jane Doe's blood was found on both rocks. (RT 5/2/03 3220-21; ER 856.) Investigators later found a burn site, as described by defendant, with remnants of items belonging to Ms. Slim. (RT 5/1/03 3031, 3035; ER 807, 808.)

*l. Defendant's Third Confession*

Several weeks later, after he was once again read his *Miranda* rights, defendant advised two other agents that on the weekend of the murders, he and Orsinger

hitchhiked from Round Rock, Arizona, to Gallup, New Mexico. (RT 5/1/03 3116-19; ER 829.) He purchased a knife while Orsinger stole one. They caught a ride to Ya Ta Hey, New Mexico, as they headed home. (RT 5/1/03 3120; ER 830.) They were next picked up by an older lady and a young girl near the Arizona-New Mexico border. (RT 5/1/03 3120; ER 830.) According to defendant, he asked to be let off near the Navajo Reservation town of Saw Mill, Arizona. (RT 5/1/03 3120, 3123; ER 830.) When the truck stopped, Defendant said Orsinger attacked the woman with a knife. (RT 5/1/03 3121; ER 830.) Defendant admitted that he, too, stabbed the woman four or five times. (RT 5/1/03 3121, 2990; ER 830, 797.) They dragged the woman over the seat and put her body on the rear seat with the little girl. (RT 5/1/03 3122; ER 830.) Defendant drove the truck into the mountains on the Navajo Indian Reservation in Arizona, where they dragged Ms. Slim's body out of the car. (RT 5/1/03 3122, 3123; ER 830.) He confirmed that they threw rocks on the little girl's head even though he knew she was still alive. (RT 5/1/03 3122, 2990; ER 830, 797.) Defendant admitted they severed the victims' heads and hands, but denied that it was his idea. He stated that he also would have severed the feet. (RT 5/1/03 3122-23; ER 830.) Finally, he admitted having a discussion about robbing the trading post prior to traveling to Gallup. (RT 5/1/03 3124; ER 831.)

*m. Accomplice Testimony*

Kinlicheenie supplied the masks used in the robbery, as well as his parents' car for use after abandoning the stolen truck. (RT 4/30/03 2786; ER 745.) He drove them to the area where the truck was parked and waited for defendant to return. (RT 4/30/03 2788; ER 746.) They changed clothes there, got into the truck and, with defendant driving, headed for the Trading Post. (RT 4/30/03 2788-89; ER 746.) After they arrived at the Trading Post, they put on the masks and defendant, wearing an "old man" mask and carrying a 12-gauge shotgun, entered the store, along with Jakegory Nakai who was carrying a .22 caliber rifle. (RT 4/30/03 2790-92, 2797; ER 746-47, 748.) Kinlicheenie initially remained outside to pump gas but the pump was off, so he entered the store and saw the other two pushing around the women and turning off the lights. He went in and tried to force open a register. (RT 4/30/03 2797-99; ER 748-49.) One of the women told him to push the "no sale" button; when it opened, Kinlicheenie took the cash. (RT 4/30/03 2799; ER 749.) The robbers drove back to Kinlicheenie's car and then he followed the truck to the dump, where defendant set the truck afire using kerosene stolen from the Trading Post. (RT 4/30/03 2804; ER 750.) They returned to the Nakai residence and split the money; Kinlicheenie received $900. (RT 4/30/03 2807; ER 751.) The next day

defendant asked for and received $300 from Kinlicheenie. (RT 4/30/03 2808; ER 751.)

## VI. SUMMARY OF ARGUMENTS

A. The district court correctly found that Mitchell's counsel provided effective assistance and it did not clearly err in its findings of fact related to the issue of the intoxication defense. The record clearly supports the findings that counsel more than adequately investigated Mitchell's substance abuse history. Mitchell repeatedly denied that drugs and alcohol were involved and aside from co-defendant Johnnie Orsinger who refused to testify, there were no witnesses to the crimes who could testify to the contrary. Mitchell cannot and does not offer anyone. The judgment should be affirmed.

B. The district court correctly found that Mitchell's counsel provided effective assistance and did not clearly err in its findings of fact related to the presentation of intoxication, addiction, troubled upbringing and executive function deficits. The record conclusively established that counsel investigated Mitchell's background with the assistance of a mitigation specialist, reviewed school and other records, spoke with Mitchell, his family members, friends, teachers and had him evaluated by a team of neuro-psychiatric specialists. Taking all of the information into account, counsel made a reasonable strategic decision to present Mitchell as a person who had many positive attributes, to argue that his life was worth saving and to highlight the

disparity that co-defendants were not facing the death penalty. The judgment should be affirmed.

C. The opening brief addresses six issues not certified in the Certificate of Appealability. In accordance with Ninth Circuit Rule 22-1(f), the United States declines to address uncertified issues unless and until ordered to do so by the Court.

# VII. ARGUMENTS

## A. Certified Issues:

**Counsel Was Not Ineffective with Respect to Deciding Not to Present an Intoxication Defense During the Guilt Phase (Claim A) Nor During the Presentation of Mitigation Evidence in the Penalty Phase (Claims B and D) Nor Can Mitchell Establish Any Prejudice.**

1. *Standard of Review.*

A denial of a 28 U.S.C. § 2255 petition is reviewed *de novo. United States v. McMullen,* 98 F.3d 1155, 1156 (9th Cir. 1996). Ineffective assistance of counsel claims are also reviewed *de novo. Id.* at 1157. This court reviews for clear error the factual findings underlying the denial of a § 2255 motion. *United States v. Christakis,* 238 F.3d 1164, 1168 (9th Cir. 2001).

2. *Analysis*.

Mitchell argues that trial counsel were ineffective because they: (1) failed to investigate, prepare and present an intoxication defense at the guilt phase (Claim A); and (2) failed to investigate, prepare, and present mitigating evidence of substance abuse, social history, mental health issues and executive functioning deficits at the penalty phase (Claims B and D). [4/] (Op. Br. at 40, 49)

---

[4/] The district court combined Mitchell's two issues originally labeled B and D in his Motion to Vacate. The court did not grant a certificate of appealability for (continued...)

To prevail on a motion under 28 U.S.C. § 2255 based on a claim of ineffective assistance of counsel, petitioner's alleged errors must demonstrate "an omission inconsistent with the rudimentary demands of fair procedure," or "a fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962). In the capital case of *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the Supreme Court held the standard for evaluating claims of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process, the trial could not have produced a just result. To prove ineffectiveness of counsel, a petitioner must show (1) counsel's performance was deficient for Sixth Amendment purposes and (2) but for the deficient performance, a reasonable probability exists the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. This standard is highly demanding. *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). It requires that a petitioner point to specific errors made by trial counsel. *United States v. Cronic*, 466 U.S. 648, 666 (1984). The burden rests with the accused to prove a constitutional violation because "we presume that the lawyer is competent to provide the guiding hand that the petitioner needs. . . . " *Id.* at 658.

---

[4/] (...continued)
Issue C (conflict of interest).

Deficient performance is demonstrated when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the petitioner by the Sixth Amendment." *Id*. "Unless a Defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2 ed. 1980) ("The Defense Function") are guides to determine what is reasonable, but they are only guides. *Id*. at 688.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (internal citation omitted). Deference is

due in part because the attorney "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Counsel also attempts to read and interact with a jury they spent considerable time selecting. Those interpersonal dynamics do not well traverse the cold hard record of the case. *Id.*

When a conviction is challenged the "question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695. When a death sentence is challenged, the question is "whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the Defendant has met the burden of showing that the decision reached would reasonably likely be different absent the errors." *Id*. at 696.

A petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. *Id*. at 694. That requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington,* 131 S. Ct. at 792. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008). As the United States Supreme Court recently reiterated,

> Surmounting *Strickland*'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom (internal citations omitted).

*Harrington*, 131 S. Ct. at 788. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id*. at 789. The court must ". . . affirmatively entertain the range of possible reasons. . . ." counsel may have had for defending the case in the manner that they did. There are countless ways to defend a case. *Cullen v.*

*Pinholster*, 131 S. Ct. 1388, 1407 (2011). "The *Strickland* standard must be applied with 'scrupulous care.'" *Id.* at 1408 (internal citation ommitted). Counsel need not "confirm every aspect of the strategic basis for his or her actions." *Harrington,* 131 S. Ct. at 790. Because a defendant must prove both prongs of an ineffective assistance claim, there is no reason "even to address both comments of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*.

