CA NO. 11-99003

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| LEZMOND C. MITCHELL,<br>Petitioner-Appellant,<br>v.<br>UNITED STATES OF AMERICA,<br>Respondent-Appellee. | ) | **DEATH PENALTY CASE**<br>DC No. CV 09-8089-MHM |

# APPELLANT'S REPLY BRIEF

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

SEAN K. KENNEDY
Federal Public Defender
STATIA PEAKHEART
JONATHAN C. AMINOFF
GIA KIM
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4408

Attorneys for Petitioner-Appellant
LEZMOND C. MITCHELL

# TABLE OF CONTENTS

Page


I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Legal Standard.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. COUNSEL'S DEFICIENT INVESTIGATION OF INTOXICATION PREJUDICED MITCHELL AT THE GUILT PHASE (CLAIM A).. . . . . . . . . . . 3

1. Counsel Unreasonably Failed to Investigate the Glaring Inconsistencies in the Intoxication Evidence. . . . . . . . 3

2. Counsel Did Not Make an Informed Strategic Decision with Respect to the Intoxication Defense. . . . . . . . . . 9

3. Mitchell Was Prejudiced by Counsel's Deficient Investigation and Presentation of the Intoxication Defense.. . 11

B. COUNSEL'S DEFICIENT INVESTIGATION, PREPARATION, AND PRESENTATION OF MITIGATING EVIDENCE PREJUDICED MITCHELL AT THE PENALTY PHASE (CLAIMS B AND D).. . . . . . . . . . 13

1. Mitchell's Trial Team Lacked Experience in Presenting Mitigation to a Capital Jury. . . . . . . . . . . . . . . . . . 13

2. Counsel's Mitigation Investigation Was Unreasonably Limited in Scope.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

a. Intoxication and Substance-Abuse Evidence. . . . . . . . 14

b. Mental Health Evidence.. . . . . . . . . . . . . . . . . . . . . . . . 19

c. Social History Evidence.. . . . . . . . . . . . . . . . . . . . . . . . 23

3. No Strategic Considerations Prevented Counsel from Investigating and Presenting This Classic Mitigation Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4. The Heinousness of the Offenses Does Not Preclude a Finding of Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF CONTENTS (continued)

**Page**

C. THIS COURT SHOULD GRANT AN EVIDENTIARY HEARING ON MITCHELL'S CERTIFIED CLAIMS OF INEFFECTIVE ASSISTANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. MITCHELL'S JUROR INTERVIEW CLAIM IS COGNIZABLE IN THIS APPEAL AND DOES NOT REQUIRE A CERTIFICATE OF APPEALABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Ainsworth v. Woodford*,
268 F.3d 868 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Babbitt v. Calderon*,
151 F.3d 1170 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Caro v. Calderon*,
165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Correll v. Ryan*,
539 F.3d 938 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cox v. Ayers*,
613 F.3d 883 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26, 29

*Crittenden v. Ayers*,
624 F.3d 943 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Cullen v. Pinholster*,
131 S. Ct. 1388 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Duncan v. Ornoski*,
528 F.3d 1222 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Evenstad v. United States*,
978 F.2d 1154 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Franzen v. Brinkman*,
877 F.2d 26 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29

*Harbison v. Bell*,
556 U.S. 180 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Harrington v. Richter*,
131 S. Ct. 770 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Heishman v. Ayers*,
621 F.3d 1030 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 28

## TABLE OF AUTHORITIES (continued)

Page

## FEDERAL CASES

*Hendricks v. Calderon*,
70 F.3d 1032 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill v. United States*,
368 U.S. 424 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Holloway v. United States*,
526 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kane v. United States*,
399 F.2d 730 (9th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lambright v. Ryan*,
698 F.3d 808 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Landrigan v. Stewart*,
272 F.3d 1221 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Leavitt v. Arave*,
646 F.3d 605 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Padilla v. Kentucky*,
130 S. Ct. 1473 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Porter v. McCollum*,
558 U.S. 30, 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Reed v. Farley*,
512 U.S. 339 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Reynoso v. Giurbino*,
462 F.3d 1099 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ring v. Arizona*,
536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stankewitz v. Wong*,
698 F.3d 1163 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Stankewitz v. Woodford*,
365 F.3d 706 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stone v. Powell*,
428 U.S. 465 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## TABLE OF AUTHORITIES (continued)

**Page**

### FEDERAL CASES

*Strickland v. Washington*,
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 9

*Summerlin v. Schriro*,
427 F.3d 623 (9th Cir. 2005) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

*Trevino v. Johnson*,
168 F.3d 173 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Addonizio*,
442 U.S. 178 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Burrows*,
872 F.2d 915 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Echeverry*,
759 F.2d 1451 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Nakai*,
413 F.3d 1019 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Sayetsitty*,
107 F.3d 1405 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. Sinisterra*,
600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Twine*,
853 F.2d 676 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wallace v. Stewart*,
184 F.3d 1112 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 21

*West v. Ryan*,
608 F.3d 477 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Wiggins v. Smith*,
539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 24

*Williams v. Woodford*,
384 F.3d 567 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*Wong v. Belmontes*,
130 S. Ct. 383 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

## TABLE OF AUTHORITIES (continued)

**Page**

## FEDERAL STATUTES AND RULES

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 28

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## MISCELLANEOUS

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, cmt. to Guideline 11.8.6 (1989 ed.). . . . . . . . . . . 14

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7 & cmt. (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1015 (2003). . . . . . . . . . . . . . . . . . . . 3, 7

Ariz. Rules of Prof'l Conduct R. 4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# I.

# INTRODUCTION

In its answering brief, the government addresses only the three ineffective assistance of counsel issues certified for appeal by the district court and two procedural issues concerning the district court's complete denial of an evidentiary hearing and denial of post-conviction counsel's request to conduct juror interviews. (GAB 28-29.)[1] Petitioner-Appellant Lezmond Mitchell's reply is therefore similarly limited in scope. Nevertheless, Mitchell respectfully requests that this Court expand the certificate of appealability in this capital case to include the six uncertified issues raised in the opening brief, and order the government to respond accordingly.

# II.

# ARGUMENT

## Legal Standard

As a threshold matter, the government misstates the legal standard for establishing ineffective assistance of counsel in a Section 2255 proceeding. The government asserts:

> To prevail on a motion under 28 U.S.C. § 2255 based on a claim of ineffective assistance of counsel, petitioner's alleged errors must demonstrate "an omission inconsistent with the rudimentary demands of fair procedure," or "a fundamental defect which inherently

---

[1] "GAB" refers to the Government's Answering Brief, "AOB" refers to Appellant's Opening Brief, "ER" refers to the Excerpts of Record, and "SER" refers to the Sealed Excerpts of Record. "RT" refers to the Reporter's Transcript and is followed by the applicable date and page number. "CR" refers to the District Court Clerk's Record and is followed by the applicable docket number.

> results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962).

(GAB at 31.) This is incorrect. *Hill* did not involve a Sixth Amendment claim of ineffective assistance of counsel.[2] Rather, the petitioner in *Hill* sought Section 2255 relief based on the district court's "failure explicitly to afford [him] an opportunity to make a statement at the time of sentencing," in violation of Federal Rule of Criminal Procedure 32. 368 U.S. at 426. The Supreme Court held that Section 2255 relief was unavailable for a technical Rule 32 violation: "It is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure." *Id.* at 428. The Supreme Court in no way suggested that the "fundamental defect" standard must be satisfied to obtain Section 2255 relief for constitutional errors, such as ineffective assistance of counsel.

