**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEZMOND C. MITCHELL,<br>*Petitioner-Appellant*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>*Respondent-Appellee*. | No. 11-99003<br><br>D.C. No.<br>3:09-cv-08089-MHM<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Mary H. Murguia, Circuit Judge, Presiding[*]

Argued and Submitted February 20, 2014
Submission Vacated February 27, 2014
Resubmitted April 21, 2015
Pasadena, California

Filed June 19, 2015

Before: Stephen Reinhardt, Barry G. Silverman,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Silverman;
Partial Dissent by Judge Reinhardt

---

[*] The Honorable Mary H. Murguia, then a district court judge, was the original trial judge in 2003 and presided over the 28 U.S.C. § 2255 proceedings that concluded in 2010. She was appointed to the United States Court of Appeals for the Ninth Circuit in 2011.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 2 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 2 of 60



## SUMMARY[**]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of federal prisoner Lezmond Mitchell's 28 U.S.C. § 2255 motion challenging his convictions under the Major Crimes Act for multiple offenses committed on the Navajo reservation including two counts of first-degree murder and multiple counts of robbery, and his conviction and death sentence under the Federal Death Penalty Act of 1994 for carjacking resulting in death.

The § 2255 motion claimed that counsel was ineffective (1) at the guilt phase of the trial in failing to assert an intoxication defense, and (2) at the penalty phase for inadequately investigating, and for choosing not to present evidence of, Mitchell's mental health, history of substance abuse, and troubled upbringing.

The panel agreed with the district court that counsel did not fall below professional standards in either their investigation of a possible intoxication defense or their decision to pursue a different defense strategy of trying to portray Mitchell's accomplice as the main malefactor.

With respect to the penalty phase of the case, the panel also agreed with the district court that Mitchell's legal team

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 3 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 3 of 60



made a more-than-adequate investigation of possible mitigation, including his mental health and social history.

Dissenting in part, Judge Reinhardt would grant relief with respect to the penalty phase because Mitchell was deprived of his Sixth Amendment right to effective counsel. He wrote that counsel's "good guy" defense was unreasonable in light of the facts and circumstances of the crimes Mitchell committed, and also because the minimal investigation underlying counsel's choice of strategy was constitutionally deficient.

---

## COUNSEL

Jonathan Aminoff and Gia Kim (argued), Deputy Federal Public Defenders, Los Angeles, California for Petitioner-Appellant.

John S. Leonardo, United States Attorney, Christina Cabanillas, Appellate Chief, and Vincent Q. Kirby (argued), Assistant United States Attorney, Phoenix, Arizona for Respondent-Appellee.

---

## OPINION

SILVERMAN, Circuit Judge:

Defendant Lezmond Mitchell, then 20 years old, plotted with three others to carjack a vehicle for use in an armed robbery of a trading post located on the Navajo reservation in Arizona. On October 28, 2001, Mitchell and his 16-year-old accomplice, Johnny Orsinger, abducted 63-year-old Alyce

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 4 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 4 of 60



Slim and her nine-year old granddaughter. Slim and the child were traveling to New Mexico in Slim's GMC pickup truck. Somewhere near Sawmill, Arizona, Mitchell and Orsinger killed Slim by stabbing her 33 times. Her dead body was pulled into the rear of the truck, where the child was made to sit beside it. Mitchell then drove the truck into the nearby mountains.

Thirty or forty miles later, Slim's body was dragged out of the truck. Mitchell told the little girl to get out and "lay down and die." Mitchell then cut her throat twice. When she did not die, Mitchell and Orsinger each dropped large rocks on her head. Twenty-pound rocks bearing the child's blood were later found at the scene.

Mitchell and Orsinger left the murder scene, but later returned to hide evidence. While Mitchell dug a hole in the ground, Orsinger severed the heads and hands of both victims in an effort to prevent their identification. The dismembered parts were buried in the hole; the torsos were pulled into the woods. Mitchell and Orsinger later burned the victims' clothing and other personal effects. Mitchell washed the knives with alcohol to remove any blood.

Three days later, on October 31, 2001, Mitchell and two accomplices (Jason Kinlicheenie and Jakegory Nakai) drove to the Red Rock Trading Post in the GMC pickup truck stolen from Slim. The three men wore masks when they entered the store. Mitchell carried a 12-gauge shotgun. Nakai had a .22 caliber rifle. One of the gunmen struck the store manager in the head with his gun. When another employee said that she did not know the combination to the safe, one of the robbers said, "If you lie to me or you don't cooperate with us, we are going to kill you." Ultimately, the robbers made off with

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 5 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 5 of 60



$5,530 from the safe and cash registers, and the store manager's purse.

The robbers drove the stolen GMC pickup truck back to Kinlicheenie's car. Kinlicheenie followed Mitchell in the truck to an area near Wheatfield, Arizona, where Mitchell set the truck on fire with kerosene stolen from the trading post. They then went to Jakegory and Gregory Nakai's house and split up the money.

Mitchell was convicted in federal court of eleven counts in all, including two counts of first-degree murder, carjacking resulting in death, and multiple counts of robbery. The two murders were not punishable by death because they were committed on the Navajo reservation. Federal jurisdiction over those counts is based on the Major Crimes Act, 18 U.S.C. § 1153, and the Navajo Nation did not "opt in" to the death penalty under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591. However, federal jurisdiction over carjacking resulting in death does not derive from the Major Crimes Act; the federal nexus is interstate commerce. It does not matter that the crime occurred in Indian country, and therefore, the opt-in provision of the Federal Death Penalty Act does not apply. In other words, carjacking resulting in death carries the death penalty regardless of where it was committed. *See* William C. Canby, Jr., *American Indian Law in a Nutshell* 185–87 (6th ed. 2015).

Mitchell was sentenced to life imprisonment for the two murder counts, long consecutive prison sentences for the robbery and related counts, and death for carjacking resulting in death. His convictions and sentences were upheld on direct appeal. *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007). The United States Supreme Court denied a

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 6 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 6 of 60



petition for a writ of certiorari. *Mitchell v. United States*, 553 U.S. 1094 (2008).

Which brings us to the subject of this appeal. After exhausting his direct appeal, Mitchell brought a motion under 28 U.S.C. § 2255 alleging that his team of defense lawyers rendered ineffective assistance of counsel. The team was made up of two veteran deputy federal public defenders and a private lawyer highly experienced in capital cases appointed as "learned counsel." The § 2255 motion raised various issues, but it boiled down to these claims: (1) Counsel was ineffective in failing to assert an intoxication defense at the guilt phase of the trial; and (2) Counsel was ineffective at the penalty phase for inadequately investigating, and for choosing not to present evidence of, Mitchell's mental health, history of substance abuse, and troubled upbringing. The trial court denied the motion in a lengthy and thorough written order.

We agree with the district court that counsel did not fall below professional standards in either their investigation of a possible intoxication defense or their decision to pursue a different defense strategy. They did indeed investigate whether Mitchell was intoxicated at the time of the offenses. Mitchell adamantly denied to them that he was. Even so, they looked for evidence to contradict their client, such as liquor bottles left at the crime scene, but they couldn't find any. The only other living witness to the murders of Slim and her granddaughter was Johnny Orsinger, and he wasn't talking; he was under indictment himself and invoked his privilege against self-incrimination. Even assuming for the sake of argument that there was some evidence of alcohol involvement, the planning and premeditation of the vehicle theft as preparation for the pre-planned trading post robbery are inconsistent with a claim that Mitchell was too drunk to

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 7 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 7 of 60



know what he was doing. And after Mitchell was apprehended, he led authorities to the desolate crime scene, further evidence that he was not so intoxicated that he could not accurately recall events or appreciate where he was and what he was doing.

We agree with the district court that counsel conducted an adequate investigation and then made a reasonable strategic decision that it would be self-defeating to try to sell a jury on an intoxication defense on these facts, and that, instead, they would be better off trying to portray Orsinger as the main malefactor. Strategic decisions such as these are entitled to deference and do not support a claim of ineffective assistance.

With respect to the penalty phase of the case, we also agree with the district court that Mitchell's legal team made a more-than-adequate investigation of possible mitigation, including his mental health and social history. Early in the case, defense counsel had Mitchell examined by a psychologist, Susan Parrish, Ph.D. Dr. Parrish diagnosed Mitchell with antisocial personality disorder and cautioned counsel against calling her as a witness. Mitchell's lawyers also had him examined by a team of doctors led by psychiatrist Barry Morenz, M.D., at the University of Arizona medical school Mitchell also was examined by neuropsychologist Anne Henning, Ph.D., and by neurologist Ronnie Bergen, M.D. Mitchell underwent brain imaging read by James Guay, M.D. and an EEG read by Colin Bamford, M.D. He also had lab work done. Dr. Morenz then produced a 19-page, single-spaced report, in which he diagnosed Mitchell with, among other things, depressive disorder, cognitive disorder, polysubstance abuse, history of head injuries, and antisocial personality disorder. He also noted a "mild deficit" in executive functioning likely due to

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 8 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 8 of 60



emotional factors, not brain trauma. No further testing or consultation was suggested.

Mitchell's lawyers also hired an experienced "mitigation specialist," Vera Ockenfels, who produced a 42-page, single-spaced "social history" of Mitchell's life. The report is thorough in the extreme, containing sections with titles like "Conception, Pregnancy and Birth," and recounts not only Mitchell's life story and social history, but that of his parents and grandparents as well.

Only after reviewing all of this data, making numerous trips to the reservation, conducting many interviews themselves, and visiting with Mitchell himself, did defense counsel choose their mitigation strategy: Forego presenting evidence of Mitchell's drug use, mental health, and physical abuse and instead make the case that Mitchell had redeeming qualities that made his life worth saving, notwithstanding a rough start in life. Counsel presented evidence that Mitchell was unloved and rejected by his mother, struggled with his mixed Navajo and Anglo heritage, and felt caught between two different cultures. Despite these obstacles, Mitchell showed highly positive qualities. He was a good student, a speaker at his high school graduation, and a good athlete, liked by his teachers, and loved by others. In all, the defense presented nine witnesses in the penalty phase of the trial.

The defense also presented evidence that Mitchell had never before been convicted of a crime, that this offense was an aberrant act for him, and that Orsinger was the instigator and actual killer. Defense counsel also showed that the death penalty for Mitchell would create a terrible sentencing disparity. Besides this crime, Orsinger and Gregory Nakai had killed two other individuals during an earlier carjacking.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 9 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 9 of 60



Orsinger had pistol whipped the victims and shot one victim in the head. Nakai had shot the other victim five times. Yet, neither Nakai nor Orsinger, who was a juvenile, would face the death penalty.

In addition, counsel presented evidence that the death penalty offends Navajo values, and the Navajo Nation did not want the United States Attorney to seek the death penalty in this case.