*a. Mitchell Fails to Show Deficient Performance or Prejudice With Respect to His Claim that Counsel Failed to Adequately Investigate, Prepare and Present an Intoxication Defense at the Guilt Phase.*

Mitchell argues trial counsel was deficient for failing to investigate and present an intoxication defense at the guilt phase of the trial. (Op. Br. at 40.) However, the district court concluded: "[g]iven the weakness in the voluntary intoxication defense, counsel's strategic choice not to pursue that defense was reasonable and does not constitute an action outside the range of professionally competent assistance." (ER 23; Civ-CR 56.)

Entitlement to a voluntary intoxication instruction requires evidence that (1) The defendant was intoxicated, and (2) his intoxication precluded him from forming the specific intent necessary to commit the crime. *United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987).

Mitchell cannot rebut the fact that there was no viable, admissible evidence physical or otherwise proving that he was intoxicated at the time of the offense. Only two individuals were present at the time of the brutal murders of the grandmother and her granddaughter. Neither Mitchell, who repeatedly denied to counsel that he used drugs or alcohol at the time of the murders, nor co-defendant, Johnnie Orsinger, whose confession to the FBI included nothing about drug or alcohol use, testified. Further, any initial statements by Mitchell made to law enforcement that he was drunk at the time were ruled inadmissible hearsay. (ER 4237; CR 230.) In any event, Mitchell could not demonstrate prejudice because the facts surrounding the crimes refuted any evidence of diminished capacity.

(1) <u>Counsels' investigation of Mitchell's claims of intoxication was adequate and reasonable</u>.

The record clearly supports the district court's finding that counsel reasonably investigated the possibility of an intoxication defense. The court found that counsel met with Mitchell who adamantly denied that he was under the influence of alcohol

despite his claims to the FBI; they reviewed crime scene photos looking for bottles of beer or liquor; their social historian investigated and documented Mitchell's substance abuse history; they had Mitchell evaluated by mental health experts and sought information from co-defendant Johnnie Orsinger who asserted his Fifth Amendment Rights and refused to cooperate. (ER 17-23; Civ-CR 56.)

There was no physical evidence of alcohol or drug abuse or paraphernalia at any of the crime scenes. (ER 3932, 3967, 4061.) In numerous conversations with counsel, Mitchell adamantly denied that he was under the influence of any substance during the commission of the crimes, told his attorneys he was sober and insisted that he had to be "sure they were clearheaded." (ER 3924, 3927, 3941, 4031, 4049, 4060, 4128.) Despite his initial claim to the FBI that he was "blacking out" due to heavy consumption of alcohol, Mitchell had no difficulty, as the district court found, directing Navajo Criminal Investigator Darrel Boye to the remote location of the bodies while specifically recognizing various landmarks. (RT 1/30/03 64-65; ER 206-07.) His counsel, even with the GPS coordinates, had difficulty locating the site of the bodies. (ER 4061.) Williams even attended the other related carjack murder trial, (CR-01-01702-PCT-FJM), involving co-defendants Johnnie Orsinger and Gregory Nakai in the hopes of learning anything that might help Mitchell, but found nothing. (ER 3928.)

Counsel had experience with violent crimes occurring on the reservation and the unfortunate role that substance abuse played. (ER 3926, 3967, 4133.) Mitchell's recitation of his actions at that time did not suggest to counsel that he was "wacked out" at the time of the crimes. (ER 4060-61.) "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691. Based on the absence of any physical evidence, witnesses, and Mitchell's denial of alcohol abuse, counsel's decision to forego an intoxication defense was reasonable.

(2) Counsel thoroughly investigated Mitchell's substance abuse history.

Counsel retained a mitigation specialist and a psychiatrist to evaluate Mitchell. Mitigation specialist Vera Ockenfels prepared a 42-page report. (ER 3089.) She argued to counsel that Mitchell must have been high on drugs/alcohol at the time of the murders. (ER 3124-26.) However, counsel felt that due to the lack of specificity as to the date and time of the crimes, it "didn't seem to apply." (ER 4043.) Dr. Barry Morenz, retained by the defense to conduct a psychiatric evaluation of Mitchell, also provided a detailed narrative of Mitchell's claims of substance abuse and diagnosed him with Polysubstance abuse. (ER 3141-51.) Mitchell never told either Ms. Ockenfels or Dr. Morenz that he was drunk or high at the time of the murders. (ER 3125-26; 3140-41.)

(3) Counsel attempted to establish a factual basis for a voluntary intoxication instruction.

Counsel called co-defendant Johnnie Orsinger to testify at trial even though Orsinger's statement to the FBI contained no discussion of any substance abuse. (ER 885, 3931.) However, Orsinger was pending sentencing for his conviction in a separate carjack/murder conviction (CR-01-1072-PCT-FJM) and pending his own trial in the instant case, and on the advice of his counsel properly invoked his Fifth Amendment Right to refuse to testify. (RT 5/6/03 3332-35; ER 885-86.) *United States v. Moore*, 682 F.2d 853, 856 (9th Cir. 1982) (blanket refusal proper when district court presided over witness's case and understood potential exposure).

Gregory, Jakegory and Jimmy Nakai, and Dennie Leal also had either pleaded guilty or were convicted in a related carjack murder case. (CR-01-1072-PCT-FJM.) All were pending sentencing at the time of Mitchell's trial, represented by counsel and therefore not available. (ER 3929, 4126.) Gregory Nakai was also pending his own trial in Mitchell's case. Even if they had agreed to testify, however, none of these proposed witnesses, including Padrian George, were present at the murders. Their post conviction statements do not address the issue of intoxication at the time of the murders. They merely confirm what counsel knew from their investigation and Mitchell's admissions–he was a drug and alcohol abuser.

The trial court did not clearly err by finding that any historical, anecdotal testimony related to Mitchell's substance abuse "would not have been particularly probative of his condition at the time of the murders." (ER 22; Civ-CR 56.) Additionally, such testimony would likely have been precluded as not relevant under Fed. R. Crim. P. 401, in the absence of any evidence of Mitchell's drug or alcohol consumption at the time of the murders. *See United States v. Kenyon*, 481 F.3d 1054, 1071 (9th Cir. 2007) (substance abuse history may be admissible if there is evidence that defendant had been drinking at the time of the offense).

(4) Counsel initially requested a voluntary intoxication instruction, but there was no evidence to support it.

Counsel requested a jury instruction on voluntary intoxication in the hope that additional statements about intoxication might be introduced, but as counsel conceded, that did not happen. (RT 5/6/03 3404-05; ER 903.) Counsel always tried to get an intoxication instruction because it was beneficial even if not being used as a defense because one juror might not find the requisite intent. (ER 4013-14.) The defense attempted to introduce some evidence of alcohol abuse by stating to the case agent ". . . and they had been drinking during the day that - -." However, the court sustained the governments's hearsay objection consistent with its pre-trial ruling. (RT 5/2/03 3153-54; ER 839.) Only where a defendant provides some evidence that

he was intoxicated at the time of the crime and that the intoxication precluded him from forming the required specific intent is he entitled to such an instruction. *Washington*, 819 F.2d at 225. The Sixth Amendment does not require counsel to do the impossible. *Cronic*, 466 U.S. at 656 n. 19. Counsel acts reasonably in foregoing a defense not supported by the evidence. *Edwards v. Ayers*, 542 F.3d 759, 769 (9th Cir. 2008) (counsel not ineffective for not asserting a diminished capacity defense due to lack of sufficient evidence).

As discussed more fully below, counsel made a strategic choice not to introduce Mitchell's substance abuse history. Introducing that history would clearly have been at odds with counsel's desire not to lose credibility with the jury and would have contradicted the mitigation strategy of presenting positive attributes of a life worth saving. (ER 4128-29.) Maintaining credibility with a jury is a reasonable strategic choice, especially given the gruesome facts of the case. *Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006); *Florida v. Nixon*, 543 U.S. 175, 191-92 (2004) (citing a study of capital jurors who become cynical when mitigation phase is logically inconsistent with the guilt phase defense).

Quite simply, there was no credible evidence that could have been introduced at trial that Mitchell had consumed, let alone was under the influence of drugs, or alcohol. "As long as a reasonable investigation was conducted, a reviewing court

should defer to counsel's strategic choices." *Cox v. Ayers*, 613 F.3d 883, 896 (9th Cir. 2010). The investigation here was reasonable and adequate. Even with his extensive post-conviction investigation, Mitchell cannot point to any additional evidence showing that he was under the influence that night. Mitchell's claim fails because he cannot demonstrate deficient performance.