The Supreme Court's subsequent cases make clear that *Hill*'s "fundamental defect" standard applies only to claims of nonconstitutional error. *See Reed v. Farley*, 512 U.S. 339, 353-54 (1994) ("[O]ur decisions assume that *Hill* controls collateral review -- under both §§ 2254 and 2255 -- when a federal statute, but not the Constitution, is the basis for the postconviction attack."); *see also United States v. Addonizio*, 442 U.S. 178, 185 (1979); *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). Therefore, the familiar *Strickland* analysis governs Sixth Amendment claims of ineffective assistance brought under Section 2255, and Mitchell need not satisfy *Hill*'s "fundamental defect" standard as well. *See, e.g.*, *United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989).

---

[2] *Hill* predated the Supreme Court's landmark decision in *Strickland v. Washington*, 466 U.S. 668 (1984), by more than twenty years.

## Discussion

### A. COUNSEL'S DEFICIENT INVESTIGATION OF INTOXICATION PREJUDICED MITCHELL AT THE GUILT PHASE (CLAIM A).

#### 1. *Counsel Unreasonably Failed to Investigate the Glaring Inconsistencies in the Intoxication Evidence.*

In arguing that counsel reasonably investigated an intoxication defense, the government relies heavily on Mitchell's denials of intoxication to his attorneys, which, in its view, superseded Mitchell's prior claims of drinking to the FBI. (GAB 36-38.) But in a capital case, "[t]he investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime . . . ." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.7(A)(1) (rev. ed. Feb. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1015 (2003) ("2003 ABA Death Penalty Guidelines").[3] Although "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions[,]" *Strickland*, 466 U.S. at 691, Mitchell's statements were not uniformly inculpatory. When a defendant gives starkly different accounts of an offense, it is unreasonable for counsel to rely "on any one of [those] statements in isolation when making tactical decisions about investigating the crime." *Duncan v. Ornoski*, 528 F.3d 1222, 1239 (9th Cir. 2008). Yet the record indicates that

---

[3] The ABA Death Penalty Guidelines were revised in February 2003. 31 Hofstra L. Rev. 913, 916 (2003). Counsel began representing Mitchell on November 29, 2001, but his trial did not start until April 1, 2003, and did not end until May 20, 2003. (SER 358, ER 1094-1095; RT 4/1/03 1, 5/20/03 4193-4196.) Therefore, both the 1989 and 2003 ABA Death Penalty Guidelines are "valuable measures of the prevailing professional norms of effective representation" at the time of Mitchell's trial. *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).

counsel stopped considering an intoxication defense as soon as Mitchell told them that he had not been drinking. (ER 4128, 4184.)

Given the totality of Mitchell's statements, which included both admissions and denials of drinking,[4] counsel's investigation of intoxication was unreasonably cursory. Although the government now asserts that Orsinger's statements to the FBI "contained no discussion of any substance abuse" (GAB 39, 63), it represented to the district court prior to trial that "some of the statements include admissions by the defendants that they had been drinking" and that, "at various times, the defendants have told us they had been drinking." (ER 102, 513; RT 8/2/02 12, 2/10/03 7.) While the district court and government pointed to Mitchell's ability to lead law enforcement to the remote crime scene as proof of his sobriety (GAB 37; ER 22 & n.6), Mitchell's attorneys never cited this fact as cause to forego further investigation of their client's conflicting statements. And for good reason -- the discovery and trial testimony showed that Mitchell could have learned the route when he returned to the crime scene on the following night with Orsinger, Gregory Nakai, and Raushandal Combs; Orsinger gave directions to the site, which was located on property belonging to Orsinger's family, near the home of Orsinger's father. (ER 767, 1886-1887; RT 4/30/03 2874.) Gregory Nakai also knew the way because he had been there before. (ER 768; RT 4/30/03 2875.)

The government also highlights attorney Williams's attendance at the Sam/Begay murder trial (GAB 37), but this hardly constituted a targeted

---

[4] The government's statement of facts includes Mitchell's mentions of intoxication in his November 4, 2001, interview but omits Mitchell's references to heavy drinking and buying alcohol in FBI interviews conducted on November 5 and November 29, 2001. (GAB 22-25; ER 1900-1903.)

investigation of intoxication: the Sam/Begay murders predated the Slim/Doe murders by more than two months, and Mitchell was not implicated in those crimes. (ER 1034-1036; RT 5/15/03 3964-3974.) If anything, the Sam/Begay trial should have spurred counsel to take seriously Mitchell's statements to the FBI, as the evidence showed that those crimes arose out of heavy drinking and bootleg alcohol sales on the Navajo Reservation, and that Gregory Nakai was drunk at the time of the offenses. *United States v. Nakai*, 413 F.3d 1019, 1021 (9th Cir. 2005). Yet, despite Mitchell's conflicting statements, counsel apparently did not investigate Mitchell's statement to the FBI that he and Orsinger had purchased liquor in Gallup on Sunday, October 28, or the possibility that Mitchell and Orsinger, both underage, had bought this liquor from bootleggers.[5] (ER 1902-1903.) As a result, they were caught flat-footed when Agent Duncan testified that Gallup was in a dry county where alcohol sales were prohibited on Sundays -- the only evidence related to intoxication introduced at the guilt phase. (ER 831; RT 5/1/03 3126.) Bartolomei also stated he discounted the possibility of intoxication because Mitchell and Orsinger were given a ride by a police officer as they hitchhiked in or around Gallup, but there is no indication that counsel ever tried to locate this potential witness.[6] (ER 4060.)

The government does not even attempt to argue that Mitchell's fact investigator, Karl Brandenberger, conducted an adequate investigation of intoxication. Brandenberger could recall conducting only one or two interviews

---

[5] Counsel's inadequate investigation also left them unprepared to rebut the "dry county" testimony at the penalty phase, despite having heard Agent Duncan's virtually identical testimony at the guilt phase. (ER 1042; RT 5/15/03 3996.)

[6] Present counsel for Mitchell has found no mention of this police officer anywhere else in the record, including the FBI interview reports, trial testimony, and depositions of Mitchell's two other attorneys.

related to the guilt phase, and the record does not reflect any specific, timely investigation he undertook of intoxication.[7] (ER 3270-3271.) The evaluations performed by the mitigation specialist, Vera Ockenfels, and psychiatrist, Barry Morenz, could not fill this void in counsel's guilt-phase investigation: Ockenfels's social history report contained no account of the offenses, aside from details drawn directly from the FBI interviews, and Morenz's psychiatric report did not cover Mitchell and Orsinger's activities in Gallup before they were picked up by the victims. (ER 3090-3091, 3125-3126, 3140.) Ockenfels was also hampered by counsel's treatment of mitigation as "distinctly separate" from the guilt phase. (ER 3305.) In keeping with this mindset, counsel ultimately disregarded Ockenfels's strong recommendation to investigate further whether Mitchell's significant history of alcohol and drug use affected his state of mind at the time of the killings. (ER 3307-3308.) Nothing in Ockenfels's report would have caused a reasonably competent attorney to stop investigating intoxication. Morenz's evaluation cannot replace a factual investigation of intoxication because he was retained to determine whether Mitchell was competent to stand trial and to diagnose any psychiatric disorders or brain dysfunction, not to investigate the

---

[7] It is undisputed that Brandenberger interviewed co-defendant Orsinger's grandmother. His claim to have interviewed Orsinger is supported by the mitigation specialist but contradicted by Mitchell's attorneys. (ER 3271, 3308, 3929, 4097, 4112.) Orsinger could not recall whether he had been interviewed by Brandenberger. (ER 3218.)