Mitchell's lawyers had to walk a very careful line to avoid opening the door to highly damaging evidence contained in the medical report, such as Mitchell's diagnosis as a sociopath, his history of swinging dogs and cats by their tails and then throwing them off of bridges just for fun, and his having told Dr. Morenz that he and his accomplice had to kill the little girl to avoid being caught.

We agree with the district court that Mitchell's defense team conducted a professional-caliber investigation and then, facing unenviable choices, made a reasonable strategic decision to defend the penalty phase of the trial the way it did. Strategic decisions such as this do not support a claim of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *Mickey v. Ayers*, 606 F.3d 1223, 1238–39 (9th Cir. 2010).

We affirm.

I. *The Record.*

The facts of the crimes are summarized above and set forth in greater detail in the opinion in the direct appeal, *United States v. Mitchell*, *supra*.

The facts bearing on Mitchell's present claims of ineffective assistance of counsel were submitted to the district court in numerous declarations, other documents, and in the lengthy depositions of Mitchell's three trial lawyers taken by Mitchell's habeas counsel. The material facts – that is, what Mitchell's lawyers *did*, what they *didn't* do, and *why* – are not disputed. What *is* disputed is whether counsels' investigation and strategic decisions were reasonable as a matter of law. In the analysis that follows, we examine whether counsels' investigation and strategy fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88. Because the material facts are not in dispute – they either entitle Mitchell to relief or they don't – the district court did not abuse its discretion in declining to hold an evidentiary hearing. *United States v. Howard*, 381 F.3d 873, 877–79 (9th Cir. 2004).

## II. *Defense counsel adequately investigated the possibility of an intoxication defense and reasonably decided against asserting it.*

Mitchell argues that his three lawyers – Deputy Federal Public Defenders Jeffrey Williams and Gregory Bartolomei, and private lawyer John Sears – failed to adequately investigate the possibility of an intoxication defense for use in the guilt-phase of the trial. The facts show otherwise.

Sears, who had practiced for 28 years and was experienced in criminal defense, was appointed as learned counsel[1] and took the lead on the guilt phase. Williams had 15 years of criminal defense experience, had already tried two

[1] 18 U.S.C. § 3005 requires the appointment of at least two defense counsel in capital cases, including one who is "learned in the law applicable to capital cases."

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 11 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 11 of 60



capital cases and had worked on several other capital cases when he was appointed in this case. Bartolomei had practiced for 23 years, mostly as a criminal defense attorney, and had previously attended the Death Penalty College at the Santa Clara University law school.[2] The Federal Public Defender's Office in Arizona is particularly well-experienced in defending Indian reservation cases.

Defense counsel were well aware of Mitchell's history of substance abuse. They knew about it from various sources, including the report of Vera Ockenfels, the lawyer whom they hired who specializes in developing mitigating evidence. They confronted Mitchell with his statements to FBI agents about his substance abuse, but Mitchell "adamantly" denied that he was under the influence of any substance at the time of the crimes. Unwilling to take Mitchell's word for it, his lawyers dutifully pored over photographs of the crime scene and visited the scene of the crimes themselves looking for any evidence of drinking or drugs. Liquor bottles left behind? Drug paraphernalia? They found nothing.

Mitchell's lawyers also knew that Johnny Orsinger, the only other living person present when the crimes were committed, used drugs and alcohol. Mitchell's lawyers sought to interview him, but Orsinger's lawyer wouldn't allow it. When Mitchell's lawyers subsequently subpoenaed Orsinger, he repeatedly asserted his Fifth Amendment privilege and refused to answer questions.

---

[2] Santa Clara Law's Death Penalty College trains defense attorneys, along with their mitigation specialists, to represent defendants in death penalty cases. *See* http://law.scu.edu/dpc.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 12 of 60
Case: 11-99003, 08/19/2015, ID: 9650429, DktEntry: 71-1, Page 12 of 60



In short, counsel investigated the possibility of asserting an intoxication defense, but could find no admissible evidence that Mitchell was intoxicated at the time of the carjacking and murders.[3] To the contrary, Mitchell himself denied being intoxicated, and the manner in which the crimes were committed was inconsistent with a supposed inability to form intent due to intoxication, even if he *had* been drinking: the carjacking was premeditated and committed in preparation for the trading post robbery; the grandmother and little girl were killed and then dismembered to get rid of witnesses and dispose of evidence; and, with impeccable recall, Mitchell gave the FBI a highly detailed account of the crime and his complicity in it. Mitchell's ability to lead investigators back to the desolate scene of the crime is further indication that Mitchell was not unaware of where he was or what he was doing when the crimes were committed.

Mitchell's lawyers did not ignore the possibility of an intoxication defense. Just the opposite. They investigated it, they discussed it with Mitchell, they attempted to interview Orsinger, they looked for extrinsic evidence, they debated it among themselves, and only then, given the lack of evidence of intoxication and the strong circumstantial evidence to the contrary, did they decide that they would be unlikely to convince a jury to accept voluntary intoxication as a defense to these premeditated crimes. Lawyers who make professional decisions of this type, after a reasonable investigation such as occurred in this case, are "strongly presumed" to have rendered adequate assistance. *Cullen v.*

[3] Defense counsel tried, but failed, to get into evidence Mitchell's statement to the FBI that he had been drinking the day of the murders. Counsel then requested an intoxication instruction to preserve the record, even though they knew the request would be denied for lack of evidence. There is no reason to fault counsel for this.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 13 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 13 of 60



*Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotation marks omitted); *Edwards v. Ayers*, 542 F.3d 759, 772–73 (9th Cir. 2008) (counsel acts reasonably by not asserting a defense that is not supported by sufficient admissible evidence). That is the situation here. The district court correctly denied Mitchell's § 2255 motion with regard to counsels' decision to forego an intoxication defense at the guilt phase of the trial.

III. *Counsel conducted a thorough investigation of mitigating evidence – social, medical, and psychiatric – only after which did they make a reasonable strategic decision about what evidence to present and what to forego.*

Given the strong evidence of Mitchell's guilt, including his well-corroborated confession, and the lack of any realistic defense, Mitchell's lawyers knew that the rubber-would-meet-the-road in the penalty phase of the trial, so they began to prepare for that part of the case immediately.

The defense team consistently met throughout the case to discuss the possible theories of mitigation. Deputy Federal Public Defender Greg Bartolomei was principally in charge of this aspect of the case. Early on, Bartolomei spoke to Mitchell in detail about the case, his childhood, interests, parents, grandparents, medical history, drug history, and schooling. The defense also hired Vera Ockenfels, a well-known and experienced "mitigation specialist," to marshal mitigating evidence. Ockenfels gathered all available records and interviewed Mitchell's mother, grandparents, uncle, other extended family members, friends, acquaintances, football coach, teachers, and other school employees. She located and

attempted to interview Mitchell's father.[4] Bartolomei traveled to the Navajo reservation with Ockenfels to interview Mitchell's mother, grandparents, uncle, friends, football coach and other employees at Mitchell's school. Deputy Federal Public Defender Jeff Williams separately interviewed Mitchell's mother, Sherry. Sherry mostly talked about herself, and she walked out of the interview with Williams. She had previously told the FBI that Mitchell belonged in prison.

Six months before the penalty trial, Ockenfels turned in her 42-page, single-spaced "social history report," consisting of a complete, thoroughly documented biography of Mitchell, his mother, and his maternal grandparents. The report noted Mitchell's struggle with his mixed race, large size, and lack of fluency in the Navajo language and culture; verbal and physical abuse of Mitchell during his childhood; and Mitchell's extensive history of alcohol and drug use. The report also documented Mitchell's own violent history: he joined a gang in third grade, formed his own gang by eighth grade, was suspended and expelled from school for fighting, and abused dogs and cats for entertainment. Ockenfels also obtained psychological records from Mitchell's school, and interviewed Dr. Edward Fields, a psychologist for the Chinle School District, who was Mitchell's therapist while he was in high school. The defense team personally met with Ockenfels and reviewed her report.

Defense counsel also hired several mental health professionals. Counsel initially hired Susan Parrish, Ph.D., a psychologist, who diagnosed Mitchell as a sociopath and

[4] Mitchell never knew his father, and his father died before the defense team was able to locate and interview him.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 15 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 15 of 60



warned counsel against calling her to testify. Following up on Ockenfels's hunch that Mitchell may have blacked out or had a psychotic episode at the time of the crimes, defense counsel hired Barry Morenz, M.D., and his team of experts at the University of Arizona medical school to look for medical or psychiatric evidence that might be helpful. Defense counsel provided extensive background information to Dr. Morenz, including all of the prosecution's evidence in the case. In addition, Dr. Morenz conducted and documented in-depth background interviews of his own with Mitchell, defense investigator Karl Brandenberger, and mitigation specialist Ockenfels.

With Dr. Morenz at the helm, Mitchell was examined and evaluated by a psychiatrist, a neuropsychologist, and a neurologist at the University of Arizona and underwent numerous tests and studies. The neurological exams, EEG, MRI, and laboratory results were normal. Testing established that Mitchell had average intelligence. When all the data was in, Dr. Morenz diagnosed Mitchell with: (1) depressive disorder not otherwise specified based on Mitchell's statements that he felt despondent and hopeless; (2) polysubstance abuse based on abuse of alcohol, marijuana, cocaine, ecstasy, and other drugs on a regular basis for a number of years; (3) a cognitive disorder not otherwise specified based on executive functioning deficits that were mild and of uncertain etiology and clinical significance; and (4) an antisocial personality disorder based on Mitchell's history of childhood aggression, deceitfulness, frequent rule violation, cruelty to animals that would have warranted a conduct disorder diagnosis as an adolescent, a continued disregard for the rights of others, and a failure to show remorse for his behavior.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 16 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 16 of 60



As already noted, neuropsychological testing by Dr. Morenz's team revealed "some mild deficits in executive functioning, impulsiveness and poor planning," that "were more likely related to emotional factors than traumatic brain injury." Mitchell now faults his lawyers for not pursuing that finding further, but it is significant to note that Dr. Morenz did not recommend further testing, if indeed there is any further testing that could have been done, relating to these "mild deficits" of likely "emotional" origin.

Defense counsel reviewed Dr. Morenz's comprehensive report, discussed it with him, and ultimately decided not to present mental health evidence for fear that it would open the door to even more damaging evidence and do more harm than good. Defense counsel knew that they would have to turn the report over to the prosecution if Dr. Morenz testified. They concluded that the report would open the door to "ugly" damaging facts that would have a "negative and adverse" effect on the jury. Specifically, the report documented Mitchell's diagnosis of antisocial personality disorder, history of violence, cruelty to animals, gang involvement, that his gang sold drugs to children, and that Mitchell had been involved in the shooting of an innocent girl during a dispute with a rival gang over marijuana. Worse, Mitchell told Dr. Morenz detailed facts regarding the crime that he had not already admitted to the police or FBI, including the fact that he decided to kill the child to prevent her from identifying him. Mitchell also told Dr. Morenz of his desire to kill the person who had ratted out their group to the police.