(5) <u>There was no possible prejudice to Mitchell</u>.

In light of the overwhelming evidence, the strategy selected by the defense team could not have altered the result in this case. The carjacking was a prelude to a planned robbery. During the course of the carjacking, Mitchell and his co-defendant brutally murdered a grandmother and her nine-year-old granddaughter. Among other things, Mitchell admitted that he personally:

- stabbed the grandmother;
- dragged the grandmother's body to the back seat of the vehicle;
- drove in the dark to a remote location while the granddaughter was in the back seat of the vehicle with her grandmother's bleeding body;
- sliced the little girl's throat
- murdered the little girl (granddaughter) by dropping twenty pound boulders on her head as she lay helpless on the ground;
- attempted to hide and destroy evidence of the murders;

- returned the next day to dismember the bodies and bury the heads and severed hands. (ER 731.)

Aside from Mitchell's own insistence to counsel that he was not under the influence of drugs or alcohol on the day of the murders, his own actions and admissions conclusively demonstrate that an intoxication defense would have been futile.

*b. Counsel Investigated a Wide Range of Potential Mitigating Evidence for the Penalty Phase; Therefore Mitchell has Failed to Show Deficient Performance*

Mitchell next argues that counsel were ineffective in their investigation and presentation of mitigation evidence. He claims that they failed to fully investigate the areas of substance abuse and addiction, his upbringing, and that he suffered executive function deficits of the brain. (Op. Br. at 49.) The district court concluded otherwise and found that counsel conducted a reasonable investigation and made a significant effort to present a sympathetic portrait of Mitchell with reasons to spare his life in a case that was difficult for the defense. (ER 58; Civ-CR 56.) The district court's conclusion that counsel conducted a reasonable investigation of potential mitigation and its findings of facts are clearly supported by the record in this case.

(1) <u>Counsel were all experienced capital litigation attorneys</u>.

Assistant Federal Public Defenders Jeff Williams and Gregory Bartolomei were appointed to represent Mitchell at his initial appearance. (ER 4030.) In early 2002,

John Sears, was added to the team as Learned Counsel, a position he held in six other federal capital cases and an equal number of state cases. (ER 4119, 4122, 4154-55.) Williams represented many Native Americans charged with violent crime and was familiar with issues arising from the reservations. He had capital litigation experience at the state level. (ER 3915-16.) Gregory Bartolomei also had experience with violent crimes occurring on reservations and had recently attended the Death Penalty College in Santa Clara just prior to joining the Federal Defender's Office in 2001. (ER 4029.) Sears as well had represented defendants from Indian Reservations and had both federal and state capital case experience. (ER 4119, 4122, 4133.)

The horrible facts of the murders, made it clear to counsel that there was a very good chance that the case was going to reach the penalty phase. (ER 3936.) They did everything they could to explain what happened and why. (ER 3936.)

(2) Counsel adequately investigated Mitchell's mental health by engaging experts to evaluate the defendant.

Mitchell now argues that counsel failed to fully investigate his substance abuse history, his social and family upbringing, speculation that there may have been mental illness in the family and the "executive functioning deficits" found during Mitchell's psychological evaluation.

Bartolomei primarily focused on the investigation of Mitchell's background in preparation for the mitigation phase. (ER 3917.) Dr. Susan Parish, a psychologist, was retained at the initial stages to assist in the area of psychological evaluations. (ER 3925.) Early on, they engaged the services of Vera Ockenfels, a highly recommended capital case mitigation specialist. (ER 4036, 3089), and Dr. Barry Morenz and his team at the University of Arizona who conducted a complete neuro-psychological evaluation of Mitchell. (ER 4050, 3135.) All background records were obtained either by the Federal Defender's Office or by Ms. Ockenfels as Mitchell concedes:

> The facts and witnesses concerning Mitchell's poor school performance and the abuse and neglect he suffered was readily available to trial counsel – most, if not all, was provided to them by their own mitigation investigator well before trial.

(ER 1152; Civ-CR 56.)

Counsel looked for any mitigation to show the jury that there was some reason to spare Mitchell's life, that his life had value and that there was some reason to explain why this happened. (ER 3936, 3962.) Ms. Ockenfels's recollection that counsel stated that "no mitigation existed," referred solely to the fact that the defense did not have "*. . . that nugget that would give us some explanation why. Something that we could convince the jury that would explain this type of behavior*" (Op. Br. 51;

ER 3938, 4064.) In their efforts to marshal mitigation evidence, counsel considered whether insanity or brain damage was a possibility, as well as whether Mitchell had been physically beaten or molested. (ER 3939, 4064, 4126.) They also searched for positive attributes of Mitchell. (ER 4042.) They repeatedly discussed the case with others inside and outside of their offices as well as those in the capital litigation community. (ER 3960-63, 4056-58, 4150-51.) Jeffrey Williams even attended a related car jacking trial involving Johnnie Orsinger and Gregory Nakai in an attempt to find mitigation. (ER 3928.)

(3) Counsel attempted to persuade Mitchell to plead guilty.

One experienced capital defense litigator, Dick Burr, overstating the obvious, offered that the facts were very ugly and counsel should plead the case. (ER 4151.) Counsel kept pressing the government for a plea offer. Using other attorneys to speak with Mitchell, he made every attempt to get Mitchell to agree to a plea if one was forthcoming. Mitchell indicated only that he would consider a plea. No plea offer was ever extended. (ER 4051.)

(4) Mitchell's position.

From the beginning, Mitchell was adamant in his discussions with his counsel that he was sober at the time and did not kill the victims. (ER 3924, 3927, 3931, 3942, 3967, 4031, 4048-49, 4060, 4128.) "The reasonableness of counsel's actions

may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691. The attorneys firmly believed that they could not disregard Mitchell's repeated statement that he did not kill either the grandmother or the little girl. (ER 4065.) He was so focused on this fact that had counsel ignored his claim, "there would have been no working with him at all. Because he was dead set this is - - 'I didn't kill anybody. To hell with Johnnie Orsinger. I don't want to see Jakeory or Jimmy Nakai again.' And, you know he just - - he wasn't going to take the fall." (ER 4066.) Counsel experienced Mitchell's anger first hand during his continued futile attempts to persuade Mitchell to attend the mitigation hearing. (ER 4066, 4070.) While a client does not have total control over his representation, his wishes should not to be completely ignored. *Williams v. Woodford*, 384 F.3d 567, 622 (9th Cir. 2004). "The lawyer is entitled to an additional measure of deference if he acts in conformity with the client's wishes." *Landrigan v. Stewart*, 272 F.3d 1221, 1226 (9th Cir. 2001) (quoting *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001)).

Regardless of a defendant's wishes, counsel is obligated to conduct a reasonable investigation so that "all relevant mitigating information [is] unearthed for consideration at the capital sentencing phase." *Silva v. Woodford*, 279 F.3d 825, 839 (9th Cir. 2002). Counsel followed that directive.

(5) Counsel spent adequate time with Mitchell.

Bartolomei established a good relationship with Mitchell and spent a significant amount of time talking with him. (ER 4030.) His attorneys found him intelligent and clearly competent. (ER 4034; 4132-34.) They never observed Mitchell under the influence of any substances during the entirety of their representation. (ER 3934, 4049, 4135.) Bartolomei spoke with Mitchell in great detail about his childhood, grandparents, schooling, and other interests. (ER 4035, 4038.)

Mitchell's claim that his attorneys did not spend a sufficient amount of time with him based solely on a mechanical recitation of some jail records is irrelevant in the absence of any evidence that more time would have resulted in additional undiscovered mitigation. [5/] "[T]he mere fact that counsel spent little time with [petitioner] is not enough under *Strickland,* without evidence of prejudice or other defects." *Bowling v. Parker,* 344 F.3d 487, 506 (6th Cir. 2003). Mitchell has provided "no explanation how additional meetings with his counsel, or longer meetings with his counsel, would have led to new or better theories of advocacy or otherwise would have created a 'reasonable probability' of a different outcome." *Hill*

---

[5/] Counsel Sears did not believe, based on his experiences, that the jail dutifully recorded every visit. He stated that his billing records would be more accurate. (ER 4188.)