Brandenberger traveled to the Marshall Islands to interview Mitchell's father, Foster Hemil, but he arrived several weeks after Hemil's death from alcohol-related liver disease on December 1, 2002. (ER 2037, 3179, 4046.) By the time of Brandenberger's attempted interview, counsel had been representing Mitchell for approximately thirteen months, and only three months remained before the start of trial. (ER 4220, SER 358; RT 4/1/03 1.)

circumstances of the offense. (ER 3152-3153.) The government also ignores counsel's failure to provide Morenz with information regarding Mitchell's substance abuse in the period preceding the offenses, which would have led Morenz to delve more deeply into the possibility of intoxication at the time of the offenses. (ER 3597-3598.)

Counsel also unreasonably neglected to interview key witnesses in Mitchell's case. Aside from Mitchell's co-defendant, Johnny Orsinger, the residents of the Nakai house were the known witnesses who had seen Mitchell closest in time to the crimes. "Barring exceptional circumstances, counsel should seek out and interview potential witnesses," including "eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself" and "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), and the degree of culpability for the offense[.]" 2003 ABA Death Penalty Guidelines, cmt. to Guideline 10.7, 31 Hofstra L. Rev. 913, 1019 (2003). By not even attempting to interview the residents of the Nakai house, who saw Mitchell and Orsinger immediately before and after their trip to Gallup, Mitchell's attorneys fell short of prevailing professional norms.

Contrary to the government's assertion, there is no indication that the Nakai brothers and their associates were categorically unavailable to testify at Mitchell's trial. The government contends that Gregory, Jakegory, and Jimmy Nakai, and Dennie Leal, who were awaiting sentencing in the Sam/Begay murder case before a different judge, were "represented by counsel and therefore not available." (GAB 39.) But representation by counsel does not equal unavailability. The Arizona Rules of Professional Conduct provide that, "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party

the lawyer knows to be represented by another lawyer *in the matter*, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Ariz. Rules of Prof'l Conduct R. 4.2 (emphasis added). Although Gregory Nakai was Mitchell's co-defendant, it is far from clear that Jakegory Nakai, Jimmy Nakai, and Dennie Leal -- charged only in the Sam/Begay case -- were represented by counsel "in the matter" of the Slim/Doe murders and trading post robbery. In any event, no ethical rule prevented Mitchell's attorneys from contacting these potential witnesses' attorneys to obtain their consent to interviews on the narrow topic of intoxication and substance abuse.

The record indicates that Mitchell's attorneys did not reach out to counsel for the Nakais and their associates. When asked whether trial counsel tried to interview those involved in the Sam/Begay case, John Sears simply stated, "No. I think they were all represented by counsel." (ER 4126.) Jeffrey Williams acknowledged that the Nakais were "obviously" relevant witnesses in Mitchell and Orsinger's case, and he vaguely recalled attempting to interview Gregory Nakai, Mitchell's co-defendant. (ER 3929.) Yet Gregory Nakai's attorney unequivocally stated in a declaration that no such request was made, and that he would have consented to an interview with Mitchell's attorneys "about the drugs Gregory and Lezmond used before the FBI and Navajo Nation police arrested them in November 2001." (ER 3683.) Similarly, there was no evidence that Mitchell's attorneys had actually tried to interview those charged in the Sam/Begay case but were rebuffed. (ER 3457, 3182, 4045.) And there was no explanation for the failure to interview Padrian George, another resident of the Nakai house during the relevant period, who was not under indictment in either case. (ER 3175-3177.) If these witnesses were unavailable, it was because counsel unreasonably failed to seek them out.

### 2. *Counsel Did Not Make an Informed Strategic Decision with Respect to the Intoxication Defense.*

The government's attempt to present counsel's handling of the intoxication defense as a coherent, informed tactical decision is unpersuasive. On the one hand, the government argues that counsel "requested a jury instruction on voluntary intoxication in the hope that additional statements about intoxication might be introduced," but reluctantly abandoned that strategy when the district court sustained the government's hearsay objection to eliciting Mitchell's statements about drinking from the case agent. (GAB 40.) On the other hand, the government argues that counsel, from the outset, strategically decided not to present an intoxication defense, for fear of losing credibility with the jury and undermining the mitigation strategy of "a life worth saving." (GAB 41.) Tellingly, these two wholly disparate views of the intoxication defense are drawn from the deposition testimony of Williams and Sears, respectively, the two attorneys who handled the guilt phase. (ER 4013-4015, 4128-4129.) These supposed strategies are not entitled to *Strickland*'s presumption of competence because they are plainly inconsistent with each other and the record.

First, the record plainly does not support Sears's view that counsel strategically rejected an intoxication defense to avoid losing credibility with the jury. Sears himself unsuccessfully attempted to examine Agent Duncan about Mitchell's drinking on Day 17 of the trial, during the guilt phase, and he mentioned the drinking again on Day 25, during his penalty-phase closing argument. (ER 839, 1080; RT 5/2/03 3153-3154, 5/16/03 4143.) This justification for failing to pursue intoxication evidence thus smacks of "'*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011)

(citing *Wiggins v. Smith* 539 U.S. 510, 526-27 (2003)); *see also Stankewitz v. Wong*, 698 F.3d 1163, 1170 n.3 (9th Cir. 2012) (rejecting state's "tactical decision" argument that was "belied by the record"). Further, any decision based on an inadequate investigation of intoxication cannot be considered truly strategic: "Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006).

Second, Williams's purported strategy of requesting an intoxication instruction and hoping Mitchell's statements would be introduced was deficient. It could come as no surprise to Mitchell's attorneys that their attempt to introduce evidence of intoxication through the case agent would be prohibited on hearsay grounds; prior to trial, the district court had granted the government's motion in limine to preclude the defendants from introducing any exculpatory statements to law enforcement through anyone but themselves. (ER 4237 [CR 230].) As counsel told the district court, it recognized that those rulings "precluded us from affirmatively raising [the intoxication] issue" at the guilt phase. (ER 1050; RT 5/15/03 4030.) Counsel could not reasonably pin their hopes for an intoxication instruction on the possibility that the government, after successfully opposing the introduction of such evidence before trial, would reverse course in the middle of the guilt phase. The government does not grapple with this Court's case law, cited in Mitchell's opening brief, holding that requesting jury instructions on a defense theory without presenting any supporting evidence itself demonstrates deficient performance. (AOB 46.) Moreover, any lack of evidence to support an intoxication instruction can be traced back to counsel's deficient investigation. Given the cursory nature of counsel's investigation of intoxication, the request for

an intoxication instruction amounted to wishful thinking that more evidence would materialize.

### 3. *Mitchell Was Prejudiced by Counsel's Deficient Investigation and Presentation of the Intoxication Defense.*

There is a reasonable probability that the jury, presented with a fully investigated and prepared intoxication defense, would have found that Mitchell's voluntary intoxication prevented him from forming the requisite specific intent at the time of the offenses. Had the intoxication defense been properly investigated and presented, Mitchell would have been entitled to an intoxication instruction on the specific-intent crimes of carjacking resulting in death, first-degree murder, and aiding and abetting each of the substantive counts. *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985); *see also Holloway v. United States*, 526 U.S. 1, 11-12 (1999) (carjacking); *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968) (first-degree murder); *United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997) (aiding and abetting). The specific intent requirement of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3), requires the government to prove that "at the moment the defendant demanded or took control of the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car . . . ." *Holloway*, 526 U.S. at 12. A first-degree murder conviction under 18 U.S.C. § 1111 requires "specific intent (willful, deliberate, malicious and premeditated), as distinguished from a general intent to kill . . . ." *Kane*, 399 F.2d at 736. (ER 919-920; RT 5/7/03 3464-3454, 3470.)