Defense counsel concluded that introducing evidence of Mitchell's mental health was fraught with danger, given the door that would be opened to extremely damaging evidence, and could negate the positive things that they had to say about

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 17 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 17 of 60



him. Counsel also decided that it would be wise to stay away from Mitchell's history of alcohol and drug abuse. In their professional opinion, jurors would be turned off by such evidence and view it as a poor excuse for extremely horrendous crimes. And, again, such evidence would contradict the more positive picture they wanted to paint.

In the § 2255 proceedings, Mitchell's new lawyers produced a new declaration from Dr. Morenz, dated in 2009. In this declaration, Dr. Morenz states that he could have testified that Mitchell "might" have been under the influence of drugs or alcohol at the time of the crime and that his perception of reality "might" have been altered. This new declaration changes nothing. Besides being equivocal, the problem remained that if Dr. Morenz had testified to such a possibility, the door would have been opened to a whole panoply of contrary evidence of which Dr. Morenz was aware, such as Mitchell telling Dr. Morenz *why* he and Orsinger killed the little girl. In his report, Dr. Morenz quoted Mitchell as telling him, "I'm running this equation in my head that 9 times out of 10 if we let the little girl go the cops will be after us."

In his deposition, defense lawyer John Sears testified that the defense team had used juror questionnaires to determine prospective jurors' attitudes towards potential issues, including their reactions to Native American crimes, vulnerable victims, and whether the jurors were open to "excuses," such as mental problems or substance abuse. The defense used a series of hypothetical questions to assess potential jurors' reactions and then factored those reactions into Mitchell's defense. The questionnaire responses by prospective jurors confirmed counsels' belief that the jury

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 18 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 18 of 60



would view both mental health and substance abuse mitigation defenses in a negative way.

Defense counsel made a reasonable professional judgment, after a careful investigation, that the introduction of mental health and drug abuse evidence would be more damaging than helpful. We do not second-guess strategic decisions such as this. *Mickey*, 606 F.3d at 1238–39.

So, if no mental health or substance abuse mitigation, then what?

Bartolomei, Williams, and Sears decided that the best way to save Mitchell from the death penalty was a mitigation strategy consisting of three main themes: First, Mitchell's life should be spared because he is not a worthless human being – that is, he is a person with significant redeeming qualities, who has overcome difficult challenges in his life, facts that weigh against simply discarding him like so much trash. Defense counsel presented the testimony of Dr. Robert Roessel, the executive director of Mitchell's high school, who testified that Mitchell had been an excellent student, respectful, an outstanding athlete, a member of the student council, and a speaker at graduation. Dr. Roessel testified that Mitchell was kind, and did well in school despite a difficult upbringing, a disinterested mother who never loved him, a school system that failed to nurture him, and confusion over his mixed Navajo and Anglo heritage. Because Mitchell's grandparents were also educators at the school, Dr. Roessel knew Mitchell's family. Dr. Roessel testified that Mitchell had his problems, but had positive qualities, too, and had the potential to teach others in prison. Dr. Roessel asked the jury to spare Mitchell's life.

The defense also presented the testimony of Ruth Roessel, Dr. Roessel's wife and a school teacher. Mrs. Roessel testified that she met Mitchell when he moved in with his grandfather in Round Rock and knew Mitchell at school. Mrs. Roessel also knew Mitchell's family. She testified that Mitchell was raised in a "cold home," but that he was always respectful to her and called her "shima," which means "my mother."

Mitchell's uncle, Ausca[5] Kee Charles Mitchell, testified that he worked at Mitchell's schools. Mitchell spent a lot of time with Uncle Ausca and his family, and was always respectful. Uncle Ausca and his family attended Mitchell's high school graduation ceremony. The defense introduced into evidence pictures of Mitchell with family on graduation day, Christmas, and other family gatherings. Uncle Ausca testified that Mitchell was a fast learner who had computer and vocational skills. He was a good kid until he met Johnny Orsinger. Although Uncle Ausca did not know Orsinger, he knew that Orsinger was dealing drugs at the school dorms. The teachers thought highly of Mitchell, but were "scared to death of Orsinger."

Marty William Conrad, the athletic director, social studies teacher and head football coach at Mitchell's high school, testified that Mitchell was a good football player, a leader on the team, interacted well with the players, and was well-behaved. Mr. Conrad testified that Mitchell was good enough to play college football, and he thought Mitchell was going to community college to play football. The defense introduced into evidence a picture of Mitchell with the football team.

---

[5] In the record, the name is also spelled Auska.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 20 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 20 of 60



John F. Fontes, Jr., the assistant principal at Mitchell's high school, testified that he saw Mitchell daily at school. Mitchell was an excellent student, a good football player, and involved with student government during his senior year. Mitchell was never physically violent. The only disciplinary incident was a brief suspension for possessing a personal amount of marijuana. Mr. Fontes testified that Mitchell knew right from wrong, but tended to withdraw or not respond if he was fearful. Although Mr. Fontes had met Mitchell's uncle and grandfather, he had never met Mitchell's mother Sherry. The one time he called Sherry, she called his supervisor and advised the school not to contact her because she wanted nothing to do with Mitchell. Mr. Fontes testified that Mitchell was smart and had the potential to lead others in a positive way in a structured environment. He believed that Mitchell's life should be spared.

Mitchell's friend, Lorenzo Reed, Jr., testified that he had known Mitchell since third grade, and that they had attended high school together. Mitchell's mother had abandoned him, and it was painful for Mitchell. Mitchell moved in with Mr. Reed's family after he turned 18. Mitchell became part of the family, was respectful, and helped with the chores. Mitchell also was respectful while living with Mr. Reed's uncle in Phoenix. Mitchell briefly moved to California, but came back for Mr. Reed's high school graduation. Mr. Reed also asked the jury to spare Mitchell's life.

Sonja Hasley, Mitchell's high school English teacher, testified that Mitchell was an excellent student who helped her and other students in class. Mitchell was gentle, quiet, and respectful. When confronted with a violent situation, Mitchell wouldn't participate either verbally or physically. Mitchell's mother, Sherry, refused to come to the school, and

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 21 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 21 of 60



his grandparents never came to the school to discuss Mitchell's progress, either. Ms. Hasley testified that Mitchell's family acted contrary to the Navajo culture, in which mothers and grandmothers are very important. Ms. Hasley stated that Mitchell had the potential to be a good teacher in prison.

Tammy Sebahe, a member of Mr. Reed's family, testified that Mitchell lived with them, became part of their family, and still remained a part of their family. She had been visiting Mitchell for the previous year at jail, where they spoke over a phone with a glass wall separating them.

The defense also played the videotaped testimony of Mitchell's grandmother, Bobbi. Bobbi mostly talked about herself, a point that the defense would mention in closing argument as illustrative of the dysfunction in the family.

In closing argument, Sears argued that these facts showed that Mitchell had redeeming qualities despite his lack of family support, responded well to structure, and if sentenced to life without parole, he would adapt to prison and could have a positive impact on other inmates.

The second theme of the penalty phase strategy was that Johnny Orsinger was the mastermind behind these crimes, and that Mitchell was a follower. The defense introduced evidence that Orsinger and Gregory Nakai were not only the brains behind these crimes, but had committed a similar carjacking and multiple murder two months earlier. In fact, Orsinger had bragged that he had murdered the victims in this case — and yet, Orsinger and Nakai would be spared the death penalty. Orsinger was immune because he was 16, but the FBI agent could not explain why Nakai, who was the

same age as Mitchell and had also committed murder during a carjacking, had not been sentenced to death. Mitchell's lawyers hammered home the point that it would create an intolerable and irrational disparity for the two main culprits to get life sentences, while Mitchell, the follower, was sentenced to death.

The third theme was that the Navajo Nation opposes the death penalty, and did not want Mitchell sentenced to death. Mitchell's defense team even put before the jury a letter from the Navajo Nation to the United States Attorney – the prosecuting agency in this very case – stating its opposition to capital punishment in general, and in this case in particular.

The strategy chosen by Bartolomei, Williams, and Sears did not come to them in a dream, nor was it the result of a coin flip. They settled on their strategy only after commissioning an exhaustive social history of Mitchell and his family, having Mitchell studied stem-to-stern by a team of doctors in a variety of specialties at the University of Arizona medical school, conducting personal interviews with potential witnesses, making numerous trips to the Navajo reservation, and spending countless hours with Mitchell himself. Counsel, who had years of experience defending violent crimes committed on Indian reservations, also contacted other lawyers who specialized in death penalty defense and sought their advice. Counsel affirmatively considered the pros and cons of other approaches, and then reasonably chose the strategy that they thought had the best chance of success. Such a decision does not support a claim of ineffective assistance of counsel. *Elmore v. Sinclair*, 781 F.3d 1160, 1170–72 (9th Cir. 2015).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 23 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 23 of 60



Apparently recognizing that trial counsel's strategic and tactical decisions are entitled to great deference, Mitchell argues that his lawyers' investigation was deficient, thereby tainting their strategy and tactics. For example, Mitchell contends that when Mitchell's lawyers learned that Dr. Morenz had diagnosed Mitchell with antisocial personality disorder (just as psychologist Dr. Parrish had) counsel should have had Mitchell examined again by yet another doctor in search of a less damning diagnosis. We agree with the district court that defense counsel did not act below professional standards in relying on the thorough and authoritative report of the highly qualified experts they hired, particularly when Drs. Parrish and Morenz independently agreed on the same primary diagnosis after extensive testing. *Crittenden v. Ayers*, 624 F.3d 943, 965–66 (9th Cir. 2010).

Although Mitchell claims that the investigation was inadequate, he has come forward with almost no new evidence not known to defense counsel and fully considered as possible mitigation. Mitchell's drug abuse and physical abuse were documented in detail in the Ockenfels and Dr. Morenz reports well before the guilt and penalty trials. Contrary to Mitchell's claim, defense counsel knew in 2003 that Mitchell and his friends had been partying and doing drugs in the months before the crimes. In fact, Dr. Morenz diagnosed polysubstance abuse based on Mitchell's extensive drug use history. The evidence of drug use and physical abuse was known to the defense team and considered by the team when it decided not to present intoxication or abuse mitigation evidence.