*v. Mitchell,* 400 F.3d 308, 325 (6th Cir. 2005); *see Lenz v. Washington,* 444 F.3d 295, 302-03 (4th Cir. 2006).

(6) Counsel adequately investigated and presented evidence of Mitchell's social history.

Bartolomei traveled with Mitigation Specialist Vera Ockenfels to the reservation to meet with Sherry Mitchell to discuss her son's background. However, Ms. Mitchell made it very clear that she did not want anything to do with her son or his case. (ER 3108, 3936, 3945, 4037.) Bartolomei also met with Mitchell's grandparents, Bobbi and George Mitchell, who essentially raised Mitchell. (ER 4039-40, 4042.) They also traveled to the home of Dr. and Mrs. Roessel, visited with the football coach, Mitchell's Uncle Auska, and went to the school from which Mitchell graduated. (ER 4042.)

Ms. Ockenfels prepared a very detailed 42-page report titled "Social History of Lezmond Charles Mitchell" which contained a wealth of information about Mitchell's life story, substance abuse history and psychological makeup. (ER 3089.) Thirty-two individuals were listed as sources of information including some who testified in mitigation. (ER 3092.) Ms. Ockenfels discussed Mitchell's parents, grandparents, childhood, education, behavioral issues, psychological evaluations,

identity issues, substance abuse, gang involvement and prior criminal history. (ER 3090-91.) As Mitchell concedes;

> [t]he facts and witnesses concerning Mitchell's poor school performance and the abuse and neglect he suffered was readily available to trial counsel – most, if not all, was provided to them by their own mitigation investigator well before trial.

(ER 1152; Civ-CR 56.)

Ms. Ockenfels reported that Mitchell was the product of a Navajo family with weak cultural and familial ties, abandoned by his mother, raised primarily by a Navajo grandfather sixty years older and raised in isolation. (ER 3093.) His grandmother Bobbi Mitchell suffered a dysfunctional childhood. (ER 3094.) But both Bobbi and George were well educated with distinguished careers as educators. (ER 3096.) Mitchell's mother, Sherry, had a combative relationship, involving both physical and emotional abuse, with her mother, Bobbi, but was also highly educated. (ER 3096-98.)

The defense, from Ms. Ockenfels's report, was well aware that Mitchell's father, Foster Hemill, suffered convictions for Assault with Intent to Commit Rape as well as a DUI with a reported alcohol level of .17%. (ER 3120.) An investigator was sent to the Marshall Islands to interview Hemill only to learn that he died three to four weeks prior. (ER 4046.)

Ms. Ockenfels further reported that Mitchell suffered physical abuse including whippings and spankings–primarily at the hand of his mother and to a lesser extent his grandmother. (ER 3101, 3142.) Mitchell's physical needs were well met but not the emotional ones. A friend of the family described the two women as "cold, domineering and stubborn" and said that George Mitchell also lacked affection and failed to teach Mitchell the Navajo Way or any other life skills. (ER 3102.) According to Mitchell himself, no one in his family cared or became involved in his life. His own mother refused to attend his graduation. (ER 3107.) It was also reported that Sherry was "ecstatic" when Mitchell was arrested for the murders. (ER 3104.)

Dr. Barry Morenz also reported that Mitchell never felt close to his family, that after the first grade his mother was no longer affectionate toward him, that he was the victim of physical punishment from his mother, but his grandparents would buy him things as expressions of their affection and there was always enough money, food and clothing. (ER 3142-43, 3153.)

According to Ms. Ockenfels, Mitchell was bright, read well and responded to nurturing by the teachers. (ER 3109.) He was a natural leader, captained the football team and was offered a full scholarship to play football at the Haskell Indian Institute.

(ER 3110.) However, he refused to attend college because his family wanted him to go and he wanted to break free from the family. (ER 3110.)

But, Dr. Morenz described Mitchell's behavioral issues as well. Mitchell was suspended a number of times for talking back and cussing at teachers, fighting, smoking and sniffing keyboard cleaner, hitting another student, throwing clay at girls, throwing a chunk of plasterboard at a teacher, and losing control during an 11th grade fight. (ER 3113-15.) He also sold drugs in school, taught others to sell as well, engaged in gang activity and exchanged gunfire with others over his stolen bale of marijuana where an innocent girl was struck in the neck by an errant bullet. (ER 3141-48.) Through the diligent efforts of counsel, the jury never learned of these behavioral issues nor the fact that Mitchell abused animals purely for entertainment by grabbing the tails of stray dogs and flinging them over a bridge and watching them slam to the ground. (ER 3116-17.) He would also shoot dogs to watch them die, hold dog fights, shoot at cats, and throw rocks at dogs. (ER 3117, 3150-51.)

Mitchell joined gangs at an early age and later formed his own gang, "East Side Thugs," while in eighth grade, and his photo was in the local sheriff's gang notebook. He also sold drugs as part of the gang lifestyle. (ER 3127, 3150-51.)

During the habeas proceeding, Mitchell offered a second mitigation report, but as the district court found, it produced very similar information as the report produced

by Ms. Ockenfels. (ER 44-45; Civ-CR 56.) It did not raise any red flags that any significant information had been overlooked.

The district court's findings that counsel conducted an extensive and adequate investigation of Mitchell's family, his background, as well as history of abuse and neglect is clearly supported by the record. (ER 45, 46.)

(7) Counsel adequately investigated Mitchell's substance abuse history.

Counsel was aware of Mitchell's substance abuse history through Mitchell and the detailed summaries furnished by both Ms. Ockenfels and Dr. Morenz, but reasonably rejected it as the basis for their mitigation argument because Mitchell stated to Dr. Morenz that he last used cocaine in July, 2001 and last used methamphetamine in September, 2001. The murders occurred at the end of October, 2001 (ER 3124-25, 3145-52.)

Ms. Ockenfels reported that Mitchell started drinking in the seventh grade, regularly consumed beer and tequila in high school, attended many parties, and smoked marijuana. He was once arrested for public intoxication in 2000 with a blood alcohol reading of .17%. While living in Phoenix he drank a lot of "hard liquor and one occasion broke into a bar and stole four bottles of alcohol during a field trip." (ER 3124.)

Ms. Ockenfels also wrote that Mitchell took up marijuana in the sixth grade and was nearly expelled during his senior year in high school for distributing marijuana to another student. He used cocaine many times starting in his freshman year. On one occasion, during his junior year in high school, he binged on cocaine, snorted an eight-ball and consumed an ounce of marijuana just to see what would happen. His friend Lorenzo Reed was aware of the cocaine use but was not worried that Mitchell was overdoing it. Mitchell stated that his last cocaine usage was in July 2001 approximately four months prior to the murders. (ER 3125.)

Mitchell told Dr. Morenz that Gregory Nakai taught him how to sell drugs and that he went on to develop his own group of drug dealers. He would get high on marijuana, alcohol, cocaine and rock. (ER 3145.) According to Mitchell, he would party every weekend drinking alcohol and usually went to school under the influence of marijuana. (ER 3146-47.)

Bartolomei confronted Mitchell with the information he learned about Mitchell's drug and alcohol usage. Mitchell denied their use at the time of the murders and explained that his role was to keep an eye on Orsinger as they attempted to steal a truck for a later robbery attempt. (ER 4048.) Despite Ms. Ockenfels's speculation that Mitchell had to have engaged in substance abuse, Mitchell steadfastly denied it. (ER 4049.) Counsel also concluded that drugs and alcohol were

not likely involved because of Mitchell's statements that he had been given a ride that day by some type of police officer, spent the day at the mall, bought knives, later got a ride from a Mexican man and later by the grandmother-victim which they believed cut against any argument that the two defendants were "wacked out." (ER 4060-61.) Mitchell never told Ms. Ockenfels or Dr. Morenz that he had been drinking at the time of the murders. (ER 3125-26, 3139-41.)

All of this information led Dr. Morenz to conclude: "Mr. Mitchell has abused alcohol, marijuana, cocaine, Ecstasy and other drugs on a regular basis for a number of years. His drug use contributed to some of the problems Mr. Mitchell has had in maintaining stability in his life and thus warrants the diagnosis of poly substance that is now under some control because he is in a secure environment." (ER 3151-52.) Bartolomei later reviewed the report with Dr. Morenz. (ER 4079.) However, Dr. Morenz never recommended the services of a pharmacologist to develop this area. (ER 3152-53.) *Babbit v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1988) (counsel not ineffective for not consulting with other experts in absence of a defense expert making such a request).