A reasonable investigation of intoxication would have turned up evidence undermining the requisite specific intent for carjacking resulting in death and first-degree murder. As discussed in the opening brief (AOB 44-45), a more targeted line of questioning could have resulted in Orsinger's providing valuable

intoxication testimony instead of invoking his Fifth Amendment right against self-incrimination. Even if Mitchell did not personally testify to his intoxication, counsel could have introduced expert testimony, through a properly prepared Morenz, that Mitchell "might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered." (ER 3598.) This sort of psychiatric opinion, though based on Mitchell's hearsay statements to law enforcement, would have been admissible under Federal Rule of Evidence 703 as based on facts reasonably relied on by experts in the field. *Cf. Heishman v. Ayers*, 621 F.3d 1030, 1041 n.3 (9th Cir. 2010) (per curiam) (discussing admissibility under Cal. Evid. Code § 801(b) of expert psychological opinion testimony based on defendant's inadmissible hearsay statements).

Because voluntary intoxication goes to the element of specific intent, even strong evidence of Mitchell's participation in the crimes does not preclude a showing of prejudice. In the last, and most inculpatory, of the four statements he gave to the FBI, Mitchell stated that Orsinger had initiated the carjacking by attacking Slim; Mitchell admitted to later inflicting four or five of Slim's thirty-three stab wounds. (ER 830, 886; RT 5/1/03 3121, 5/6/03 3336.) Mitchell could be convicted only under an aiding-and-abetting theory on the carjacking count because there was no evidence that he personally demanded or took control of the car. Therefore, the relevant question is whether Mitchell possessed the specific intent to seriously harm or kill Slim "at the moment" when Orsinger took control of Slim's car (the requisite intent of the underlying offense), as well as the specific intent to facilitate Orsinger's commission of the crime (the requisite intent for aiding and abetting). *See Sayetsitty*, 107 F.3d at 1412. Viewed in the context of Mitchell's intoxication, the evidence on this point is far from overwhelming. The jury might well have concluded that Mitchell drunkenly reacted to Orsinger's

unexpected outburst of violence. The same is true of the premeditation required for first-degree murder. The facts cited by the government regarding the brutality of the crimes and destruction of evidence on the following day are equally consistent with a frenzied, spontaneous attack on the side of the road as with a planned and deliberate crime. Counsel's deficient investigation and preparation of a voluntary intoxication defense should undermine this Court's confidence in the outcome of Mitchell's guilt phase.

## B. COUNSEL'S DEFICIENT INVESTIGATION, PREPARATION, AND PRESENTATION OF MITIGATING EVIDENCE PREJUDICED MITCHELL AT THE PENALTY PHASE (CLAIMS B AND D).

### 1. *Mitchell's Trial Team Lacked Experience in Presenting Mitigation to a Capital Jury.*

The government overstates counsel's relevant penalty-phase experience. (GAB 43-44.) Mitchell's attorneys were Arizona practitioners, and Williams and Sears had previously tried capital cases in state court. (ER 3914-3915, 3969, 4029, 4118-4119.) But as the Supreme Court noted a year before Mitchell's trial, Arizona was one of only five states to "commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges." *Ring v. Arizona*, 536 U.S. 584, 608 n.6 (2002). Jury sentencing in death-penalty cases, more than judge sentencing, demands that counsel "try[] to translate a community's sense of capital punishment's appropriateness in a particular case . . . ." *Id.* at 616 (Breyer, J., concurring). Mitchell's attorneys were not versed in this aspect of death penalty advocacy. More generally, "[s]entencing proceedings in a capital case resemble a separate trial more than they resemble non-capital sentencing proceedings. . . . Experienced criminal counsel familiar with sentencing practices in non-capital cases may not recognize the different form of advocacy required at a death penalty

sentencing trial." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, cmt. to Guideline 11.8.6 (1989 ed.).

Bartolomei, who bore primary responsibility for the mitigation case, had no capital litigation experience whatsoever. (ER 4029, 4091.) Although inexperience does not necessarily mean incompetence, it strains credulity for the government to argue, in the context of Mitchell's penalty-phase ineffectiveness claim, that "[c]ounsel were all experienced capital litigation attorneys." (GAB 43.) *See Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 453 (2009) (per curiam) (in course of finding deficient penalty-phase investigation, noting that "[i]t was the first time this lawyer had represented a defendant during a penalty-phase proceeding"). Nor can the government rely on counsel's infrequent consultations with others "in the capital litigation community" (GAB 46), as the record shows that these experienced capital litigators regarded counsel's mitigation efforts as inadequate. (ER 3281-3283, 3267-3269, 3961, 4057.) The views of these capital litigators constitute compelling evidence of the prevailing standard of professional competence in federal capital cases at the time of Mitchell's trial. *Cf. Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011).

**2. *Counsel's Mitigation Investigation Was Unreasonably Limited in Scope.***

**a. Intoxication and Substance-Abuse Evidence**

In addition to conducting an unreasonably limited investigation of intoxication to support the guilt-phase defense of diminished capacity, *see supra* pages 3-8, counsel failed to investigate the broader universe of substance-abuse evidence relevant to the statutory mitigator of impaired capacity and to the catchall mitigator concerning "[o]ther factors in the defendant's background, record or character," 18 U.S.C. §§ 3592(a)(1), (a)(8). *See Summerlin v. Schriro*, 427 F.3d

623, 630 (9th Cir. 2005) (en banc) ("The defendant's history of drug and alcohol abuse should also be investigated."). The information counsel did discover "would lead a reasonable attorney to investigate further," not to stop. *Wiggins*, 539 U.S. at 527; *Stankewitz v. Woodford*, 365 F.3d 706, 720 (9th Cir. 2004).

Counsel could not reasonably decide to stop investigating substance-abuse evidence based on Mitchell's statements to Ockenfels regarding the last time he used drugs.[8] First, Ockenfels's social history report, prepared more than a year after the October 2001 offenses, reflected the inconsistencies in Mitchell's accounts of substance abuse. For instance, Mitchell reported last using crystal methamphetamine in September 2001, the month before the murders, but he also reported his "heavy use" of the drug in the period "immediately preceding this incident" and "immediately before his arrest in this case." (ER 3125.) Once again, counsel's characteristic failure to "consider all of the defendant's statements, not just those that make his job easier[,]" constituted deficient performance. *Duncan*, 528 F.3d at 1239. Second, Ockenfels underscored the possibility that Mitchell was minimizing his addiction problems and therefore urged further investigation, including consultation with a psychopharmacologist. (ER 3307-3308.) *Cf. Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1988) (holding that counsel's failure to consult additional experts was not unreasonable when retained experts "did not state they required the services of these additional experts"). Finally, the dates of Mitchell's illegal *drug* use have no bearing on his undisputed *alcohol* abuse, which "significantly increased" in the months preceding his arrest and was sufficiently obvious to warrant a recommendation for alcohol treatment in jail shortly after his arrest. (ER 3117 n.40, 3125.)

---

[8] The government's brief erroneously identifies Morenz's report as the source of this information. (GAB 53.)