Mitchell points out that neither defense counsel's investigation, nor that of their mitigation specialist, Vera Ockenfels, uncovered the fact that Mitchell's grandfather

Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 24 of 60



(with whom Mitchell had lived for a time) had molested two girls in Kansas sometime in the 1950s or '60s, about 20 years before Mitchell was born. Mitchell himself was never molested by the grandfather and Mitchell never met the girls. This bit of ancient family history was never disclosed to defense counsel, their investigator Karl Brandenburger, or Ockenfels, despite their numerous interviews with family members. The grandfather's behavior in the '50s or '60s toward people *other* than Mitchell, whom Mitchell does not even know, before he was even born, is of dubious relevance when it comes to mitigation. In any event, Mitchell was entitled to a reasonable investigation, not a perfect one. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

In 2009, habeas counsel managed to find a doctor, Pablo Stewart. M.D., who would give them a declaration stating that in 2001 Mitchell suffered from post traumatic stress disorder and substance-induced psychotic disorder. Dr. Stewart's declaration says that he could testify that Mitchell's intoxication and mental illness "synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral function, which severely impaired his ability to premeditate or intend to commit murder." (Never mind that Mitchell stated that he and Orsinger killed and dismembered the grandmother and little girl to get rid of the witnesses to the theft of the vehicle they stole for use in the trading post robbery they planned to commit.) At most, Dr. Stewart's new diagnosis of Mitchell's mental state, eight years after-the-fact, is a "difference in medical opinion, not a failure to investigate." *Crittenden*, 624 F.3d at 965.

Finally, Mitchell faults defense counsel for not calling his mother, Sherry, to testify. But, Bartolomei testified that Sherry refused to cooperate and only wanted to talk about

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 25 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 25 of 60



how Mitchell's crimes impacted *her*. She walked out on her interview with Williams, and had told the FBI that Mitchell belonged in prison. Counsel reasonably concluded that Sherry was a "loose cannon" who was better kept away from the witness stand.

We agree with the district court that Mitchell's lawyers made an adequate investigation and then, with full knowledge of all of the relevant facts, made reasonable strategic decisions to present what they did and to stay away from things that they thought would do more harm than good. *Elmore*, 781 F.3d at 1170–72. The possibility that some of the evidence rejected by defense counsel "could have assisted [Mitchell's] case," is "little more than a challenge to his defense attorney's trial strategy with the benefit of hindsight." *Id.* at 1171. Like the defense team in *Elmore*, which reasonably chose a "remorse strategy" over a mental health strategy, Mitchell's defense team made a reasonable strategic decision to pursue what it believed to be the stronger life-worth-saving defense, along with evidence of sentencing disparity and evidence that the Navajo Nation wanted Mitchell's life spared. They reasonably chose not to present evidence that "would detract from, or destroy," the chosen strategy. *Id.* Considering the unusual brutality of these crimes – committed not in passion but in furtherance of a planned armed robbery – and that Mitchell himself refused to attend the penalty phase of the trial, it is a remarkable tribute to Mitchell's lawyers that they were able to get the jury to find several mitigating factors.[6] Even assuming for the sake

[6] At least one juror found every factor presented by the defense to be mitigating for both murders. Twelve jurors found that: (1) Mitchell did not have a significant prior criminal record; (2) another person who was equally culpable in the crime would not be punished with death; and (3) Mitchell would be sentenced to life in prison without the possibility of

of argument that some other lawyer might have preferred a different strategy, there is no showing that Mitchell's lawyers' strategy was unreasonable. *Bell v. Cone*, 535 U.S. 685, 701–02 (2002). Because Mitchell did not rebut the presumption that counsel rendered effective assistance, the district court correctly denied Mitchell's § 2255 motion with respect to the penalty phase of the trial.[7]

IV. *Conclusion*

The judgment of the district court is **AFFIRMED**.

---

release if not sentenced to death. Two jurors found that Mitchell responded well to structure and would adapt to life in prison. One juror found that Mitchell's capacity to appreciate the wrongfulness of his conduct was so impaired as to constitute a defense to the charge. Six jurors found that Mitchell's childhood, background record, character or other circumstances of the offense mitigated against the death sentence. Finally, seven jurors found that the letter from the Navajo Nation opposing the death penalty was mitigating.

[7] We decline to grant a certificate of appealability for the uncertified issues raised in Mitchell's brief.

REINHARDT, Circuit Judge, dissenting in part:

I would grant Mitchell's petition for habeas relief with respect to the penalty phase of his trial because he was deprived of his Sixth Amendment right to effective counsel. Counsel's "good guy" defense was unreasonable in light of the facts and circumstances of the crimes Mitchell committed, and also because the minimal investigation underlying counsel's choice of strategy was constitutionally deficient. Before delving into the myriad ways in which counsel performed deficiently, however, I would note that this is a highly unusual death-penalty case in several respects, all of which exacerbate the impropriety of sending Mitchell to his death in violation of his constitutional rights to a fair trial, but none of which is more disturbing than the failure to give the jurors the opportunity to understand what made him the person he became before they voted to have him executed.

**I.**

Federal executions are quite rare and are normally reserved for the most heinous of crimes that are of national significance. There have been only three executions since the federal death penalty was reintroduced in 1988—one being in the Oklahoma City bombing case in which 168 people died and more than 600 were injured, and another being a drug kingpin found responsible for at least eight murders. Most recently, the death penalty was authorized for a perpetrator of the Boston Marathon bombing. However gruesome the crime in this case, Mitchell, who was twenty years old at the time and had no prior criminal record, does not fit the usual profile of those deemed deserving of execution by the federal government—a penalty typically enforced only in the case of mass murderers and drug overlords who order numerous

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 28 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 28 of 60



killings. Nor is this a case of national interest or significance. The penalty is possible only by virtue of the fact that Mitchell and a fellow Navajo, aged sixteen, stole a car in connection with the murders they committed. The murders by themselves did not subject Mitchell to the death penalty because, as explained below, the Navajo Nation has decided that the death penalty should not apply to intra-Indian crimes committed on its reservation. As a result, in the absence of the carjacking, Mitchell would not have been eligible for the death penalty.

Equally important, none of the people closely connected to the case wanted Mitchell to be subjected to the death penalty: not the victims' family, not the Navajo Nation—of which the victims and perpetrators were all members and on whose land the crime occurred—and not the United States Attorney whose job it was to prosecute Mitchell. So how did Mitchell nonetheless become one of a relatively small number of inmates on federal death row over the protestations of everyone with a personal stake in the case? A bit of background is necessary to answer that question.

The Navajo Nation is opposed to the death penalty, both as a general matter and in this case in particular, but it has only limited power over crimes committed on Navajo land.[1] In 1994, however, Congress enacted "a small but important development toward tribal self-determination" with respect to prosecutions by the federal government of crimes committed on tribal lands: the so-called tribal option, which allowed Native American tribes to decide whether the death penalty applies to most crimes committed by an Indian against another Indian on tribal lands (also known as "Indian

[1] *See* 18 U.S.C. § 1302(a)(7).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 29 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 29 of 60



country").[2] In pressing for the tribal option, representatives of the Navajo Nation explained to Congress:

> It is incumbent upon the federal government to allow Indian tribes the choice of whether the death penalty should be extended to our territory. . . . [T]he death penalty is counter to the cultural beliefs and traditions of the Navajo people who value life and place great emphasis on the restoration of harmony through restitution and individual attention. *The vast majority of major crimes committed on the Navajo Nation and within other Indian reservations are precipitated by the abuse of alcohol. The death penalty will not address the root of the problem; rather rehabilitation efforts will be more effective.*[3]

As Kevin K. Washburn, the current Assistant Secretary for Indian Affairs for the U.S. Department of the Interior, a former law professor and United States Attorney, wrote, adoption of the tribal option reflected a "modest step[]" in

---

[2] *See* 18 U.S.C. § 3598.

[3] *Crime Prevention and Criminal Justice Reform Act of 1994: Hearings on H.R. 3315 before the Subcommittee on Crime and Criminal Justice of House Judiciary Committee*, 103 Cong., 2d Sess., Feb. 22, 1994 (statement of Helen Elaine Avalos, Assistant Att'y Gen., Navajo Dep't of Justice, on behalf of Peterson Zah, President of the Navajo Nation) (emphasis added).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 30 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 30 of 60



favor of a policy that "criminal justice in Indian country must be decolonized."[4]

Having been empowered by the tribal option to determine whether the death penalty should apply to most federal crimes committed against Navajo people on Navajo land, the Navajo Nation decided that it should not.[5] For this reason, Mitchell was not eligible for the death penalty with respect to any crimes for which he was prosecuted under the Major Crimes Act—including several counts of first-degree murder, kidnapping, and robbery. Maj. Op. at 5. However, notwithstanding the fact that his crime was committed "by one Indian against other Indians in Indian country," the death penalty applied to the federal crime of carjacking resulting in death.[6] The theory underlying this anomalous result is that carjacking is a crime of general, nationwide applicability—rather than a Major Crimes Act offense—and the tribal option is not applicable to such crimes. *See Mitchell I*, 502 F.3d at

[4] Kevin K. Washburn, *Federal Criminal Law and Tribal Self-Determination*, 84 N.C. L. Rev. 779, 830, 854 (2006).

[5] Indeed, only one Native American tribe has exercised the tribal option to permit the death penalty. *See* Washburn, *supra* note 4, at 831.

[6] *United States v. Mitchell* ("*Mitchell I*"), 502 F.3d 931, 946 (9th Cir. 2007). The Anti Car Theft Act of 1992 established the federal crime of carjacking, which is codified at 18 U.S.C. § 2119. *See* Pub. L. No. 102-519, § 101(a), 106 Stat. 3384 (1992). The Violent Crime Control and Law Enforcement Act of 1994 made carjacking resulting in death subject to the death penalty. *See* Pub. L. No. 103-322, § 60003(a)(14), 108 Stat. 1796 (1994).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 31 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 31 of 60



946–49.[7] Thus, although the Navajo Nation had clearly voiced its opposition to the death penalty, even in cases of first-degree murder, the death penalty remained available to federal prosecutors in Mitchell's case because he stole a car in the course of committing his crimes.

Faced with the possibility that federal prosecutors would seek the death penalty, the daughter and mother of the victims strongly urged that the death penalty not be imposed and made a request to the federal prosecutor that he seek only life without parole. The Attorney General of the Navajo Nation Department of Justice, Levon B. Henry, also wrote a letter to the United States Attorney for the District of Arizona, Paul Charlton, "express[ing] the current positions of the Navajo Nation with respect to the possibility of the United States seeking capital punishment" in Mitchell's case. Henry explained that although "the details of the case[] were shocking," the Navajo Nation "would not support a death penalty," because "[o]ur culture and religion teaches us to value life and instruct against the taking of human life for vengeance." Moreover, Mitchell's execution would be directly contrary to the Navajo Nation's belief that rehabilitation, not the death penalty, is needed to address

---

[7] The Ninth Circuit has long held that intra-Indian offenses committed in Indian country may be prosecuted under federal criminal statutes of general, nationwide applicability such as § 2119 (absent exceptions not raised in this case), rather than solely under the Major Crimes Act—a holding I find to be of somewhat dubious merit but that a three-judge panel cannot revisit. *See, e.g.*, *United States v. Begay*, 42 F.3d 486, 497–98 (9th Cir. 1994). Because Congress limited the tribal option's application to offenses in which federal jurisdiction "is predicated solely on Indian country"—namely, Major Crimes Act offenses—the Navajo Nation's exercise of the tribal option against the death penalty does not "turn off" that penalty with respect to § 2119. *See Mitchell I*, 502 F.3d at 948–49.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 32 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 32 of 60



crimes associated with drug and alcohol addiction, in which category, the Navajo Nation told Congress, the vast majority of major crimes committed on reservations fall. *See supra* p. 29 & note 3. As explained below, Mitchell had a long history of drug and alcohol abuse that contributed to the person he became and the crimes he committed.