Mitchell's unsubstantiated claim that counsel failed to furnish the proposer information to the experts is refuted by Dr. Morenz and was rejected by the district court. (Op. Br. at 55; ER 48.) Dr. Morenz reported that he reviewed the FBI reports

as well as those prepared by the Navajo Criminal Investigators, the autopsy report, photographs of the bodies, and listened to an audiotape of Mitchell's first interview with the FBI on November 4, 2001. He spoke with the public defender investigator, Karl Brandenberger, for an hour and mitigation specialist Ms. Ockenfels for one and one half hours concerning the information they had developed about Mitchell and his family and conducted two separate interviews with Mitchell. (ER 3135-36.) Mitchell's trial counsel fully performed their duty to provide the required information to the mental health expert. *See Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (counsel has affirmative duty in capital cases to provide mental health expert with information needed to develop an accurate profile of defendant's mental health).

The trial court found "in light of the information available to counsel, including Petitioner's insistence that he was not intoxicated, the Court concludes that the scope of their investigation into Petitioner's alleged intoxication at the time of the crime was reasonable." (ER 52-3; Civ-CR 56.)

(8) <u>Counsel reasonably investigated the defendant's mental issues</u>.

Counsel also considered but eventually rejected the possibility of an insanity defense. "We felt that it would be best from the defense point of view if we had some sort of psych defense that everything just sort of went black, you know, blacked out, and this happened. . . ." (ER 4049.) Dr. Susan Parish, a psychologist, provided an

early assessment that Mitchell was sociopathic but told counsel she should not be called as a witness. (ER 3926.) Counsel also reviewed Dr. Fields' interview relating to his treatment of Mitchell from September 1998 through May 1999. (ER 4038, 3086). Field's found Mitchell at a significant risk to suffer from anti-social behavior that could lead to serious law encounters. (ER 3118.)

Counsel has an obligation to investigate a defendant's mental issues if he is on notice that the client might be mentally impaired. *Heishman v. Ayers*, 621 F.3d 1030, 1039 (9th Cir. 2010). The defense retained a team headed up by Dr. Barry Morenz to conduct a full neuro-psychological evaluation. Mitchell underwent an exhaustive battery of tests including a neuropsychological evaluation, a neurologic evaluation, a brain imaging study, an MRI of the brain, an EEG exam, laboratory studies as well as several one-on-one interviews with Dr. Morenz. (ER 3135.)

The extensive evaluations did not produce any findings of a permanent brain dysfunction or mental defects that would support an insanity or diminished capacity defense. Mitchell was diagnosed as suffering Depressive Disorder not Otherwise Specified, Polysubstance Abuse in a Controlled Environment and Cognitive Disorder Not Otherwise Specified (provisional)–based on a finding that Mitchell's executive functioning deficits "were mild and of uncertain etiology and clinical significance." One of the team doctors, Dr. Herring, concluded that the deficiencies, "were likely

related to emotional factors rather than traumatic brain injury." (ER 3152.) Such equivocal findings are not sufficient to overcome a presumption that counsel acted reasonably in declining to forego further testing. *Leavitt v. Arave*, 646 F.3d 605, 609-10 (9th Cir. 2011) (some evidence of cognitive impairment later found to be consistent with a diagnosis of a personality disorder is an equivocal finding supporting a decision to forgo additional testing); *West v. Ryan*, 608 F.3d 477, 489 (9th Cir. 2010) (counsel's decision to forgo further investigation despite an equivocal finding of some cognitive impairment was reasonable).

Mitchell was also diagnosed with Anti-Social Personality Disorder based on findings that Mitchell:

> has a history beginning in childhood of aggression, deceitfulness, frequent rule violation and cruelty to animals such as that he would have warranted a conduct disorder diagnosis as an adolescent. Since he turned 18 this pattern has continued. He has been deceitful, impulsive, aggressive and irresponsible. He has disregarded the rights of others. He also shows little remorse for his behaviors. These factors indicate he warrants the diagnosis of antisocial personality disorder.

(ER 3151-52.)

Counsel visited with Dr. Morenz to discuss the findings and contents of the report. Ultimately, it was decided that there was no basis to ask for a different evaluation by another mental health expert. (ER 4079, 4108-09.) In his report, Dr.

Morenz merely suggested that other testing might be available. Any failure on the part of the expert to diagnose a mental condition is not ineffective assistance of counsel. *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011). Later disagreement by other experts does not demonstrate ineffectiveness. *Id*. at 1252.

Counsel were clearly not "wedded" to any particular course for mitigation. Mitchell's claim that counsel decided on a course of action too early is refuted by the extent of the investigation. Counsel reported "looking for everything." (ER 4042.) As Bartolomei stated, "I was looking for something that would say Lezmond wasn't qualified to make the statements he was making, and I was looking for whatever positive things I could find on Lezmond Mitchell." (ER 4042.) Ockenfels's report was dated November 2, 2002. (ER 3089.) He was classified as a sociopath by Dr. Susan Parish early in the investigation. (ER 3926.) An insanity defense was considered. (ER 4035.) But, Mitchell denied that substance abuse or a psychotic episode was involved. Their client's denial was very concerning to the defense, and they were uncomfortable with his position. (ER 4049.) Despite his denial, counsel had Mitchell neuro-psychologically evaluated by Dr. Barry Morenz who met with Mitchell on October 22, 2002, followed by a second interview on January 16, 2003. The final report was dated March 3, 2003. (ER 3135.) Bartolomei later met with Dr.

Morenz to discuss the findings. (ER 4052-53, 4079.) Jury selection began April 2, 2003. (ER 4241; CR 268.)

The investigation into Mitchell's upbringing, background and schooling was thorough and detailed. The investigation mirrors that found reasonable in *Williams v. Woodford*, where counsel learned of the turbulence in defendant's family, his life history, drug abuse and the weak evidence of his psychiatric history, gang involvement and determined that none of it would serve the defendant's interest before the jury. *Williams*, 384 F.3d at 615. Having this extensive information in hand, it was reasonable for counsel to conclude their search for witnesses to talk about Mitchell's past. *Id.* at 616.

(9) <u>Counsels' chosen mitigation strategy and presentation focusing on the positive aspects of Mitchell, explaining the crime as an aberrant act, and emphasizing that the co-defendants were not facing the death penalty was reasonable</u>.

"As long as a reasonable investigation was conducted, a reviewing court should defer to counsel's strategic choices." *Cox*, 613 F.3d at 896.

> Strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must

> be directly assessed for reasonableness in all the circumstances applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. The issue is not whether a specific type of mitigation should have been presented but whether the decision not to was itself reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). This Court's inquiry does not focus on what "defense counsel could have presented, [but] whether counsel's actions were reasonable." *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002). The Court must affirmatively entertain the range of possible reasons that counsel may have had for proceeding in the way they did. *Cullen*, 131 S. Ct. at 1407. Review is limited to the objective reasonableness of counsel's performance. *Harrington*, 131 S. Ct. at 790.

The ABA Guidelines, in place at the time of this investigation and of which counsel was aware, provided that investigations "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). (ER 4035.)

Counsel made a reasoned decision to introduce Mitchell's family dynamics primarily through Dr. Robert Roessel and his wife Ruth. The defense did not present the highly dysfunctional mother defense because they chose to inform the jury that

Mitchell came from a family of educators and possessed positive qualities and that this was an aberrant act. (ER 4102.) Furthermore, as a potential witness, Mitchell's mother Sherry was a loose cannon who had made comments to the FBI that her son was where he belonged and was not of much help as she was totally self-absorbed and embarrassed by her son's actions. (ER 3936-37, 3947, 4039, 4066, 4102.)

Substance abuse was considered as a potential mitigation factor but was rejected as not viable and in direct contradiction to the life worth saving approach that was one of the paths chosen. (ER 4063.) *Williams*, 384 F.3d at 616-17 (drug use and mental state evidence would have detracted from a lingering doubt of guilt approach). It was also contrary to Mitchell's unbending claim that he did not kill those people. Counsel also had concerns that after 9/11, jurors, in his experience, were less likely to accept substance abuse or mental issues and view them merely as excuses for horrible conduct. (ER 4149-50.) Sears did not think that they would have had any credibility with the jury if they presented substance abuse through Mitchell's socially irresponsible group of friends. (ER 4167.) Counsel's decision-making was also influenced by their experience that often a jury's decision to impose death "often hinges on who was killed and how they're killed" and in this case they "had the most helpless and vulnerable victims imaginable killed in the most grotesque and horrible way imaginable." (ER 4167.) Nonetheless, the venire persons were questioned

about their views on drugs and alcohol to allow for a change in the mitigation presentation if circumstances warranted. (ER 4162-68.)