Given the close link between penalty-phase evidence of intoxication and a long history of substance abuse, *see, e.g.*, *Stankewitz*, 698 F.3d at 1165, it was particularly unreasonable for counsel to abandon further investigation of substance abuse if they believed the evidence of intoxication to be thin. The government downplays the mitigation value of drug and alcohol evidence provided by Mitchell's friends and associates (GAB 64), most of whom were facing charges or were substance abusers themselves, but that does not excuse counsel's failure to seek them out as part of their mitigation investigation. Although Bartolomei claimed that no physical evidence of substance abuse was found in the Nakai house, which the government cites as proof of the reasonableness of counsel's limited investigation (GAB 63 [citing RT 3932]), FBI Agent Kent Hush testified at the suppression hearing that drugs and drug paraphernalia were found in the bedroom where Mitchell was found sleeping on the morning of his arrest. (ER 347-352; RT 1/30/03 205-210.) The fact is that it was Mitchell's peers, and not his high-school English teacher or football coach, who could best speak to Mitchell's drug and alcohol usage. Counsel's failure to interview these witnesses, and to provide the resulting evidence to Morenz, was deficient. In *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999), this Court held that counsel has a duty to consult appropriate experts and to provide them with "relevant" information. *Id.* at 1226; *see also Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999) (same). The government asserts that additional substance-abuse evidence was not relevant to Morenz's conclusions (GAB 55-56), but Morenz himself thought otherwise, as he stated that this information "could have made a significant difference" to his findings. (ER 3598.)

Further, the substance-abuse information uncovered by post-conviction counsel was not cumulative of any background Morenz received from

Brandenberger and Ockenfels. Indeed, the government concedes as much when it states that the new evidence "contradict[s]" Mitchell's claim of giving up drugs before the crimes. (GAB 64.) Brandenberger could not recall any information he gathered regarding intoxication and substance abuse and did not even know that Mitchell had ever used drugs. (ER 3271.) Ockenfels interviewed five of Mitchell's friends (ER 3092), but none of them had firsthand knowledge of what transpired at the Nakai house in the fall of 2001. Brijito Hernandez and Charles Price were grade-school friends from California. (ER 3092, 3113.) Lorenzo Reed and Herman Tsosie were high-school friends who became estranged from Mitchell because their parents forbade them from visiting the Nakai house. (ER 3258-3259.) Delilah Betsuie, Mitchell's girlfriend, stated that Mitchell was "always talking about alcohol" in the weeks preceding the offenses, but there is no evidence that she knew the quantity and nature of the substances Mitchell ingested when associating with the Nakais. (ER 3125, 3131.) That particular angle on Mitchell's substance-abuse problems, which would have compelled competent counsel to take a fresh look at Mitchell's denials of intoxication, was completely missing from Ockenfels's report.

The record does not support the government's assertion that counsel strategically declined to introduce mitigation evidence through Mitchell's "socially irresponsible group of friends." (GAB 62, 64.) Counsel could not have made an informed strategic decision without first learning what Mitchell's friends had to say regarding Mitchell's chronic substance abuse and intoxication. Further, the record shows that counsel did not hesitate to rely on mitigation provided by Mitchell's "socially irresponsible" friends in the penalty phase, at least when they did not have to go to the trouble of seeking it out. In penalty closing argument, Sears read from an unsolicited letter he received from "stone killer" Gregory

Nakai, who blamed Orsinger for the Slim/Doe murders and opined that "Lezmond is a good person."[9] (ER 1083; RT 5/16/03 4153.) The government cites a slew of unpublished, out-of-circuit, and dissenting opinions for the proposition that substance-abuse evidence can be a double-edged sword. (GAB 64-65.) This Court's precedent, however, indicates that evidence of regular alcohol and drug abuse is mitigating, especially when linked to the petitioner's troubled childhood and mental and emotional problems. *See Ainsworth v. Woodford*, 268 F.3d 868, 875-76 (9th Cir. 2001); *Stankewitz*, 698 F.3d at 1171-72.

Because counsel decided to introduce intoxication evidence at the penalty phase, albeit at the last minute and in desultory fashion, it behooved them to support this mitigation theme to the strongest extent possible. Yet the only evidence Williams elicited came straight from the FBI interviews provided in the government's discovery, thus allowing the case agent to testify that he didn't believe Mitchell's account. (ER 1033, 1037, 1042; RT 5/15/03 3959-3960, 3975-3976, 3996-3997.) The government tries, unpersuasively, to recast counsel's ineffectual performance as a concerted effort to portray the crimes as "the product of a one-time binge." (GAB 73.) But the intoxication evidence did not "dovetail[]" with Sonja Halsey's testimony that she had never heard of Mitchell drinking alcohol before the crimes. Bartolomei, who examined Halsey, did not ask her or any other mitigation witnesses about Mitchell's alcohol consumption; rather, Halsey volunteered the alcohol information in response to a general question about her reaction to hearing the charges against Mitchell. (ER 1029; RT

---

[9] The volunteered nature of Gregory Nakai's letter, which corroborates his post-conviction declaration stating his contemporaneous willingness to speak to Mitchell's attorneys concerning intoxication and substance abuse prior to the offenses, makes counsel's failure to seek an interview with him particularly unreasonable. (ER 3213, 3683.)

5/15/03 3944-3945.) This is not surprising, as Bartolomei stated that counsel had decided not to introduce intoxication evidence at either phase of Mitchell's trial. (ER 4063, 4099.) Further, Sears did not draw any connection between Mitchell's "drinking hard" and Halsey's testimony in his closing argument. (ER 1080; RT 5/16/03 4143.)

By the end of the penalty phase, the jury was left with the impression that Mitchell was a non-drinker who was probably lying about having bought liquor in Gallup and gotten intoxicated to the point of blackout on the day of the crimes. Without evidence of Mitchell's substance-abuse problems, both longstanding and recent, this theory seemed to come out of left field. But the jury heard none of Mitchell's substance-abuse history because counsel failed to develop it. Counsel was "willing to present mitigating evidence" of intoxication "insofar as it fell in [their] lap[s]," but constitutionally effective assistance demands more. *Stankewitz*, 698 F.3d at 1170 n.3.[10]

**b. Mental Health Evidence**

The government recapitulates counsel's error by equating a reasonable investigation of insanity and diminished capacity -- both guilt-phase defenses --

---

[10] This pattern of presenting mitigation through the most convenient, as opposed to the best prepared, witness is evident throughout the penalty phase. *See infra* page 24 (discussing testimony of Ruth Roessel and Bobbi Mitchell). For instance, counsel introduced evidence of the severity of life imprisonment solely through the testimony of Tammy Sebahe, a high-school junior who was selected to testify after she happened to accompany her mother to an interview with Mitchell's attorneys. (ER 1032, 3245; RT 5/15/03 3955.) Sebahe testified that she was unable to touch, kiss, or hug a shackled Mitchell when visiting him in pretrial custody. (ER 1032; RT 5/15/03 3955-3956.) This lackluster evidence, apparently introduced as an afterthought after ten minutes of preparation (ER 3245), cannot compare to the "vivid testimony" regarding the violent, unsanitary, and harsh conditions at San Quentin State Prison offered by a former head nurse in *Cox v. Ayers*, 613 F.3d 883, 889, 898 (9th Cir. 2010).

with a reasonable investigation of mental health for mitigation purposes. (GAB 56-57, 59.) An insanity defense "operates to completely excuse the defendant whether or not guilt can be proven." *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988). A diminished-capacity defense, though not an excuse, "is directly concerned with whether the defendant possessed the culpable state of mind which defines the crime." *Id.* At the penalty phase, however, the statutory mitigating factor of "impaired capacity" is satisfied by a less burdensome showing: "The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, *regardless of whether the capacity was so impaired as to constitute a defense to the charge*." 18 U.S.C. § 3592(a)(1) (emphasis added). Mental health evidence can also be used to support "[o]ther factors in the defendant's background, record or character or any other circumstance of the offense that mitigate against imposition of the death sentence." *Id.* § 3592(a)(8). Therefore, "it does not follow that an investigation sufficient to foreclose the possibility of a mental defense necessarily forecloses the possibility of presenting evidence of mental impairment as mitigation in the penalty phase." *Hendricks v. Calderon*, 70 F.3d 1032, 1043-44 (9th Cir. 1995); *see also Wallace*, 184 F.3d at 1117 & n.5.