In light of the position of the Navajo Nation and the family of the victims, United States Attorney Charlton, a local Arizonan appointed by President George W. Bush, who was intimately familiar with the relations between the Navajo tribe and the citizens of the State of Arizona, declined to seek the death penalty. However, in the words of the victims' family, the request that the federal government not seek the death penalty was ultimately "ignored and dishonored." Attorney General John Ashcroft overruled Charlton and forced a capital prosecution based on the carjacking aspect of the crime, thereby avoiding the application of the tribal option. The overruling by Ashcroft marked the beginning of an aggressive expansion of the federal death penalty, particularly into jurisdictions that did not permit the use of that penalty. Mitchell was the first object of the new policy.[8]

---

[8] The third person against whom the federal death penalty has been enforced since it was reinstated in 1988 was Louis Jones, Jr., who was neither a mass murderer nor a drug overlord who ordered numerous killings. Jones, an African-American war veteran, kidnapped and murdered an airwoman at an air force base. Jones was a highly decorated soldier, whose 22-year military career included service as an Army Ranger. Jones returned home from the first Gulf War with post-traumatic stress disorder and brain damage likely linked to his exposure to nerve gas during the war—known as Gulf War Syndrome—and displayed symptoms of that syndrome during his commission of the crime. He was executed over vigorous protests by United States Senators and others during the tenure of Attorney General Ashcroft.

The arbitrariness of the death penalty in this case is apparent. Mitchell raises a number of serious constitutional issues regarding both his conviction and his death sentence. Some were litigated on his direct appeal and decided against him by a fiercely contested two to one vote. Another critical fundamental constitutional question is decided on this appeal by a similar division and despite equally strong views expressed by both sides. Whatever a particular jurist, or even two, may believe regarding these issues, uncertainty remains, to say the least, as to whether the judicial proceedings afforded Mitchell comported with the constitutional protections to which he is entitled. That uncertainty alone is sufficient to raise serious questions regarding whether Mitchell should be put to death by his government.[9] Further, although Mitchell committed a horrible crime, it was hardly one of national import or of particular federal interest other than the fact that it involved the Navajo Nation, and all of the persons with the greatest stake in the outcome of the case

[9] I was a member of the divided panel that affirmed Mitchell's death sentence on direct appeal. I stand by my dissent explaining the constitutional infirmities in Mitchell's conviction and sentence that were considered there and that I still believe warrant relief. Rather than explain my reasons again here, a summary of the most significant constitutional violations follows: First, federal prosecutors colluded with tribal authorities to detain Mitchell and elicit confessions from him in violation of his federal rights to timely arraignment and to counsel. *Mitchell I*, 502 F.3d at 998–1002 (Reinhardt, J., dissenting). Next, the prosecutor struck the only African-American juror on the venire in violation of *Batson v. Kentucky*, 476 U.S. 79, (1986). *See Mitchell I*, 502 F.3d at 1003–06 (Reinhardt, J., dissenting). Then, as to the penalty phase, (1) the district court allowed Mitchell to be absent from the sentencing phase in direct contravention of the Federal Rules of Criminal Procedure, meaning the jurors did not have to face the man they were sending to his death; (2) the prosecutor made numerous improper statements intended to arouse the passion of the jury; and (3) the district court failed to instruct the jury on the proper burden of proof. *See id.* at 1006–14.

oppose his execution. The novel use of carjacking as a loophole to circumvent the tribal option also renders this an anomalous case. Mitchell will, unless spared by executive clemency, in all likelihood, suffer the ignominious fate of being the first person to be executed for an intra-Indian crime that occurred in Indian country. While this court's jurisprudence indeed gives the federal government the legal authority to exercise jurisdiction over this case for the purpose of obtaining capital punishment, succeeding in that objective over the express objections of the Navajo Nation and the victims' family reflects a lack of sensitivity to the tribe's values and autonomy and demonstrates a lack of respect for its status as a sovereign entity. Should the federal government pursue a death warrant for Mitchell, I hope that it will have better reasons for doing so than adherence to the wishes of a former attorney general.[10]

## II.

I now turn to the legal question at issue on this appeal: whether Mitchell was deprived of effective assistance of counsel in violation of the Sixth Amendment.[11] I would hold

[10] *See* Amnesty Int'l, *USA Capital Deficit: A Submission on the Death Penalty to the UN Human Rights Comm.*, at 8 (Sept. 2013), *available at* http://www.amnestyusa.org/sites/default/files/amr510622013en.pdf ("[T]here is nothing to stop any administration, consistent with the [International Convention on Civil and Political Rights], supporting reversal of the death sentence . . . .").

[11] With respect to the guilt-phase claim at issue on this appeal, I would hold that Mitchell was not prejudiced by any deficient performance on counsel's part. As noted *supra* note 9, I would have granted guilt- and penalty-phase relief based on claims raised on direct appeal. Most of the uncertified claims relate to those claims. I thus find it unnecessary to address the uncertified claims on this appeal.

that counsel performed deficiently at the penalty phase for two independent reasons: First, counsel's decision to present a tepid "good guy" defense—that Mitchell's was "a life worth saving"—was unreasonable in light of the nature of the horrific acts Mitchell committed and in light of the mitigating evidence in counsel's possession: evidence of drug and alcohol abuse, physical abuse, and of emotional and mental problems that would have helped the jury understand what led up to Mitchell's commission of those acts. Second, counsel did not perform a constitutionally adequate investigation into the mitigating evidence, failing to pursue obvious leads before deciding to abandon the latter defense. Counsel thus did not make a reasonable strategic decision to forego further investigation of mitigating evidence in favor of presenting a "good guy" defense—a defense it is difficult to conceive of any reasonable juror crediting. Finally, I conclude that there is a reasonable probability that but for counsel's deficient performance, at least one juror would have found (1) that the crimes were at least in part attributable to Mitchell's exceedingly unfortunate background, including his long history of drug and alcohol abuse, the physical and emotional abuse he suffered as a child, and his ensuing mental and emotional problems; (2) that these circumstances collectively rendered him less culpable than he might otherwise have been; and (3) that life without parole rather than the extreme penalty of death was the appropriate punishment.

**A.**

"[C]ertain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002), *as amended* (quotation marks omitted).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 36 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 36 of 60



The ill-prepared "good guy" defense that counsel presented at the penalty phase in this case was clearly doomed from the start. The lead penalty-phase attorney Gregory Bartolomei had never tried a murder case, much less a capital one, and his so-called strategy was no strategy at all. After the defense essentially conceded the guilt phase in a gruesome double murder (it presented no witnesses), counsel planned a half-day penalty-phase defense seeking to portray Mitchell as generally a nice fellow. To do so instead of presenting evidence that his abusive childhood, drug and alcohol abuse, and mental and emotional problems contributed to his violent acts was "patently deficient" performance in violation of the Sixth Amendment. *Id.*

The majority identifies three "themes" of the penalty-phase defense: (1) that Mitchell had redeeming qualities making him a "life worth saving" (also known as a "good guy" defense); (2) "that Johnny Orsinger was the mastermind behind these crimes"; and (3) that the Navajo Nation did not want Mitchell sentenced to death. Maj. Opinion at 26–28. In reality, the defense that counsel presented centered almost exclusively on the first theme—that Mitchell had been a "good guy." That argument had no chance of convincing a jury to return a sentence other than death. Life without parole could hardly have been justified by the snippets of normal conduct which counsel chose to offer to the jury. The latter two themes were barely included in the defense as presented, but if properly developed, would have been wholly consistent with the defense that counsel should have offered: a far more plausible defense that sought to explain how the crimes ultimately were attributable in large measure to Mitchell's drug and alcohol addiction, wretched upbringing, and the ensuing mental and emotional difficulties from which he suffered.

In light of the shocking facts of the double murder of which the jury had just convicted Mitchell, the "limited strategy that [counsel] developed was unreasonably constricted." *Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008). Focusing the penalty-phase presentation on evidence that Mitchell was "a 'good person' and one who had 'done good deeds' . . . was, in and of itself, unreasonable given the extreme unlikelihood that any testimony about [Mitchell's] character would have been sufficient to 'humanize[] him during the time frame of the murder conspiracy at issue.'" *Id.* at 946 (citation omitted).[12] *See also Hamilton*, 583 F.3d at 1122. In short, "a good character defense was unlikely to be persuasive to a jury that had just decided that [Mitchell] had carried out a grizzly murder." *Bemore v. Chappell*, No. 12-99005 (9th Cir. June 9, 2015).

The "most likely" evidence to sway the jury "was the type that would portray [Mitchell] as a person whose moral sense was warped by abuse, drugs [and alcohol] [or] mental incapacity." *Correll*, 539 F.3d at 946. Evidence that a defendant has these kinds of problems provides the jury with a coherent picture of the circumstances that led to his criminal acts, *see Sears v. Upton*, 561 U.S. 945, 951 (2010), and may lead the jury to reject a death sentence "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be

---

[12] "Defense counsel compounded the errors he committed during the investigative stage of the penalty phase by presenting almost none of the little mitigating evidence he had discovered." *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009). Moreover, as explained in the next section, choosing the "good guy" defense was also unreasonable in light of counsel's failure to adequately investigate other more compelling mitigation evidence.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 38 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 38 of 60



less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citation omitted). Despite possessing evidence that Mitchell had been physically abused as a child, had long been addicted to drugs and alcohol, and had serious mental and emotional problems, defense counsel presented no evidence of such "explanatory or exculpatory attributes" to the jury and did not pursue obvious leads regarding those issues. *Allen v. Woodford*, 395 F.3d 979, 1005–1007 (9th Cir. 2005). Indeed, counsel made no effort to explain to the jury how a "good guy" could also be a murderer, arguing only that "something happened" to Mitchell but "we are never going to know."[13] Counsel's failure to present any explanatory mitigating evidence and, as discussed below, to adequately investigate the existence and nature of such evidence, constituted deficient performance in light of the egregious facts and circumstances of Mitchell's crimes. *See Hamilton*, 583 F.3d at 1113 ("Counsel . . . has an obligation to present and explain to the jury all available mitigating evidence.").