Bartolomei was well aware that Mitchell was partying a lot, that Ms. Ockenfels believed it to be a problem and that Dr Morenz reported on it, but "relating it to the crime and the date of the crime, it didn't seem to apply." (ER 4043-44.) Co-defendant Johnnie Orsinger, in his confession to the FBI, never stated that the two of them drank, used drugs or went without sleep for days around the time of the murders. Mitchell denied any use of drugs or alcohol at the time of the crimes and never said anything about going without sleep until post conviction to Dr. Stewart. (ER 3930-31.) Furthermore, no physical evidence of drug and alcohol abuse was found during a law enforcement search of the Nakai residence where Mitchell was living at the time he was arrested or during a search of the crime scenes. (ER 3932.) Williams attempted to interview Johnnie Orsinger by asking his counsel for permission but got the expected refusal from his attorney. (ER 4000.) Undeterred, Bartolomei subpoenaed Orsinger to testify even though he was still pending his own trial in this case. However, on advice of his counsel, Orsinger refused to answer any questions. (RT 5/6/03 3332-35; ER 885-86, 4045.) *Moore*, 682 F.2d at 856 (blanket refusal is proper when court is fully aware of a witness's criminal exposure.)

Mitchell only now offers convicted felons who were not available as witnesses at the time of trial because of their own murder cases and who can provide only general claims of drug and alcohol usage during the summer of 2001. As the court found, none of them had any information about what Mitchell might have consumed at the time of the murders. (ER 52.) *Williams*, 384 F.3d at 617 (lack of evidence that defendant was materially affected by drugs supported decision to forego a diminished capacity defense). In fact, they contradict Mitchell's statement that he gave up drugs in September 2001. (ER 3125.) Counsel has no duty to investigate witness who are merely cumulative or of little mitigation value and of questionable credibility before a jury. *Bobby v. Van Hook*, 558 U.S. 4, 130 S. Ct. 13, 19 (2009) (there comes a point when further investigation will only result in cumulative evidence). "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbitt*, 151 F.3d at 1173.

Presenting such evidence through convicted felons would have undermined the good qualities counsel attempted to present and allowed the jury to conclude that Mitchell was not only a murderer but also a drunk and a drug abuser as well. *Baca v. Knowles*, 258 Fed. App'x 958, 960 (9th Cir. 2007) (unpublished). Substance abuse can be a double-edged sword. *Rose v. McNeil*, 634 F.3d 1224, 1244 (11th Cir. 2011); *Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009); *Ainsworth v. Woodford*,

268 F.3d 868, 880 (9th Cir. 2001) (Graber, J., dissenting) (much of the evidence upon which the majority relied to find ineffective assistance of counsel prejudice at sentencing-antisocial personality disorder and history of drug abuse-presented a double-edged sword, opening the door to harmful rather than helpful inferences). Counsel must be wary of the "two edge sword" of any "mitigation" evidence that also allows aggravation evidence before the jury allowing them to conclude that the life is not worth saving and that the defendant is a very dangerous individual. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

Counsel originally hoped for a psychological defense in which they could argue that Mitchell "blacked out" or something along those lines. (ER 4049.) But the only "brain dysfunction," found by Dr. Morenz was "some *mild* deficits in executive functioning (impulsiveness and poor planning)," nothing that could have offered a satisfactory basis for the jury to spare his life. (ER 3152.) Bartolomei met with Dr. Morenz to discuss the findings, but Dr. Morenz never recommended that any further testing be done. (ER 4079.) Counsel is entitled to rely on the advice of experts. *Williams*, 384 F.3d at 611. There was no basis for an insanity defense. (ER 4130.)

Moreover, the trial evidence clearly refuted any alleged impulsivity or poor decision making. Mitchell planned to rob a local Trading Post. (RT 4/30/03 2779;

ER 744.) When he and his co-defendant could not find a truck to steal in Gallup, New Mexico, they changed gears and car jacked Ms. Slim's four-door pickup truck. In the dark, Mitchell drove the truck with the grandmother and child into the mountains where he eliminated the only witnesses, burned evidence and later hid the truck in a remote canyon. (RT 5/1/03 3122-23; ER 830.) Despite the murders and the subsequent beheading of the victims, Mitchell several days later took this truck and carried out the planned armed robbery of the Trading Post wearing a mask and carrying a shotgun. (RT 4/30/03 2796; ER 748.) He also attempted to burn the truck in order to avoid leaving any identifiable evidence linking him to the murders. Nothing Mitchell did was impulsive. *Edwards*, 542 F.3d at 773-75 (facts showing deliberate decision making by the defendant clearly undermined any diminished capacity defense). Additionally, the diagnosis of anti-social personalty disorder would not have been helpful. *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (a diagnosis of sociopath or anti-personality disorder can be considered harmful to a defendant).

The psychiatric presentation was ultimately rejected as too dangerous because Dr. Morenz's report would have "opened up other doors and would have affected the jury in a very negative way." (ER 4054.) *Edwards*, 542 F.3d at 776 (evidence of mental illness can backfire). Given the "ugly facts" of the case, counsel did not want

to make Mitchell look like someone the jury should be afraid of, nor completely nullify the potential humanizing aspects of Mitchell. (ER 4053-55, 4065, 4100-01.) Mitchell's statements would have been incredibly devastating: "I'm running this equation in my head that 9 times out of 10 if we let that little girl go, the cops will be after us." (ER 3141.) He expressed a desire to kill the individual who called the FBI and identified Mitchell as a suspect, and "if you piss me off enough, I'm liable to kill you." (ER 3141.) Additionally, all of his criminal acts–including animal abuse, throwing dogs from bridges, forming his own gang (East Side Thugs), and his involvement in a shooting over his bale of marijuana during which an innocent girl was shot in the neck–would have been placed in front of the jury. (ER 3141, 3146-50.) *Wong v. Belmontes*, 558 U.S. 15, 130 S. Ct. 383, 388-89 (2009) (opening the door to the admission of evidence that would have only added to the government's aggravation evidence is a reasonable basis to forgo the presentation of such evidence.) The introduction of additional aggravating evidence may well have led the jury to conclude that Mitchell was beyond rehabilitation. *Cullen*, 131 S. Ct. at 1410 (decision to focus on sympathy for defendant's mother as defendant was a very unsympathetic personality was reasonable). Mitchell would also have been subject to an evaluation by an expert chosen by the government which could have been just as devastating.

Mitchell offers no powerful mitigating evidence that counsel missed. *Van Hook*, 130 S. Ct. at 19. This is clearly not a case in which counsel abandoned an investigation after only obtaining a rudimentary knowledge of the defendant's history. *Wiggins*, 539 U.S. at 525. Speculation that Bobbi Mitchell, Mitchell's grandmother, suffered from mental illness is just speculation and nothing in their investigation put counsel on notice of this possibility. *Babbit*, 151 F.3d at 1174.

After a thorough and detailed investigation into Mitchell's background, his upbringing, substance abuse and mental makeup, counsel reviewed their options on what to present to a jury that had heard the most graphic and gruesome details of the brutal murder of a grandmother and her nine-year-old granddaughter. Many discussions were held both inside and outside of the Public Defenders Office for enlightenment. (ER 4057.) The issue of how best to present mitigation was a source of constant worry with counsel because they were very uncomfortable with the position that Mitchell took. (ER 4049, 4056-58, 4065.)