Had counsel recognized the special role played by mental health evidence in the penalty phase, the reasonable course would have been to follow up on the psychiatric and neuropsychological evaluations they obtained. The executive functioning deficits resulting in increased impulsivity, brain scan abnormalities, and history of head injuries documented by Mitchell's experts are not the sort of equivocal findings that justify declining further investigation, as in the cases cited by the government. (ER 3151-3152; GAB 58). In *West v. Ryan*, 608 F.3d 477 (9th Cir. 2010), the record did not support petitioner's claims of numerous head

injuries, and the expert found no cognitive impairment. *Id.* at 488-89. And in *Leavitt v. Arave*, 646 F.3d 605 (9th Cir. 2011), three experts diagnosed the petitioner "with a personality disorder, without suggesting any possibility of an organic brain injury." *Id.* at 609. In *Leavitt*, counsel was also influenced by the trial court's indication that any request for further psychological testing would be denied. *Id.* at 611. But counsel for Mitchell expressly disclaimed any budgetary reasons for failing to consult another mental health expert. (ER 4109.) Because "strong psychiatric evidence of . . . lack of impulse and emotional control and organic brain dysfunction could have provided significant mitigating evidence," *Summerlin*, 427 F.3d at 641-42, counsel should have pursued this line of inquiry.

As discussed above, *supra* page 16, counsel performed deficiently by failing to provide relevant substance-abuse information to Morenz. Counsel also unreasonably curtailed their search for mental health mitigation based on the diagnoses Morenz did provide, which included depressive disorder, polysubstance abuse, a history of head injuries, and executive functioning deficits. (ER 3151-3152.) Although Bartolomei thought that a psychological defense based on blackouts "would be best" (ER 4049), that does not excuse counsel's failure to recognize the mitigation value of the information before them. In *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009), this Court characterized evidence of longstanding mental health problems, including "ongoing depression and suicidal thoughts through trial," as "classic mitigating evidence" that defense counsel deficiently failed to investigate and present. *Id.* at 1131; *see also Wallace*, 184 F.3d at 1116 (describing "major depressive disorder" and probable "organic brain damage" as "mitigating circumstances"). Yet even Mitchell's waiver of his penalty-phase appearance, which counsel attributed to possible "despair or hopelessness or depression," did not provoke counsel to reconsider the mitigation

potential of such evidence. (SER 438; RT 5/13/03 3671.)

The government's recitation of facts also elides conflicts in the record that call for an evidentiary hearing. For instance, the government cites Bartolomei's follow-up consultation with Morenz to discuss his psychiatric report as proof of counsel's adequate investigation. (GAB 58, 59-60.) Bartolomei could not recall the details of this purported meeting. (ER 4079.) However, Morenz unequivocally stated that he never heard back from Mitchell's defense team after submitting his report.[11] (ER 3598.) In a similar vein, the government suggests that Dr. Susan Parrish's psychological evaluation of Mitchell as a sociopath supported counsel's decision not to pursue additional mental health evidence. (GAB 56-57, 59.) But this fact is disputed. Although Williams thought that Parrish had evaluated Mitchell and found him to be sociopathic, he said that "Greg [Bartolomei] could probably tell you better about that" because he handled this aspect of the case. (ER 3925-3926.) Bartolomei, in turn, did not think that Parrish ever made a DSM-IV assessment of Mitchell and described Parrish's role as one of coordination and consultation. (ER 4034-4035.)

Finally, counsel had no tactical basis for failing to present the mental health mitigation of which they were aware. *See Hamilton*, 583 F.3d at 1113 ("Counsel . . . has an obligation to present and explain to the jury all available mitigating evidence."). To be sure, there was unfavorable information in Morenz's report, including a diagnosis of antisocial personality disorder and Mitchell's claims of animal abuse, gang activity, and uncharged acts of theft, fighting, and drug dealing. (ER 3145-3151.) But Morenz situated Mitchell's personality problems in

---

[11] Morenz's recollection is consistent with the declaration of neuropsychologist Anne Herring, who never heard back from Mitchell's attorneys after submitting her report. (ER 3618.)

the context of "[t]he violence Mr. Mitchell was subjected to, the ridicule from his family, the inconsistent and ineffective discipline he received and his struggles with not having a clear ethnic identity" (ER 3153), and such "contextual evidence and argument" can "mitigate the appropriateness of imposing the death penalty." *Correll v. Ryan*, 539 F.3d 938, 953 n.8 (9th Cir. 2008). Mitchell specifically linked the animal abuse to being "high on some drug." (ER 3151.) Counsel knew that Mitchell projected a "tough" persona (ER 3115, 3946), and, with adequate investigation, they could have defused his claims of gang activity; Lorenzo Reed, one of the other two members of Mitchell's "gang," told post-conviction counsel that while he, Mitchell, and another friend got "East Side Thugs" tattoos, they were just "pretending" and "goofing around." (ER 3225.) In any event, the unadjudicated criminal conduct was both unsubstantiated and relatively minor. There was nothing sufficiently damaging in Morenz's report to justify abandoning the pursuit of mental health mitigation altogether.

**c. Social History Evidence**

The government makes much of the fact that the mitigation specialist, Vera Ockenfels, discussed aspects of Mitchell's troubled childhood in her draft social history report.[12] (GAB 45, 50, 80 [citing ER 1152].) But counsel's mere awareness of mitigation evidence is not enough to prove adequate performance. For instance, in *Stankewitz*, it was undisputed that the attorney who represented the petitioner at his second trial possessed the prior attorney's files, which "contained much of the mitigating evidence that Stankewitz now relies on." 698

[12] The government incorrectly states that Ockenfels interviewed thirty-two sources for her social history report. (GAB 49.) Although there are thirty-two people listed in Ockenfels's "Cast of Characters," a significant number, including Mitchell's deceased father Foster Hemil, were not actually interviewed. (ER 3092.)

F.3d at 1171. Nevertheless, this Court held that counsel's failure to investigate this mitigation, including evidence of Stankewitz's substance-abuse history, was constitutionally deficient. *Id.* at 1171-72. "Counsel's possession and awareness of the evidence, but failure to investigate or present it, is evidence of -- not an excuse for -- his deficiency." *Id.* at 1172; *see also Wiggins*, 539 U.S. at 527.

Counsel's investigation and presentation of social history mitigation was deficient, not strategically limited. Counsel's closing showed that they tried to portray Mitchell's "awful" and "terrible" upbringing. (ER 1084; RT 5/16/03 4157-4158.) But Robert and Ruth Roessel's vague references to growing up in a "cold home" with "no love" did not convey a full picture of Mitchell's dysfunctional childhood. (ER 997, 1004; RT 5/14/03 3801, 3828.) The government is mistaken when it dismisses evidence that Bobbi Mitchell, Mitchell's grandmother and primary caretaker, suffered from severe chronic anxiety and depression as "just speculation" (GAB 68), and counsel's failure to discover this readily available evidence demonstrates their deficient investigation of Mitchell's background. Once again, counsel proved themselves willing to present social history mitigation only insofar as that evidence fell in their laps. *See Stankewitz*, 698 F.3d at 1170 n.3. This pattern of passivity explains their reliance on Ruth Roessel, a witness who barely knew the Mitchell family and simply happened to accompany her husband to an interview (ER 3236-3237), as well as the peculiar use of Bobbi Mitchell's videotaped testimony against her, instead of locating and calling the many witnesses who could testify to her abusive behavior. Finally, just three weeks before trial began, Bartolomei told the district court that the defense would call a social history expert at the penalty phase -- another indication that defense counsel had decided to pursue this path of mitigation instead of strategically shying away from it. (ER 598; RT 3/11/03 41.)