To make matters worse, the "good guy" defense that counsel presented was weak and inadequately prepared—an "anemic strategy" at best. *Correll*, 539 F.3d at 945. Counsel called a number of witnesses to speak to Mitchell's good

[13] Counsel's penalty-phase presentation "left the false impression that [Mitchell's] childhood, while unhappy, was not unusual." *Hamilton*, 583 F.3d at 1120. The witnesses' testimony made only oblique, passing references to Mitchell's difficult home life—that he was raised by his grandparents, who were both educators, in a home where "the word [love] was never said" that "didn't give him love"; that his mother "wanted nothing to do with [him]"; and that it was a "cold home." In fact, the defense team intentionally downplayed evidence of Mitchell's troubled background—for example, advising one teacher to "stick to only what [she] knew about . . . Mitchell [from the] classroom" and not to mention "that he seemed like a boy without a family . . . ."

Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 39 of 60



character, the vast majority of whom had known him only briefly, when he was in high school. The consensus was that Mitchell was a good high school student and athlete; that he was respectful; and that he might be a good teacher to other prisoners because he had some "computer skills" and "vocational skills that he could pass on." None of the witnesses offered more than a superficial impression of Mitchell, and most of them had not had any contact with him since well before the time of the crimes. Moreover, the conclusion from this "evidence" that Mitchell was a "good guy" seems to have been one that could have been drawn by no one other than his counsel. *Cf. Allen*, 395 F.3d at 1007 (holding that character witnesses whose "knowledge of [the defendant] was neither deep nor contemporaneous with [the] crimes" were unlikely to persuade the jury to choose life). Anything positive conveyed to the jury by this tepid testimony was surely undone when counsel referred to Mitchell in his closing argument as "a jackass," and said that "there is the possibility that if Lezmond Mitchell lives on, he might help someone else[.] Maybe he won't. Maybe he will."

"Witness preparation is a critical function of counsel," *Doe v. Ayers*, 782 F.3d 425, 442 (9th Cir. 2015), yet the character witnesses were woefully ill prepared. Many had no contact with defense counsel prior to short meetings on the day of their testimony—meetings at which counsel primarily showed them photos of the victims' bodies and asked whether they would still testify. Such "spur-of-the-moment mitigation presentations form no part of constitutionally adequate representation." *Id.* at 443; *see also Hamilton*, 583 F.3d at 1121 ("[T]he failure to prepare a witness adequately can render a penalty phase presentation deficient."). Even those who had met the defense team prior to the day of testimony were not prepared "to understand the proceeding in which

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 40 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 40 of 60



[they were] participating," *Doe*, 782 F.3d at 443, as counsel did not tell them what sorts of questions would be asked.

As a result, much of the good character testimony elicited was quite damaging. Although identifying Mitchell as a "very excellent student" and "an outstanding athlete," Dr. Roessel, executive director of Mitchell's high school, testified that Mitchell "broke into [his] office" to steal a computer and a shotgun, which he used in a robbery, and that he had been suspended for having a marijuana joint. His wife, Ruth Roessel, testified to the singular importance of grandmothers in Navajo families, which allowed the prosecutor to stress how devastating Slim's death must have been to her family. Mitchell's uncle testified that Mitchell once "disrespected [him], [his] wife, [and] [his] kids," by smoking pot in his house because "in the Native American church . . . marijuana is evil."

Meanwhile, the prosecution used the defense's "good guy" evidence to its own advantage, arguing that because Mitchell was smart and a leader, he would not have gotten involved in the crime purely by accident or because of Orsinger's influence; that he had squandered a chance to go to college; that his home life was better than average; and that his experiences and environment did not contribute to his crimes—concluding that their cruelty was "so inexplicable" that the only reasonable response was to punish the perpetrator with death. Defense counsel's failure to submit any evidence explaining what went wrong in Mitchell's life ensured that "the prosecutor's main argument to the jury during sentencing was the dearth of evidence in mitigation of the crimes." *Silva*, 279 F.3d at 830. In fact, not only did counsel fail to challenge the prosecution's assertion that Mitchell's background could not mitigate his culpability for

Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 41 of 60



the crimes, "he effectively validated it," *Hamilton*, 583 F.3d at 1121, by stating in closing that "people come from bad backgrounds all the time and never get involved in anything like this."

The other two themes identified by the majority—that Orsinger was the mastermind and that the Navajo Nation opposed the death penalty—could not and did not redeem counsel's worthless and implausible "good guy" defense for two reasons. Most important, these two themes were irrelevant to counsel's choice between a doomed "good guy" defense and a far more plausible defense that sought to explain how and why Mitchell became a criminal, as the two subsidiary arguments were fully consistent with either choice. Counsel's decision to use them along with the doomed "good guy" theme did not in any way make the deficient performance in choosing that theme as the primary defense any less deficient.

Moreover, these two subsidiary themes were inadequately developed and halfheartedly presented to the jury. Virtually no evidence of the "Orsinger was the mastermind" theme was introduced in the penalty phase, and neither was a serious argument to that effect made to the jury. The sum total of penalty-phase evidence pertaining to this theme was Mitchell's uncle's speculative statement that Mitchell "was a good kid until he met Orsinger,"[14] and evidence that Orsinger had earlier committed a similar crime with someone else. Then, in closing, counsel asserted that although Mitchell admitted stabbing Slim, as well as cutting the child's throat and throwing rocks on her head, "there is no evidence . . .

[14] The uncle admitted on cross-examination that he had no first-hand knowledge of Orsinger.

Mitchell began the stabbing," that it was *possible* that Orsinger "threw the first rock," and that "the cause of death for that child *could* have been inflicted by the first rock." (emphasis added). These hypothetical suppositions did not constitute a reasonable argument for sparing Mitchell's life. As the prosecution pointed out, Mitchell was death-eligible whether he delivered the fatal blows or not.

The third theme—the Navajo Nation's opposition to the death penalty—could have been quite compelling, particularly if combined with evidence of Mitchell's drug and alcohol addiction. Unfortunately, the only evidence that the jury heard regarding the Navajo Nation's opposition to the death penalty consisted of counsel reading from Henry's letter. The jury was unaware that the victims' family had asked the prosecutor not to seek the death penalty. No defense witness testified about why the death penalty contravenes Navajo conceptions of justice, or about the tribe's belief that rehabilitation, not the death sentence, is needed to address major crimes committed on the reservation, most of which are associated with alcohol addiction. Indeed, counsel seems not to have even realized this *was* a potential theme; the Navajo Nation's opposition to Mitchell's execution was never formally presented to the jury as a mitigating factor.[15] In combination with the missing direct evidence of drug and alcohol addiction (along with the other evidence regarding Mitchell's emotional and mental problems and the physical abuse he suffered), evidence relating to the Navajo Nation's reasons for opposing his death

[15] The seven members of the jury who found the Navajo Nation's opposition to the death penalty mitigating included it as *write-in* non-statutory mitigator on the verdict form. By contrast, the verdict form included typed questions regarding the prosecution's non-statutory aggravating factors.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 43 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 43 of 60



sentence could have provided substantial support for a defense that explained why Mitchell became what he did—although it provided no support for the "good guy" argument.

"Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving." *Allen*, 395 F.3d at 1000. In this case, however, counsel's halfhearted attempt at a good character defense provided no context at all. The jury simply heard mixed evidence that Mitchell had been an ok guy to a few people at some point in his life, with no explanation whatsoever regarding why he committed extremely violent acts that jurors might well believe no decent human being would commit. To the contrary, the evidence that counsel failed to present—that Mitchell was addicted to alcohol and drugs, that he had been physically abused as a child, and that he had mental and emotional problems—could have helped persuade at least one juror that Mitchell was not as culpable as would have been the good guy from a fine family background that counsel sought to portray him as being. The strategy employed by Mitchell's counsel does not fit with the commission of the horrific acts of which the jury had just convicted him. Any reasonable juror would need some explanation of what was wrong with Mitchell—why what he did was not simply due to an evil nature. Simply saying he's really a good guy with some good qualities could not conceivably help. Counsel's strategy—if it can be called that—was outside "the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S.668, 689 (1984); *see also Silva*, 279 F.3d at 846 ("[A]n attorney's performance is not immunized from Sixth Amendment

challenges simply by attaching to it the label of 'trial strategy.'"). I would hold that for this reason alone counsel's performance was constitutionally deficient.

**B.**

Even assuming that counsel's "good guy" defense strategy might in some limited circumstances have been reasonable—and it's hard to make that assumption given the nature of the acts that Mitchell committed—the question remains "whether the investigation supporting their decision not to introduce mitigating evidence of [Mitchell's] background [and to rely on the 'good guy' defense] was *itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 511 (2003). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 690–91, before deciding on the strategy to be followed at the trial and the penalty phase, with a particular emphasis on the latter. In fact, "the reasonableness of counsel's investigatory and preparatory work at the penalty phase should be examined in a different, more exacting, manner than other parts of the trial." *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006).

In Mitchell's case, counsel unduly circumscribed the scope of the mitigation investigation and prematurely settled on a "good guy" strategy before obtaining all the facts necessary to the making of an informed decision. Although "[n]o particular set of detailed rules" establishes the contours of competent representation, the Supreme Court and this

court recognize that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails . . . to the extent they describe the professional norms prevailing when the representation took place." *Doe*, 782 F.3d at 434 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)) (quotation marks omitted); *see also Wiggins*, 539 U.S. at 524. Counsel's investigation clearly fell short of the professional norms in place at the time of Mitchell's trial, which included "the duty to investigate mitigating evidence in exhaustive detail" and required "that counsel's investigation cover every period of the defendant's life from 'the moment of conception,' . . . and that counsel contact 'virtually everyone . . . who knew [the defendant] and his family' and obtain records 'concerning not only the client, but also his parents, grandparents, siblings, and children.'" *Bobby*, 558 U.S. at 8 (quoting *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* ("*ABA Guidelines*"), cmt. to Guideline 10.7 (rev. ed. Feb. 2003)).

Counsel was on notice that Mitchell struggled with drug and alcohol abuse but unreasonably decided not to investigate further. Vera Ockenfels, an experienced capital lawyer and mitigation specialist hired by the defense, provided a preliminary report that identified Mitchell as a "heavy" user of crystal methamphetamine, particularly in the months preceding the crimes, as well as a user of marijuana, cocaine, and alcohol.[16] She informed counsel "that Mitchell was

[16] Contrary to the majority's contention that Ockenfels' report was complete, Maj. Op. at 14, it was clearly a draft—the conclusion section of the report read "[TO BE DRAFTED FOLLOWING EDITS FROM ATTORNEYS]" and during post-convictions proceedings Ockenfels explained that it was a "draft document that [she] expected would be further developed and revised before it was finalized . . . ."

Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 46 of 60



addicted to alcohol and drugs and that he had started using drugs at age eleven," and recommended that counsel further investigate Mitchell's history of addiction in consultation with a psychopharmacologist. This advice was not followed. In fact, when Ockenfels informed counsel that Mitchell's addiction could be used as mitigating evidence, Mitchell's lawyers simply responded that "there was 'no mitigation' in his case," and "that the team did not intend to pursue evidence of Mitchell's significant history of drug and alcohol abuse . . . because Mitchell had denied being drunk or high on drugs at the time of the killings."