They finally concluded that the best approach was to blame it all on Johnnie Orsinger, who was responsible for two other carjack murders in addition to the grandmother and granddaughter and appeared to have been the initiator in both cases. They believed they had sufficient sources of positive aspects of Mitchell's life to pursue the theme that Mitchell's life was worth saving and that this was out of

character. (ER 4073.) It did not help counsel when Mitchell knowingly and voluntarily absented himself from the hearings during the time when his friends and family testified that his life should be spared. (ER 4069-72.) A decision, after a thorough investigation, to portray the defendant as a good guy rather than to present excuses such as upbringing, substance abuse or mental health problems is reasonable. *Crittenden v. Ayers*, 624 F.3d 943, 969-71 (9th Cir. 2010) (dwelling on behavioral problems and brain dysfunction would undermine the presentation of the defendant's good qualities). "Counsel also is not required to have a tactical reason–above and beyond a reasonable appraisal of a claim's dismal prospects for success–for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (counsel recommended dropping an insanity defense after his assessment that it would not work). It is rare that constitutionally competent representation will require any one technique or approach. *Harrington*, 131 S. Ct. at 779.

(10) Counsels' presentation of mitigation evidence was reasonable.

Defense counsel developed several themes to present to the jury. The themes included the positive aspects about Mitchell, the family deprivation he suffered, and that the crimes represented an aberrant act. *Edwards*, 542 F.3d at 775. But perhaps most persuasive was the fact that co-defendant Orsinger avoided the death penalty

only because of his age and Gregory Nakai avoided the death penalty because of a government decision even though he committed a related carjack and murder in a very similar fashion. (ER 4144-46.) The defense theory, consistent with Mitchell's repeated assertions to counsel, was that he did not commit the murders. (ER 4047, 4056.) Additionally, portraying co-defendant Orsinger as the actual killer in order to raise a lingering doubt whether Mitchell actually killed anyone and foregoing the "poor abused kid" with the absentee mother was a reasonable decision. *Cox v. Ayers*, 613 F.3d at 898 (defense of residual doubt is an effective argument in capital cases).

Dr. Robert A. Roessel, whom counsel found to be a fine man, and who was well acquainted with Mitchell and his family testified not only about Mitchell's positive characteristics, but also the fact that Mitchell was unloved at home and that Mitchell struggled with his identity because he was only half-Indian and not educated in the ways of the Navajo culture. He also provided great insight to the jury of the ways of the Navajo people. (RT 5/15/03 3788-3819; ER 994-1001, 4073.) The mere fact that he testified that Mitchell stole from him established candor with the jury. Despite the fact that he was very disappointed with Mitchell, he was still willing to ask that Mitchell's life be spared. Dr. Roessel was far more helpful than harmful. *Beardslee*, 358 F.3d at 583 (fact that defense expert testified defendant was a sociopath outweighed by relevant mitigating evidence that he added). Dr. Roessel's

wife, Ruth, explained the importance of the mother to the Navajos, that the Mitchell family was cold and that the Navajos preached forgiveness. She also provided a special cultural perspective of the impact on Mitchell of his mother's abandonment. (RT 5/15/03 3820-3828; ER 1002-1004.) Coach Marty Conrad testified that Mitchell was respectful, an asset to the high school football team as a leader and had an opportunity to secure a football scholarship to Haskell College. (RT 5/15/03 3900-3906; ER 1018-19.) Assistant Principal John Fontes told the jury he had daily contact with Mitchell and that over time he became an excellent student. Mitchell was involved with the student government and Fontes never observed any physical altercations involving Mitchell. He also recalled that when he attempted to contact Sherry Mitchell, she made it clear that she wanted nothing to do with her son. (RT 5/15/03 3909-3921; ER 1020-1023.) Lorenzo Reed, with whom Mitchell lived after turning eighteen, reported that Mitchell was pained by his mother's abandonment, was never disrespectful to Reed's family and would help out with chores around the house. (RT 5/15/03 3926-3935; ER 1024-1027.) A school counselor, Sonya Halsey, who taught Mitchell high school English said that he was very bright, assisted others with reading and was very respectful. She also testified that Mitchell's mother never conveyed any interest in her son. Ms. Halsey was very surprised to learn that alcohol might have been involved in the case since she had

never known him to use alcohol or drugs. (RT 5/15/03 3936-3947; ER 1027-1030.) Tammy Sebahe testified that she visited Mitchell in jail for over a year and provided a snapshot of prison life demonstrating how he was physically restrained with chains and handcuffs and could only speak by phone through a glass partition. (RT 5/15/03 3951-3956; ER 1031.) All of these witnesses told the jury that Mitchell's life was worth saving.

Finally, FBI Special Agent Ray Duncan was called by the defense to provide details of the other carjacking case involving Orsinger and Nakai. He testified that Orsinger shot the first victim in the head, then Nakai took the gun and shot the other victim five times. The bodies were then burned beyond recognition and buried. He explained that Orsinger was too young to receive the death penalty and the Attorney General decided not to pursue it against Nakai. A proportionality argument is recognized as a very strong and effective approach. *Pizzuto v. Arave*, 385 F.3d 1247, 1253 (9th Cir. 2004); *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir. 1996); *Riley v. Taylor*, 277 F.3d 261, 305 (3d Cir. 2001). The agent confirmed that Mitchell had no prior felony recorded and Mitchell claimed to have been drinking on the day of the murders to the point of blacking out. (RT 5/15/03 3957-3974; ER 1032-1036.) There is a marked difference between attempting to show that Mitchell was drunk on this one occasion and presenting evidence of a deliberate lifestyle choice of substance

abuse. This testimony dovetailed with the testimony of Sonja Halsey who had never known Mitchell to drink thereby creating the illusion that the murders might have been the product of a one-time binge. The fact that counsel introduced Mitchell's claim that he was drinking heavily at the time "shows merely that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent." *Harrington*, 131 S. Ct. at 790 (counsel's opening remarks that there was no blood analysis prompting the prosecution to immediately conduct one with results to the detriment of the defense did not constitute ineffective assistance).

(11) Counsel's closing argument was reasonable.

Counsel is accorded wide latitude in closing argument and appellate review should be highly deferential. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Closing arguments are not to be scrutinized in isolation, but rather considered with the totality of measures taken on behalf of the defendant. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997).

In his initial remarks to the jury, counsel offered that good people sometimes do horrible things and acknowledged; "this is a terrible, terrible tragic loss to these people, to their community, to the people of Arizona." (RT 5/16/03 4136-37; ER 1079.) He then gave an impassioned argument that there was no evidence that Mitchell had *actually* killed either the grandmother or her granddaughter, only that

he was an aider and abetter. (RT 5/16/03, 4144-47; ER 1081.) He fixed the blame squarely on co-defendant Johnnie Orsinger time and time again pointing to the similarities between Orsinger's actions in this case as well as those of the first carjacking murders during which Orsinger fired the first shot into head of the first victim. (RT 5/16/03 4141-51, 4159; ER 108-82, 1084.) "Lingering doubt" is a extremely effective argument in a capital setting. *Lockhart v. McCree*, 476 U.S. 162, 181 (1986); *Cox,* 613 F.3d at 898-99 (decision to focus on non-shooter strategy was reasonable). This approach was especially effective as counsel went to great lengths to argue that it was unfair that neither Orsinger–because of his age–nor Gregory Nakai–because of a decision by the Attorney General of the United States–was subject to the death penalty. (RT 5/16/03 4141-43; ER 1080.) The jury later agreed unanimously that this was a mitigating factor. (RT 5/20/03 4199-4200; ER 1096.) An unsolicited letter from Gregory Nakai blaming Orsinger and not Mitchell for these murders was read to the jury. (RT 5/16/03 4153-54; ER 1083.) It was also argued that life in prison was no picnic, but was a just punishment for Mitchell's role in the offense and that Mitchell could be worth something as an example to others while in prison. (RT 5/16/03 4149-50, 4161; ER 1082-85.) Counsel then argued that Mitchell did not know who he was because of his upbringing, abandonment by his mother, mixed race, and pointed to the video of Bobbi Mitchell speaking mostly about herself

and next to nothing about Mitchell as powerful evidence of a dysfunctional upbringing. (RT 5/16/03 4156-58; ER 1084.) It was not necessary to discuss every mitigation witnesses' testimony since the jury had heard from them within the two previous days. The jury was reminded that the Navajo Nation, of which Mitchell was a member, asked the United States not to seek death because of their culture that values life but not revenge. (RT 5/16/03 4162-64; ER 1085-86.) He also challenged the jury; "[o]nly one of you needs to stop this." If just one juror, for whatever reason, believed that a sentence of life imprisonment was the appropriate punishment, then that was the sentence that Mitchell would receive. He implored them not to change their opinion merely to get along with the other jurors. (RT 5/16/03 4166-67; ER 1086.)