But there is no indication that a social history expert was ever consulted, despite Ockenfels's recommendation that counsel retain a forensic psychologist to present Mitchell's social history to the jury. (ER 3308.)

### 3. *No Strategic Considerations Prevented Counsel from Investigating and Presenting This Classic Mitigation Evidence.*

Mitchell's position did not preclude counsel from pursuing specific avenues of mitigation or mitigation in general. Although Mitchell did not attend the penalty phase of his trial, he informed the trial court he did not object to counsel's investigating and presenting mitigation evidence on his behalf. (SER 432; RT 5/9/03 3611.) The government's reliance on *Landrigan v. Stewart*, 272 F.3d 1221 (9th Cir. 2001), and *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), is therefore misplaced. (GAB 47.) In *Landrigan*, the petitioner stated in open court that he had instructed his lawyer not to present any mitigating evidence and "took an actively aggressive posture, which ensured that counsel's attempts to place mitigating factors before the sentencing court would come a cropper." 272 F.3d at 1225, 1226. Similarly, in *Williams*, the petitioner insisted that no witnesses testify at the penalty phase. 384 F.3d at 621-23. In addition, Mitchell's wish to waive his penalty-phase appearance, which he announced after the guilt-phase verdicts were read (SER 427; RT 5/8/03 3598), could not have influenced the direction of counsel's earlier investigative efforts.

Here, counsel's selection of a humanizing strategy was neither supported by a thorough investigation nor dictated by a need to exclude damaging rebuttal evidence. In *Crittenden v. Ayers*, 624 F.3d 943 (9th Cir. 2010), this Court cautioned that reliance on a humanizing strategy at the penalty phase "has considerable pitfalls, and may reasonably be undertaken only after constitutionally adequate investigation and preparation on counsel's part." *Id.* at 970 n.18. In

*Crittenden*, a post-AEDPA case, this Court held that counsel's choice of a humanizing strategy was not objectively unreasonable. *Id.* at 970. However, in *Crittenden*, counsel did not make an unadorned "good guy" argument. Instead, they also presented two medical experts to testify to Crittenden's treatable brain abnormalities in executive functioning, thus portraying their client as "a young man with many redeeming personal qualities, who, perhaps because of a treatable brain defect, lost control of himself in a fateful departure from an otherwise law-abiding life." *Id.* at 967-69. This is precisely the sort of mitigating evidence that Mitchell's attorneys possessed, but failed to investigate further or present. (ER 3151-3153.) Crittenden's attorneys made this decision after adequate investigation and preparation, which involved consulting no fewer than seven mental health professionals to evaluate their client before the penalty phase. *Id.* at 964-65. Crittenden's attorneys were also hindered by their desire to exclude evidence of their client's prior convictions for attempted forcible escape and assault on a custodial officer, and guilty plea to unlawful fighting. *Id.* at 969 & n.17. Mitchell, however, had never been formally charged with a criminal offense. (ER 3134.)

Further, while focusing on "lingering doubt" may be a reasonable strategy in some capital cases, it was not so given the facts and circumstances of Mitchell's case. In *Cox*, counsel used two eyewitness descriptions to argue that the petitioner was not the shooter and "actual killer" of the four victims; the jury asked for readbacks of the descriptions and pictures of both petitioner and his co-defendant at the penalty phase. 613 F.3d at 889, 892. The evidence in Mitchell's case did not support this sort of either-or scenario. Rather, Mitchell's statements and the forensic evidence -- both of which had already been introduced at the guilt phase -- pointed to joint participation in both murders. (ER 731, 797, 893; RT 4/30/03

2727, 5/1/03 2990, 5/6/03 3364.) In *Williams*, this Court held that counsel's selection of a lingering-doubt defense was reasonable where the case turned on circumstantial evidence, there were no witnesses to one of the charged crimes, and the eyewitnesses to the other crime had serious credibility issues and strong incentives to lie; Williams also presented three alibi witnesses. 384 F.3d at 580, 624. By contrast, the prosecution's case against Mitchell rested largely on the direct evidence of his multiple statements, which not only placed him at the scene but also portrayed him as an active participant in the killings.

Moreover, the "lingering doubt" defense employed by Mitchell's attorneys at the penalty phase did not rule out other forms of mitigation because it was not intended as mitigation at all; it was intended to rebut the gateway intent factors required for death eligibility under the Federal Death Penalty Act ("FDPA"). 18 U.S.C. § 3591(a)(2). Significantly, unlike in other lingering doubt cases, counsel conceded that Mitchell was not only present during the murders but also helped stab Slim and threw a rock on Doe's head. (ER 1080-1082; RT 5/16/03 4143-4148.) Counsel's very technical argument was that Orsinger had initiated both killings, and that both victims may have already been dead by the time Mitchell acted. (ER 1080-1082; RT 5/16/03 4143-4148) Counsel argued that under the FDPA, Mitchell had to be the actual killer for the jury to find the requisite gateway intent factor.[13] (ER 1082; RT 5/16/03 4148.) The government recognized the lingering-doubt defense as an argument against death eligibility and responded accordingly, saying, "So the gateway factors are clearly there. Do not get confused or misdirected by, hey, he actually has to kill." (ER 1089; RT 5/16/03 4176.) That counsel did not regard the lingering-doubt argument as mitigation is

[13] As discussed in the opening brief (AOB 60), counsel's interpretation of the FDPA was erroneous.

borne out by their failure to seek a jury instruction on the statutory mitigating factor of "minor participation," which applies when "[t]he defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(3). A strategic desire to focus on "lingering doubt" in this very circumscribed sense cannot justify counsel's failure to investigate and present mitigation relating to intoxication and substance abuse, mental health, and social history.

Thus, despite pursuing a limited "lingering doubt" defense to the gateway intent factors, counsel was still left to explain how Mitchell came to participate in the violent crimes. A compelling presentation of evidence regarding intoxication, substance abuse, mental health disorders, executive functioning deficits, and social history would have provided this missing link without undermining counsel's plan for avoiding a finding of the gateway intent factors.

**4. *The Heinousness of the Offenses Does Not Preclude a Finding of Prejudice.***

The government's primary argument against prejudice turns on the brutality of the crimes of conviction. (GAB 77-78.) But the cases cited by the government involved petitioners with serious criminal histories as well as heinous capital offenses. In *Heishman*, this Court held that the petitioner failed to show prejudice because "[t]he compelling aggravation case included evidence of *eight* sexual assaults" in addition to the instant offense of committing "a calculated, cold-blooded murder of another rape victim to prevent her from testifiying[.]" 621 F.3d at 1038. The government's reliance on *Wong v. Belmontes*, 130 S. Ct. 383 (2009) (per curiam), is also misplaced. In *Belmontes*, the Supreme Court reasoned that the additional mitigation would have opened the door to "the worst kind of bad

evidence," namely, strong evidence that Belmontes had committed another murder. *Id.* at 390-91. Similarly, in *Cox*, additional mitigation "may have opened the door to damaging rebuttal evidence about Petitioner's violent gang activities as an 'enforcer.'" 613 F.3d at 899. Yet, when the petitioner's only prior felony conviction was for grand theft, this Court has found prejudice even where the circumstances of a crime were "cold and calculating, motivated by personal desire and greed." *Hamilton*, 583 F.3d at 1102-04, 1133-34 (killing of pregnant wife for life insurance money).