Declining to pursue substance abuse evidence in favor of a "good guy" defense at this stage was unreasonable for several reasons: First, Ockenfels had explained that it was common for young Native American clients to deny addiction to their attorneys. Second, "[a] defendant's lack of cooperation does not eliminate counsel's duty to investigate." *Hamilton*, 583 F.3d at 1118; *see also ABA Guidelines*, cmt. to Guideline 10.7 (describing duty to conduct a "thorough and independent" investigation *regardless of "client statements concerning the facts of the alleged crime*" (emphasis added)).

Third and most important, whether Mitchell was intoxicated *during the commission of the crime* was not the relevant penalty-phase question. Even if evidence of substance abuse was "[in]sufficient to demonstrate that [the defendant] lacked the requisite mental state for the crime," it remained an "important mitigating factor" for the jury to consider in that it would have played a major part in explaining Mitchell's life story to the jury. *Frierson*, 463 F.3d

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 47 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 47 of 60



at 994 n.12.[17] Evidence that Mitchell was a chronic user of alcohol and drugs from a young age is the kind of "classic mitigating evidence" that counsel must pursue at the penalty phase, *Correll*, 539 F.3d at 952, irrespective of whether the defendant was under the influence at the time of the crimes. Substance abuse constitutes "behavior that can be characterized as self-medication for the everyday trauma of his life and for the mental health illnesses that were later diagnosed." *Id.* Evidence of Mitchell's addiction would have helped a jury to far better comprehend why he committed the crimes he did—particularly when linked to the abusive circumstances in which he was raised. Counsel had a duty to pursue this lead. Further investigation would have revealed that Mitchell's drug and alcohol problems escalated drastically in the months preceding the crimes. He heavily used crystal methamphetamine, powder and crack cocaine, ecstasy, LCD, PCP, marijuana, and alcohol, often staying up for three nights in a row. It would also have revealed a family history of alcoholism and the ugly and noxious family environment in which he was raised.

The majority dismisses counsel's decision not to investigate or present evidence of Mitchell's history of alcohol and drug abuse as a strategic decision based on "their professional opinion [that] jurors would be turned off by such evidence . . . ." Maj. Op. at 16–17. This explanation, however, is not only inconsistent with the many well-established judicial conclusions to the contrary, but it is

[17] *See also Correll*, 539 F.3d at 944 (finding ineffective assistance at penalty phase because "[d]espite his knowledge that [Defendant] was a drug user . . . defense counsel did not interview witnesses about th[is] issue[] or obtain records concerning these matters"); *ABA Guidelines*, cmt. to Guideline 10.7 (describing "substance abuse" as a mitigating factor counsel "needs to" explore).

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 48 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 48 of 60



directly contradicted by counsel's actions in this case, and thus can only constitute a "*post hoc* rationalization of counsel's conduct." *Wiggins*, 539 U.S. at 526–27. In fact, counsel *did* introduce evidence of intoxication at the penalty phase, albeit ineffectively, through the testimony of FBI Agent Duncan, who testified on cross-examination that he did *not* believe Mitchell's account of having been intoxicated the day of the crime. Counsel also requested and received a jury instruction on the statutory mitigating factor of impaired capacity and, during closing argument, asserted that "[Mitchell] was so drunk that he didn't even remember where this all happened and he blacked out . . . ." Thus, "counsel never actually abandoned the possibility" of introducing evidence of drug and alcohol abuse but instead presented a "halfhearted mitigation case" on the matter ineptly and without proper investigation. *Wiggins*, 539 U.S. at 526.

Most important, the weak evidence of drug and alcohol use that counsel haphazardly introduced was deployed for the wrong purpose. The point was not that Mitchell was intoxicated during the crimes to the point that he lost control—an unsubstantiated claim that likely *did* "turn off" the jury. Rather, evidence of Mitchell's long history of addiction commencing at an early age—which was easily corroborated, as post-conviction counsel found—could have been used effectively to give the jury a complete picture of why Mitchell became the person he was. Trial counsel, however, failed to conduct the investigation necessary to make a reasonably informed decision regarding whether to present evidence that Mitchell's struggle with addiction and his otherwise damaging life history mitigated his culpability. The resulting unexplored and undeveloped presentation that he was simply drunk at the time was wholly unbelievable and served only to undermine the "good guy" defense. Clearly no

Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 49 of 60



reasonable strategic decision to withhold evidence of Mitchell's drug and alcohol addiction or to end the investigation into such evidence was made; nor could it have been made without investigating in "exhaustive detail" all aspects of Mitchell's life that could have contributed to his ultimately committing so horrendous an offense. *Bobby*, 558 U.S. at 8.[18]

Counsel did not, it is clear, adequately investigate Mitchell's family history or make a reasonable decision not to investigate further. Counsel was on notice from Ockenfels' draft report that Mitchell's home life was marked by abandonment, instability, isolation, and abuse. For example, Ockenfels found that Mitchell's mother, with whom he lived until seventh grade, was physically abusive, as was his grandmother, with whom he lived periodically. An uncle had observed that Mitchell "'never had a chance' with his family," while Dr. Roessell told Ockenfels that Mitchell "was 'on his own from the time he was born.'" Ockenfels concluded that by high school "the neglect [Mitchell] had endured had taken its toll and had hardened him."

Counsel did not follow up on any of these leads. The defense team's view was that "nothing [stood] out . . . . [The family was] educated. They were, at least . . . by reservation standards, . . . middle-class." In short, the attorneys ignored red flags regarding physical and emotional abuse, instead taking away from Ockenfels' report and their own interviews

[18] Moreover, the "two sentencing strategies" of (1) good character evidence and (2) explanatory mitigating evidence of drug and alcohol abuse, mental illness, or a difficult background "are not mutually exclusive." *Bemore*, No. 12-99005 (quotation marks omitted). Thus, counsel could not have made a reasonable strategic decision to cut off the investigation into the latter type of evidence to focus solely on the former.

Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 50 of 60



with Mitchell's family only that "he came from basically a family of educators." They accordingly ceased investigating Mitchell's family background, unreasonably constricting the mitigation investigation and presentation to good character evidence.

This premature narrowing of the scope of the mitigation investigation was not within the range of reasonable professional conduct. "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (quotation marks omitted). "[I]f what counsel knows or should know suggests further investigation might yield more mitigating evidence, counsel must conduct that investigation." *Doe*, 782 F.3d at 435. Had counsel conducted further inquiry, additional mitigating evidence ripe for presentation at the penalty phase would have been uncovered. The post-conviction investigation revealed that Mitchell's home was far more violent and dysfunctional than Ockenfels' incomplete draft report suggested; there was "constant uncertainty of what would happen . . . because of the verbal and sometimes physical abuse, and the emotional abuse . . . ."

One particularly egregious deficiency of the mitigation investigation into family history bears mention. Even though the defense team knew that Mitchell's grandfather George was "'the only one who raised [him]," they uncovered only very elementary background information about him—that he had ten siblings; that he had held "several teaching and administrative positions in several Reservation schools"; that he married Mitchell's grandmother when she was thirteen and was twenty years her senior; and that he was a "dour, sour man." Critically, counsel failed to investigate Ockenfels'

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 51 of 60
Case: 11-99003, 06/19/2015, ID: 9580429, DktEntry: 71-1, Page 51 of 60



finding that both of Mitchell's grandparents and his uncle had told him that he was the product of rape and/or that his grandfather was also his father. Growing up with this "knowledge," true or false, is certain to adversely affect an individual's emotional well-being.

Had counsel further investigated George—consistent with the ABA Guidelines' requirement of an "extensive and generally unparalleled investigation into personal and family history" that includes "[t]he collection of corroborating information from multiple sources," *ABA Guideline*s, cmt. to Guideline 10.7—they would have learned that there were "persistent rumors regarding George molesting children." Residents of the reservation told post-conviction investigators that George was fired from a school principal position because he molested children. His wife's sisters also alleged that he raped them when they were nine and twelve years old, respectively, and his wife told a relative that he molested the three-year-old child of a neighbor. Mitchell's mother, Sherry, told post-conviction investigators that her mother (George's wife) repeatedly accused her of having a sexual relationship with George and that some people thought Mitchell was the product of incest.[19] Sherry also "stated an uncertainty whether or not George may have molested [Mitchell]."[20]

---

[19] Although Sherry did not believe that her father had sex with her, she reported memories of a man with "whiskers" kissing her while she was asleep and of a vision that her "father had performed a binding ceremony with [her] when [she] was little" and that the "ceremony meant that . . . [she] would become his wife, which included having sex with him."

[20] Trial counsel "did not get much of a history of [Mitchell]'s life from his mother" Sherry because she stopped cooperating when Ockenfels, against her express instructions, told Mitchell certain things she had said. However, even without Sherry's cooperation, an adequate investigation

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 52 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 52 of 60



The majority dismisses the evidence that Mitchell's primary caregiver was a pedophile and rapist as of "dubious relevance" because the alleged conduct took place "sometime in the 1950s and 1960s, about 20 years before Mitchell was born," Mitchell never met the alleged victims, and there was no allegation that George ever molested Mitchell himself. Maj. Op. at 23–24. The conduct was not, however, limited to the 1950s and 1960s. For example, the complaints of sexual abuse lodged against George when he was a principal pertained to incidents in 1985 or 1986.

Moreover, the majority's belief that it is of little relevance that Mitchell was primarily raised by a man who was probably a child molester is puzzling for several reasons. First, this court routinely upholds lifetime requirements that sex offenders avoid *any* contact with minors, reasoning that "'the perpetrators of child sexual abuse crimes' often have 'deep-seated aberrant sexual disorders that are not likely to disappear within a few years . . . .'" *United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir. 2011) (citation omitted). Second, the sexual abuse allegations against George could have been presented to the jury as evidence of the degree to which his family neglected him, as his "mother and grandmother knowingly gave up his care for extended periods of time . . . [to] a man whom they knew sexually preyed on children." Third, the atmosphere in a home dominated by a child molester was necessarily fraught with tension, sexual and otherwise, an atmosphere hardly conducive to the healthy emotional development of a young child. Fourth and most important, Mitchell's attorneys could not reach any conclusion regarding the relevance or value of mitigating

---

would likely have uncovered the sexual abuse allegations made by other family members and residents of the Navajo Reservation.

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 53 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 53 of 60



evidence pertaining to the sexual abuse allegations until they reasonably investigated those allegations. It was undoubtedly constitutionally deficient performance for counsel to fail to perform any investigation whatsoever into the allegations after having been alerted to them by Ockenfels' draft report.