Finally, counsel made an all out plea for mercy and forgiveness, arguing that it made no sense to kill a killer to show others that killing is bad. *Darden v. Wainwright*, 477 U.S. 168, 186-87 (1986) (a simple plea for mercy was sound trial strategy to avoid opening doors to damaging rebuttal evidence including that defendant was a sociopathic personality). (RT 5/16/03 4165-68; ER 1086-87.)

12. Conclusion.

In mitigation, the jury found unanimously that Mitchell did not have a prior criminal record, that an equally culpable defendant would not face a death sentence, and that Mitchell would spend the rest of his life in prison if not sentenced to death. Seven jurors found the Navajo Nation recommendation to not seek death, six found his background, two found that he would adapt to prison life and only one found that he was significantly impaired in his ability to appreciate the wrongfulness of his conduct as additional mitigation. (RT 5/20/03 4199-4200; ER 1097.) Counsel's concerns about a substance abuse presentation were borne out by the verdict in which only one juror found any evidence of alcohol to be mitigating. Convicted felons bragging about a substance abuse summer in 2001 could not change that result especially when they were not with Mitchell at the time of the murders.

In light of the reasoned decision to portray Mitchell's life as "worth saving," aberrant conduct and others more culpable were not facing the death penalty and to forgo the abused child, substance abuse route, there was no need to investigate every cumulative witness who could provide evidence of Mitchell's substance abuse history. *Van Hook*, 130 S. Ct. at 19. Trial counsel had more than sufficient information upon which to make a reasoned decision. The defense succeeded in presenting to the jury a picture of Mitchell that was far from the reality discovered by

their investigation. By not opening doors, they were able to prevent the government from introducing devastating evidence of the true Lezmond Mitchell. No other presentation could have cast Mitchell in any better light that would have caused this jury to change its decision.

*c. Mitchell cannot carry his burden of demonstrating prejudice.*

The district court did not reach the question of prejudice as it properly found counsel conducted a reasonable investigation of Mitchell and his background and made reasoned decisions on how best to present mitigation. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The burden is on Mitchell, not the government, to show a reasonable probability that the result would have been different. *Wong*, 130 S. Ct. at 390-91. It requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 131 S. Ct. at 791. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at 1015-16.

Mitchell participated in the attack on the 63-year-old grandmother who suffered thirty-three stab wounds, not including the defensive wounds, he drove the 9-year old granddaughter riding in the rear of her truck with her dying grandmother into the mountains in the dark, he slit the girl's throat and when that failed to kill her

told her to lay down to die and then crushed her head with twenty-pound boulders while she was conscious. He returned the next day to behead the victims, remove their hands and bury them in a hole in order to prevent identification. Two days later he used the blood-soaked pickup truck to rob a Trading Post at gun point.

Substantial mitigation was presented in an attempt to persuade the jury that Mitchell was a person whose life was worth saving, that is was an aberrant act and co-defendants were not facing the death penalty for their same conduct. Given the overwhelming evidence of Mitchell's cold blooded actions over the course of these crimes, there is no reasonable likelihood that the death penalty would not have been the result even with additional mitigation. *Heishman*, 621 F.3d at 1038; *Cox*, 613 F.3d at 898; *Wong*, 130 S. Ct. at 390.

### B. Procedural Issues:

#### 1. The Court Did Not Abuse It's Discretion by Denying a Request for an Evidentiary Hearing.

A trial court's decision to deny an evidentiary hearing is reviewed for abuse of discretion. *McMullen,* 98 F.3d at 1156. The court denied Mitchell's request for an evidentiary hearing, finding "that Petitioner has failed to allege facts that, if true, would entitle him to relief." (ER 71; Civ-CR 56.) The court later affirmed its ruling

in denying Mitchell's Motion for Reconsideration stating that there "were no material factual disputes that required a hearing to resolve." (ER 77; Civ-CR 66.)

A district court must grant a federal habeas petitioner's motion for an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Although section 2255 imposes a fairly lenient burden on the petitioner, the petitioner is nonetheless "required to allege specific facts which, if true, would entitle him to relief." *McMullen,* 98 F.3d at 1159. An evidentiary hearing is not warranted if the allegations, "'when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal.'" *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (internal citation ommitted).

Habeas is not meant to allow for a "fishing expedition" in order that a petitioner can find whether a case exists. *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) Discovery is only available in the discretion of the court and for good cause shown. *Id.* at 1068. "Merely conclusory statements in a §2255 motion are not enough to require a hearing." *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980). Section 2255 is not designed to provide criminal defendants multiple opportunities to challenge their sentence. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

Mitchell supported his arguments through a voluminous record consisting of sworn statements, expert reports, opinions, statistics and other material. He raised nothing that diminished counsel's reasonable investigation found by the judge who presided over the entire case including motions, hearings, the trial and penalty phases. Mitchell argues, without authority, that every capital defendant is entitled to an evidentiary hearing as a matter of right.

Unlike the state of the record in *United States v. Sinisterra*, 600 F.3d 900, 906-07 (8th Cir. 2009), Mitchell concedes:

> The facts and witnesses concerning Mitchell's poor school performance and the abuse and neglect he suffered was readily available to trial counsel – most, if not all, was provided to them by their own mitigation investigator well before trial.

(ER 1152, 4080; Civ-CR 56.) The depositions of the three counsel in this case, questioned by both parties, the 42-page report of the mitigation specialist and the neuropsychological evaluation amply demonstrate that counsel were aware of all relevant facets of Mitchell and his background and support the court's determination that counsel were not ineffective. In *Sinisterra*, counsel stated he was unaware of the defendant's childhood in Colombia which included allegations of beatings, sexual abuse, homelessness, gang rape and illiteracy. *Id.* at 905. Mitchell fails to point to specific arguments that the court did not have the necessary information before it. He

does not demonstrate how the court abused its discretion other than by arguing that he is entitled to a hearing as a matter of right.

The trial court did not abuse its discretion in denying the request for an evidentiary hearing because Mitchell failed to demonstrate that his allegations if true would entitle him to relief. The decision should be upheld.

**2. The Court Did Not Err by Denying Mitchell's Post-Conviction Request to Interview Trial Jurors.**

Mitchell argues that the district court erred in denying his motion to interview the trial jurors. (Op. Br. at 78.) He filed his motion on May 22, 2009, six years after the jury returned its verdicts. On September 4, 2009, the court denied the request based on Mitchell's failure to comply with the District of Arizona's Local Rule requiring such a request to be filed within the time limits for a motion for new trial and good cause shown. (ER 6; Civ-CR 21.) Although not raised with the original Motion to Vacate, he re-urged it in his Amended Motion. (ER 1289.) The district court denied relief on the basis that any alleged error in denying to motion to interview jurors occurred in a postconviction proceeding and was therefore not entitled to Section 2255 consideration citing *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) (per curiam). (ER 70; Civ-CR 56.) No Certificate of Appealability was

issued by the court below. The government will only respond at the direction of the Court in accordance with Ninth Circuit Rule 22-1(f).

## VIII. CONCLUSION

For the foregoing reasons, this Court should affirm the judgment entered by the district court.

JOHN S. LEONARDO
United States Attorney
District of Arizona

CHRISTINA M. CABANILLAS
Appellate Chief

*s/ Vincent Q. Kirby*
VINCENT Q. KIRBY
Assistant U.S. Attorney

## IX. STATEMENT OF RELATED CASES

To the knowledge of counsel, there are no related cases pending.

## X. CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-4 FOR CASE NO. 11-99003

I certify that: (check appropriate option(s))

√ 1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-4, the attached opening/answering/reply/cross-appeal brief is

√ Proportionately spaced, has a typeface of 14 points or more and contains 17,531 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words), or is

☐ Monospaced typeface shall either: (a) not exceed 75 pages (1,950 lines) for a principal brief of 35 pages (910 lines) for a reply brief or (b) conform to the word count set forth in (1) above.

2. The attached brief is **not** subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

☐ This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages;

☐ This brief complies with a page or size-volume limitation established by separate court order dated            and is

☐ Proportionately spaced, has a typeface of 14 points or more and contains            words, or is

☐ Monospaced, has 10.5 or fewer characters per inch and contains            pages or            words or            lines of text.

October 25, 2012
Date

*s/ Vincent Q. Kirby*
Signature of Attorney

## XI. CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Vincent Q. Kirby*
VINCENT Q. KIRBY
Assistant U.S. Attorney