"The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases." *Cox*, 613 F.3d at 897. Significantly, the government does not address the many other factors that this Court has found relevant to a prejudice analysis. In particular, the government does not dispute Mitchell's lack of a violent criminal history, the existence of a serious proportionality argument, the Arizona United States Attorney's recommendation against pursuing the death penalty, the Navajo Nation's and Marlene Slim's requests that the federal government not seek the death penalty, and the lengthy deliberations at the penalty phase. (AOB 71-73.) Given the incredibly thin evidence of drinking and social history that the jury actually heard, the fact that even one juror found impaired capacity mitigating, and six jurors found other factors in Mitchell's background mitigating, strongly suggests that a fuller mitigation presentation could have influenced at least one juror to vote against the death penalty.

### C. THIS COURT SHOULD GRANT AN EVIDENTIARY HEARING ON MITCHELL'S CERTIFIED CLAIMS OF INEFFECTIVE ASSISTANCE.

Contrary to the government's argument, Mitchell seeks an evidentiary hearing not as "a matter of right" (GAB 80-81), but in accordance with this

Court's precedent on (1) the low threshold for granting Section 2255 evidentiary hearings in general; (2) the particular need for an evidentiary hearing when the claim is one of ineffective assistance involving off-the-record facts and credibility judgments; and (3) the presumption that capital Section 2255 movants asserting a "colorable claim" should be given an opportunity to develop the factual record on that claim in federal court. (AOB 74-78.) The government does not argue that this case law is inapplicable; it simply ignores it.

The government's attempt to distinguish the Eighth Circuit's grant of an evidentiary hearing in *United States v. Sinisterra*, 600 F.3d 900 (8th Cir. 2010), is unavailing. The government mistakenly asserts that Sinisterra's counsel, unlike Mitchell's attorneys, claimed to be unaware of his client's abusive childhood. (GAB 80.) In fact, Sinisterra had two attorneys; while one stated that she did not know about Sinisterra's difficult upbringing, the other affirmatively stated that "he was 'aware of all of this information prior to the start of trial.'" *Id.* at 907. Thus, *Sinisterra* is not solely a deficient-investigation case. Rather, like Mitchell's case, it involved a "claim of ineffective assistance of counsel for failing to investigate *and present* mitigation evidence." *Id.* (emphasis added). The record of counsel's performance in *Sinisterra* is strikingly similar to the record in Mitchell's case. As in *Sinisterra*, Mitchell was represented by attorneys who divided responsibility for the guilt and penalty phases of trial and were not always on the same page. *Id.* at 903-04, 907. As in *Sinisterra*, counsel conducted or delegated some mitigation investigation. *Id.* at 904. As in *Sinisterra*, counsel arranged for a pre-trial psychiatric evaluation but did not pursue mental health issues any further after receiving the results. *Id.* at 905. Ten mitigation witnesses, mostly friends and family members, testified at both Sinisterra's and Mitchell's respective penalty phases. *Id.* at 904. (ER 966, 1008; RT 5/14/03 3677, 5/15/03 3860.) The Eighth

Circuit remanded for an evidentiary hearing because this record "does not conclusively show that Sinisterra's attorneys acted within the range of competence demanded of attorneys in criminal cases" with respect to investigating and presenting mitigation. *Id.* at 907-08. At a minimum, this Court should likewise remand for an evidentiary hearing in Mitchell's case.

### D. MITCHELL'S JUROR INTERVIEW CLAIM IS COGNIZABLE IN THIS APPEAL AND DOES NOT REQUIRE A CERTIFICATE OF APPEALABILITY.

Contrary to the government's argument, Mitchell does not claim on appeal that the district court's denial of his request to interview the trial jurors constitutes a stand-alone claim justifying habeas relief. Before filing his Section 2255 motion, Mitchell filed a request to interview the trial jurors in his case (CR 1), which the district court denied in a written order on September 24, 2009. (ER 1-6.) Out of an abundance of caution, Mitchell later incorporated the juror interview claim into the amended Section 2255 motion he filed on November 12, 2009. (ER 1289-1293). However, in the opening brief he appealed the denial of juror interviews only as a procedural error, not as a substantive ground for vacating his conviction and sentence. (AOB 79-84.) He therefore focused on the district court's September 24, 2009 order denying juror interviews, not the district court's subsequent order denying habeas relief. (AOB 79.)

Because Mitchell is not arguing on appeal that the district court's erroneous denial of juror interviews independently warrants the grant of Section 2255 relief, *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) (per curiam), is inapposite. In *Franzen*, a state prisoner filed a federal habeas petition claiming that the state court's delay of over a year in deciding his petition for post-conviction relief violated his due process rights. *Id.* at 26. This Court held that "a petition alleging errors in the state post-conviction review process is not addressable through

habeas corpus proceedings" because it did not allege that the petitioner's detention violated the Constitution, federal statute, or treaty. *Id.* *Franzen* is inapposite because it involved errors in a *state* post-conviction proceeding raised in a federal habeas petition. *Id.* Alleged errors in a *federal* post-conviction proceeding may be raised and considered on appeal in federal court. *See, e.g.*, *Evenstad v. United States*, 978 F.2d 1154, 1158 (9th Cir. 1992) (reviewing federal district court's denial of recusal motion in Section 2255 case). More fundamentally, *Franzen* does not foreclose appellate consideration of Mitchell's juror interview claim because Mitchell is no longer raising the juror interview claim as a stand-alone basis for Section 2255 relief. In other words, the remedy for the district court's erroneous denial of juror interviews is a remand with instructions for the district court to grant leave for the interviews, not vacation of Mitchell's conviction and sentence.

Finally, Mitchell does not need a certificate of appealability ("COA") to challenge the denial of juror interviews. (GAB 81-82.) Section 2253(c)(1) requires a COA as follows: "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from -- (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or (B) the final order in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1). In *Harbison v. Bell*, the Supreme Court construed the "final order" language in Section 2253(c)(1)(A), applicable to habeas corpus proceedings under Section 2254, to refer only to "final orders that dispose of the merits of a habeas corpus proceeding[.]" 556 U.S. 180, 183 (2009). The *Harbison* Court reasoned that "[a]n order that merely denies a motion to enlarge the authority of appointed counsel (or that denies a motion for appointment of counsel) is not such an order and is therefore not subject to the

COA requirement." *Id.* Likewise, in *Lambright v. Ryan*, 698 F.3d 808 (9th Cir. 2012), a Section 2254 case, this Court held that a COA was not required for it to exercise jurisdiction over an appeal of the district court's modification of a protective order because it was "not reviewing the district court's 'final order[] that dispose[s] of the merits of [the] habeas corpus proceeding.'" *Id.* at 817 n.2 (quoting *Harbison*, 556 U.S. at 183); *see also Trevino v. Johnson*, 168 F.3d 173, 177 (5th Cir. 1999) (in Section 2254 case, no COA required for appellate jurisdiction over denial of motion for recusal of federal district court judge because appellant's arguments "are not addressed to the merits of [the] order denying his habeas petition"). The term "final order" should be given the same meaning in Section 2255 proceedings governed by Section 2253(c)(1)(B) as in Section 2254 proceedings governed by Section 2253(c)(1)(A). *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (relying on "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (internal quotation marks and citation omitted). Therefore, no COA is required for this Court to review the district court's denial of Mitchell's request for juror interviews, as that order did not "dispose of the merits" of Mitchell's Section 2255 proceedings. This Court should decide this issue on the basis of the briefing before it.

## III.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the opening brief, this Court should reverse the judgment of the district court.

February 13, 2013

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

By:_________s/ *Gia Kim*________
GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(c) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 9,778 words.

DATED: February 13, 2013

s/ *Gia Kim*
GIA KIM
Deputy Federal Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2013, I electronically filed **Appellant's Reply Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*Lynn Evangelista*
Lynn Evangelista