Finally, the investigation into Mitchell's mental health was also inadequate. "The presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating," *Doe*, 782 F.3d at 435 (quotation marks and citation omitted), but counsel failed to pursue clear leads regarding Mitchell's mental problems. First, counsel did not follow up on Ockenfels' finding that when Mitchell underwent counseling at age seventeen, a doctor found him to be "a very troubled young man" in need of "[i]ntensive psychotherapy" who experienced suicidal ideation when his family fought. Counsel also ignored Ockenfels' recommendation that they hire a forensic psychologist to explain how Mitchell's upbringing had caused him to turn to alcohol and drug abuse.

Second, the majority overstates its case when it asserts that Dr. Morenz, who oversaw the team evaluating Mitchell, "did not recommend further testing." Maj. Op. at 16.[21] Rather,

[21] The majority erroneously relies on the purported evaluation of psychologist Susan Parrish in ruling that counsel reasonably decided not to further investigate Mitchell's mental problems. *See* Maj. Op. at 14–15. It is unclear whether Dr. Parrish actually performed a complete psychiatric evaluation of Mitchell. Although one attorney stated in a post-conviction deposition that Dr. Parrish diagnosed Mitchell as a sociopath and indicated that she would not serve as a witness, Bartolomei, the attorney in charge of the penalty phase, testified that her role was "more to assist in

Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 54 of 60



in addition to finding polysubstance abuse and "significant depressive symptoms," Dr. Morenz concluded that Mitchell may "have some subtle brain dysfunction in the frontal lobes caused by his head injuries . . . [that] might have contributed to Mr. Mitchell being more impulsive . . . including . . . during the time of the alleged instant offenses." He suggested that "[a] PET scan could be obtained that could, if abnormal, contribute further corroborating evidence to the diagnosis of a cognitive disorder not otherwise specified." Counsel neither discussed Dr. Morenz's report with him, followed up on these leads, nor presented any evidence of Mitchell's mental problems to the jury.

The majority asserts that counsel made a reasonable decision not to further investigate or to present mental health evidence for fear that doing so would open the door to damaging aspects of Dr. Morenz's report. Maj. Op. at 16–17. However, the question is not, as the majority appears to believe, whether it was reasonable not to call Dr. Morenz to the stand. There may be good reasons not to call a particular witness, but counsel cannot forego an entire line of inquiry on that basis unless there is no way, other than the problematic witness, to get that evidence before the jury. *See Karis v. Calderon*, 283 F.3d 1117, 1140 (9th Cir. 2002) (holding that even if "[i]t was within the range of reasonable tactics not to put [a certain witness] on the stand, . . . that does not excuse the failure to present the evidence of abuse through other witnesses"); *see also Doe*, 782 F.3d at 439 ("Other witnesses, such as those whom habeas counsel was able to find, were 'easily within [counsel's] reach,' and would have been discovered by trial counsel, '[h]ad [he] only looked.")

coordinating or reviewing materials or giving ideas" and stated, "I don't believe she . . . ever [made] a DSM-IV assessment."

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 55 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 55 of 60



(quoting *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999)) (some alterations in original); *Wiggins*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Nothing suggests that Dr. Morenz was the only mental health witness available. Indeed, Ockenfels referred counsel to a forensic psychologist whom she believed could provide a helpful synthesis of Mitchell's history to the jury. There is no indication in the record that counsel ever contacted him.

Moreover, at the penalty phase, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). In this case, however, the inadequacy of counsel's investigation into Mitchell's personal and family history tainted the mental health investigation. For example, Dr. Morenz stated during post-convictions proceedings that he "would have developed further" whether Mitchell's "perceptions of reality might have been altered" at the time of the crimes had he known the full extent of Mitchell's addictions and Dr. Stewart, a psychiatrist who examined Mitchell post-conviction, reached a diagnosis of post-traumatic stress disorder based in part on the evidence uncovered post-conviction regarding the "severity and frequency" of the abuse Mitchell experienced as a child.

"*[A]ll* potentially mitigating evidence is relevant at the sentencing phase of a death case" and thus counsel had a duty to investigate further once put on notice that Mitchell struggled with addiction, that he had a troubled childhood,

Case: 11-99003, 10/02/2015, ID: 9705372, DktEntry: 74-2, Page 56 of 60
Case: 11-99003, 08/19/2015, ID: 9580429, DktEntry: 71-1, Page 56 of 60



and that he had mental and emotional problems. *Wallace*, 184 F.3d at 1117 n.5 (emphasis added). Counsel failed to appreciate, however, that evidence of these mitigating circumstances "may help" the penalty-phase defense "even if they don't rise to a specific, technically-defined level." *Id.* In short, "counsel were not in a position to make a reasonable strategic choice as to whether to focus on" a "good guy" defense, "the sordid details of [Mitchell's] life history, or both, because the investigation supporting their choice was unreasonable." *Wiggins*, 539 U.S. at 536. I would accordingly hold that for this reason as well counsel's performance was constitutionally deficient.

**C.**

In order to establish a violation of the defendant's Sixth Amendment right to effective counsel, it is not enough that counsel performed deficiently. The defendant must also have been prejudiced. In this case, when one evaluates "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding" and reweighs it against the aggravating evidence, "there is a reasonable probability that at least one juror would have struck a different balance between life and death" but for counsel's deficient performance. *Hamilton*, 583 F.3d at 1131 (quotation marks and citation omitted).

A number of factors tell us that a death sentence was far from a foregone conclusion in this case: (1) Notwithstanding the attorneys' deficient performance, the jurors found a number of mitigating factors, including, for example, a unanimous finding that Mitchell's lack of a prior record was mitigating and a finding by seven jurors that the Navajo Nation's opposition to the death penalty was mitigating.

(2) Neither the Arizona United States Attorney, the Navajo Nation, nor the victims' family wanted to see Mitchell executed. (3) Neither Orsinger, who was a minor at the time of the crime, nor his adult accomplice in another strikingly similar double murder were sentenced to death.

Most important, "there was a substantial amount of classic mitigating evidence that could have been presented, but was not." *Correll*, 539 F.3d at 952. Evidence that Mitchell suffered from severe drug and alcohol abuse problems, was raised by a child molester, experienced physical and emotional abuse, and had mental problems is "precisely the type of evidence we have found critical for a jury to consider when deciding whether to impose a death sentence," *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003), yet the case that counsel presented gave the mistaken impression that no such mitigating circumstances were present. *See supra* note 13. Indeed counsel gave the jurors precisely the opposite impression—that Mitchell simply came from a middle-class home of educators and had a rather unremarkable upbringing that made his inexplicably heinous crimes deserving of punishment by death.

"[B]oth this court and the Supreme Court have consistently held that counsel's failure to present readily available evidence of childhood abuse, mental illness, and drug addiction is sufficient to undermine confidence in the result of a sentencing proceeding, and thereby to render counsel's performance prejudicial." *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007); *see also Hamilton*, 583 F.3d at 1113 ("In a capital case, such evidence [of a disadvantaged background, emotional or mental problems] can be the difference between a life sentence and a sentence of death."). Here, evidence of Mitchell's abusive history, as

well as his addiction and mental problems, would have been especially compelling when combined with evidence that the Navajo Nation opposes the death penalty in part because addiction plays a substantial role in most "major crimes committed on the Navajo Nation" and the Navajos fervently believe that treatment, not execution, is the proper long-term answer. *Supra* p. 29 & note 3.

True, "[t]he aggravating evidence in [Mitchell's] case was strong, but it was not so overwhelming as to preclude the possibility of a life sentence. Heinous crimes do not make mitigating evidence irrelevant." *Hovey v. Ayers*, 458 F.3d 892, 930 (9th Cir. 2006); *see also Hamilton*, 583 F.3d at 1134 ("[E]ven the gruesome nature of a crime does not necessarily mean the death penalty [i]s unavoidable." (quotation marks and citations omitted)). In my view, notwithstanding Mitchell's terrible criminal acts, the likelihood of a different outcome (which required the casting of only a single vote against the imposition of the death penalty) had counsel competently investigated and presented the mitigation case that could have been put before the jury is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, in my opinion, counsel's constitutionally deficient performance was indeed prejudicial.

In this respect, I would add a final thought. This is a purely federal habeas case—a federal court's review of a *federal* conviction. Any concern that we might have regarding the doctrine of comity when we review a state conviction does not apply. That is, this case involves prosecution and judicial review by one sovereign—the federal government—and not a federal court's review of the criminal adjudication of a second sovereign government—a state. In this case, we owe no deference to what another

sovereign's court has done and we are perfectly free to review the important questions in this case de novo. The majority, however, fails to recognize this key distinction from the usual habeas cases heard by our court seeking relief from a state conviction, inappropriately relying on cases in which the Antiterrorism and Effective Death Penalty Act applies. In this case, the only other sovereign government to which comity might apply is the Navajo Nation, which vigorously opposes Mitchell's death sentence. Although there is no obligation to defer to its legal rulings, perhaps the jury would have given more weight to its pleas had Mitchell's counsel presented a case that helped explain how his disadvantaged background, addiction, and mental and emotional difficulties contributed to his commission of his crimes and rendered him less culpable, even though the federal government itself seemed totally unmoved by the concerns and interests of the sovereign primarily affected.

## Conclusion

The majority tragically errs in sending Mitchell on to his death notwithstanding the fact that he was deprived of effective representation and a fair trial. I sincerely hope that the executive branch will not compound the error by carrying out Mitchell's execution in violation of the Constitution, as well as in contravention of the wishes of the Navajo Nation and the family of the victims. It is time for those with the ultimate power to decide the fate of federal prisoners to arrive at a more sensible policy regarding the execution of our citizens by the federal government and to apply it to Mitchell's case. At the very least, arbitrariness must not be a

factor.[22] There are currently fifty-nine inmates on federal death row awaiting execution, yet just three executions have been carried out since the reinstatement of the federal death penalty in 1988. There is little value in adding to this backlog someone like Mitchell who committed a crime solely of local interest to the Navajo Nation, brutal as that crime may have been. Most important, there is still a place in our federal system for clemency—for the commutation of a death sentence to life without the possibility of parole (or even, given Mitchell's age at the time of the crimes, life *simpliciter*). A very recent ABC News/Washington Post poll shows that for the first time a majority of our citizens favors life without parole over the government's taking of human life.[23] I am hopeful that if and when the President is required to determine whether capital punishment is the appropriate remedy for Mitchell's offenses, he (or she) will bear in mind both the interests of justice and the wishes of the victims' family, the Navajo Nation, and the American people.

I dissent.

---

[22] President Obama ordered the Justice Department to consider a formal moratorium on federal executions, but that effort stalled when Attorney General Holder announced his plans to resign. *See* Matt Apuzzo, *U.S. Backed Off on Push to End Death Penalty*, N.Y. Times, April 30, 2015, at A1.

[23] Damla Ergun, *New Low in Preference for the Death Penalty*, ABC News (June 5, 2014), http://abcnews.go.com/blogs/politics/2014/06/new-low-in- preference-for-the-death-penalty/.